REDACTED TRANSCRIPT

1              UNITED STATES DISTRICT COURT
              SOUTHERN DISTRICT OF INDIANA
2                 INDIANAPOLIS DIVISION

3

4   UNITED STATES OF AMERICA,        )
                                     )
5                Plaintiff,          ) CAUSE NO.:
                                     ) 1:08-CR-004-SEB/KPF
6                                    ) Indianapolis, Indiana
           -v-                       ) **March 1st, 2010**
7                                    ) 9:30 a.m.
    DALE RUSSELL,                     ) V O L U M E   I
8                                    )
                 Defendant.          )
9

10

11             **Before the Honorable**
             **SARAH EVANS BARKER, JUDGE**

12

13          OFFICIAL REPORTER'S TRANSCRIPT OF
          OPENING ARGUMENTS AND TESTIMONY ONLY

14

15

16

17

18

19

20   Court Reporter:      Laura Howie-Walters, CSR, RPR
                          Official Court Reporter
21                        United States District Court
                          46 E. Ohio Street
22                        Room 217
                          Indianapolis, Indiana  46204
23

24

25            PROCEEDINGS TAKEN BY MACHINE SHORTHAND
    TRANSCRIPT PRODUCED BY ECLIPSE NT COMPUTER-AIDED TRANSCRIPTION

REDACTED TRANSCRIPT          2

1                    **A P P E A R A N C E S**

2

3 **For Plaintiff:**      Gayle Helart, Esq.
                          A. Brant Cook, Esq.
4                         Assistant U.S. Attorney
                          United States Attorney's Office
5                         10 West Market Street
                          Suite 2100
6                         Indianapolis, IN  46204

7

8 **For Defendant:**      James C. McKinley, Esq.
                          Indiana Federal Community Defenders
9                         111 Monument Circle
                          Suite 752
10                        Indianapolis, Indiana  46204-3048

11                               and

12                        Jessie A. Cook, Esq.
                          LAW OFFICE OF JESSIE A. COOK
13                        400 Wabash Avenue, Suite 212
                          Terre Haute, IN  47807

14

15

16

17

18

19

20

21

22

23

24

25

1

## **I N D E X**

2

3 **PLAINTIFFS' WITNESSES**                                    **PAGE**

4 DAWN RUSSELL

5 Direct Examination by Ms.  Helart ..............63
Cross-examination by Ms. Cook ..................76

6

7 JANE DOE 1

8 Direct Examination by Mr. Cook ................85
Cross-examination by Ms. Cook ................114
9 Redirect examination by Mr. Cook .............127

10

11

12 **PLAINTIFF'S EXHIBITS**          PAGE

13 6.......................... 65

14 8.......................... 69

15 12......................... 71

16 2.........................106

17 1.........................109

18 1B........................110

19

20

21

22

23

24

25

REDACTED TRANSCRIPT          4

1          (Open court.)

2          THE COURT:  Good morning, all.  You may be seated.

3          We've convened prior to calling down the venire to

4  resolve some legal issues that the parties have placed before

5  the Court in written fashion, but without enough detail for me

6  to be able to rule in a pre-trial way.

7          First let me ask, is there a motion for separation

8  of witnesses?

9          MR. McKINLEY:  Yes, the defense would so move.

10          THE COURT:  All right.

11          In no particular order, I'm just going to try to

12  march through these things so we don't keep the jury in idle

13  status up there because they're quite ready to come.

14          With respect to the defendant's request to

15  participate in the voir dire by asking 20 minutes' worth of

16  questions after the Court completes its voir dire, until I was

17  just ready to take the bench, I was not apprised of what kinds

18  of questions the defense wanted to ask.  So I was going to

19  temporize frankly and ask my standard voir dire, and then

20  invite counsel to the bench as I always do to see if there are

21  areas of omitted questioning or questioning that only the

22  lawyers can propound that require the Court to allow the

23  lawyers to ask those questions.  Both of you, lawyers, all you

24  lawyers know that it's my practice not to do that.  I'm

25  particularly wary in a case such as this because of the nature

REDACTED TRANSCRIPT          5

1  of the issues that the jury will have to decide, but I

2  recognize that that also makes it a special case from your

3  point of view, too, and perhaps that's necessary.

4        So I have now your tendered voir dire which I will

5  incorporate into mine, and ask those questions, and then we'll

6  follow the same procedure.  I'll have you come up and see if

7  there's anything that you need to ask, or that I didn't ask,

8  or whatever.  You can make your request at that time.  But I

9  will include, to the extent that it seems appropriate, the

10 questions that you've tendered just this morning.

11       Now, there are a couple other things that had to be

12 resolved before we went too far into the proceedings, although

13 I think we're going to have to have some sessions where

14 proffers happen outside the presence of the jury so that I can

15 make a decision about evidence that one side wants in and the

16 other one doesn't.

17       I have already inquired as to whether the

18 Government's witnesses need the additional protection of

19 references as Jane Doe 1 and Jane Doe 2, and apparently that's

20 not necessary; is that right, Miss Helart?

21       MS. HELART:  Your Honor, thank you for asking that

22 question.  They're older children now.  They are 17 and 15.

23 And we think the trial will just be much more cumbersome to do

24 Jane Doe 1 and Jane Doe 2 and confusing.  The defendant is

25 their father, so we're going to go ahead and do the trial with

REDACTED TRANSCRIPT          6

1  their real names.

2          If at any time in the future transcripts are

3  necessary, we will be seeking to make them back to Jane Doe 1,

4  Jane Doe 2 in the transcripts.  But for purposes of getting

5  through the trial a little more smoothly, we'll just use their

6  names.

7          THE COURT:  So it's ordinarily my practice in voir

8  dire to ask the jury if they know any of the people whose

9  names have been provided.  I don't have a witness list from

10 you, Mr. McKinley, right?

11         MR. McKINLEY:  No, we filed a notice of expert

12 witness, our intent to call John Bower as a witness in our

13 case, and, most likely, Mr. Russell.

14         THE COURT:  Do you want me to voir dire on the

15 defendant's testimony issue, that he has a right not to

16 testify?

17         MR. McKINLEY:  Yes, if you would, please.

18         THE COURT:  So I'll handle it in my questions to the

19 jury in terms of its being undecided basically at this

20 juncture; is that true, or is that -- I don't care if he's

21 undecided.  It's how I should handle the question.  That's

22 what I'm asking.

23         MR. McKINLEY:  I believe how you proposed would be

24 appropriate, Your Honor.

25         THE COURT:  Okay.  So I will just use those names

REDACTED TRANSCRIPT        7

1   as --

2           MS. HELART:  Yes.  And the only other solution would

3   be "There are two children of Dawn and Dale Russell.  Does

4   anybody know any of their children?"  But if you read their

5   names, that's fine too, Your Honor, because they are minors.

6           THE COURT:  I think I'll just ask their names.

7           MS. HELART:  It's not likely the jurors will know

8   them because they're minors, but if there's any chance.

9           THE COURT:  Okay, sure.

10          Now, the question is before the Court with respect

11  to whether to allow -- who is named 01?  Is that Jane Doe 1 or

12  Jane Doe 2?

13          MS. HELART:  Jane Doe 1.

14          THE COURT:  Okay -- to allow Jane Doe 1 to testify

15  to certain events that she has some late-breaking

16  recollections by her, but they have to do with acts of

17  molestation or alleged molestation, and whether that testimony

18  should be elicited as part of her direct testimony.  Is that

19  what you intend to do, Miss Helart?

20          MS. HELART:  Yes, Your Honor.

21          THE COURT:  And what's the relevance of that?

22          MS. HELART:  The relevance, Your Honor, is that the

23  Government sees this as clear relevance under Rule 414 and

24  also under Rule 404(b).

25          Under 404(b), prior sexual contact is clear evidence

1  to his intent, his motive, his knowledge, and his lack of

2  mistake or accident should those be his defenses.

3          Under 414, an even broader rule exists applying to

4  crimes-against-children cases.  It comes in on any matter upon

5  which it is relevant.

6          THE COURT:  And that's what I'm asking, what's the

7  relevance?

8          MS. HELART:  In this trial, Mr. Russell surely has

9  to be pitting himself against Jane Doe 1 on at least one

10  credibility --

11          In this trial, Mr. Russell surely has to be pitting

12  himself against Jane Doe on at least one credibility point

13  that's important.  That is that the pictures he took of her

14  were nonsexual in nature.  We believe this because he wants to

15  argue somewhat -- we believe his argument is that he was a

16  nudist, but prior sexual contacts with her show his sexual

17  attraction to her, and also show a sexual purpose, therefore,

18  in taking the photographs.

19          The prior sexual contact with her is highly relevant

20  because she is the same girl as is in the pictures.

21          THE COURT:  And when did it happen?

22          MS. HELART:  It happened when she was in about

23  fourth or fifth grade.

24          THE COURT:  Was it at the time --

25          MS. HELART:  Probably one to two years prior to the

REDACTED TRANSCRIPT          9

1  pictures being taken, but his feelings and biases toward her

2  on a sexual level are surely relevant to the rules of evidence

3  recognized under 404(b) and 414.

4          Also, as part of one of the molestation incidents

5  where Mr. Russell provided her what he called a muscle

6  relaxer, we had, as part of our pre-trial interviews with

7  which the defense was allowed to speak with her, her draw a

8  picture of this.  What it ends up looking like is an adult sex

9  toy vibrator, and I think a jury would surely see that

10  providing a 12-year-old and a 10-year-old-girl with vibrators.

11          THE COURT:  I thought you said they were younger

12  than that?  That's why I'm asking when did these acts of

13  molestation occur.

14          MS. HELART:  Yes, Jane Doe 1 remembers that it was

15  like fourth or fifth grade.

16          THE COURT:  How many acts are there?

17          MS. HELART:  We would like to introduce three acts

18  of behavior that we think are sexual in nature.  One of them

19  was when he placed this vibrating object against her vaginal

20  area.

21          THE COURT:  And how old was she and when was that?

22          MS. HELART:  She recalls about fourth or fifth

23  grade.

24          THE COURT:  And when is that vis a vis the photos

25  that were taken that are at issue here?

1          MS. HELART:  I'm going to ask that.  I think it's

2     one to two years prior.

3                    (Off-the-record discussion.)

4          The incidents with the adult sex toy, the vibrator,

5     was when he lived at the Braeburn Apartments between 2003 and

6     2004.

7          Our pictures are taken in the calendar year 2004.

8     So actually, you know, depending on when it was because she's

9     not clear on the exact time, month, et cetera, but it is in

10    the same time zone.

11         THE COURT:  What's the other one?

12         MS. HELART:  The other one is an incident of the

13    kids, all three of the Russell children, putting powdered

14    sugar on each other's nude bodies.  He puts the two other

15    children in the shower.  There's two photographs that we seek

16    to put into evidence because he's taken pictures of them with

17    powdered sugar on their bodies.  He puts --

18         THE COURT:  When did that happen?

19         MS. HELART:  She doesn't know but it's about the

20    same time period.

21         THE COURT:  The time period of what?

22         MS. HELART:  Of when they lived at the Braeburn

23    Apartments.

24         THE COURT:  When the photos were taken?

25         MS. HELART:  Correct.

REDACTED TRANSCRIPT          11

1          THE COURT:  The photos were taken when they lived at

2    the Braeburn Apartments.

3          MS. HELART:  Not all the photos because --

4          THE COURT:  That's why I'm trying to get you to give

5    me the particulars here.  So don't mislead me with vague

6    responses because I can't tell from -- either from what you've

7    written or from what you say.  So you've got to nail it down,

8    Miss Helart.

9          MS. HELART:  Mr. Russell lived at Braeburn

10   Apartments between August 2003 and August of 2004.  Before

11   that, I was given a more specific time period by my

12   co-counsel.

13         Just before August 2003, Mr. Russell lived with a

14   woman named Mary Kay.  This is from the children's

15   recollections.  The powdered sugar incident happened at

16   Mary Kay's house shortly before they visited their father at

17   the Braeburn Apartments.  So probably sometime in 2003.

18         THE COURT:  Was he there?

19         MS. HELART:  Yes.

20         THE COURT:  Did he do that?  Did the defendant do

21   the powdered sugar --

22         MS. HELART:  Yes.

23         THE COURT:  -- routine.

24         MS. HELART:  Yes, Mr. Russell --

25         THE COURT:  What does "shortly before" mean?  I mean

REDACTED TRANSCRIPT          12

1  was it the same day?  Six hours before?  Or was it six months

2  before?

3          MS. HELART:  I don't know.  I don't know.

4          THE COURT:  What's the third?

5          MS. HELART:  But it's not just the powdered sugar.

6  It's an incident where Jane Doe 1 was placed up on the toilet

7  and Mr. Russell licked her vaginal area with the powdered

8  sugar on it and then placed her in the shower.  So that was an

9  incident --

10          THE COURT:  How old was Jane Doe 1 at the time?

11          MS. HELART:  11.

12          THE COURT:  And she was how old when the photos were

13  taken?

14          MS. HELART:  11 and 12 depending on what time of the

15  year in 2004.  Her birthday is 1992, so that's -- you know, it

16  will always depend on what time of the year it happened.

17          THE COURT:  Okay.  Then the third item?

18              (Off-the-record discussion.)

19          MS. HELART:  In the third incident, which we filed

20  notice about Friday, is Jane Doe 1 in the shower and her

21  father is washing her.  She recalls that happening at

22  Mary Kay's house.

23              (Off-the-record discussion.)

24          MS. HELART:  And while Mr. Russell was washing her,

25  he said a statement to the effect, "Don't you want a personal

REDACTED TRANSCRIPT          13

1  washer?"  She is a person who would have been 10 or 11, would

2  normally take her own showers by that point.  So this was an

3  unusual event because he -- her father was helping her wash.

4          THE COURT:  And how did he help her wash?

5          MS. HELART:  Helped her wash her private areas, her

6  vaginal area.

7          THE COURT:  And that would have been when vis a vis

8  the photo shoot?

9          MS. HELART:  Before the photo shoots.

10          THE COURT:  All of these were prior to the photo

11  shoot.

12          MS. HELART:  Yes, because the photo shoots, all that

13  we have charged, occurred in 2004.

14          THE COURT:  All right.  So those are the three acts

15  of alleged molestation, or I'll just say the three acts --

16          MS. HELART:  The three acts, yes.

17          THE COURT:  -- that the Government intends to elicit

18  in the direct examination of Jane Doe 1?

19          MS. HELART:  Yes.  And again, we would say the same

20  child.  It shows clearly his feelings towards her, his sexual

21  feelings toward her, making his motive to take these pictures

22  very relevant.

23          THE COURT:  Okay.

24          MS. HELART:  And we also point out that 414 doesn't

25  have as part of the rule a time frame, but we know the Court

REDACTED TRANSCRIPT          14

1  has to rule on relevance, but it doesn't have a time frame to

2  do it.

3          THE COURT:  Yes -- well, that's right.

4          Mr. McKinley, what's the Government's response to

5  this proffer by the Government -- what's the defense response?

6          MR. McKINLEY:  Your Honor, to the extent that these

7  purported acts have any relevance, we'd say it's marginal at

8  best to show his state of mind and to show, you know, his

9  motive to take the photographs.

10          Counter to any marginal relevance it does have here

11  is the fact that I think it's going to tend to confuse the

12  issue, obscure the issue before the jury.

13          The issue here is the images themselves, whether the

14  images that are charged in the indictment portray

15  sexually-explicit conduct.  The impact of this evidence, of

16  course, is, you know, from the defense perspective is it's

17  devastating.  And 404(b), of course, and 414 are not

18  unlimited.  The Court still has to go through the balancing

19  factors in 403.  And we would submit that the prejudicial

20  impact here greatly outweighs any probative value this would

21  have.

22          The factors that we laid out and discussed briefly

23  in our response to the Government's trial brief lay out the

24  factors the Court is to consider, including the similarity of

25  the uncharged acts to the crime that's charged.  Here we're

1 talking about acts of improper touching compared to acts of

2 taking photographs of portraying sexually-explicit conduct.

3        So there is really marginal similarity.  Certainly

4 they both carry with them a sexual connotation, but the acts

5 themselves are very dissimilar.

6        With regard to the frequency of the prior acts,

7 we're talking about three somewhat isolated instances.  The

8 allegations are certainly that there's only comparatively few

9 instances.

10        The proximity in time, I have to defer to the

11 Government's description.  But the fact that there has been

12 this intervening amount of time, these matters have only come

13 to light in the last couple of weeks, notwithstanding multiple

14 opportunities for this information to be disclosed.

15        THE COURT:  As to all three?  They came to life in

16 the last couple of weeks as to all three incidents?

17        MR. McKINLEY:  That's correct.  That is correct.  In

18 fact, it came to light after my own interview of Jane Doe 1

19 during which she -- I specifically asked her about any prior

20 acts of improper touching.

21        She reported there had been no prior acts.  And

22 following my interview of Jane Doe 1, which was on February

23 the 5th, the Prosecutor's office called me and said that she

24 had disclosed that these acts had occurred.

25        The intervening circumstances between the time these

REDACTED TRANSCRIPT          16

1  acts purportedly occurred and a couple of weeks ago include,

2  as I understand, multiple counseling sessions, multiple

3  questions or questioning by law enforcement investigators,

4  Child Protective Services, four or five meetings with the

5  United States Attorney's Office, and what, a span of at least

6  five or six years during which she has been separated,

7  isolated from her father.  She hasn't seen her father in five

8  years.

9          Given the remoteness in time and all these

10 intervening circumstances and the late disclosure of this

11 information, we think all countenance against admissibility of

12 these in the trial, again the prejudicial impact I need not

13 expound on.  Your Honor knows what an impact this is going to

14 have on any jury.  It's going to be very troubling.

15         I don't want to have this trial turn into a jury

16 judgment of my client based on that conduct rather than for

17 what's charged here; that is, are these images depicting

18 sexually-explicit conduct?  Do they portray lascivious

19 exhibition of the genitals?

20         Our position, I think, as made evident in our

21 response, is that this is a simple portrayal of nude children.

22 There's no sexual intercourse, any masochistic, sadistic abuse

23 portrayed here.  It's just simply images portraying nudity and

24 does not rise to that level.

25         That's the question for the jury to decide, and I

REDACTED TRANSCRIPT          17

1   think that evidence of these alleged acts, which I don't know

2   have been corroborated in any way, shape or form, are going to

3   be such that the issue's likely to be obscured by the jury,

4   confusing, and I think the prejudicial impact outweighs any

5   probative value that it has here.

6           THE COURT:  Miss Helart?

7           MS. HELART:  The defense point is exactly why this

8   is all very relevant.  It absolutely is devastating.  It

9   actually, though, bears right on the heart of the matter,

10  which is did he take these pictures, did he use, persuade,

11  entice, this minor, Jane Doe 1, to produce pictures, to engage

12  in sexually-explicit conduct for the purpose of producing the

13  pictures?

14          And instances of clear sexual acts upon her, with

15  her, show clearly what he had in mind when he was taking the

16  pictures of her.  And the time frame is just not that off,

17  which is one concern that this Court would have.  It is

18  exactly the heart of the issue, Your Honor.  So we're asking

19  that this evidence come in.

20          Mr. McKinley is correct.  She has been asked many

21  times in the past "Has your father ever done anything,

22  touching you in an inappropriate way?"  She's answered the

23  question no.  I can never explain why children disclose —— the

24  timing of their disclosure.

25          The truth is the trial was coming.  We were

REDACTED TRANSCRIPT          18

1  interviewing her for pretrial purposes.  Mr. McKinley has had

2  two opportunities to speak with her about this.  And the

3  second that she disclosed it, we, of course, called the

4  defense and told him.  But as far as whether it was relevant,

5  we absolutely think this is the most highly relevant thing

6  that the jury has to decide in this trial about these

7  pictures.

8          THE COURT:  Okay, thank you.  I'm going to take this

9  under advisement so that I can get some of these other issues

10  resolved before we bring down the jury.

11          With respect to the issue of the defense evidence on

12  nudism and the defendant's interest in that activity and

13  participation in that activity, I will allow the defendant to

14  testify to the fact that he practices nudism, that it's an

15  interest, and that he has, from time to time, included his

16  children in nudist activities and so forth; but I will not

17  allow him to bring in pictures and paintings and other

18  depictions, photographic or otherwise, that he indicates

19  inspired him in his photography and his artistry.  And I won't

20  permit him to testify to the publications that may come out of

21  nudism and so forth; nor can he call as a witness his expert

22  witness to testify about nudism.

23          This case is not about nudism.  This is about these

24  photos and the defendant's actions, alleged actions, in

25  creating them, whatever the purpose was, so he could be a

1  nudist and be a drug dealer, for example.  And it doesn't

2  excuse the photographs.

3          To the extent that it bears on the factor about the

4  lasciviousness intentions of the defendant, as is one of the

5  factors that the Court is going to instruct the jury as a

6  factor that it can consider in making the determination about

7  the sexually-explicit conduct, and the lascivious exhibition

8  of any genitals and the pubic area of any person, the last

9  factor is that whether the visual depiction is intended or

10 designed to elicit a sexual response in the viewer may have

11 some marginal relevance to nudism, but it does not constitute

12 a defense to this action.  And so the Court will not permit

13 the other periodicals, which, of course, we don't know whether

14 they also may be offensive in a criminal way under this

15 statute because I doubt if they've been ruled upon, and I'm

16 not going to allow the jury to be distracted by other photos

17 and other materials on the grounds that they justify the

18 defendant's artistic interest and sensibilities.

19          So with those limitations, you can raise the issue

20 that he is a nudist, and that he participated in those

21 activities, and that he did it with his children, and these

22 pictures that were taken were part of that pattern and not

23 otherwise violative of the statute.  That line you can

24 develop, but you can't create it as a defense in the sense

25 that if other people do it and they think it's all right, then

REDACTED TRANSCRIPT          20

1  it trumps the jury's decision as to whether these particular

2  depictions are violative of the statute.

3          So I'll impose those restrictions on you, and you

4  need to know those as you make your opening statement to the

5  jury.

6          Hang on one minute, please.

7                  (Off-the-record discussion.)

8          I want to raise the issue with respect to the

9  Government's intention to put in additional photos beyond

10 those that have been identified in the indictment as the

11 charged conduct, the 81 photos, or something to that effect.

12         So, Miss Helart, what's your intention with respect

13 to the additional photos?  What's the relevance of those?

14         MS. HELART:  Your Honor, we have the exhibit.  We

15 have the exhibit if the Court would like to see what we're

16 talking about.  And the Government believes, especially with

17 Mr. Russell testifying that he's a nudist, that there's great

18 value in the jury looking at the entire photo session of

19 Count 1.  This is one area of other uncharged pictures,

20 another area of other photo-taking sessions, but the exhibit

21 that has been marked Exhibit 1B would be the entire photo

22 session of Count 1.

23         THE COURT:  Is that the 81 photos?

24         MS. HELART:  Yes, it's 86.

25         THE COURT:  86?

REDACTED TRANSCRIPT          21

1          MS. HELART:  Yes.  And if the Court or the jury

2     looks at these, and you'll see how many don't fit within the

3     technical definition under 2256, they couldn't be charged, but

4     the pictures tell something very, very important.  They tell

5     us the whole story of Count 1, and that this blanket didn't

6     just come off in a "whoops" scenario.  It tells us that this

7     girl, because her testimony will corroborate this, this wasn't

8     her just really waking up, that Mr. Russell took these as a

9     joke and kind of silly.  The extra pictures show her covered

10    and partially covered, sometimes a bare breast, sometimes bare

11    bottom, all pictures not being able to be charged under

12    federal law, but yet completely noteworthy, relevant,

13    corroborative of her story that Dale Russell directed the

14    actions that she's doing in the photos.

15          She's expected to describe that this was a photo

16    session staged by Mr. Russell to make it look like she was

17    waking up out of bed.  The viewer of photos are led to believe

18    that she sleeps in the nude when normally she does not.

19          Mr. Russell and other viewers of this material watch

20    then as she puts the SpongeBob blanket up and around her

21    several times, taking it partially off, completely off,

22    strategically --

23          THE COURT:  Are these still photos as opposed to a

24    video?

25          MS. HELART:  Correct, they are still photos.

REDACTED TRANSCRIPT          22

1           THE COURT:  But they're sequential?

2           MS. HELART:  They are sequential, yes.

3           THE COURT:  And that's the way you've organized the

4  exhibit?

5           MS. HELART:  Yes, this exhibit was not organized as

6  well.  We have printed them out again with their time stamps

7  on them so we're going to see them sequentially.

8           The whole thing --

9           THE COURT:  Was only the defendant present as the

10 photographer?

11          MS. HELART:  Yes.

12          THE COURT:  There was no assistant?

13          MS. HELART:  No, no assistant.  It was her and him.

14          THE COURT:  Where were they taken?

15          MS. HELART:  In a room, in a bedroom.

16          THE COURT:  At a house?

17          MS. HELART:  In his residence.  All the photo-taking

18 sessions that occurred with him were during his visitation

19 weekends.

20          THE COURT:  So no other adults present?

21          MS. HELART:  Sometimes there were other adults

22 present, but in this photo-taking session, only he and her

23 were -- the only other adult would be a friend of his on some

24 occasions that are in outdoor settings or in a gym setting,

25 and -- well, and the only other possible adult would be his

REDACTED TRANSCRIPT         23

1  present wife.  She was sometimes present during the photo

2  sessions with both the girls.

3          But both the girls are clear that only Mr. Russell

4  took photos of them, even if there were other people in the

5  room.  But this is an example of just him and her in the room.

6          And so this whole thing, in somewhat crass terms, is

7  a strip tease.  It is putting clothes on, taking clothes off,

8  very teasing, very salacious behavior between when she wakes

9  up out of bed nude, takes the blanket off and then gets

10 dressed at the very end.

11         The SpongeBob themed items are items which he bought

12 for her at a Christmas sometime prior; very kid-like, not an

13 accident of her being in the pictures and being a kid herself.

14 She had actually woken up much earlier in the day so this was

15 a very staged photo session.

16         The entire context tells the whole story of this

17 event.  Whether he used or enticed or employed this minor,

18 because there will be some evidence that he paid the girls

19 money for photo sessions to engage in sexually-explicit

20 conduct for the purpose of producing this conduct, because 86

21 times he purposely pointed the camera.

22         THE COURT:  Are there other surrounding or pattern

23 photographs with respect to the other charge or just Count 1?

24         MS. HELART:  We are seeking just Count 1.  There are

25 some others for the other counts.  For example, in Counts --

REDACTED TRANSCRIPT          24

1          THE COURT:  Wait a minute, I don't understand that.

2    You're seeking Count 1, but there are others.  So are you

3    going to offer them?

4          MS. HELART:  If relevant for cross -- under

5    cross-examination, maybe.  And we will bring those up to the

6    Court prior --

7          THE COURT:  Cross-examination of the defendant?

8          MS. HELART:  Of the defendant, yes.

9          Here's an example.  Counts 2 and 4 were taken in a

10   gym.  It is nude gymnastics that he's taking photos of.  Count

11   2 is Jane Doe 1/Jane Doe 1, Count 4 is Jane Doe 2/Jane Doe 2,

12   and she's in a little dance studio that's part of the gym.

13         There's a video that was taken as part of this set

14   as well.  And so this whole gym video has audio that may be

15   relevant, but only for cross-examination would we be seeking

16   to get it in.  So for the four charged counts, Exhibit 1B,

17   we'd be seeking to put this in in Jane Doe 1's testimony.

18         THE COURT:  As 404(b) evidence?

19         MS. HELART:  Yes, because the 7th Circuit doesn't

20   like the language inextricably intertwined, so certainly it

21   would go to his intent, his lack of mistaken accident, and all

22   the other possible 404(b) --

23         THE COURT:  In pattern?

24         MS. HELART:  Yes, in pattern.

25         THE COURT:  Mr. McKinley?

REDACTED TRANSCRIPT          25

1          MR. McKINLEY:  Just very briefly, Your Honor.

2          Again, our position on this is that they have --

3    these additional images have marginal relevance and are likely

4    to confuse the jury.  Again, I don't dispute what Miss Helart

5    described as the charged images in Count 1 being a part of a

6    larger series of images that they have recovered.

7          But again, the issue for the jury is going to be

8    just the charged images.  And to the extent these additional

9    images are relevant to show that the charged images were

10   staged somehow, again, I don't understand how that plays into

11   the case as being relevant because, you know, artistic

12   expressions are -- which this is a series of photographs that

13   were taken that artistic expressions are often posed or staged

14   to get the image that the photograph wants, but that doesn't

15   make the charged images more likely to go beyond the

16   boundaries that the law clearly sets in determining what is

17   sexually-explicit conduct.

18         So again, I think the issue is likely to be obscured

19   here by the introduction of these other images.  I mean, what

20   is the jury to conclude from those other images that they

21   can't conclude from looking at the charged images?

22         THE COURT:  The Court will permit the 404(b)

23   evidence with respect to the additional photos that surround

24   the charged conduct in Count 1.  It seems to me to be pretty

25   classic 404(b) evidence.  It does establish the elements

REDACTED TRANSCRIPT          26

1  Miss Helart mentioned:  Pattern, lack of mistake, similarity,

2  et cetera.  So this evidence is permissible under 404(b).

3          The evidence of the sexual acts, the alleged

4  molestations, seems to me to be more remote and less -- and

5  therefore less relevant.  It's inherently prejudicial, of

6  course, so the Court has to balance very carefully.  So the

7  Court will rule that the Government cannot bring out the

8  molestation incidents, the three that were cited to the Court

9  as part of its case-in-chief.

10         The door may be opened to the inclusion of that

11  evidence on cross-examination of the defendant, depending on

12  how that testimony goes, and also as possible rebuttal

13  evidence depending on what the defense evidence is, if any.

14         The defendant's not obligated to present any

15  evidence, but if the defense does not present evidence on

16  issues that would be -- that would make this relevant and

17  relevant as impeachment and relevant as to the charges in the

18  indictment, then it can't come in any other way.

19         So that's my ruling on that.  I think we need to

20  call down the jury now and get started.  I believe I've

21  covered most of the pretrial matters that you need to know

22  about as we go forward.

23         Am I right about that?  Anything else, Miss Helart?

24         MS. HELART:  No, Your Honor.

25         THE COURT:  Anything else, Mr. McKinley?

REDACTED TRANSCRIPT         27

1          MR. McKINLEY:  There is one other thing.  Will the

2   Court be giving preliminary instructions to the jury that will

3   include the offense elements?  It was something we were

4   intending to address in opening statement.

5          THE COURT:  I usually don't, but I don't have to do

6   the preliminary instructions right away, so let me think about

7   that.  Certainly not before the voir dire.

8          MR. McKINLEY:  Right.  But we had intended to -- the

9   Government and defense has --

10         THE COURT:  Have you proffered an issue instruction?

11         MR. McKINLEY:  No, but we have --

12         THE COURT:  See, I need to see yours before you

13   start telling what the law is.

14         MR. McKINLEY:  Actually, we're going to use what the

15   Government has proffered.  We've worked with the Government in

16   trying to come to agreement and have come into agreement as

17   far as the elements of instruction, and the definition of

18   lascivious exhibition.  Miss Cook will be doing the opening

19   statement as she had proposed to.

20         THE COURT:  Are you going to speak to the essential

21   elements when you do your opening statement, Miss Helart?

22         MS. HELART:  I will mention the phrase "lascivious

23   exhibition of the genitals or pubic area," and I will not go

24   into it further.  I'm going to say they're going to get

25   further guidance later.

REDACTED TRANSCRIPT          28

1          THE COURT:  Let me -- have you given us that

2    instruction?

3          MS. HELART:  I have tendered to the Court the

4    Government's proposed instructions, and we did work together.

5    We only had one disagreement which -- it's not part of what

6    the Court got.  So what the Court got is what the parties

7    agreed on.

8          THE COURT:  So it's stipulated between you

9    essentially?

10          MS. HELART:  Yes.

11          MR. McKINLEY:  Yes.  Essentially it is, yes, Your

12    Honor.

13          THE COURT:  I'll look at it again and give you a

14    final word, but I can't foresee that that would be a problem,

15    Mr. McKinley.

16          MR. McKINLEY:  Thank you, Judge.

17          THE COURT:  Mr. McKinley, while you're standing

18    there, would you turn that podium so that it addresses the

19    jury directly, please?

20          And you may call down the jury (indicating).

21          We have 51 people who have responded to the venire.

22          So Miss Helart, are you prepared to read the

23    indictment?

24          MS. HELART:  Yes.

25          THE COURT:  Do we still expect the trial to last

REDACTED TRANSCRIPT          29

1  three days?

2          MS. HELART:  Yes.  Certainly no more than that.

3  It's conceivable we could go --

4          THE COURT:  Three days is a safe estimate for the

5  jury?

6          MS. HELART:  Yes.

7          MR. McKINLEY:  Yes.

8                  (Off-the-record discussion.)

9                      (Open court)

10  (Prospective jurors were brought in and voir dire conducted)

11                  (The venire was sworn.)

12          THE COURT:  Very good.  Thank you.  And be seated

13  just for a minute.  I know we've gone really through the lunch

14  hour here and you've been kind to not make too much of an

15  issue of that, although I expect you're ready for a break, and

16  so we all are.

17          I just want to tell you two things before you leave.

18  I'll have full instructions for you when you come back.  You

19  are now officially impaneled as a jury, and so we won't be

20  able to take any of the succeeding steps without you here.  So

21  you have to please arrange your activities and your time

22  schedule and so forth so when the Court's ready to convene,

23  you're ready to go as well.

24          We're going to take a lunch hour first thing, and

25  I'll tell you the time in just a minute.  But during this

REDACTED TRANSCRIPT          30

1  period of time while you're away from the court and away from

2  these proceedings, you must refrain from talking about the

3  case among yourselves or allowing anyone to talk to you about

4  it.

5          The truth is right now you don't know anything about

6  the case.  I've told you about it, but you're to make your

7  decision on the evidence, not on the basis of what I've told

8  you.  So you have to wait till the evidence comes in and then

9  finally match it up with the instructions on the law as I give

10 them to you.

11         So if anyone should try to talk to you about it, if

12 anyone should approach you about it, you should bring that to

13 my attention right away.  So don't talk about it among

14 yourselves or allow anyone to talk to you about it.

15         Now, my guess is that you'll be like most juries,

16 that having been selected, you'll want to call in and tell

17 somebody who pays attention to your schedule with you that

18 you're going to be tied up through Wednesday of this week and

19 what you're going to be doing.  So you'll call the office or

20 you'll call your spouse or you'll call your family member, and

21 you'll say "Hey, guess what, I got picked for jury duty."  And

22 that's the red flag because what is likely to generate from

23 the other person is "Really?  What's the case about?"  And

24 they won't understand the importance of the promises you've

25 made and how important it is that you not talk about this and

1   so forth.

2          This is something you've done.  So you have to help

3   them help you be a good responsible juror.  So you head them

4   off at the pass right away.  You cut them off and say "I can't

5   tell you.  I can't tell you anything about this case."  And

6   then you threaten them, and you say "After it's over, I'm

7   going to tell you everything about it."  And they'll back off

8   pretty quickly.  And you can do that after it's over.  You can

9   tell them all about it.  But until then, really, it's one of

10  those things you just have to hold close inside yourself until

11  you're finally prepared to deliberate and to reach a verdict.

12         I'll tell you why this is so important.  First of

13  all, it's going to be just your decision, and no one else is

14  entitled to or ought to be invited into helping you decide the

15  case.  They won't have listened to the evidence.  They won't

16  have done any of the things we've talked about.  They can't

17  weigh the credibility of the witnesses.

18         The moral weight of deciding is not on them.  They

19  could just be a hero on your time.  They might give you advice

20  that's completely stupid, but you feel a little beholding to

21  them because they're close to you and you don't want them to

22  think you're stupid if you did something.

23         So don't invite them in for that purpose.  It's a

24  decision that's entrusted just to you, and if you didn't give

25  us every reason to believe that you understand that and you're

REDACTED TRANSCRIPT          32

1  capable of being entrusted with that, you wouldn't have been

2  selected.  But you have been selected, so be worthy of that

3  trust.

4          The second reason that you need to hold the horses

5  here a little bit so that you make your decision at the end of

6  the trial is because each witness and each question and answer

7  to each witness is entitled to the same consideration by you

8  as every other witness.

9          So the first witness that comes, you'll be right on

10 the edge of your chair.  You're going to be thinking what is

11 this about.  And then it gets a little bit more familiar to

12 you, maybe a little bit more old hat, but you have to be as

13 open and receptive to the last witness and the last answer

14 that the last witness gives as you are to the first.

15         And we know about ourselves that when we start

16 telling a story or creating mindset, we want people to tell

17 the story that conforms to our views or our impressions or our

18 preconceived notions.  So you're not as open to it as you

19 would be if you didn't encumber them with that, if you didn't

20 have any expectations of them; only that they'll tell you the

21 truth, the whole truth and nothing but the truth.

22         So let's take a lunch break.  It's 1:00.  Let's

23 reconvene at 2:15.  That will give you a chance to figure out

24 where you are downtown.  You shouldn't have to wait in any

25 lines now for lunch.  I hope everything's not completely

REDACTED TRANSCRIPT          33

1   picked over.  I doubt it on a Monday, if it's picked over.

2          We'll reconvene and we'll be ready to go at 2:15.

3   So please gauge your timing to be back then, too.

4          Oh, I told you just two things, but here's a third.

5   Your jury room, as you know from when you gathered this

6   morning, is on the third floor.  So when you come and go in

7   our courthouse, get on that elevator, and go from the first

8   floor, where you're coming in, up to the third floor.

9          The lawyers use this room, this space out here, I

10  should say, this anteroom to confer about things and to get

11  witnesses lined up, and it's sort of a gathering place, and it

12  will be awkward if you're bumping into each other.

13         So don't come here on the second floor.  That's

14  where you are now.  Go on up to the third floor.  That door

15  will be open for you.  Don't leave valuables, but it's

16  available to you to use whenever you want to access it.  But

17  you should come and go from the first floor to the third

18  floor, please so that you're not otherwise caught in some

19  awkward encounter.

20         Anything else for the jury before we recess for

21  lunch, Miss Helart?

22         MS. HELART:  No.

23         THE COURT:  Mr. McKinley?

24         MR. McKINLEY:  No, nothing further at this time,

25  Your Honor.

REDACTED TRANSCRIPT          34

1            THE COURT:  Okay.  Those of who you are familiar

2   with downtown, give your fellow jurors some directions as to

3   where the restaurants are.  The good news is Miss Schneeman

4   knows every one of them, so she'll be able to accommodate your

5   tastes.

6            If you have coats in the back, swing by and get them

7   right now, and come across the well of the court and out this

8   door where I came in this morning.  And you'll go up to your

9   jury room and depart from there.

10                        (Jury excused)

11                    (Open court, no jury present.)

12            THE COURT:  The jury's departed.  Lawyers, be sure

13   to give the jury questionnaires to Miss Schneeman before you

14   leave today.  We'll see you in an hour and 10 minutes.

15              (Recess taken from 1:04 p.m. to 2:29 p.m.)

16

17

18

19

20

21

22

23

24

25

1           **A F T E R N O O N    S E S S I O N**

2               (Open court, jury present)

3                 (Open court.)

4           THE COURT:  You may be seated.  I hope everyone had

5   a nice lunch break.  I guess I fairly well assured myself that

6   you would because I got to the point of really hungry at 1:00.

7           Members of the jury, now that you've been selected

8   and sworn, I'm going to give you preliminary instructions to

9   guide you in your participation in this trial.  It will be

10  your duty to find from the evidence what the facts are.

11          You and you alone are the judges of the facts.  You

12  will then have to apply to those facts the law as I give it to

13  you, and you must follow that law whether you agree with it or

14  not.

15          Nothing that I may say or do during the course of

16  the trial is intended to indicate, nor should be taken by you

17  as indicating, what your verdict should be.  The evidence from

18  which you will find the facts will consist of the testimony of

19  the witnesses, they'll be here at the witness stand right

20  before you; documents and other things received into the

21  record as exhibits, and any facts that the lawyers agree to or

22  stipulate to.

23          We use that word "stipulate" in court to mean an

24  agreement as to whatever the matter is between the parties.

25          You must also accept the facts that the Court

1 instructs you to find.  Certain things, however, are not

2 evidence and must not be considered by you.  I'll list for you

3 now the things that are not evidence.

4           First, the statements, arguments, and questions by

5 lawyers are not evidence.

6           Secondly, the objections to questions are not

7 evidence.  Lawyers have an obligation to their clients to make

8 objections when they believe evidence is being offered that is

9 improper under the rules of evidence.

10           You should not be influenced either by the objection

11 or by my ruling on it.  If the objection is sustained, then

12 ignore the question.  If the objection's overruled, treat the

13 answer like any other.  If you are instructed that some item

14 of evidence is received for a limited purpose only, then you

15 must follow that instruction.

16           The third thing that's not evidence is testimony

17 that I order excluded or tell you to disregard.  It's not

18 evidence and it must not be considered.

19           Fourth, anything that you may have seen or heard

20 outside the courtroom is not evidence, and it must be

21 disregarded completely.  You are to decide this case solely on

22 the basis of the evidence that's presented here in the

23 courtroom.

24           Now, there are two kinds of evidence.  There's

25 direct and circumstantial evidence.  Direct evidence is direct

1   proof of a fact such as the testimony of an eyewitness.

2          Circumstantial evidence is proof of facts from which

3   you may infer or conclude that other facts exist.  So I'll

4   give you an example.

5          Maybe you heard that the weather this week is

6   supposed to be a little bit warmer than it's been the last few

7   weeks.  It's supposed to get up in the 30s, and towards the

8   end of the week, maybe even up into the 50s.  So we had a lot

9   of snow there for a while and it's still sitting around.

10         So if we took just this morning, for example,

11  March 1st on this Monday, if there were conversations at your

12  house before you left this morning about what to wear and what

13  to expect by way of the weather, you might be able to

14  participate in that conversation just by other things that you

15  know.

16         For example, if you wanted to know if it's already

17  warmed up, how would you know that if you're sitting inside in

18  your robe and your slippers still?  Obviously the easiest way

19  is to go outside to see if it's warmer, so that's direct

20  evidence.  It's warmer, you can tell that.

21         But there's some other ways.  How much snow is

22  melted?  Whether there was ice this morning on the windshield

23  if your car's parked outside.  Whether the newspaper got

24  delivered really early and it's got any icy moisture on it,

25  that sort of thing.

1          So you can tell just by looking for a variety of

2     signs and signals.  After all, the thermometer on the window

3     is circumstantial evidence, isn't it?  When you look at it,

4     it's telling you something about the weather, but it's not the

5     weather itself.  It's giving you a measurement of the weather.

6          So you could have looked out the window and seen

7     that it was maybe 30 this morning.  So you would have an

8     answer to your question about whether that warmup has started

9     just by paying attention, but you also could go outside and

10    feel the air yourself, see if it's warm, warmer.

11         So that's a pretty rough example, but it's the best

12    I can do today to give you an example of direct and

13    circumstantial evidence.

14         Direct evidence is direct proof of a fact.  Do you

15    want to know if it's cold out?  Go out and see.  And

16    circumstantial evidence is proof of facts from which you may

17    infer or conclude that other facts exist.

18         There's not as much snow out there as there was

19    yesterday.  Some of it's melted and so forth.  I'll give you

20    further instructions on these, as well as other matters, at

21    the end of the trial to keep in mind at that time, and to use

22    in your deliberations, but for now, you can keep these things

23    in mind, and in particular, you should keep in mind that you

24    can consider both kinds of evidence, both direct and

25    circumstantial.

1    It will be up to you to decide which witnesses to

2 believe, which witnesses not to believe, and how much of any

3 witness's testimony to accept or reject.  And I'll give you

4 guidelines for determining that issue.  We call that the

5 credibility of the witness.  Do you hear in that the credit

6 you're going to give to that testimony?  The witness's

7 credibility means the witness's believability.

8    And I'll give you some instructions to help guide

9 you in making that assessment at the end of the case.  As I

10 told you, this is a criminal case.  And there are three basic

11 rules about a criminal case that you should keep in mind.

12    First, the defendant, Mr. Russell, is presumed

13 innocent unless and until he's proven guilty.  The indictment

14 brought by the Government against the defendant is only an

15 accusation, nothing more.  It's not proof of guilt or anything

16 else.  Therefore, Mr. Russell starts out with a clean slate.

17    Second, the burden of proof is on the Government

18 until the very end of the case.  The defendant has no burden

19 to prove his innocence or to present any evidence or to

20 testify.

21    Since Mr. Russell has the right to remain silent,

22 the law prohibits you from arriving at your verdict by

23 considering that he may not have testified.

24    The third special rule is that the Government must

25 prove Mr. Russell's guilt beyond a reasonable doubt.  And I'll

1   give you further instructions on this point later, but bear in

2   mind that in this respect, a criminal case is different from a

3   civil case.  Maybe you've heard of the standard in a civil

4   case meaning by a preponderance of the evidence.  That applies

5   in a civil case.

6          In a criminal case, the standard, the measure for

7   how much convincing force the evidence has to have before a

8   jury can find a person guilty is beyond a reasonable doubt.

9          Now, in this case, as I've told you, the defendant

10  is charged with four offenses, four counts.  And I will give

11  you detailed instructions on the law to guide you -- at the

12  end of the case to guide you in your assessment of the

13  evidence, and those instructions will control your

14  deliberations and decisions.

15         I have asked the Government counsel to read to you

16  the indictment, which she did.  And I understand that both

17  lawyers are going to talk to you about the charge, or the

18  charges, and the essential legal elements, what that means in

19  terms of what the Government has to prove to make its case.

20         So I'll leave to them to review that.  At the end of

21  case, I will give you instructions on the essential legal

22  elements of these charges.

23         Now, a few words about your conduct as jurors.

24  First, I instruct you that during the trial, you're not to

25  discuss this case with anyone or permit anyone to discuss it

1  with you.  Until you retire to the jury room at the end of the

2  case to deliberate on your verdict, you simply are not to talk

3  about this case.

4          Secondly, do not read or listen to anything touching

5  on this case in any way.  If anyone tries to talk to you about

6  it, bring it to my attention promptly.  You can do that by

7  telling Miss Schneeman, and she'll be sure to tell me.

8          Third, do not try to do any research or make any

9  investigation about the case on your own.  The research and

10 the investigation will have happened by the people who are

11 entrusted with that responsibility; that is to say, both

12 parties, and they'll present the fruits of their efforts here.

13 So you don't need to make your own, and in fact you shouldn't

14 make your own investigation or do your own research.

15         Finally, do not form any opinion until all the

16 evidence is in.  Keep an open mind until you start your

17 deliberations at the end of the case.

18         Now, let me speak to you about taking notes during

19 the trial.  You may take notes if you wish, but you're not

20 required to.  There's no expectation of you to take them.

21 We've given you paper and pencils, pens, I guess, if you want

22 to make notes.  The notes that you would make would be

23 entirely for your own use and your own help.  They are not

24 going to have any other purpose, and for that reason, we would

25 ask you to leave the notes here in the evening.  And they'll

1    be available for you when you come back after each break.

2         The circumstance, the problem, you might say, with

3    notetaking is that sometimes notetaking can be a colossal

4    distraction, and it will keep you from noticing things and

5    paying attention to things that you probably or maybe want to

6    take in as part of your consideration of the evidence.

7         There are lots of ways in which you'll be asked to

8    assess a witness's credibility.  And one of the ways you

9    usually do that, you're not usually walking down the street

10   with a notepad and writing down "somebody's drumming their

11   fingers on the desk," but you take that in.  You notice that

12   about the witness, something like that.

13        And so you want to be free to take in all the

14   evidence as it comes to you.  And part of it is visual.  And a

15   lot of it is hearing and thinking about what was said without

16   trying to write it down.  So don't let notetaking be a

17   distraction so you miss the forest for the trees here.

18        The other thing about notetaking is that sometimes

19   we don't want to say it this way to each other, but sometimes

20   some of us are better at it than others, and we miss the

21   point.  And so the notetaking's just for you.  If it's going

22   to help you that Witness X wore a red tie, you might just want

23   to write down that, "red tie" or something, if there's

24   something in particular, or go ahead and take more fulsome

25   notes if you think it will be helpful to you and you can do it

1  with none of these other risks.

2          When it comes time to deliberate, it will be a

3  misuse of the notes if your deliberations somehow devolve into

4  a contest over who's got the most accurate notes.  So if one

5  of you is likely to say "Hey, I wrote it down, I know that's

6  the fact," and it's not remembered that way by somebody else,

7  you have to be respectful of the other person's opinion as

8  well because maybe this is what they didn't want to say, you

9  didn't get it.

10          So the notes are intended to be a help.  To the

11  extent that they're not a help, don't feel like you need to do

12  it.  As I said, they're private to you.  And you may use them

13  but you wouldn't want to misuse them at the time when you're

14  deliberating on your verdict.

15          I'll read to you the standard instructions so that

16  you know what the law says because I've sort of embellished on

17  it here.  If you want to take notes during the course of the

18  trial, you may do so.  However, it's difficult to take

19  detailed notes and pay attention to what the witnesses are

20  saying at the same time.

21          If you do take notes, be sure your notetaking does

22  not interfere with your listening to and considering all of

23  the evidence.  Also, if you do take notes, do not discuss them

24  with anyone before you begin your deliberations.  Do not take

25  your notes with you at the end of the day.  Be sure to leave

1  them here in the jury room.

2        If you choose not to take notes, remember that it is

3  your own individual responsibility to listen carefully to the

4  evidence.  You can not give this responsibility to somebody

5  else who is taking notes.  We depend on the judgment of all

6  members of the jury.  So you all must remember the evidence in

7  the case.

8        The trial is ready to begin.  First, Miss Helart, on

9  behalf of the Government -- I assume it's Miss Helart, it

10 could be Mr. Cook -- will make an opening statement.  The

11 opening statement, remember, is not evidence.  It's simply an

12 outline or a road map or blueprint to help you understand the

13 evidence as it comes in.

14       Next, the defendant's attorney, either Mr. McKinley

15 or Miss Jessie Cook, will make an opening statement.  They're

16 not required to, but they have an opportunity to if they wish.

17 Opening statements, as I've said, are neither evidence nor

18 arguments.

19       The Government will then present its witnesses and

20 counsel for the defendant may cross-examine them.  Following

21 the Government's case, the defendant may, if he wishes,

22 present witnesses whom the Government may cross-examine.

23       After all the evidence is in, the attorneys will

24 present their closing arguments to summarize and interpret the

25 evidence for you, and then I will instruct you on the law.

1  After that, you will retire to deliberate on your verdict.

2           Now, I want to circle back to emphasize one specific

3  matter because it comes up from time to time, and you need to

4  know from the get-go about how to handle this.  You, as

5  jurors, must decide this case based solely on the evidence

6  that's presented here within the four walls of this courtroom.

7           This means that during the trial, you must not

8  conduct any independent research about the case, as I've

9  already told you, or about the matters in the case or the

10 individuals or the corporations involved if there were to be

11 corporations somehow tangentially brought into this.

12          In other words, you should not consult dictionaries

13 or reference materials such as the Internet, websites, blogs

14 or use any other electronic tools to obtain information about

15 this case, or to help you decide the case.  Please do not try

16 to find out information from any source outside the confines

17 of this courtroom.

18          Until you retire to deliberate, you may not discuss

19 the case with anyone or even your fellow jurors as I've told

20 you before.  After you retire to deliberate, you may begin

21 discussing the case with your fellow jurors, but you cannot

22 discuss the case with anyone else until you have returned a

23 verdict and the case is at an end.

24          I hope that for all of you, this case is interesting

25 and noteworthy.  I know that many of you use cell phones,

1 Blackberries, the Internet and other tools of technology.  You

2 also must not talk to anyone about this case or use these

3 tools to communicate electronically with anyone about the

4 case.  This includes your family and your friends.

5          You may not communicate with anyone about the case

6 on your cell phone, through e-mail, Blackberry, iPhone, text

7 messaging or on Twitter, through any blog or website, through

8 any Internet chat room or by way of any other social

9 networking websites including Facebook, My Space, LinkedIn and

10 YouTube.

11          That completes the Court's preliminary instructions.

12 Do the parties have any objection to the preliminary

13 instructions?

14          MR. McKINLEY:  Not from the defense, Your Honor.

15          MS. HELART:  Not for the Government.

16          THE COURT:  Then we're ready for the opening

17 statements.  Miss Helart, you may lead off.

18                   Opening statement by Ms. Helart

19          MS. HELART:  Thank you, Your Honor, and good

20 morning.

21          In October 2004, Dawn Russell, who is the ex-wife of

22 Dale Russell, the defendant, received a telephone call from

23 the school where her older daughter attended.  The nature of

24 the call was that the school had received information about

25 pictures of her daughter.  Ms. Russell responded to the

1 school.

2        Dawn Russell and Dale Russell had been married from

3 between about 1990 and 1998.  They had separated in 1996.

4 They had three children together.  You will hear from two of

5 those children during this trial.

6        After the divorce, you will also hear that Dawn and

7 Dale Russell had been to court regarding child support and

8 child visitation orders.

9        Specifically, what Ms. Russell learned in

10 October 2004 was that school officials had determined that her

11 older daughter had written a website name on a notebook at

12 school that she traded with some friends.  The website name in

13 a round-about-way got back to school officials who saw

14 pictures of concern on it.

15       They printed the pictures to show to Ms. Russell.

16 When Ms. Russell arrived at the school, she saw the pictures

17 herself.  The pictures appeared to have come from websites on

18 the Internet and were associated with both of her daughters.

19       Her daughters were dressed in a way that she did not

20 approve.  She had not authorized the pictures to have been

21 taken, nor had she authorized them to have been placed on

22 these websites.

23       She learned that Mr. Russell was responsible for

24 taking the pictures and running the websites.  Her daughters'

25 websites had fake or other names associated with them.

1          A hearing regarding support or visitation had

2     already been set for October 19th, 2004, within a week of

3     hearing this information from the school.  Ms. Russell turned

4     that preset court time into a hearing for an emergency order

5     to determine what Mr. Russell's parenting rights should be.

6          During that hearing, Ms. Russell said that Dale

7     Russell admitted to running the websites and taking the

8     pictures.  One result of the hearing was that the judge

9     ordered the websites taken down.

10          Jane Doe 1, the older daughter, and Jane Doe 2, the

11     younger daughter, will both be here to testify.  The images

12     charged in Counts 1 through 4 are not the pictures that Dawn

13     Russell saw at the school.  The images charged in Counts 1

14     through 4 are from an individual's computer in Canada, and the

15     information about these pictures came to law enforcement in

16     2007.

17          The pictures you will see in Counts 1 through 4 here

18     are of Jane Doe 1 and Jane Doe 2 nude and posed in a bedroom,

19     a gym and a bathroom.

20          One task you will be called on to decide is whether

21     these pictures charged in Counts 1 through 4 amount to what

22     the law says is a lascivious exhibition of the genitals or

23     pubic area of these girls, and you will be given some guidance

24     as to what that means at the end of this trial.

25          Some facts about the pictures that you will hear at

1  this trial are first, that if Dawn Russell did not [sic] know

2  that Dale Russell had put up websites of their daughters, she

3  would have said no to this.

4       Second, the girls had been photographed nude by only

5  one person in their whole lives, their father, Dale Russell.

6       Third, Dale Russell took these pictures and other

7  pictures, including clothed pictures, during his visitation

8  time with his daughters.

9       Fourth, that Dale Russell brought up the ideas of

10  taking pictures, taking nude pictures and putting up websites.

11  The girls did not bring up these ideas.

12       Fifth, that Dale Russell paid the girls for taking

13  pictures.

14       Sixth, that Dale Russell directed the activities in

15  the photo-taking sessions by telling them how to adjust their

16  arms, spread their legs, et cetera.

17       Seventh, that Dale Russell talked to them during the

18  photo-taking sessions with things like "That looks good" or

19  "Hold that pose" or "It looks pretty."

20       Dale Russell ran the websites.  The girls' names

21  were changed to fake names.  Jane Doe 1 was known as

22  kaseymodel.com, and Jane Doe 2 was known as octobermodel.com.

23       The camera that was used to take the pictures in

24  each of Counts 1 through 4 was determined by looking at data

25  embedded in the pictures called ExEf data, E-X-E-F data.  It

1   is data that manufacturers of digital cameras embed into

2   pictures that software can help determine.

3          The Canon camera that took these was of a particular

4   serial number.  When this camera was purchased, its owner sent

5   back the registration information for warranty and guaranty

6   purposes, and that person was Dale Russell.

7          The pictures taken charged in this case were taken

8   at various times in 2004 as shown by the ExEf data embedded

9   into the pictures.  Jane Doe 1, again known as Jane Doe 1 in

10  the indictment, was born in 1992, and was in sixth and seventh

11  grades during the calendar year of 2004.

12         Jane Doe 2, known as Jane Doe 2 in the indictment,

13  was born in 1994, and was in fourth and fifth grades during

14  the calendar year 2004.  The girls are now in 10th and 12th

15  grades.

16         At the end of this trial, the Government expects

17  that one main issue will be the content of the pictures and

18  whether they are illegal, as the definition provides to us

19  under federal law.

20         The Government does not expect for Dale Russell to

21  contest that he took the pictures.  Rather, the parties will

22  largely be arguing about the nature of the content of the

23  pictures.

24         At the end, the Government expects to request a

25  verdict of guilty as to each of the four counts.  Thank you.

1          THE COURT:  Thank you, Miss Helart.

2          Mr. McKinley?  Ms. Cook?

3          MS. COOK:  Yes, Your Honor.  Good afternoon.  May it

4   please the Court, Counsel.

5          Mr. McKinley and I will be representing Dale Russell

6   during the trial.  And during the trial, you'll have an

7   opportunity to learn about Dale and his life.

8          Dale grew up in the Indianapolis area.  He went to

9   school in this area.  He worked a variety of jobs here.  And

10  he raised his family in this and the surrounding counties.

11         The evidence will show that he has had a lifelong

12  love of photography.  And his love of photography began when

13  he got his first camera at the age of nine.

14         By the time he was 11 years old, he was developing

15  his own film and printing his own pictures.  And that love of

16  photography and interest in photography followed him into high

17  school.  He attended Manual High School here in Indianapolis

18  and eventually graduated from that school.

19         While he was in high school, he was the photographer

20  for the school newspaper, and he worked as a photographer for

21  the yearbook.  Following his graduation from high school, he

22  took a photo journalism class at Ball State University because

23  he intended to pursue photography as a career.

24         He then opted to study engineering at IUPUI, but

25  after one semester, because of his economic circumstances, he

1  had to leave college and go to work at RCA.  And he continued

2  to work at RCA for a couple of years until there was an

3  economic downturn and a reduction in force when he lost his

4  job.

5       When he was laid off, he continued to pursue his

6  photography.  It was a hobby for him.  But in addition to

7  being his hobby, he also began to use his photography as a way

8  to earn additional money.  Although he was employed at a

9  variety of jobs during this period of time, he began taking

10  portrait shots of people and he began taking sports shots.  He

11  would travel around to different sporting events and take

12  photographs.

13       By the age of 24 or 25, he returned to his studies

14  at IUPUI, this time with a major in sports studies, and he

15  began teaching gymnastics in the area.

16       This time while he was a student at IUPUI, he was a

17  member of the campus photography club and a photographer for

18  the student newspaper.  It was around this time that, in

19  addition to considering photography as his hobby and as a way

20  to make some extra money, he also began to regard it as a

21  means of artistic expression.

22       He completed a photography workshop at the Herron

23  Art School, and then he transferred to Indiana University in

24  Bloomington so that he could take classes at the School of Art

25  in Bloomington.  He worked weekends while he was initially in

1 Bloomington at a photography studio.

2            He eventually graduated from Indiana University, but

3 with a degree in physical education and an emphasis in

4 gymnastics.

5            In 1990, when he was 29 years old, he married Dawn

6 Russell who would become the mother of his children.  And over

7 the next four years, Dawn and Dale had three children.  ████

8 was born in 1991; Jane Doe 1, the oldest daughter, girl, was

9 born in 1992; and Jane Doe 2, the youngest, was born in 1994.

10           During the years when his children were young, Dale

11 had a succession of different jobs, some lasting longer than

12 others, some where he worked for other people in the

13 community, and some where he was basically self-employed.

14           During this period of time, he worked for Master

15 Lab, a photography studio.  And during all of these years

16 while he was working at these various jobs, his interest in

17 photography continued.  It provided him with an occasional

18 source of money, but more often, it was his hobby.

19           The evidence will be that over the years that Dale

20 was interested in photography, he has taken thousands of

21 photographs, tens of thousands of photographs.  And his

22 favorite subject consistently over all the years that he has

23 taken photographs has been people.  Since his marriage and

24 since the birth of his children, the people that he

25 photographed most often have been his family and his children.

1          Many times, the photographs that he took got thrown

2   into boxes, and later on when photography became digital, they

3   were saved on CDs or DVDs.  But occasionally, he took pictures

4   that he thought were worthy of showing, and they were entered

5   in various art shows in the community.  And he's even won

6   awards for some of those photographs that he's made.

7          The photographs that he has taken both of his

8   family, his children, and other individuals not in his family,

9   have included photographs of persons who were clothed,

10  partially clothed, and in some cases, nude.

11         Dale has photographed his children their entire

12  lives from the time that they were infants.  As long as he has

13  been around them, he has photographed them.  In 1996, when he

14  and Dawn separated, he was working part-time and supplementing

15  his income with some high-end portraiture work.

16         He also supplemented his income by traveling to

17  sporting events, gymnastics tournaments, cheerleading

18  contests, and he would take photographs at these sporting

19  events.  He would hand out his business card to people who

20  attended the event and offer to print the photographs for them

21  and sell them.  And he made a little extra money that way.

22         Around this time, in the late 1990s, he began a

23  child modeling agency called Kid Model.  He photographed

24  children, not his children initially, but other people's

25  children.  And he received photographs from other parents who

1  had photographed their own children or had them professionally

2  photographed.  And from those photographs which he compiled,

3  he produced brochures.  And those brochures were sent out to

4  retailers in the hope of attracting the attention of a Kohl's,

5  a Target, or a Sears who might be interested in using some of

6  the children in the brochures as models.

7          Dale's expectation, of course, was that he might be

8  the person who sparked the modeling career of one of these

9  children, which would, of course, represent income to him as

10  well as income to the children.

11          After about a two-year period of an acrimonious

12  separation from his wife, Dawn, his divorce was finalized in

13  1998.  At that time, he was working at Spectrum Sports in

14  Carmel, and he was continuing with this freelance modeling

15  agency.

16          You're going to hear that in the year 2000, he met

17  his current wife, Betsy.  And it was around the same time that

18  the modeling agency that he had established went online as a

19  way of attracting more businesses and more clients, hopefully

20  expanding the distribution of the modeling information and

21  attracting more income both for himself and for the models.

22          In that year, 2002, his own daughters were then 8

23  and 10 years old.  And it was around that time that he began

24  shooting photographs of them specifically for the purpose of

25  creating modeling sites for each of them.  And he did this

1  with their permission.

2          The modeling sites that he established for them were

3  online, and like the modeling sites for other children, they

4  did not contain the true names of the children who were

5  pictured on the sites for safety reasons.

6          All of the children who were depicted in these

7  modeling sites, including his two daughters, were clothed.

8  They were wearing the types of clothing that you would expect

9  children who model for various retail establishments to wear:

10  dresses, costumes, shorts, bathing suits, the kind of clothing

11  that's sold by the target businesses, Sears, Target, Kohl's.

12          He created the websites for his daughters and he

13  maintained the websites for his daughters.  If he thought that

14  the websites attracted inappropriate attention, he removed

15  photographs from them.  The models on those websites,

16  including his daughters, were not unlike the models in various

17  teen magazines at the time.

18          And with these modeling websites, Dale earned small

19  amounts of money, and those small amounts of money were shared

20  with his daughters as they were earned, part going into an

21  educational account for the two of them together, part given

22  directly to them.

23          And it was the year or so after these modeling sites

24  were online that Jane Doe 1, the older daughter, showed her

25  modeling site or provided information about it to a school

1  friend, who eventually told a parent, who told a school

2  counselor, who as you've heard called Jane Doe 1's mother,

3  Dawn, and talked to her about the existence of the website.

4        We expect to hear Dawn's testimony that she saw the

5  photographs from the website and that she didn't approve of

6  the photographs from the website.  But I think you'll also

7  hear that the photographs that she saw depicted the girls

8  clothed.

9        Now, the discovery of those websites led to the

10  investigation that has culminated in this prosecution, and

11  eventually it led to the loss of Dale's contact with his

12  children.

13        In the course of this trial, you're going to learn

14  that Dale has a lifestyle with his wife, Betsy, that is

15  different than the lifestyles that many of us lead.  He and

16  his wife, Betsy, are naturists, or nudists.  At times, they

17  have been members of a national organization of naturists or

18  nudists; folks who believe that clothing should be optional in

19  their own home or at special resorts that are reserved for

20  people who belong to the organization or who pursue a naturist

21  or nudist lifestyle.

22        This may not be a lifestyle that you or I would

23  choose for ourselves or our family, but the evidence is going

24  to be that there is a segment of our population that chooses

25  that lifestyle, and there's nothing criminal about it.

1          When Dale's children visited him and his home with

2    Betsy, there are times when they were clothed in the home and

3    times when they were naked in the home; times when they were

4    clothed when they went on vacation, and times when they

5    vacationed at resorts and beaches which were set aside for

6    persons for whom clothing was optional.

7          Dale will not deny that he has photographed his

8    girls at times when they were naked.  The photographs that he

9    took of them when they were naked are a small percentage of

10   the total photographs that he has taken of them throughout

11   their lives.

12         You'll have an opportunity to view the images which

13   the Government has charged.  And you will learn that the

14   Government selected those images from among thousands of

15   photographs that Dale created.

16         The imagines that they chose depict Dale's

17   daughters, Jane Doe 1 and Jane Doe 2, either nude or partially

18   nude.  And as you examine the photographs, you may not like

19   them.  You may find that one of the images or more than one of

20   the images are unsettling or upsetting to you, but these

21   images were not created for public viewing.  They were created

22   for family viewing.  And I would ask that as you look at these

23   photographs, you keep an open mind as you look at the

24   photographs and listen to the evidence because the government

25   in this case has the burden of proof.

1          The burden of proof that they have in this case is

2    the highest standard recognized in the law, and that is proof

3    beyond a reasonable doubt.  They are required to prove each

4    element of each of the charged offenses considered

5    individually beyond a reasonable doubt.

6          That means that you will examine the photographs or

7    photograph of each count individually in order to make a

8    determination as to whether the Government has carried its

9    burden of proof beyond a reasonable doubt.

10          The fact that a photograph in a particular count may

11   depict a naked child does not make it a violation of the law.

12   Nudity in a photograph of a child is not by itself a crime.

13   In order for the Government to prove that Dale violated the

14   law, you must find beyond a reasonable doubt with respect to

15   each photograph or group of photographs that three elements

16   are present.

17          What I've put on the projector is a portion of an

18   instruction which contains the three elements that the

19   Government must prove beyond a reasonable doubt, and I've

20   highlighted the first and third element.

21          THE COURT:  You need to specify that this is not the

22   Court's instruction.

23          MS. COOK:  This is not the Court's instruction.

24          THE COURT:  I have not instructed you on these

25   elements.

1          MS. COOK:  But we believe that the instructions will

2    include three elements that the Government must prove beyond a

3    reasonable doubt.  And in this proposal, I have highlighted

4    the first and the third element because I want to speak to

5    those first.

6          The first element that the Government has to prove

7    beyond a reasonable doubt is that at the time the visual

8    depictions were produced, Jane Doe 1 and Jane Doe 2, that

9    being Jane Doe 1 and Jane Doe 2, were each below the age of 18

10   years.

11         Now, I'm going to tell you at this point that this

12   element is not in dispute.  We agree with the age of the

13   girls.  There's not going to be any disagreement about the

14   first element.

15         The third element that the Government will have to

16   prove beyond a reasonable doubt is that either the visual

17   depiction was produced using materials that have been shipped

18   or transported in interstate or foreign commerce, or the

19   defendant knew or had reason to know that such visual

20   depiction would be transported in interstate or foreign

21   commerce or mailed, or the picture itself was transported in

22   interstate commerce across state lines.

23         And I will tell you that with respect to this third

24   element, there is not going to be any dispute.  There's no

25   disagreement between the defense and the Government with

1  respect to the third element.

2          It's the second element that will be in dispute

3  during the course of this trial.  It's the second element that

4  the Government will have to prove beyond a reasonable doubt

5  with respect to each charged photograph or group of

6  photographs.

7          And the second element provides that the defendant

8  employed, used, persuaded, induced, enticed or coerced Jane

9  Doe 1 and Jane Doe 2, again Jane Doe 1 and Jane Doe 2, to

10 engage in sexually-explicit conduct for the purpose of

11 producing a visual depiction of such conduct.  It's the second

12 element that Dale Russell emphatically denies.

13         You might ask what does it mean to engage in

14 sexually-explicit conduct.

15         THE COURT:  Counsel, these instructions are not

16 approved.

17         MS. COOK:  It's the Government's tendered ones, Your

18 Honor.

19         THE COURT:  But the Court hasn't made a ruling on

20 them.

21         MS. COOK:  I understand.

22         Sexually-explicit conduct has a specific meaning,

23 and that specific meaning is --

24         THE COURT:  This is your opening statement?

25         MS. COOK:  Yes, it is, Your Honor.

1        THE COURT:  All right.  So let's keep it with the

2    opening statement with respect to what you expect the evidence

3    to show.  And after we get to the place where the instructions

4    are given by the Court, you can go through the instructions

5    and argue those.  But right now, it's just the blueprint of

6    what's coming ahead, not argument, Counsel.

7        MS. COOK:  All right.  Thank you.

8        We -- well, we expect that the evidence will not

9    show that the photographs depict sexually-explicit conduct.

10   We do not believe that the Government is able to carry its

11   burden of proving that the photographs depict what the law

12   defines as sexually-explicit conduct.

13       At the end of the evidence, we are going to be

14   asking you to return a verdict of not guilty with respect to

15   each of the charged offenses.  And I would ask that as you

16   listen to the evidence that comes in, you keep an open mind

17   and that you keep an open mind during the presentation of the

18   defense case as well as the Government's case.

19       Thank you.

20       THE COURT:  Thank you, Miss Cook.

21       Miss Helart, the Government may call its first

22   witness.

23       MS. HELART:  If I might tender to the Court an

24   exhibit list at this point?

25       THE COURT:  Thank you.  Get one for Miss Schneeman.

63

1           MS. HELART:  Yes.

2           THE COURT:  Thank you.

3           MS. HELART:  The Government would call Dawn Russell.

4           THE COURT:  All right.

5           Good afternoon, Miss Russell.  Come around that way

6  towards the witness stand, please.  Before you pull up a

7  chair, remain standing, raise your right hand and be sworn by

8  the Clerk.

9           **DAWN RUSSELL, PLAINTIFF'S WITNESS, SWORN**

10                     **DIRECT EXAMINATION**

11          THE COURT:  You may be seated.

12 BY MS. HELART:

13 Q   Good afternoon.  Could you please state your name?

14 A   Dawn Russell.

15 Q   What city do you live in now?

16 A   Greenfield.

17 Q   When did you --

18          THE COURT:  Greenfield, Indiana?

19          THE WITNESS:  Yes.

20 BY MS. HELART:

21 Q   When did you move to Greenfield approximately?

22 A   Approximately 2004.

23 Q   Where had you lived just before you moved to Greenfield?

24 A   I lived in Indianapolis in Braeburn Village Apartments.

25 Q   Do you know the cross streets of Braeburn Village

RUSSELL – DIRECT/HELART          64

1   Apartments in Indianapolis?

2   A   21st Street and Franklin Road.

3   Q   On the east side?

4   A   Yes.

5   Q   When you lived at the Braeburn Village Apartments, did

6   anyone else live there also that you knew?

7   A   Yes, Dale Russell.

8   Q   Who is he?

9   A   Dale is my ex-husband.  He's sitting at that table with it

10  looks like a black suit on.

11  Q   All right.

12          MS. HELART:  And let the record reflect that she's

13  pointed to the direction of Dale Russell who is wearing a

14  black suit.

15          THE COURT:  The record so reflects.

16          MS. HELART:  At this time, we have a stipulation

17  we'd like to read into the record, Your Honor.  It's

18  Exhibit 6.

19          THE COURT:  Okay, what is the stipulation?

20          MS. HELART:  It regards the Braeburn Village

21  Apartments and when Mr. Russell lived there.

22          THE COURT:  All right.  Let me explain to you about

23  stipulations.  I mentioned it in my preliminary instructions,

24  but an additional word might be appropriate here.  When the

25  parties stipulate to something, they mean that they agree to

RUSSELL – DIRECT/HELART          65

1  it.  So it's not in dispute.  And you can take whatever the

2  facts are that are encompassed within that stipulation as

3  true.  You don't have to hammer out a disagreement when it's

4  time to deliberate on that.

5          What weight you choose to give to it –– I'm spelling

6  weight, W-E-I-G-H-T –– what difference it makes, what effect

7  it has on your deliberations, even when it's not in dispute,

8  is still up to you to decide.  You'll have to decide that when

9  you deliberate.  But this matter will come into evidence

10 without disagreement as a stipulation.  And so I will admit

11 Exhibit 6 and you may read the stipulation to the jury.

12          (Plaintiff's Exhibit 6 received in evidence.)

13          MS. HELART:  Thank you.  And if I could publish it

14 on the document camera?

15          THE COURT:  Yes, and a word about that.  Those

16 monitors pull out from where they are now so you can get them

17 a little closer if you need to get your bifocals adjusted.

18 That's what I have to do.  And they are positioned to be

19 located between each two of you so that you can see them

20 easily.

21          So adjust them so there's no glare –– sometimes off

22 the window back there, we get some glare –– so that you can

23 see these things and read along with us.

24          And finally, a word of explanation, all of these

25 exhibits will come to the jury room and be there with you and

RUSSELL – DIRECT/HELART          66

1   available to you when you deliberate.  So you don't have to

2   memorize what's in them, or try to absorb all the many

3   details.  Follow the questions as the lawyers ask the

4   questions, and then you'll remember what it's about when you

5   have the documents and the exhibits there to deliberate on.

6           Now you may do it.

7           MS. HELART:  Thank you.  The United States by

8   counsel --

9           THE COURT:  Can you enlarge that any because --

10          MS. HELART:  Yes.

11          THE COURT:  -- for my eyes, it's a little small.

12  How about you?

13          There, that's better.

14          MS. HELART:  The United States, by counsel, Gayle L.

15  Helart, and A. Brant Cook, and Defendant, Dale Russell, by and

16  through his counsel, James C. McKinley, hereby stipulate and

17  agree as follows:

18          Dale Russell lived at the ███████████████

19  ███████, ████████████████████, Indianapolis, Indiana,

20  from approximately August 20, 2003, until approximately

21  August 25, 2004.  The forwarding address and telephone number

22  provided by Dale Russell was 664 Marana Drive, Carmel,

23  Indiana, (317)705-9896.

24          By affixing their signatures hereto, the Government

25  and defendant's counsel, with the consent of the defendant,

1   agree to the stipulation, and that the stipulation may be

2   entered into evidence during the course of this trial.  Signed

3   Gayle L. Helart, A. Brant Cook, Dale Russell, and James C.

4   McKinley.

5              THE COURT:  Okay.

6   BY MS. HELART:

7   Q    Ms. Russell, when were you married and divorced from Dale

8   Russell?

9   A    We were married from approximately 1990 until 1998.

10  Q    How did you first meet him?

11  A    We worked together.

12  Q    Where?

13  A    Master Lab.

14  Q    Did you both like photography?

15  A    Yes.

16  Q    Have you kept up with photography?

17  A    No, not really.

18  Q    As far as you know, did Mr. Russell maintain an interest

19  in photography?

20  A    As far as I know, yes.

21  Q    Did the two of you have children together?

22  A    Yes.

23  Q    How many children and what are their genders?

24  A    We had three children, one son and two daughters.

25  Q    When was your son born?

1  A    March 15th, 1991.

2  Q    When were your two daughters born?

3  A    May –– August 8th, 1992, and May 15th, 1994.

4  Q    May what?

5  A    Fifteenth.

6  Q    And your daughter who was born in 1992, what is her name?

7  A    Jane Doe 1.

8  Q    And what is your daughter who was born in May of 1994,

9  what is her name?

10  A    Jane Doe 2.

11           MS. HELART:  At this point, the Government has

12  Exhibit 8, another stipulation to read into the record.

13           THE COURT:  You may read your stipulation.

14           MS. HELART:  "The United States by counsel, Gayle

15  L. Helart and A. Brant Cook, and defendant, Dale Russell, by

16  and through his counsel, James C. McKinley, hereby stipulate

17  and agree as follows:

18           "A minor is defined as a person less than 18 years

19  old.  Jane Doe 1 was born in 1992.  Jane Doe 2 was born in

20  1994.  In 2004, when the crimes were alleged to have been

21  committed, Jane Doe 1 was 11 to 12 years old.  In 2004, Jane

22  Doe 2 was 9 to 10 years old.  Dale Russell knew the ages of

23  Jane Doe 1 and Jane Doe 2.

24           "By affixing their signatures hereto, the Government

25  and defendant's counsel, with the consent of the defendant,

1  agree to this stipulation, and that the stipulation may be

2  entered into evidence during the course of the trial in this

3  case.

4          "Signed Gayle L. Helart, A. Brant Cook, Dale

5  Russell, and James McKinley.

6          THE COURT:  Your stipulation is admitted.

7          (Plaintiff's Exhibit 8 received in evidence.)

8  BY MS. HELART:

9  Q   For several years after the divorce in 1998, did you and

10 Mr. Russell go to court for orders regarding things like child

11 support and child visitation?

12 A   Yes, we did.

13 Q   On October 19th, 2004, did you go to Family Court

14 regarding a specific topic?

15 A   Yes, we did.

16 Q   What was that court hearing originally scheduled for?

17 A   It was scheduled for child support.

18 Q   Did that hearing turn into something else?

19 A   Yes.

20 Q   Within a week of October 19th, 2004, had you received a

21 call that was unusual to you?

22 A   Yes, I did.

23 Q   Who did you receive the call from?

24 A   It was from Kim Kyle, the middle school counselor in

25 Greenfield.

RUSSELL – DIRECT/HELART          70

1   Q   Who was she in relationship to your family?

2   A   She was just the school counselor.  She wasn't really a

3   relationship, the school counselor.

4   Q   And which school had the relationship with your family?

5   A   Greenfield Central, or it was Greenfield Middle School.

6   Q   Which of your children attended that school?

7   A   Jane Doe 1 and Jane Doe 2.

8   Q   At that time?

9   A   Yes.

10  Q   What was the call in relationship to?  What was the nature

11  of the call?

12  A   The counselor called to say that they had received

13  information of some photographs that my daughters had been on

14  some pictures.  My daughter had been on a website, and they

15  wanted to talk to me about it.

16  Q   Did you respond to the school with that call?

17  A   Yes.

18  Q   Did the school officials show you anything?  Did you see

19  any photographs?

20  A   Yes, they had a packet of papers with several photographs

21  on each sheet of paper, in color, of the pictures as they were

22  on the websites.

23  Q   Did you provide those pictures to your lawyer who was

24  representing you in Family Court?

25  A   Yes.

RUSSELL – DIRECT/HELART          71

1  Q   Were those pictures attached to a pleading, a document

2  that was in front of the court?

3  A   Yes.

4  Q   And have you seen Exhibit 12, pages one through 27, before

5  you came here to testify today?

6  A   Yes.

7  Q   What is Exhibit 12?

8  A   They're pictures of the internet websites of my daughters.

9  Q   And do you recognize them for a specific reason?

10  A   Yes, because --

11  Q   Why do you recognize them?

12  A   Yes, they're my daughters.

13  Q   And did you see these pictures at the Greenfield school

14  the day that they called you?

15  A   Yes, the pictures I saw at the Greenfield school were

16  actually in color.  Those are in black and white, but they are

17  the exact same pictures.

18  Q   And your attorney had attached these to the pleading and

19  we simply took a copy off of that; is that correct?

20  A   Right.

21        MS. HELART:  We'd ask that Exhibit 12 be admitted.

22  Exhibit 12, specifically pages 1 through 27.

23        THE COURT:  Any objection?

24        MS. COOK:  No, Your Honor.

25        THE COURT:  Exhibit 12 is admitted.

1          (Plaintiff's Exhibit 12 received in evidence.)

2    BY MS. HELART:

3    Q    I'm going to hand you Exhibit 12, and if you could

4    describe what you see in these pictures in terms of who are

5    the people depicted?

6    A    These are my daughters, Jane Doe 1 and Jane Doe 2.

7    Q    What name is associated with your daughter, Jane Doe 1?

8    A    Kasey.

9              THE COURT:  Spelled C–A–S–E–Y?

10             THE WITNESS:  K–A–S–E–Y.

11             THE COURT:  K–A–S–E–Y.

12   BY MS. HELART:

13   Q    What is the full website name if it's ever shown?

14   A    I think it's kaseymodel.com.  Yeah, kaseymodel.com.

15   Q    Who else is depicted?

16   A    Jane Doe 2.

17   Q    Does she have her own name associated?

18   A    Hers was October.

19   Q    Do you see her full name website?

20   A    Yes, it's –– it is in here.  I don't see it right now.

21   Q    And do you see any other individuals depicted?

22   A    Yes, there's another girl in here.  Her name, under here,

23   is called Annabelle.

24   Q    Do you recognize that girl?

25   A    She is Dale's stepdaughter.

RUSSELL – DIRECT/HELART          73

1  Q    He is currently married?

2  A    As far as I know, yes.

3  Q    And who's the -- who is the person that he is married to?

4  A    Her name is Betsy.

5  Q    And so the person depicted there is Betsy's daughter?

6  A    Right.

7  Q    Her name is Annabelle as depicted there.  Is that her real

8  name?

9  A    No.

10 Q    In the pictures showing your daughters, do you recognize

11 the clothing that they're wearing?

12 A    No.

13 Q    Is that anything that came from your house where they

14 lived with you?

15 A    No.

16 Q    Can you describe for the jury what kinds of clothing they

17 are wearing in those pictures and which daughters associated

18 with what you're looking at?

19 A    There's pictures here of Jane Doe 1 in bra and panties.

20 Some of them are thong underwear; swimsuit, pajamas.

21 Q    What about Jane Doe 2?

22 A    Same thing, bra and panties, swimsuit.

23 Q    As their mom, did you want a website up showing pictures

24 like that of your daughters?

25 A    No.

1   Q    Had you ever given permission for those pictures to have

2   been taken or up on a website?

3   A    No.

4   Q    During the hearing on October 19th, 2004, were you present

5   for that hearing?

6   A    Yes.

7   Q    Did Mr. Russell admit to anything regarding the website

8   information that you see in Exhibit 12?

9   A    Yes.

10  Q    Like what you had received from the school?

11  A    Yes.  He said that he took the pictures.

12  Q    Did he talk about running the websites?

13  A    Yes, he did.

14  Q    With respect to the websites and anything that the judge

15  said that day, what did the judge say regarding the websites?

16           MS. COOK:  Objection, hearsay.

17           THE COURT:  Sustained.

18  BY MS. HELART:

19  Q    Did you make a request of the judge during that hearing

20  regarding the websites?

21  A    Yes, I asked that the websites be immediately shut down.

22  Q    Do you know if that happened?

23  A    Yes, I believe it did.

24  Q    Had you known before the October 19th, 2004 hearing that

25  Mr. Russell had put up websites involving Jane Doe 1 and Jane

1  Doe 2?

2  A    No.

3  Q    Had he ever talked about this with you?

4  A    No.

5  Q    Before you got the call from the school, had you heard it

6  from Jane Doe 1 herself?

7  A    She mentioned once that "I have a website," but I -- you

8  know, that she had a website, but I didn't think to look into

9  it because I had already told Dale I didn't want any kind of

10 personal information, pictures, or anything on any kind of

11 website.  And I assumed that he respected those wishes.  So I

12 assumed that when she said she had a website, that it was

13 something childlike and simple.

14 Q    Did Jane Doe 1 -- I'm sorry, did Jane Doe 2 ever disclose

15 that she had a website before October 19th, 2004?

16 A    No.

17 Q    Do you recall Jane Doe 1 ever receiving a particular theme

18 of things for a Christmas present one year?

19 A    Yes.

20 Q    What particular theme of things did she get?

21 A    SpongeBob.

22 Q    Who did she get that from?

23 A    From Dale.

24 Q    After the divorce, do you ever recall finding out about

25 bank accounts in your daughters' names that you had not known

1  about?

2  A    Yes.

3  Q    Do you know who set those bank accounts up?

4  A    Dale.

5  Q    Did you ever see -- when your daughters would return home

6  from visiting Dale, did you ever see your daughters, either

7  daughter, with any amount of money that seemed unusual

8  given what you knew their resources were?

9  A    They didn't bring any large amounts of money home to my

10  house, but they did talk about things that they had received

11  while they were with Dale.

12  Q    Did you see these things?

13  A    Sometimes, but not very often.

14  Q    Did you ever see clothing back at your house that you

15  hadn't seen them dressed in before?

16  A    Yes.

17  Q    Did you ever see things like thongs or bikinis or any of

18  the things that you saw in these pictures?

19  A    No.

20        MS. HELART:  Thank you, Your Honor.  Nothing else

21  right now.

22        THE COURT:  All right.  Cross-examine, Ms. Cook.

23                      **CROSS EXAMINATION**

24  BY MS. COOK:

25  Q    Miss Russell, as I understand it, you and Dale were

1  divorced in 1998?

2  A    Yes.

3  Q    And that divorce followed a separation of approximately

4  two years?

5  A    Yes.

6  Q    Would it be fair to say that the divorce was not a

7  particularly amicable one?

8  A    Yes.

9  Q    And that during the period of your separation from Dale in

10 the years following, there was very little contact between you

11 and Dale?

12 A    No, I wouldn't say that.  We had adequate contact because

13 the children had to be -- you know, he'd pick them up for

14 visitation.  And also because Dale took me to court, we were

15 in court a lot in the two years.

16 Q    You testified that there was a point in time where Jane

17 Doe 1 mentioned to you that she had a website?

18 A    Yes.

19 Q    And you didn't ask her to show you the website?

20 A    No, we -- our computer was broken at the time, and I

21 didn't really think it was that bad.

22 Q    And you didn't follow up to look at it?

23 A    No.

24 Q    Or make any other inquiries at a later time when your

25 computer was operable?

*RUSSELL – CROSS/COOK*          78

1  A   No.

2  Q   So when the school called you and indicated that they had

3  some information about a website that your daughter's

4  photographs were on, you went to the school?

5  A   Yes.

6  Q   And met with a counselor?

7  A   Yes.

8  Q   And the counselor gave you photographs that you understood

9  had come from the websites?

10 A   No, the -- when I arrived at the school, there was Kim

11 Kyle, the counselor there, but there was also Greenfield

12 police department.  There was also Child Protective Services,

13 Laura Gentry representing Child Protective Services.  There --

14         THE COURT:  Tap that and see if it's still going

15 (Indicating).

16         Yeah, it's going.

17 A   The police department are the ones who showed me the

18 photographs.

19 Q   And was it your understanding that the photographs which

20 you received all came from the two websites in question?

21 A   Yes.

22 Q   Was it your understanding that the individuals who gave

23 you the website -- who gave you the photographs -- were giving

24 you all of the photographs which came off the website?

25 A   No, I don't believe it was all the photographs.

1  Q   Well, did you ever follow up to look and see whether there

2  were any other photographs on the websites?

3  A   I personally did not view the websites myself.

4  Q   Did you ever ask anyone else to follow up and retrieve

5  from the websites any additional photographs which might exist

6  on them?

7  A   There was an investigation so I trusted the investigators

8  to be following up.

9  Q   My question to you was:  Did you ever ask anyone to

10 retrieve for you any additional photographs which might have

11 been on the websites?

12 A   No.

13 Q   Now, when you viewed the photographs from the websites --

14 and let me ask you this:  Are the photographs which have been

15 introduced into evidence as Government's Exhibit -- I'm sorry,

16 was that 1?

17          MS. HELART:  12.

18 Q   -- 12, were those all of the photographs which you

19 received when you went to the school?

20 A   There were other photographs that I was given, but they

21 were of other girls.

22 Q   With respect to your girls, are the photographs that are

23 contained in Government's Exhibit 12 all of the photographs

24 which you received?  And I understand these are copies of the

25 originals.

1  A   Right.  I don't know because I was given a large packet.

2  I didn't examine each photograph.  It was really hard to look

3  at.  So I can't really answer that they were all of the

4  photographs.

5  Q   As you sit here today, you don't know of or remember any

6  specific photographs that are missing from Government's

7  Exhibit 12, do you?

8  A   No.

9  Q   All right.  And as you look at the photographs, it's your

10  opinion, isn't it, that the girls are effecting modeling-type

11  poses or positions?

12  A   To someone's opinion maybe.  I wouldn't call them modeling

13  poses.

14  Q   Ms. Russell, do you remember having testified before a

15  grand jury on January the 8th of 2008?

16  A   Yes.

17  Q   Do you remember being placed under oath --

18  A   Yes.

19  Q   -- prior to your testimony?

20  A   Yes.

21  Q   And being asked questions by Ms. Helart?

22  A   Yes.

23  Q   And do you recall page 10, Ms. Helart asking you.

24              Question:  "With respect to your girls, and

25  they were both dressed in clothing that would you, as their

*RUSSELL - CROSS/COOK*          81

1    mom, say that that was inappropriate clothing?

2             And your answer:  "It would be appropriate

3    under clothes and not being photographed, but they were in

4    modeling-type positions."

5             Do you recall having given that answer?

6    A   No, not specifically.

7    Q   Would it refresh your recollection to see a copy of your

8    grand jury transcript?

9    A   Yes.

10            MS. COOK:  May I approach, Your Honor?

11            THE COURT:  Yes.

12   BY MS. COOK:

13   Q   I'm handing you what I'll represent and what is entitled

14   "Regular Grand Jury, Dawn Russell, page 10."  And direct

15   your attention to --

16            THE COURT:  Miss Cook, excuse me, stand with your

17   back to the wall, and then you can speak to the witness over

18   your shoulder, but the jury hears too.

19            MS. COOK:  All right.

20   BY MS. COOK:

21   Q   Direct your attention to lines 14 through 16, ask if you

22   would read that to yourself?

23   A   (Witness complied.)

24   Q   Okay.  Having read that statement, does that refresh your

25   recollection that you testified before the grand jury that

1  they were in modeling-type positions?

2  A   Yes.

3  Q   Now, you testified that on an occasion, one of your

4  daughters, and correct me if I'm wrong, but I believe it was

5  Jane Doe 1, had received from her father gifts of items with a

6  SpongeBob theme?

7  A   Yes.

8  Q   She brought those items home?

9  A   No.

10 Q   She told you about having received those items?

11 A   Yes.

12 Q   Did she tell you what those items were?

13 A   She listed a large amount of SpongeBob items.  I mean,

14 several, several things, a lot.

15 Q   Did she tell you, for example, that she had a SpongeBob

16 poster?

17 A   I don't remember the specifics, but it was a lot of

18 things.

19 Q   Do you recall any of the specific items which she told you

20 she had received?

21 A   I think there were some bed -- like the bed clothing, the

22 comforter, things like that.

23 Q   So a sheet set?

24 A   Yeah.

25 Q   Something like that with a SpongeBob theme?

1   A   Right.

2   Q   And it wasn't your opinion that a SpongeBob theme was

3   inappropriate for Jane Doe 1, was it?

4   A   Right.

5   Q   With respect to the bank account or accounts that you

6   learned were in the girls' name, did you learn that there was,

7   in fact, an educational account that had been established for

8   them?

9   A   No.

10  Q   Did you learn that there was an account in their names

11  that had a sum of money in it?

12  A   No.  I didn't have access to any dollar amount.

13  Q   But you knew that there was an account in their names?

14  A   Right.

15  Q   And during the course of the hearings that you

16  participated in, was there testimony that would indicate that

17  that account had money in it?

18  A   Yes.

19  Q   And that that money was to be used for educational

20  reasons?

21  A   I don't know why they were set up.  I don't have -- I

22  mean, I assume that's what maybe Dale said, but --

23  Q   All right.

24          MS. COOK:  I have no further questions.

25          THE COURT:  Redirect?

1          MS. HELART:  No redirect, Your Honor.

2          THE COURT:  Thank you very much.  You may step down.

3    Watch your step as you go.  You may leave the exhibit there

4    and counsel will take it.

5          Your next witness, please.

6          MS. HELART:  Thank you.  Before we call our next

7    witness, Your Honor, I have one more stipulation to admit.

8          THE COURT:  All right.  You may.

9          MS. HELART:  It's Exhibit 5.

10          "The United States, by counsel, Gayle L. Helart and

11   A. Brant Cook, and defendant, by and through his counsel,

12   James C. McKinley, hereby stipulate and agree as follows:

13          The images charged in Counts 1 and 2 of Jane Doe 1,

14   and Counts 3 and 4 of Jane Doe 2, were located on a computer

15   drawing and investigation of a Canadian citizen unrelated to

16   the current investigation of Dale Russell in approximately

17   February 2007 in Canada, and subsequently sent to the National

18   Child Exploitation Coordination Center for NCECC, 890 Taylor

19   Creek Road, Ottawa, Ontario, K1A0R2.  The information from

20   NCECC was subsequently related to law enforcement officers of

21   the Indiana Internet Crimes Against Children Task Force

22   Officers for use during the current investigation of Dale

23   Russell.

24          By affixing their signatures hereto, the Government

25   and defendant's counsel, with consent of the defendant, agree

1   to this stipulation and that the stipulation may be entered

2   into evidence during the course of the trial in this case.

3   Signed Gayle L. Helart, A. Brant Cook, Dale Russell, and James

4   C. McKinley."

5          THE COURT:  Your stipulation is admitted.

6          MS. HELART:  We would call Jane Doe 1.

7          THE COURT:  There's an exhibit on the desk there.

8   Maybe, Mr. Cook, you want to get it.

9          Miss Russell, come right across there and over here

10  to the witness stand.  Before you take the chair, remain

11  standing, raise your right hand and be sworn by the clerk.

12          **JANE DOE 1, PLAINTIFF'S WITNESS, SWORN**

13                    **DIRECT EXAMINATION**

14          THE COURT:  You may be seated.

15          MR. COOK:  May I proceed, Your Honor?

16          THE COURT:  You may.

17          MR. COOK:  Thank you.

18  BY MR. COOK:

19  Q   Would you please state your name for the Court, spelling

20  your − both your first and last name for the court reporter?

21  A   Jane Doe 1, ███████████████████.

22  Q   Jane Doe 1, how old are you right now?

23  A   Seventeen.

24  Q   When is your birthday?

25  A   ████.

JANE DOE 1 - DIRECT/COOK          86

1  Q   I'm sorry, I missed that.   ████?  I'm sorry, say it again,

2  please.

3  A   ██████████████.

4  Q   You have kind of a low voice, so I ask that you try to

5  keep it up and speak into the microphone that's in front of

6  you.

7            What grade of school are you right now?

8  A   I'm a senior.

9  Q   So you're pretty close to graduation right now?

10 A   Yeah.

11 Q   Just a couple of months away?

12 A   Uh-huh.

13 Q   How do you feel about that?

14 A   I'm excited.

15 Q   Do you have any plans for after you graduate?

16 A   I plan to go to IUPUI.

17 Q   How are you doing grades-wise?

18 A   As and Bs right now.

19 Q   Do you get those As and Bs while also doing some school

20 activities as well?

21 A   Yeah, I'm on the dance team.

22 Q   What does the dance team, if you can describe that for us,

23 please?

24 A   We have hip-hop and palm routines, and we compete on

25 Saturdays against other dance teams.

1  Q    How many competitions do you do a year?

2  A    About nine.

3  Q    Jane Doe 1, which high school is it that you attend right

4  now?

5  A    Greenfield Central High School.

6  Q    So do you live in Greenfield now?

7  A    Yes.

8  Q    How long have you lived in Greenfield?

9  A    For about five and a half years.

10  Q    And while we're talking about Greenfield, it is

11  Greenfield, Indiana; is that correct?

12  A    I'm sorry?

13  Q    Is that Greenfield, Indiana, I assume?

14  A    Yes.

15  Q    Okay.  I want to talk to you a little bit about your

16  family.  With whom do you live right now?

17  A    My mom and my sister.

18  Q    What's your mom's name?

19  A    Dawn Russell.

20  Q    And how about your sister?

21  A    Jane Doe 2.

22  Q    Is Jane Doe 2 your little sister or big sister?

23  A    My like younger sister.

24  Q    How much younger than you is she?

25  A    She's 15.

1  Q   How's your dad's relationship right now?

2  A   I'm sorry?

3  Q   How's your dad's relationship right now?

4  A   Good.  Pretty close.

5  Q   Do you have any other siblings?

6  A   I have an older brother.

7  Q   What's his name?

8  A   ███████████.

9  Q   How old is he right now?

10 A   He's 18.

11 Q   And does he live somewhere around you or elsewhere?

12 A   He lives in the same apartment complex, I guess, but a

13 couple doors down.

14 Q   So you, your mom and your sister live in the same

15 apartment complex as your brother, ████?

16 A   Right.

17 Q   Who is your father, Jane Doe 1?

18 A   Dale Russell.

19 Q   Do you see your father, Dale Russell, in the courtroom

20 here today?

21 A   Yes.

22 Q   If you could just point him out and describe what he's

23 wearing?

24 A   He's wearing black and tan.

25          MR. COOK:  Your Honor, if the record can reflect

JANE DOE 1 - DIRECT/COOK          89

1  that Jane Doe 1's identified the defendant, Mr. Russell?

2          THE COURT:  The record so reflects.

3  BY MR. COOK:

4  Q   Jane Doe 1, I want to talk to you about your relationship

5  with your father, Mr. Russell.  Is your father still married

6  to your mother?

7  A   No.

8  Q   Do you know how old you were when they were divorced?

9  A   I was three.

10 Q   So do you have any memory of that at all?

11 A   Not really.

12 Q   Following the divorce when you were about three, which

13 parent did you primarily live?

14 A   After that?

15 Q   Yeah.

16 A   We lived with my mom, and my grandma and grandpa.

17 Q   And did that -- did you continue to live with your mom and

18 other siblings through the course of your life up to now?

19 A   Yes.

20 Q   Did you have visitation with your father for at least part

21 of your childhood?

22 A   Yes.

23 Q   Did that visitation arrangement stay the same or did it

24 change through time?

25 A   It changed through time.

1  Q   Okay.  How old were you when visitation stopped?

2  A   I was in 7th grade, so I was around 12.

3  Q   So when you were around 12 or in 7th grade is when

4  visitation stopped?

5  A   (Witness nodded head.)

6  Q   When you did visitation with your father, was it normally

7  done with yourself and your two siblings or were there times

8  that you saw him just on your own?

9  A   There were times that I saw him just on my own.

10 Q   Was it normal practice, though, to go over with your

11 siblings for visitation?

12 A   Yeah.

13 Q   During the course of time that you had visitation with

14 your father, what were the places that he lived?  He didn't

15 live in the same place the whole time, correct?  Did he move a

16 couple times?

17 A   Correct.  He lived in -- he lived with his friend,

18 Mary Kay, for a while, and then he lived with Betsy and Amy in

19 Braeburn Village Apartments, and then he lived in Carmel in a

20 house.

21 Q   I understand that we're looking back a little ways, but do

22 you know about how old you were when your father moved to the

23 apartments at Braeburn Village?

24 A   Sixth grade.

25 Q   So you were around 11 years old or so; is that correct?

1   A    Yeah, 11.

2   Q    And do you know about how old you were when he moved to

3   the house in Carmel?

4   A    12 or 13.

5   Q    So a year or so later to your recollection?

6   A    Right.

7   Q    Now you've told us that your visitation with your father

8   ceased when you were about 12 or 13 years old.  When is the

9   last time you saw your father before today?

10  A    At a dance competition.

11  Q    About how old were you at that dance competition?  How

12  long ago was that?

13  A    It was a couple years ago.

14  Q    I want to look back to the time during which you did have

15  visitation with your father.  How would you describe your

16  relationship with him as you were growing up?

17  A    We were very close.

18  Q    You were close?

19  A    Yeah.

20  Q    What kind of things did he and you and your siblings all

21  do together during those visits you had?

22  A    We would hang out, go to parks.

23  Q    Hang out, go to parks, normal kid-like things?

24  A    Right.

25  Q    Do you know where your father last worked during, I guess,

1   the last year or so of your visitation with him?

2   A    At Master Lab and at Spectrum Gymnastics.

3   Q    And so the jury knows, what was Master Lab?

4   A    It's a photo studio.

5   Q    And Spectrum Gym, what was that?

6   A    It's a gymnastics gym.

7   Q    And did you take part in gymnastics at Spectrum Gym?

8   A    Yes.

9   Q    And was your father involved in your instruction in

10  gymnastics there, or was someone else?

11  A    I had a different coach, but he still helped me out.

12  Q    Now you mentioned that your father worked at Master Lab

13  which is a photo studio.  As you were growing up, was it your

14  understanding that your father had or was particularly

15  interested in photography?

16  A    Yeah.

17  Q    Did that interest become part of your relationship with

18  him?

19  A    Yes.

20  Q    So he'd take, I guess, just -- did it seem to you that he

21  took a little, a lot, or some other amount of pictures of you?

22  A    He normally took a lot of pictures.

23  Q    He took a lot of pictures of you.

24        When did he start taking pictures of you, just as

25  long as you can remember or is there a discrete time?

JANE DOE 1 - DIRECT/COOK          93

1  A    As long as I can remember.

2  Q    Did your father taking pictures of you, did that become

3  more, I suppose, formalized at any point in your relationship

4  with him?

5  A    What do you mean by that?

6  Q    I guess what I mean is did he take pictures just as you

7  guys were doing normal kid sort of things or were there

8  particular photo shoots that would occur?

9  A    Usually it would be, like, any time, and then he started

10 doing photo shoots.

11 Q    Okay.  I want to talk to you about these photo shoots.

12 Describe to the jury what you mean by a photo shoot, what that

13 meant between you and your father?

14 A    He would tell us what our theme was for the day, like

15 where we would go and pick out an outfit, and we would have a

16 shoot.

17 Q    Were these pictures -- speaking generally, were these

18 pictures for the family or were these photo shoot pictures for

19 something else?

20 A    They were for our website.

21 Q    All right.  How old were you when this talk about websites

22 began?

23 A    I was 11 or 12.

24 Q    11 or 12 you said?

25 A    Right.

JANE DOE 1 – DIRECT/COOK          94

1  Q   And what was the, I suppose, the theme of the website?  I

2  mean, was it just photographs, or were they modeling

3  photographs?  What was that about?

4  A   They were modeling photographs.  Each set had a different

5  place and theme about it.

6  Q   Whose idea was it for there to be modeling photographs of

7  you on a website?

8  A   My dad's.

9  Q   It was your dad's idea?

10  A   Yes.

11  Q   What were your thoughts on it?

12  A   I thought it would be fun.

13  Q   You thought it would be fun?  Okay.

14         Did your father suggest reasons for why a modeling

15  website would be starting with you?

16  A   Not really.

17  Q   Did he run a modeling photograph site just of you or were

18  there other people that you knew with modeling sites also?

19  A   My little sister had one, too, and my stepsister had one.

20  Q   And your little sister's Jane Doe 2; is that correct?

21  A   Yeah.

22  Q   Who's your stepsister?

23  A   ■.

24  Q   And I take it by that your father at some point got

25  remarried?

1   A   Yeah.

2   Q   Do you know around when that was?

3   A   I was around 12.

4   Q   And what was his wife's name?

5   A   Betsy.

6   Q   So was ███ Betsy's daughter then who became your

7   stepsister?

8   A   Yeah.

9   Q   What was the name of the website that contained

10  photographs of you?

11  A   Kaseymodel.

12  Q   Where did the term "Kasey" come from?

13  A   He made it up.

14  Q   I'm sorry?

15  A   My dad made it up.

16  Q   He made it up?  Okay.

17          And what was "Kasey"?  Like, what's the point of

18  that name?

19  A   It was a fake name 'cause he didn't want my real name on

20  there.

21  Q   So it was a fake name for use for your website?

22  A   Yeah.

23  Q   Okay.  It was a name that he came up with?

24  A   Yeah.

25  Q   At your particular website, were there photos just of you?

JANE DOE 1 – DIRECT/COOK          96

1  Were you, I suppose, the focus of that website?

2  A   Yeah.

3  Q   And what was your website called again?

4  A   Kaseymodel.

5  Q   I assume there's a dot com in there?  Do you recall that?

6  A   Yeah, dot com.

7  Q   What kind of photographs were on the website?

8  A   On the page, there was regular sets.  Like, if you click

9  on each picture, it gives you a whole set.

10 Q   Okay.  And I suppose -- what kind of things do these

11 pictures depict?  Were you wearing particular kinds of

12 clothing or anything like that?

13 A   I would wear regular clothing, swimsuits, bra and

14 underwear.

15 Q   So some of the pictures of you were actually you in a bra

16 and underwear?

17 A   Yeah.

18 Q   Okay.  And some also in swimsuits?

19 A   Right.

20 Q   And I think you said some also you were clothed in them?

21 I suppose in regular, you know, shirts and pants and that sort

22 of thing; is that correct?

23 A   Yes.

24 Q   Did your sister also have a separate fake name that was

25 for her modeling site?

1  A    Yes.

2  Q    What was that name?

3  A    "October."

4  Q    What did your father say to you about your mother and

5  these websites?

6  A    He didn't want my mom to find out, so he told us not to

7  tell her.

8  Q    You were told not to tell your mother about the websites?

9  A    Right.

10 Q    Who supplied the clothing that you wore on the website

11 pictures?

12 A    Most of them my dad did, but some of them I had already

13 had from my own closet.

14 Q    Okay.  So some of them were from your own closet, most of

15 them were provided by your father; is that correct?

16 A    Yes.

17 Q    How about the images in which you were in your underwear?

18 A    I think those were already mine.

19 Q    Did your father provide any kind of different underwear

20 than you normally wore?

21 A    Yes.

22 Q    What kind of underwear was that?

23 A    Thong underwear.

24 Q    Thong underwear you said?

25 A    Yes.

1  Q   Were you allowed to tell your mother about having that

2  kind of underwear?

3  A   No.

4  Q   How often did you do the photo shoots with your father for

5  the website and other stuff?

6  A   Sometimes it was twice, every time we had a visitation.

7  Sometimes it was none at all.  Sometimes it was just one.

8  Q   And how would you know that images were to be for your

9  website?  How did that come to your attention?

10  A   He would say we have a shoot today and he would tell me

11  about it.

12  Q   Who decided where a photo shoot would take place?

13  A   Mostly my dad, but some of them were from me.

14  Q   Okay.  So mostly your dad, some of them were from you.

15          Did your father direct certain poses for you to take

16  or did you take them?

17  A   My dad directed them.  Most of them I would just do on my

18  own, but some of them he told me what to do.

19  Q   So he would specifically direct some poses?

20  A   Right.

21  Q   And other times you would do your own poses?

22  A   Right.

23  Q   How did it come out that you had this website with

24  pictures of you, some wholly-clothed, some in underwear, some

25  in swimsuits?  How did the kaseymodel.com website come to

JANE DOE 1 – DIRECT/COOK          99

1  anyone's attention?

2  A   Come to my attention?

3  Q   How did it come to anyone's attention outside of the

4  family?

5  A   I told a friend at school.  I wrote it in my notebook that

6  we all shared.

7  Q   I'm going to draw your attention to another subject, Jane

8  Doe 1.  Did your father also engage you in doing photo shoots

9  when you had no clothes on?

10  A   Yes.

11  Q   Whose idea were those photo shoots?

12  A   My dad's.

13  Q   I want to step back to the website just for a minute.  Did

14  you receive any money from your father for the photo shoots

15  you did for the website?

16  A   Yes.  Every -- not every shoot, but for some of them he

17  gave us $20.

18  Q   Did you also get money from your father for the nude photo

19  shoots that you did?

20  A   I don't remember.  I don't think I received any.

21  Q   Okay.  Had he told you that you would get money for doing

22  the nude photo shoots?

23  A   Yes, he told us we would get more.

24  Q   He told you you would get more money for doing the nude

25  photo shoots?

JANE DOE 1 – DIRECT/COOK          100

1  A   Yes.

2  Q   Did he say what the nude photo shoots were for?

3  A   For special people on the website that paid more.

4  Q   So the nude photo shoots were for special people that

5  would pay more?

6  A   Right.

7  Q   Did anyone else ever take nude photographs of you?

8  A   No.

9  Q   I want to draw your attention, Jane Doe 1, and talk about

10 Spectrum Gym for a minute.  Again, you took gymnastics at

11 Spectrum Gym; is that correct?

12 A   Correct.

13 Q   Is that part of something that you did with your father or

14 did you do that apart from your father as well?

15 A   I did it with my father.  He took me there.

16 Q   Did you ever do any nude photo shoots at the Spectrum Gym?

17 A   Yes.

18 Q   Do you recall just around how old you were or what grade

19 you were in when the photo shoot at Spectrum Gym was done?

20 A   I was 12.

21 Q   And that would have you what, in like 6th or 7th grade; is

22 that correct?

23 A   Yes.

24 Q   Who all was there for the nude photo shoot at Spectrum

25 Gym?

1  A    Me, Jane Doe 2 and my dad.

2  Q    How did you guys get access to the gym?  Let me ask it

3  this way first:  Was the gym open at the time that your father

4  did this photo shoot there?

5  A    No, he had a key to the gym.

6  Q    Your father had a key to the gym?

7  A    Yes.

8  Q    Whose idea was it to go to the gym that evening?

9  A    It was his idea.

10  Q    I suppose I should ask for clarification.  Was there just

11  this one nude photo shoot at the gym or were there other nude

12  photo shoots at the gym?

13  A    There was one.

14  Q    Okay.  So the one that was at the gym, he had a key to get

15  in and it was his idea to go?

16  A    Yes.

17  Q    The gym was closed at the time?

18  A    Right.

19  Q    Whose idea was it to be nude at the gym?

20  A    His idea.

21  Q    This may seem like kind of a silly question, Jane Doe 1,

22  but I ask it just for clarity.  Did you normally do gymnastics

23  or were you normally nude at the Spectrum Gym?

24  A    No.

25  Q    Did your father say what the purpose was of taking nude

JANE DOE 1 – DIRECT/COOK          102

1  pictures in the gym?

2  A    They were for the website.

3  Q    He said they were for the website?

4  A    Yes.

5  Q    Was it your understanding that you would get some money

6  for taking these pictures?

7  A    Yes.

8  Q    Was it your understanding that you would get more money

9  for these pictures than for the clothed ones?

10  A    Yes.

11  Q    Getting into the gym, how many ways in and out of the gym

12  space are there?

13  A    There's one main door, and there was one side door.

14  Q    Okay.  Does the main door have a window in it or anything

15  like that?

16  A    Yeah, it was all glass.

17  Q    It was all glass?

18        Was that covered over for the purposes of the photo

19  shoot or was that left uncovered?

20  A    He covered it up with a blanket.

21  Q    We're talking this afternoon about a photo shoot that

22  happened at Spectrum Gym.  Was that done with a regular

23  camera, a video camera, both or something else?

24  A    He had a regular camera and a video camera.

25  Q    Do you know whether he used both of those at the same time

JANE DOE 1 - DIRECT/COOK          103

1   or do you recall?

2   A   They weren't at the same time.

3          COURT REPORTER:  Were or weren't?

4          THE WITNESS:  They weren't.

5   BY MR. COOK:

6   Q   They were not?

7   A   They were not.

8   Q   Do you recall whether your father asked you to take your

9   clothes off before or after the door was covered over?

10  A   He told us to after it was covered.

11  Q   I want to talk a little bit about what your father told

12  you at the photo shoot at Spectrum Gym.  What did you and your

13  sister do during the time that your father had the video on

14  and was taking pictures?

15  A   We talked to the video about how gymnastics is called the

16  naked sport, like the real meaning of it.

17  Q   Who told you to talk that way?

18  A   My dad.

19  Q   Did you use your names or your model names?

20  A   Model names.

21  Q   During the time that you were in the gym naked and your

22  father was taking pictures and video, did you do gymnastics

23  then?  Did you do some gymnastics moves?

24  A   Yeah, we —— we just —— he told us to like run around and

25  we just goofed off and did our own gymnastics, and then he

JANE DOE 1 – DIRECT/COOK          104

1  would take pictures of us, and he told us to do specific

2  moves.

3  Q   Okay.  Just so I understand that correctly, so you kind of

4  goofed around doing some regular gymnastics moves that he took

5  pictures and video of?

6  A   Yes.

7  Q   And then occasionally he would have you do certain moves?

8  A   Yes.

9  Q   Certain poses as well?

10 A   Yes.

11 Q   Jane Doe 1, I want to approach you with what's been marked

12 as Government's Exhibit 2, if I may, Your Honor.

13          THE COURT:  You may.

14 BY MR. COOK:

15 Q   Jane Doe 1, I'm going to ask you to take a look at

16 Government's Exhibit 2 there, and just flip it open.  There's

17 two pages; is that correct?

18 A   Yes.

19 Q   The second page is an image.  Is that an image of you?

20 A   Yes.

21 Q   You can go ahead and close that.

22          Now, was that image a picture from the gym session

23 at the Spectrum Gym we've been talking about?

24 A   Yes.

25 Q   And again, it does depict you?

JANE DOE 1 – DIRECT/COOK          105

1  A   Yes.

2  Q   Is that a picture that your father took?

3  A   Yes.

4  Q   I know you only glanced at it briefly, but we have gone

5  over this image --

6  A   Right.

7  Q   -- a couple times before, correct?

8        Okay.  What were you doing in that image?  Were you

9  getting ready to do a gymnastics move?

10  A   Yeah, I was getting ready to do a handstand.

11  Q   Who told you to do the handstands?

12  A   My dad.

13  Q   Does that picture accurately portray you at the photo

14  shoot in the gym you did?

15  A   Yes.

16  Q   I'm going to approach you again, if I may.

17        Jane Doe 1, at the bottom of the image, which is

18  page 2 of Government's Exhibit 2, you'll see that there's

19  noted there a date that starts with the year followed by the

20  month, followed by the number -- it says 2004.09.19.  Does

21  that time frame seem to be about right from when that gym

22  photo session took place?

23  A   Yes.

24  Q   There's a time noted in military time, 19:48.16, which

25  would be 7:48 p.m.  Does that sound about right for when you

JANE DOE 1 – DIRECT/COOK          106

1   were at Spectrum Gym and your father was taking pictures of

2   you there?

3   A   Yes.

4   Q   Thank you, Jane Doe 1.

5          MR. COOK:  Your Honor, at this time, I would offer

6   Government's Exhibit 2 into evidence.

7          THE COURT:  Any objection?

8          MS. COOK:  No.

9          THE COURT:  Exhibit 2 is admitted.

10         (Plaintiff's Exhibit 2 received in evidence.)

11  BY MR. COOK:

12  Q   With regard to the nude photo shoot at the gym, did your

13  father tell you anything about whether you could talk to your

14  mother about that photo shoot?

15  A   He told us not to.

16  Q   You testified earlier there were approximately five nude

17  photo shoots that your father did with you.  Was there another

18  photo shoot, Jane Doe 1, that involved pictures showing items

19  in the background of both the, I guess Nickelodeon character

20  SpongeBob?

21  A   Yes.

22  Q   Do you know about how old you were, just generally, when

23  those images were taken?

24  A   Around 12.

25  Q   Whose idea was the photo shoot with the SpongeBob items?

1  A   My dad's.

2  Q   Who suggested the scene?  Who suggested using the

3  SpongeBob items in the nude photo shoot?

4  A   My dad.

5  Q   Did he instruct you in any poses for that photo shoot?

6  A   Yes.

7  Q   Speaking generally, what did your father tell you to do

8  for that photo shoot?

9  A   He told me to pretend like I was sleeping, and wake up in

10  the nude, and I put on a bra and underwear, and then he had me

11  pose.  And then he said to go to the closet and pretend like I

12  was getting dressed.

13  Q   Do you know about what time of day, as best as you can

14  recall, that these pictures were taken?

15  A   Around noon or the middle of the day.

16  Q   Somewhere around noon, but had you gotten up already for

17  the day at that point?

18  A   Yes.

19  Q   So were you actually waking up from being asleep as the

20  pictures in that photo shoot suggested?

21  A   No, it was posed.

22  Q   Did you normally sleep in the nude at that point?

23  A   No.

24          MR. COOK:  I'd like to approach the witness, if I

25  may, Your Honor?

JANE DOE 1 – DIRECT/COOK          108

1        THE COURT:  You may.

2    BY MR. COOK:

3    Q    Jane Doe 1, I'm going to approach you with Government's

4    Exhibit 1.  It has a cover sheet followed by nine pages of

5    images.  I'm going to ask you to just briefly take a look at

6    them.

7    A    (Witness complied.)

8    Q    Are those all images from the –– I suppose just so we can

9    be on the same terms here, we'll call this the SpongeBob photo

10   shoot.  Are those all images from the SpongeBob photo shoot?

11   A    Yes.

12   Q    I'm going to open up to the first page.  I'm sorry to

13   stand next to this picture, but you'll note on the bottom the

14   date again.  It says 2004/09/06, indicating September 6th of

15   2004.  Does that seem like it may be, to your recollection,

16   around when this photo shoot was done?

17   A    Yes.

18   Q    Following that date, again in military time, this is

19   11:29:44, and this is on page 2 of Government's Exhibit 1,

20   indicating 11:24 [sic] in the morning; does that seem around

21   the time, to your recollection, that this photo shoot was

22   done?

23   A    Yes.

24   Q    These are the nine images that was in Government's Exhibit

25   1.  Does that depict you?  Are you the person depicted in that

JANE DOE 1 – DIRECT/COOK          109

1   picture?

2   A   Yes.

3   Q   Do these images accurately reflect the photo shoot that

4   your father conducted that day?

5   A   Yes.

6           MR. COOK:  At this point, Your Honor, I would offer

7   into evidence Government's Exhibit 1.

8           THE COURT:  Any objection?

9           MS. COOK:  No, Your Honor.

10           THE COURT:  Exhibit 1 is admitted.

11           (Plaintiff's Exhibit 1 received in evidence.)

12   BY MR. COOK:

13   Q   Jane Doe 1, we just showed you nine of -- nine images that

14   were from the SpongeBob photo shoot.  To your recollection,

15   did he take more pictures that day during that photo shoot?

16   A   Yes.

17   Q   I'm going to approach, if I may, Your Honor, with

18   Government's Exhibit 1B.

19           THE COURT:  1B?

20           MR. COOK:  1B.

21           THE COURT:  B as in Barker?

22           MR. COOK:  B as in Barker, yes.

23   BY MR. COOK:

24   Q   Jane Doe 1, I'm going to ask you to briefly open up

25   Government's Exhibit 1B and flip through -- excuse me just one

1   moment.  Government's Exhibit 1B has a cover page plus about

2   86 images behind that cover page.

3          Jane Doe 1, what does Government's Exhibit 1B have

4   in it?

5   A   It has my bed with SpongeBob blankets and me with my

6   SpongeBob blanket and SpongeBob bra and underwear.

7   Q   Does that -- do those appear to be at least many of the

8   images from the photo shoot revolving around the SpongeBob

9   items?

10  A   Yes.

11  Q   And it does accurately reflect that photo shoot?

12  A   Yes.

13  Q   It does depict you, right?

14  A   Yes.

15         MR. COOK:  At this point, I would offer into

16  evidence Government's Exhibit 1B.

17         MS. COOK:  It was cited in the defense pretrial

18  motion.

19         THE COURT:  All right.  Those objections are

20  overruled for the reasons cited by the Court previously.

21  Exhibit 1B is admitted pursuant to 404(b).

22         (Plaintiff's Exhibit 1B received in evidence.)

23  BY MR. COOK:

24  Q   Jane Doe 1, I want to ask you a couple of at least

25  relatively specific questions about the pictures that are in

JANE DOE 1 - DIRECT/COOK          111

1  Government's Exhibits 1 and 1B, the SpongeBob pictures.

2          Let's concentrate on Government's Exhibit 1 for a

3  minute.  That has the cover page, plus the nine images, okay?

4  Jane Doe 1, we've had an opportunity to talk before today,

5  correct?

6  A   Correct.

7  Q   You've seen those images before and talked through them

8  with me?

9  A   Yes.

10 Q   And Government's Exhibit 1, a number -- some of the images

11 show you -- you're nude in those images; is that correct?

12 A   Yes.

13 Q   In some of those images, you are holding a leg out to the

14 side, that's your recollection?

15 A   Yes.

16 Q   Who -- did you do that on your own or did your father

17 direct you to take that pose?

18 A   He directed me to.

19 Q   There's some images of you getting out of bed, opening

20 your legs as you do so.  Did your father direct you in those

21 poses or did you do that on your own?

22          MS. COOK:  Objection.

23          THE COURT:  Sustained.

24 BY MR. COOK:

25 Q   How did you end up in the poses in which your legs are

JANE DOE 1 – DIRECT/COOK          112

1  opening getting in and out of bed?

2  A   I'm sorry.

3  Q   How did the poses come about where you're getting out of

4  bed with your legs open that were in Government's Exhibit 1?

5  A   I had started to get out myself when he told me to stop or

6  move in a certain way.

7  Q   Where did these SpongeBob items that are depicted in

8  Government's Exhibits 1 and 1B, where did those items come

9  from?  Who got those for you?

10  A   The bra and underwear?

11  Q   Yes, the bra and underwear, the SpongeBob blanket, all of

12  that?

13  A   The blanket was already mine that I had on my bed, and the

14  bra and underwear, he might have bought for me or it might

15  have already been mine.  I'm not sure.

16  Q   So you're not sure.

17          If I could have a moment with co-counsel, please.

18          THE COURT:  Yes.

19              (Off-the-record discussion.)

20          MR. COOK:  I'm sorry, if I may proceed, Your Honor?

21          THE COURT:  You may.

22  BY MR. COOK:

23  Q   I had asked you the question, Jane Doe 1, whether anyone

24  else had taken nude pictures of you between the ages of 10 and

25  13.  To your recollection, has anyone other than your father

JANE DOE 1 – DIRECT/COOK          113

1   ever taken nude photographs of you?

2   A   No.

3           THE COURT:  I'm prepared to take an afternoon recess

4   so that we push through the normal break time, but I want to

5   ask counsel if you wish to have the Court make a 404(b)

6   instruction to the jury with respect to Exhibit 1B?

7           MS. COOK:  Yes, Your Honor.

8           THE COURT:  And should I do that now before you

9   cross-examine?

10          MS. COOK:  Yes.

11          THE COURT:  Ladies and gentlemen, the matter that I

12  just discussed in rather cryptic ways between defense counsel

13  and me has to do with the admissibility or the use of this

14  testimony and this exhibit that was just elicited from

15  Ms. Russell.

16          The charge against the defendant in Count 1

17  identifies specific images.  How many, eight are there?

18          MR. COOK:  In Government's Exhibit 1, there were

19  nine images that were the substance of Count 1.  Government's

20  Exhibit 1B had 86 images.

21          THE COURT:  Okay, I'm just talking about what's

22  charged.  Nine images are charged in Count 1.  So when you

23  finally receive the case and deliberate, you'll have to decide

24  whether, with respect to those nine images, there was a

25  violation of law that occurred.

JANE DOE 1 - DIRECT/COOK          114

1          The Court has permitted additional images to be

2     admitted into evidence of which these nine are part of the

3     series.  The reason that the Court determined that the others

4     are admissible is to the extent that they may tend to prove,

5     and you'll have to decide whether they do, such things as the

6     defendant's opportunity to create the images that he's charged

7     with, if he did -- this is all alleged, you have to decide --

8     his intent or his preparation, his plan or his knowledge,

9     absence of mistake or accident.

10         So the Court permitted those exhibits to come in for

11    those additional purposes, to help you understand better the

12    surrounding circumstances of the alleged offense.  You may

13    consider these additional items of evidence only for these

14    limited purposes.  All right?

15         Now, let's take a 15-minute recess, and then we'll

16    come back and we'll go till, oh, 5:15 or so, when it seems

17    like a natural place to break in the action.

18         During this time in recess, as at all times when

19    you're away from the court, remember and follow my admonitions

20    to you.  You may rise and depart.

21                        (Jury excused)

22                        (Recess taken.)

23                  (Open court, jury present)

24         THE COURT:  You may be seated.

25         You may cross-examine, Ms. Cook.

1      MS. COOK:  Thank you, Your Honor.

2                **CROSS EXAMINATION**

3   BY MS. COOK:

4   Q   Jane Doe 1, as I understand your testimony, your parents

5   were divorced when you were still quite young?

6   A   Right.

7   Q   And you don't have any recollection of living in the home

8   with your father on a full-time basis?

9   A   Yeah, I do.

10  Q   Primarily your recollection is of visiting him on

11  weekends?

12  A   When I -- when they were together?

13  Q   I guess what I'm asking you is if the majority of the time

14  that you've spent with your father during your life has been

15  visitation on weekends?

16  A   On weekends, and during the summer we visited every other

17  week or every other -- it was different.  It's always been

18  different.

19  Q   You had longer periods of visitation in the summer months?

20  A   Right.

21  Q   And took vacations with him?

22  A   Yes.

23  Q   And your sister and brother?

24  A   Yes.

25  Q   And would it be fair to say that during those years when

*JANE DOE 1 - CROSS/COOK*          116

1   you were visiting with him, you had a good relationship with

2   him?

3   A   Yes.

4   Q   You felt close to him?

5   A   Yes.

6   Q   And your recollection was that your father was always

7   taking photographs of the family?

8   A   Not always, but if the -- like if we went somewhere

9   exciting.

10  Q   Do you recall that he sometimes worked at jobs that

11  involved photography?

12  A   Yes.

13  Q   And that he would take photographs of you and your sister

14  and your brother?

15  A   Yes.

16  Q   Was that something that you understood he enjoyed doing?

17  A   Yes.

18  Q   And that was true during the entire time that you were

19  growing up?

20  A   Yes.

21  Q   Now, I want to talk to you a little bit about the modeling

22  website that you testified about.  There came a time when you

23  and your father discussed establishing a modeling website for

24  you?

25  A   Yes.

*JANE DOE 1 – CROSS/COOK*          117

1   Q   And at the time when you and he talked about that, he

2   already had modeling websites for some other people.

3           THE COURT:   Is that a question?

4           MS. COOK:   Yes.

5   A   I don't know.

6   Q   Did he ever talk to you about modeling websites which he

7   had already established for other people?

8   A   No.

9   Q   Did you ever see any of those modeling websites?

10  A   I never knew, so no.  I saw other ones that were on the

11  Internet after he had already asked me.  I don't know if he

12  controlled those or not.

13  Q   Did you see those other modeling websites on the Internet

14  because your father showed them to you?

15  A   Yes.

16  Q   Were they examples of other young people around your same

17  age?

18  A   Yes.

19  Q   Were they similar websites to the one that was established

20  for you?

21  A   Most of them, they were nude.

22  Q   All right.  Now, when you and he discussed establishing a

23  website for you, it was your understanding that a name other

24  than your real name would be selected for the website?

25  A   Yes.

*JANE DOE 1 – CROSS/COOK*          118

1    Q    And was it your understanding that your father thought it

2    wasn't a good idea to have your real name on the Internet?

3    A    Yes.

4    Q    When you talked with your father about the purpose of the

5    website, did he tell you that he hoped that you might get a

6    modeling job as a result of that?

7    A    No.

8    Q    Did he tell you that one of the reasons for establishing

9    the website was to try to attract some income from the website

10   from businesses that might be looking for young models?

11   A    He didn't tell me that directly at first.

12   Q    Did he tell you that at some point in time?

13   A    He said that we would get money for it.

14   Q    All right.  And during the period of time this modeling

15   website was on the Internet, there were occasions where money

16   did come in as a result of that website?

17   A    Yes.

18   Q    And on those occasions, he gave you money?

19   A    Yes.

20   Q    Or put money into an account for you?

21   A    I don't know about that.

22   Q    Did he tell you that that was one of his plans?

23            MR. COOK:  Objection, calls for hearsay, Your Honor.

24            THE COURT:  Sustained.

25   BY MS. COOK:

*JANE DOE 1 — CROSS/COOK*          119

1  Q    You had an opportunity to look at the modeling photographs

2  that were taken of you?

3  A    Yes.

4  Q    And when you looked at those modeling photographs, at the

5  time you looked at them, you thought that they looked much

6  like modeling shots that you might have seen in teen

7  magazines?

8          MR. COOK:  Objection, Your Honor.  There's no

9  foundation that she's seen such teen magazines.

10         THE COURT:  Sustained, lack of foundation.

11  BY MS. COOK:

12  Q    Have you ever looked at teen magazines?

13  A    Yes.

14  Q    When you looked at those teen magazines, did you see

15  photographs?

16         THE COURT:  You have to put it in time, Counsel,

17  when she would have looked at those, vis a vis when hers were

18  produced.

19  BY MS. COOK:

20  Q    At or around the time that your father was taking

21  photographs of you for your modeling website, did you have

22  occasion to look at teen magazines?

23  A    Yeah.

24  Q    And did some of those teen magazines contain photographs

25  of young persons who were modeling?

*JANE DOE 1 - CROSS/COOK*          120

1   A   Yes.

2   Q   Did you believe that the photographs that were taken of

3   you were similar to those modeling photographs?

4   A   I don't remember how -- I don't remember what I thought

5   when I was looking at them.  That didn't come up in my mind.

6   Q   All right.  When you said that in taking these modeling

7   photographs, your father would ask you to pose --

8   A   Yes.

9   Q   -- do you mean that he took you to a particular location

10  and took photographs of you for the modeling website?

11  A   Yes.

12  Q   And that he might ask you to stand in a particular way

13  when he took the photographs?

14  A   Yes.

15  Q   Did you believe that the positions in which he was asking

16  you to stand at that time were similar to photographs of

17  models that you may have seen?

18          MR. COOK:  Objection.

19          THE COURT:  Objection sustained.

20          MR. COOK:  Thank you.

21  BY MS. COOK:

22  Q   At the time you were participating in these modeling

23  photographs, you didn't think that there was anything wrong

24  with the modeling that you were doing, did you?

25  A   When?

*JANE DOE 1 – CROSS/COOK*          121

1   Q   When you were having the photographs taken for the

2   modeling website.

3              MR. COOK:  I'm going to object as to relevance, Your

4   Honor?

5              THE COURT:  Sustained.

6   A   I did think --

7              THE COURT:  Hold on.  I sustained the objection.

8   You wouldn't know that that means you don't have to answer.

9   BY MS. COOK:

10  Q   All right.  Did you have occasion to look at your own

11  modeling website?

12  A   Yes.

13  Q   And when you looked at your own modeling website --

14             THE COURT:  Is this back at the time it was being

15  created?

16             MS. COOK:  Yes.

17             THE COURT:  Okay, go ahead.

18  BY MS. COOK:

19  Q   And when you looked at your modeling website at that time,

20  you saw photographs of yourself posted?

21  A   Yes.

22  Q   None of those photographs depicted you in the nude, did

23  they?

24  A   Not the ones that you could view.  I don't know how to get

25  to the nude ones.

*JANE DOE 1 – CROSS/COOK*          122

1  Q   None of the ones that you saw depicted you in the nude,

2  did they?

3  A   No.

4  Q   Now, you testified that at some point, there was a

5  discussion with your father about taking nude photographs?

6  A   Yes.

7  Q   Am I correct that that took place sometime after the

8  modeling website was first established?

9  A   That it first started?

10 Q   I'm sorry?

11 A   You asked -- can you ask it again, please?

12 Q   Yes, I'm sorry.  It was a confusing question.

13         When the nude photographs of you were taken, were

14 those photographs taken after your modeling website had been

15 established?

16 A   Yes.

17 Q   And you testified that during some of these times when

18 nude photographs were taken, that your father would ask you to

19 pose; is that correct?

20 A   During the photo shoots?

21 Q   Yes.

22 A   Yes.

23 Q   Were these generally photo shoots with many photographs

24 taken in a series?

25 A   Yes.

1   Q    And, for example, Government's Exhibit 1 contains nine

2   photographs; is that your recollection?

3   A    Yes.

4   Q    And Government's Exhibit 1B contains 86 photographs?

5   A    Yes.

6   Q    Were the photographs that were taken that you saw, which

7   are now contained in Government's Exhibit 1, a part of a

8   larger photo shoot included in Government's Exhibit 1B?

9   A    Are there more pictures; is that what you're asking?

10  Q    I'm asking whether those nine photographs were actually

11  part of the series that included the 86 photographs?

12  A    Yes.

13  Q    And those photographs depict you with some items with a

14  SpongeBob theme?

15  A    Yes.

16  Q    Were those photographs taken in your bedroom?

17  A    Yes.

18  Q    And that would be the bedroom that you shared with your

19  sister?

20  A    Yes.

21  Q    In your father's home?

22  A    Yes.

23  Q    Were the SpongeBob sheets or blanket, were they already in

24  the bedroom?

25  A    Yes.

*JANE DOE 1 – CROSS/COOK*          124

1  Q   Was there a time when you asked to have –– to receive

2  SpongeBob-themed items for Christmas?

3  A   Yes, I asked for a blanket.

4  Q   And around that period of time, did you have a number of

5  different items with that same theme?

6  A   Yes.

7  Q   You indicated that when your father took those photographs

8  having to do with the SpongeBob theme, that he asked you to

9  pose?

10 A   Yes.

11 Q   When he was taking these photographs of you, he didn't ask

12 you to act sexy, did he?

13 A   I don't remember.

14 Q   He didn't ask you to touch yourself in any kind of a

15 sexual way, did he?

16 A   No.

17 Q   And he didn't ask you to simulate or mimic any kind of

18 sexual activity?

19 A   No.

20 Q   With respect to the photographs that were taken in the

21 gym, was this a gym that you and your sister had visited

22 before?

23 A   Yes.

24 Q   Was this a gym where you and your sister had been engaged

25 in gymnastics?

1  A   Yes.

2  Q   Were you on some kind of a gymnastics team that practiced

3  there?

4  A   Yes.

5  Q   Was your father employed at the gym?

6  A   Yes.

7  Q   And so it would have not been unusual for you to go to the

8  gym with him?

9  A   It was after hours, so yeah.

10  Q   During regular hours, was it common for you to be at the

11  gym with your father?

12  A   If -- yeah, I would.

13  Q   Was he one of the people who instructed either you or your

14  sister or both of you in gymnastics?

15  A   I don't remember who my sister's coach was, but he wasn't

16  my main coach, but he still coached me, like helped me out and

17  stuff.

18  Q   All right.  And on this particular occasion when you went

19  to the gym, as I understand it, there was a discussion between

20  you and your father about whether or not you would take your

21  clothes off and engage in gymnastics?

22  A   Was there a discussion?

23  Q   Yes.

24  A   Yes.

25  Q   And during the period of time that you were in the gym,

1  you did engage in some kind of gymnastics maneuvers?

2  A   Yes.

3  Q   Was your father taking photographs pretty continuously

4  while you were in the gym?

5  A   Yes.

6  Q   Of both you and your sister?

7  A   Yes.

8  Q   And when you said that he asked you to pose, I recall that

9  Mr. Cook asked you on one occasion whether he asked you –– did

10 he ask you to do some kind of a handstand or something?

11 A   Yes.

12 Q   And is that what you meant when you said that he asked you

13 to pose?

14 A   Can you ask again?

15 Q   Yes.  You indicated on your direct examination that at one

16 point in time while you were in the gym, your father asked you

17 to do a handstand?

18 A   Yeah.

19 Q   Is that what you meant when you said he asked you to pose

20 in various ways?

21 A   Yeah, I mean there were other times.

22 Q   All right, but that's an example of what you meant by

23 asking you to pose?

24 A   Yeah.

25 Q   And with respect to the manner in which he asked you to

*JANE DOE 1 – CROSS/COOK*          127

1  pose, again in the gym, he didn't ask you to act sexy?

2  A    No.

3         MR. COOK:  I'm going to object.  That calls for

4  hearsay.

5         THE COURT:  Sustained.

6  BY MS. COOK:

7  Q    Did he also ask you when you were in the gym to perform

8  other kinds of gymnastics --

9  A    Yes.

10  Q    -- that you would have been in the habit of doing while

11  you were clothed at other times in the gym?

12  A    Yes.

13  Q    And other than you and your sister and your father, there

14  was no one else in the gym at the time?

15  A    Yes.

16  Q    Yes, meaning there was no one else there?

17  A    Right, there was no one else.

18  Q    Okay.

19         MS. COOK:  I have no further questions.

20         THE COURT:  Redirect?

21         MR. COOK:  May I have just a moment, Your Honor?

22         THE COURT:  Okay.

23                 **REDIRECT EXAMINATION**

24         MR. COOK:  I have just a couple of questions if I

25  may, Your Honor.

1          THE COURT:  You may.

2    BY MR. COOK:

3    Q    How are you doing up there?  You've been up there a while.

4    A    I'm fine.

5    Q    Miss Cook talked to you about the fact that your father

6    took frequent photographs of you; that is correct, right?

7    A    Right.

8    Q    The images that you were shown from Government's Exhibit 1

9    and 1B, which were the SpongeBob picture, and the gym

10   pictures, those were specific photo shoots; is that correct?

11         MS. COOK:  Objection, leading.

12         THE COURT:  Sustained.

13   BY MR. COOK:

14   Q    Were those photos -- how were those photos produced?  How

15   did those photos come to be taken?

16   A    He decided that we were going to take them.  He thought

17   them up himself.

18   Q    He decided that you were going to take them?

19   A    Yeah.

20         MR. COOK:  I think that's all I have, Your Honor.

21         THE COURT:  Recross?

22         MS. COOK:  No, Your Honor.  Thank you.

23         THE COURT:  Jane Doe 1, thank you very much.  You

24   may step down from the witness stand.  Take that microphone

25   with you, and you can give it to Miss Schneeman over here on

1   your way out.

2              Or you can give it to Mr. Cook.

3              MR. COOK:  I thought I'd intercept it.

4              THE COURT:  That's a long enough day for us today.

5   So we'll wrap it up for today and start tomorrow at 9:30.

6   We'll be ready for you before that.  We'll try to have the

7   coffee going up there.  So if you'll get here a little before

8   you're supposed to be down here, so aim for 9:15 or so, we

9   won't worry about you and you'll be here on time.

10             Some of you are coming from a bit of a distance.  I

11  know that.  And the traffic patterns are anything but

12  predictable.  So give yourselves plenty of time so you're not

13  having to be breathless when you get here and also assuming

14  too many risks in getting here, but we can't start without

15  you.

16             If something comes up so that you are delayed, you

17  get a flat tire or something like that, use your cell phone

18  and call us here at the courthouse so we know what's up,

19  because we'll start looking for you if you're not here and we

20  haven't heard from you.  We can't, as I've said, start without

21  you.

22             Tonight, while you're in recess from this trial,

23  remember and follow my admonitions to you.  You're not to talk

24  about the case among yourselves or allow anyone to talk to you

25  about it.  Don't form any opinions or conclusions with respect

1    to any of these matters until the case is finally submitted to

2    you for your deliberations.

3            Don't read anything, view anything, listen to

4    anything.  This includes everything electronic that I read to

5    you earlier in my list; but basically the object is that you

6    have to be able to decide this case based on what happens here

7    in this courtroom, within these walls, without any other

8    extraneous or outside influences.  So if you'll follow that,

9    we'll be in good stead.

10            Remember, tonight you can use the same techniques

11   that I suggested for you to use at noon, and that is to hold

12   off any innocent, interested inquiries by people who are close

13   to you and say "Man, I can't talk about it.  That's what Judge

14   Barker said."  And then you can tell them that you'll talk to

15   them about it later.  That was the promise you've made, and we

16   know you understand the importance of it because that's one of

17   the reasons that you were selected to serve because you gave

18   us every reason to believe that.

19            So we'll call it a day.  Thank you very much.  We'll

20   look forward to seeing you in the morning.  You may rise and

21   depart.

22                        (Jury excused)

23       THE COURT:  The jury's departed.  I want to put on

24   the record the fact of the view of Exhibits 1, 1B and 2 by the

25   jury in the jury room, as was approved by the lawyers during

1   the recess, so that they could review those exhibits without

2   having the witness who is depicted there be present for that

3   particular otherwise awkward time.

4           At my direction, Miss Schneeman took them up to the

5   jury room and instructed the jury not to discuss them, just

6   review them, and when they're completed, to hand them back to

7   her.  Is that what happened?

8           THE CLERK:  It is.

9           THE COURT:  So we have them back here now for your

10  use in the trial.

11          We'll start up, as I said, at 9:30.  Do you expect

12  to call these remaining five witnesses, Government?

13          MS. HELART:  We'll start off with Jane Doe 2 in the

14  morning; we will go to Andy.  We will then finish with Mike

15  Johnson.  We do not anticipate calling Jeff Catt.

16          THE COURT:  How about Mr. Rothrock?

17          MS. HELART:  He's more of a rebuttal witness.

18          THE COURT:  So we should be through those by noon.

19  So whatever evidence the defense is going to put on, if any,

20  should be right ready to go.

21          I'll have a set of instructions for you in the

22  morning to review.  I know that doesn't give you as much time

23  as if you had them tonight, but I need to sort of see how

24  things are going to unfold before I can give you a dependable

25  set, but we'll have some for you early in the morning.

132

1           Anything else tonight?

2                   (Off-the-record discussion.)

3           Goodnight all.

4                   (Court adjourned at 5:23 p.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CERTIFICATE OF COURT REPORTER


        I, Laura Howie-Walters, hereby certify that the foregoing is a true and correct transcript from reported proceedings in the above-entitled matter.



/S/LAURA HOWIE-WALTERS   September 9th, 2010

LAURA HOWIE-WALTERS, RPR/CSR
Official Court Reporter
Southern District of Indiana
Indianapolis Division