REDACTED TRANSCRIPT

1                    UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF INDIANA
2                        INDIANAPOLIS DIVISION

3

4    UNITED STATES OF AMERICA,        )
                                      )
5               Plaintiff,            ) CAUSE NO.:
                                      ) 1:08-CR-004-SEB/KPF
6                                     ) Indianapolis, Indiana
           -v-                        ) **March 2nd, 2010**
7                                     ) 9:30 a.m.
     DALE RUSSELL,                    ) V O L U M E   I I
8                                     )
                Defendant.            )
9

10

11                    **Before the Honorable**
                    **SARAH EVANS BARKER, JUDGE**
12

13              OFFICIAL REPORTER'S TRANSCRIPT OF
                           JURY TRIAL
14

15

16

17

18

19

20   Court Reporter:      Laura Howie-Walters, CSR, RPR
                          Official Court Reporter
21                        United States District Court
                          46 E. Ohio Street
22                        Room 217
                          Indianapolis, Indiana  46204
23

24

25            PROCEEDINGS TAKEN BY MACHINE SHORTHAND
     TRANSCRIPT PRODUCED BY ECLIPSE NT COMPUTER-AIDED TRANSCRIPTION

REDACTED TRANSCRIPT          133

## **A P P E A R A N C E S**

**For Plaintiff:**          Gayle Helart, Esq.
                           A. Brant Cook, Esq.
                           Assistant U.S. Attorney
                           United States Attorney's Office
                           10 West Market Street
                           Suite 2100
                           Indianapolis, IN  46204


**For Defendant:**         James C. McKinley, Esq.
                           Indiana Federal Community Defenders
                           111 Monument Circle
                           Suite 752
                           Indianapolis, Indiana  46204-3048

                                  and

                           Jessie A. Cook, Esq.
                           LAW OFFICE OF JESSIE A. COOK
                           400 Wabash Avenue, Suite 212
                           Terre Haute, IN  47807

REDACTED TRANSCRIPT          134

1                        **I N D E X**

2

3    PLAINTIFF'S WITNESSES                          PAGE

4    JANE DOE 2

5    Direct Examination by Ms. Helart .............138
     Cross-examination by Ms. Cook ................174
6    Redirect examination by Ms. Helart ...........187
     Recross-examination by Ms. Cook ..............189

7

8    PHILLIP ANDREW BYERS

9    Direct Examination by Ms. Helart .............191
     Cross-examination by Mr. McKinley ............202

10

11   MICHAEL JOHNSON

12   Direct Examination by Mr. Cook ...............217
     Cross-examination by Mr. McKinley ............237

13

14

15   DEFENDANT'S WITNESS

16

17   DALE RUSSELL

18   Direct Examination by Mr. McKinley ...........243
     Cross-examination by Mr. Cook ................328

19

20

21

22

23

24

25

1          **I N D E X (Cont.)**

2

3     <u>PLAINTIFF'S EXHIBITS</u>          <u>PAGE</u>

4

5     10  .......................145

6     13  .......................149

7     14  .......................150

8     3  .......................165

9     4  .......................165

10    15  .......................168

11    10A  .......................201

12    16  .......................201

13    1A  .......................227

14    2A  .......................230

15    3A  .......................230

16    4A  .......................230

17    7  .......................236

18

      **<u>DEFENDANT'S EXHIBITS</u>**

19

20    G .......................284

21

22

23

24

25

REDACTED TRANSCRIPT          136

1              (Open court, jury present)

2         THE COURT:  Good morning.  Good to see you.  You may

3    be seated.

4         Where's our defendant?  Did we forget?

5              (Off-the-record discussion.)

6         THE COURT:  We'll get him here in one second.  So

7    just stand by.  I'll say while we're waiting his arrival,

8    something that doesn't matter at all to the case except that

9    I'm glad to see you.  And I'll tell you that on the second day

10   of trials, I breathe a big sigh of relief when you all get

11   here because now I know you found the groove, and you can get

12   here and get your car parked and get upstairs and be ready to

13   go.  So thank you for letting me breathe easy today.

14        It's toasty in here, isn't it?  Do you get cold air

15   off that window over there?

16        A JUROR:  Not at the moment.

17        THE COURT:  You haven't noticed that?

18        A JUROR:  A little bit.

19        THE COURT:  Okay.

20        Morning, Counsel.

21        MR. COOK:  Morning.

22        It's a meditational moment, ladies and gentlemen.

23   Go inside yourselves.  Maybe you might fall asleep.  Don't do

24   that.

25        Pretend that you're at the airport waiting to make

REDACTED TRANSCRIPT          137

1  your flight that you made a reservation on, and you were there

2  right on time ready to go but the plane wasn't quite ready.

3  So just go into that little waiting mode.

4                          (Pause.)

5          Okay, let's do this.  Ladies and gentlemen, without

6  talking, would you stand and come with me?  I'm going to give

7  a walk-through tour of chambers, but you can't talk while

8  you're out there.  Just -- we'll do that while we're waiting

9  instead of sitting here.  So would you rise and I'll lead you

10 out.

11                      (Jury excused)

12                      (Recess taken.)

13                  (Open court, jury present)

14         THE COURT:  You may be seated.  Well, good morning,

15 all.

16         I think we're ready to go now.

17         Mr. McKinley?

18         MR. McKINLEY:  Your Honor, for the record, I would

19 offer my profoundest apologies to the Court and the jury for

20 the delay.  I accept full responsibility.  It was a

21 miscommunication on the timing, and I bear the blame.  And all

22 I can tell you is I'm very sorry.

23         THE COURT:  You're always the gentleman,

24 Mr. McKinley.  So thank you for saying that.  I think we're

25 ready to go now, and the delay didn't hurt any of us.  We

REDACTED TRANSCRIPT          138

1   filled the time all right, didn't we, ladies and gentlemen?

2           So good morning to you, Miss Helart.

3           MS. HELART:  Good morning, Your Honor.

4           THE COURT:  Would you officially call your witness

5   and we'll have her sworn, please.

6           MS. HELART:  Jane Doe 2.

7           THE COURT:  Good morning, Jane Doe 2.  Would you

8   stand, please.  Raise your right hand over this way, and the

9   Clerk will swear you.

10          **JANE DOE 2, PLAINTIFF'S WITNESS, SWORN**

11                    **DIRECT EXAMINATION**

12          THE COURT:  You may be seated.

13  BY MS. HELART:

14  Q   Good morning, Jane Doe 2.  Can you please spell your name.

15  A   A-R-I-E-L-L-E.

16  Q   That was actually a test question to see if everybody can

17  hear you okay.  You need to talk loud enough so that the last

18  gentleman in the jury box can hear you this morning.

19          Can you tell us your birthday?

20  A   May 19th.

21  Q   What year?

22  A   1994.

23  Q   How old are you right now?

24  A   15.

25  Q   This May, you'll turn 16 years old?

1   A    Yes.

2   Q    What grade are you in right now?

3   A    Sophomore.

4   Q    Is that tenth grade?

5   A    Yes.

6   Q    What kinds of activities are you involved in at school?

7   A    I'm not involved in any.

8   Q    Do you like going to classes?

9   A    Yeah.

10  Q    What city do you live in?

11  A    Greenfield.

12  Q    And who do you live in Greenfield with?

13  A    My mom.

14  Q    And who else?

15  A    My sister.

16  Q    Is that an older sister?

17  A    Yes.

18  Q    Do you happen to have an older brother?

19  A    Yes.

20  Q    Where does he live?

21  A    He lives by us, but he doesn't live with us.

22  Q    Is he old enough to be out of the house now?

23  A    Yeah.

24  Q    Where does he work?

25  A    Bob Evans.

JANE DOE 2 - DIRECT/HELART          140

1  Q   What is your older brother and sister's names?

2  A   My older brother's name is Aaron, and my sister's name is

3  Jane Doe 1.

4  Q   What's your mom's name?

5  A   Dawn.

6  Q   And who is your dad?

7  A   Dale.

8  Q   Do you see your dad here in the courtroom today?

9  A   Yes.

10 Q   Can you please point to him and tell us what he's wearing

11 today?

12 A   He's wearing a black suit and a blue tie.

13 Q   Let the record reflect that he's wearing a black suit --

14 and do you mean a blue shirt?

15 A   Yeah.

16 Q   -- and that you've pointed the direction of your father.

17        Are your mom and dad married?

18 A   No.

19 Q   Did they used to be married?

20 A   Yes.

21 Q   Were you young when they got divorced?

22 A   Yes.

23 Q   Do you know about how young you were?

24 A   I was one.

25 Q   The last time that you have seen your father, where did he

JANE DOE 2 – DIRECT/HELART        141

1   live?

2   A   Carmel.

3   Q   In a house?

4   A   Yes.

5   Q   Did you visit him at that house?

6   A   Yes.

7   Q   Does the street Marana Drive sound familiar?

8   A   Yes.

9   Q   Where did he live before he lived on Marana Drive in

10  Carmel?

11  A   Braeburn Village.

12  Q   What city is Braeburn Village in?

13  A   Indianapolis.

14  Q   And does Braeburn Village refer to a house or an

15  apartment?

16  A   Apartment.

17  Q   Why do you know that your dad lived in Braeburn Village

18  before he lived in Carmel?

19  A   Because I visited him there.

20  Q   You lived with him there?

21  A   I visited him there.

22  Q   You visited him there.

23          And did you and your mom and sister and brother have

24  any connection to the Braeburn Apartments for a while?

25  A   Yes, we lived there.

JANE DOE 2 - DIRECT/HELART          142

1  Q    Did you live there at least a little bit of time while

2  your dad lived there, too?

3  A    Yes.

4  Q    During the time that you and your mom and sister and

5  brother lived in one apartment and your dad lived in another

6  apartment, was it close enough to be walking distance?

7  A    Yes.

8  Q    Do you remember how often you visited him when you lived

9  at the Braeburn Apartments?

10  A    I think it was every other week.

11  Q    When he moved to Carmel, and your family moved to

12  Greenfield, how often did your visits with him usually happen?

13  A    I don't think they were as often.

14  Q    During the summers, do you remember visiting him a little

15  bit more or a little bit less?

16  A    A little bit more.

17  Q    Is your father married now?

18  A    Yes.

19  Q    Who's the woman he's married to now?

20  A    Betsy.

21  Q    Does Betsy have any children?

22  A    Have any what?

23  Q    Does Betsy have any children?

24  A    Yes, she has a daughter.

25  Q    Is that daughter older or younger than you?

JANE DOE 2 - DIRECT/HELART          143

1  A   Older.

2  Q   What have been the jobs that you've known that your dad

3  has had?

4  A   He worked at Master Lab and at Spectrum Gym.

5  Q   What did your dad do at Master Lab?

6  A   Took pictures.

7  Q   What did your dad do at Spectrum Gym?

8  A   He was a gymnast coach.

9  Q   Were you involved in gymnastics at Spectrum Gym?

10 A   Yes.

11 Q   Were you on a team?

12 A   Yes.

13 Q   Was your sister involved in gymnastics at Spectrum?

14 A   Yes.

15 Q   Was she on a team?

16 A   Yes.

17 Q   Were the two of you on a different team or same team?

18 A   Different.

19 Q   Did your dad coach you?

20 A   Yeah, sometimes.

21 Q   And then did somebody else coach you, too?

22 A   Yeah.

23 Q   Was your dad your main coach or just one of your coaches?

24 A   My main.

25 Q   How much time do you remember spending at Spectrum Gym to

JANE DOE 2 – DIRECT/HELART        144

1   go practice gymnastics?

2   A   Usually whenever we visited.  Not every time, but

3   sometimes when I visited him.

4           THE COURT:  Can you keep your voice up a little bit.

5           THE WITNESS:  Yeah, sorry.

6           THE COURT:  That's okay.  You're doing all right.

7   Q   Shout.  Pretend you're shouting.

8           When you went to Spectrum Gym, did you only go there

9   when you were visiting your dad or sometimes did your mom take

10  you to Spectrum?

11  A   Just my dad.

12  Q   So your only opportunities to go there were with your dad

13  and never your mom?

14  A   Yes.

15  Q   Do you remember what city Spectrum Gym was in?

16  A   Carmel.

17  Q   I'd like to focus now on things that occurred with your

18  dad when you visited him and things that you all did together.

19  What kinds of things did you and your dad and sister and

20  brother do when you visited him?

21  A   We just hung out and watched movies and played games.

22  Q   What else?

23  A   He took pictures of me and my sister.

24  Q   Did your dad take pictures of your brother in the same way

25  he took pictures of you and your sister?

JANE DOE 2 – DIRECT/HELART        145

1  A    No.

2  Q    Did your dad own a camera?

3  A    Yes.

4  Q    I'd like to show you Exhibit 10.  Do you recognize

5  Exhibit 10?

6  A    Yes.

7  Q    What is it?

8  A    A camera.

9  Q    Why do you recognize it?

10  A    Because it was my dad's.

11  Q    And why else do you recognize it?

12  A    Because he used it to take pictures of us.

13  Q    Did he use that camera to take pictures of you?

14  A    Yeah.

15         MS. HELART:  We'd ask that Exhibit 10 be admitted.

16         THE COURT:  Any objection?

17         MS. COOK:  No objection.

18         THE COURT:  Exhibit 10 is admitted.

19      (Government's Exhibit 10 received in evidence.)

20  BY MS. HELART:

21  Q    How often, Jane Doe 2, during your visits with him, did he

22  take pictures of you or your sister of any kind?

23  A    Every day usually.

24  Q    Were you in public settings or outdoors sometimes with

25  other people when he took your pictures?

1  A   Yes.

2  Q   When you were outdoors or in settings with other people,

3  what kind of pictures would your dad take?

4  A   Pictures with our clothes on.

5  Q   Were you ever indoors when your dad take your picture?

6  A   Yes.

7  Q   Sometimes were you by yourself and your dad, just the two

8  of you, when he took your picture?

9  A   Yes.

10 Q   I'm talking indoor settings now.  Is that a "yes" still?

11 A   Yes.

12 Q   Okay.  Sometimes when you were in indoor settings, was

13 your sister, Jane Doe 1, also there when your dad took

14 pictures of you?

15 A   Yes.

16 Q   What are examples of the kinds of pictures your dad took

17 of you when you were in indoor settings?

18 A   Pictures with our clothes off.

19 Q   What rooms would you be in when you had your clothes off?

20 A   The bedroom.

21 Q   Any other rooms that you remember?

22 A   The bathroom.

23 Q   Can you remember being in indoor settings where sometimes

24 you had some of your clothes off, but not all?

25 A   Yes.

JANE DOE 2 - DIRECT/HELART          147

1  Q   What are examples of the kinds of clothes you would wear

2  if some of your clothes were on, but not all of them were off?

3  A   Bra and panties.

4  Q   Was this clothing, like bra and panties, things that you

5  had already in your wardrobe?

6  A   No, he had given them to me.

7  Q   Were they clothing items that you would typically wear

8  being your age or were they for older people?

9  A   I wouldn't wear them.

10  Q   Say that again.

11  A   I wouldn't wear them.

12  Q   Was it ever the kind of clothing, like bra and panties,

13  that you would bring from your house where you lived with your

14  mom?

15  A   No.

16  Q   Did you ever take this clothing home -- when you went home

17  to live with your mom, did you take it home with you?

18  A   No.

19  Q   Why didn't you take those kind of clothes home like the

20  bra and pantie-type clothing home?

21  A   Because they weren't appropriate and I didn't wear them.

22  Q   Besides bra and pantie-type clothing, what other kinds of

23  descriptions of clothing would you wear in indoor settings?

24  A   I don't really know.  That was usually it.

25          THE COURT:  Could you say that again?  I missed it.

1          THE WITNESS:  That was usually it.

2          THE COURT:  That was it?

3    BY MS. HELART:

4    Q    Are you familiar with the phrase "thong" underwear?

5    A    Yes.

6    Q    What is that?

7    A    It goes up your butt.

8    Q    It's a very small piece of material in the backside?

9    A    Yes.

10   Q    And is that something familiar to you as something you

11   ever wore?

12   A    Yes.

13   Q    Explain that.

14   A    There are sets with thongs and bras.

15   Q    Was that one type of underwear your father would give to

16   you?

17   A    Yes.

18   Q    Where did you keep all of the bra and pantie or thong

19   underwear?

20   A    At my dad's.

21   Q    Did your dad take pictures in indoor settings of you in

22   Carmel?

23   A    Yes.

24   Q    Did he take pictures of you in indoor settings at

25   Braeburn?

JANE DOE 2 – DIRECT/HELART          149

1   A    Yes.

2   Q    Did your dad own a computer?

3   A    Yes.

4   Q    I'd like to show you Exhibits 13 and 14.  First,

5   Exhibit 13, do you recognize that?

6   A    Yes.

7   Q    What is it?

8   A    Betsy's computer.

9   Q    I'm sorry?

10  A    Betsy's computer.

11  Q    You're saying Betsy's computer, that was a place that

12  Betsy usually worked in the house?

13  A    Yes.

14  Q    Which house does picture 13 belong to?

15  A    Carmel.

16          MS. HELART:  Ask that Exhibit 13 be admitted?

17          THE COURT:  Any objection?

18          MS. COOK:  No objection, your Honor.

19          THE COURT:  Exhibit 13 is admitted.

20        (Government's Exhibit 13 received in evidence.)

21  BY MS. HELART:

22  Q    And I'd like to show you Exhibit 14.  Do you recognize

23  Exhibit 14?

24  A    Yes.

25  Q    What is that?

JANE DOE 2 – DIRECT/HELART        150

1  A   My dad's computer.

2  Q   And why do you recognize that as your dad's computer

3  station?

4  A   Because he worked there.

5  Q   Okay.  Do we see the computer tower in that picture of

6  Exhibit 14?

7  A   No.

8  Q   But did it –– was it part of that and just not part of the

9  picture?

10  A   Yeah.

11        MS. HELART:  We'd ask that Exhibit 14 be admitted.

12        THE COURT:  Any objection?

13        MS. COOK:  No, Your Honor.

14        THE COURT:  14 is admitted.

15      (Government's Exhibit 14 received in evidence.)

16  BY MS. HELART:

17  Q   And Jane Doe 2, just so now the jury can see it, this is

18  Exhibit 14.  This is the place where your dad worked and you

19  said the computer is –– the computer tower's out of sight but

20  that's generally where you saw your dad working in the house?

21  A   Yes.

22  Q   In Carmel?

23  A   Yes.

24  Q   And then Exhibit 13 was a different work station in the

25  house?

JANE DOE 2 - DIRECT/HELART          151

1    A    Yes.

2    Q    And this is Betsy's work station?

3    A    Yes.

4    Q    All right.  Did you see your dad use his computer

5    sometimes?

6    A    Yes.

7    Q    Did you use his computer sometimes?

8    A    Not usually.

9    Q    If you ever did use his computer, what are the kinds of

10   things you did on your dad's computer?

11   A    There's the Internet to play games.

12   Q    Are you familiar with the word "websites"?

13   A    Yes.

14   Q    What are websites as you understand them?

15   A    Places to go on the web.

16   Q    Sometimes during your homework, do you have to go to

17   websites to research homework?

18   A    Yes.

19   Q    Do you -- did you have a website associated with you?

20   A    Yes.

21   Q    Explain how that happened.

22   A    My dad set it up.

23   Q    Explain more about how that happened.

24   A    He put pictures on there and made a fake name.

25   Q    And why was the website associated with you -- sorry, how

JANE DOE 2 – DIRECT/HELART          152

1   was the website associated with you?

2   A   There's pictures of me on there.

3   Q   What was the fake name he gave you?

4   A   "October."

5   Q   Was that your choice or his?

6   A   His.

7   Q   Did your dad tell you why he made a website for you?

8   A   To make money.

9   Q   What did you think about a website associated with you to

10  make money?

11  A   I didn't really care because he gave me some of the money.

12  Q   Did your dad ever use the word "model"?

13  A   Yes.

14  Q   How did he use that word as it related to you?

15  A   He said that I was a model when I took these pictures.

16  Q   Did he call you a model?

17  A   Yes.

18  Q   Did he call you a model on more than one occasion?

19  A   Yes.

20  Q   How many times did your dad call you a model?

21  A   Whenever he took the pictures.

22  Q   Did you hear your dad calling your sister, Jane Doe 1, a

23  model?

24  A   Yes.

25  Q   How many times did you hear him calling your sister a

1   model?

2   A   Whenever he took pictures of her and I was there.

3   Q   Do you know if your sister, Jane Doe 1, had a website

4   associated with her?

5   A   Yes.

6   Q   Why do you know that?

7   A   Because I saw it.

8   Q   What was –– was her real name, Jane Doe 1, associated with

9   the website?

10  A   No.

11  Q   What was her name associated?

12  A   Kasey.

13  Q   Did you operate your website?

14  A   No.

15  Q   Who did?

16  A   My dad.

17  Q   Did you set up your website?

18  A   No.

19  Q   Who did?

20  A   My dad.

21  Q   Do you know if it was free for people to go to your

22  website?

23  A   I don't know.

24  Q   When your dad took your clothed pictures or your

25  partially-clothed or nude pictures, did he give you anything?

JANE DOE 2 – DIRECT/HELART          154

1   A    Yes.

2   Q    What did he give you?

3   A    Money.

4   Q    How much?

5   A    Usually about 70.

6   Q    70?  7-0?

7   A    (Witness nodded.)

8   Q    Per photo session?

9   A    Yes.

10  Q    What kinds of things did you buy with your money?

11  A    Clothes.

12  Q    Are these clothes you could have otherwise bought with the

13  money you already had from birthdays or Christmases,

14  et cetera?

15  A    Yes.

16  Q    I mean, did you already have money to buy those things or

17  was this extra?

18  A    Extra.

19  Q    How about Jane Doe 1, in terms of money, did you ever see

20  her receive money from your dad?

21  A    Yes.

22  Q    Do you know how much?

23  A    The same amount.

24  Q    Did you see that?

25  A    Yes.

JANE DOE 2 - DIRECT/HELART          155

1  Q    And what kinds of things did your sister spend her money

2  on?

3  A    The same thing, clothes.

4  Q    And again, the same question as it pertained to you, was

5  this extra money for her as far as you knew?

6  A    Yes.

7  Q    She couldn't have otherwise afforded those clothes without

8  this extra?

9  A    No.

10 Q    Did you actually go onto the Internet to ever see your

11 website?

12 A    No.

13 Q    Did you ever use your dad's computer to see your website?

14 A    Yes.

15 Q    Okay.  Did you go to the Internet to go to your website?

16 A    Yes.

17 Q    How do you know that you were accessing the Internet

18 versus just seeing pictures on your dad's computer?

19 A    Because you click on the Internet link thing, and then you

20 can type in an address.

21 Q    Have you heard the term "browser"?

22 A    Yes.

23 Q    Did you click on a browser to go to the Internet?

24 A    Yes.

25 Q    Then how did you get to your website?

JANE DOE 2 – DIRECT/HELART          156

1    A    You type in the address for the website.

2    Q    Which was?

3    A    Octobermodel.com.

4    Q    What was Hannah's?

5    A    Kaseymodel.com.

6    Q    When you went to the Internet to see your website, do you

7    remember how often you did that?

8    A    Not very often.

9    Q    What's not very often?

10   A    A couple times.

11   Q    On the couple of times that you went to see your

12   website, what did you see on your website?

13   A    Pictures of me.

14   Q    Describe the pictures of you.

15   A    They were nude.

16   Q    Were all of them nude or were just some of them nude?

17   A    All of them.

18   Q    Did you have to pay any money to get to your website?

19   A    No.

20   Q    Do you remember that they were the pictures that your dad

21   had taken of you?

22   A    Yes.

23   Q    Did you put pictures of you on your website?

24   A    No.

25   Q    Who did that?

JANE DOE 2 – DIRECT/HELART          157

1   A    My dad.

2   Q    Did anybody else in your whole life ever up till now take

3   pictures of you without your clothes on?

4   A    No.

5   Q    Has Betsy?

6   A    No.

7   Q    Has your mom?

8   A    No.

9   Q    Has Jane Doe 1?

10  A    No.

11  Q    How about your brother?

12  A    No.

13  Q    How about any of your dad's friends?

14  A    No.

15  Q    Just your dad?

16  A    Yes.

17  Q    Did you ever see pictures on your website in outdoor

18  settings?

19  A    Yes.

20  Q    Were you wearing clothes?

21  A    Yes.

22  Q    Did you see some examples on your website of you wearing

23  some of the bra and pantie-type clothing?

24  A    Yes.

25  Q    And then you saw some nude pictures?

JANE DOE 2 – DIRECT/HELART        158

1  A   Yes.

2  Q   When you looked at your own website on the couple of times

3  that you did, did it seem to you, did you have the impression

4  that about every picture he had ever taken was on the website?

5          MS. COOK:  Objection, leading.

6          THE COURT:  Sustained.

7  BY MS. HELART:

8  Q   When you looked on your own website, how many pictures

9  were on there given the number of times your dad took pictures

10  of you?

11  A   Mostly all of them.

12  Q   Did you give any input to your dad as to what pictures

13  should go on the website and what should not or could not?

14  A   No.

15  Q   Did you give your dad any input as to how the pictures

16  looked as a final finished picture in terms of backgrounds or

17  borders?

18  A   Yes.

19  Q   Explain that.

20  A   You could pick a background theme, and there is like polka

21  dots and stars and stripes.

22  Q   And so explain that interaction that you would have with

23  your dad in picking out backgrounds.

24  A   He would ask me which one I wanted to pick.

25  Q   Did you?

1   A   Yes.

2   Q   Did it seem to you that when you visited, your dad took a

3   lot of pictures or not really a lot?

4   A   A lot.

5   Q   What was the discussion about taking pictures before they

6   were taken?

7   A   He would ask me if I wanted to.

8   Q   And what was your answer?

9   A   Yes.

10  Q   I'd like to show you Exhibit 3.  And, Jane Doe 2, if you

11  could just flip through those few pages of Exhibit 3.  Have

12  you seen that before coming to court today?

13  A   Yes.

14  Q   What is it?

15  A   Pictures of me.

16  Q   Where are you?

17  A   In the bathroom.

18  Q   Why do you recognize those pictures?

19  A   Because it's me.

20  Q   What does it depict?  What do those pictures depict you

21  doing?  What do they show you doing?

22  A   Standing -- getting out of the shower with the towel on my

23  leg.

24  Q   Describe more.  Are you dressed in any way?

25  A   No.

JANE DOE 2 – DIRECT/HELART          160

1  Q   Who took the pictures in Exhibit 3?

2  A   My dad.

3  Q   Do you remember which residence he was in when those were

4  taken?

5  A   Braeburn.

6  Q   Do you remember who all was in the bathroom?

7  A   My father, and I think his wife.

8  Q   So Betsy was in the bathroom also?

9  A   Yes.

10 Q   In Exhibit 3, it appears you're just coming out of the

11 shower.  Were you really just coming out of the shower?

12 A   No.

13 Q   Was it –– let me ask you this way:  Was it –– when's your

14 normal shower time for the day?

15 A   At night.

16 Q   Was this –– were these pictures taken at night?

17 A   No.

18 Q   How was it that you were taking pictures at another time

19 than your normal shower hours?

20 A   He told me to.

21 Q   What did he say with respect to taking a shower at a

22 different time?

23 A   He said to take a shower so that he could take pictures.

24 Q   So you really did take a shower then?

25 A   Yeah, but ––

JANE DOE 2 – DIRECT/HELART          161

1  Q    It just wasn't your normal time?

2  A    Yeah.

3  Q    How is it that you have your leg propped up either on the

4  toilet seat or side of the tub or whatever?

5  A    Oh, he told me to.

6  Q    Tell us about that.

7  A    He said put your leg on the side of the bathtub and put

8  the towel over it.

9  Q    Did you do that?

10  A    Yes.

11  Q    Is Exhibit 3 an example of your dad paying you $70?

12  A    Yes.

13  Q    Do you remember if you ever saw the pictures in Exhibit 3

14  on your website?

15  A    No.  I didn't see very many of the pictures, but I knew

16  that he put them on there.

17  Q    I'm going to show you now Exhibit 4.  Have you seen

18  Exhibit 4 before coming to court today?

19  A    Yes.

20  Q    Do you recognize Exhibit 4?

21  A    Yes.

22  Q    What is it?

23  A    Pictures of me.

24  Q    Why do you recognize those pictures?

25  A    Because it's me.

JANE DOE 2 – DIRECT/HELART          162

1  Q   Who took that –– I think it is –– is it one picture?

2  A   Yeah.

3  Q   Who took that one picture?

4  A   My dad.

5  Q   Where was it taken?

6  A   At Spectrum Gym.

7  Q   Can you explain where you were in the gym and where that

8  picture's taken?

9  A   It was a room.  It wasn't the gym.  It was a –– I think

10 like a ballet room with mirrors, and a rod that he said to

11 hold onto like ––

12 Q   I'm going to ask you to repeat part of that.  I heard

13 you're in a room, it's at Spectrum Gym, and then explain what

14 else about it.

15 A   There's mirrors and there's like a rod to hold onto.

16 Q   A rod to hold onto?

17 A   Yes.

18 Q   Is it a different part than where all the gymnastics

19 equipment is?

20 A   Yes.

21 Q   Is it a room that's separate from the gymnastics

22 equipment?

23 A   Yes.

24 Q   What do people do in the room that you're in?

25 A   Dance, and just ––

JANE DOE 2 – DIRECT/HELART          163

1   Q   And I heard you say "ballet"?

2   A   Yes.

3   Q   What did you associate with ballet?

4   A   Well, there's mirrors.

5   Q   Then there's a bar in that picture?

6   A   Yes.

7   Q   Where are you in relationship to the mirror and the bar?

8   A   Holding onto the bar.

9   Q   How are you dressed in Exhibit 4?

10  A   Nude.

11  Q   Did you usually go into the ballet room nude in Spectrum

12  Gym?

13  A   No.

14  Q   Where had you been just before you had gone into the dance

15  room?

16  A   The gymnasium, whatever.

17          THE COURT:  I'm sorry, say it a little louder.

18          THE WITNESS:  The gymnasium.

19  BY MS. HELART:

20  Q   When you were in the gymnasium part of Spectrum, is that

21  where the gymnastics equipment was?

22  A   Yes.

23  Q   How were you dressed just before you walked in and that

24  picture was taken?

25  A   Nude.

JANE DOE 2 – DIRECT/HELART          164

1  Q   Explain how you were nude in the gym and then in the dance
2  room.
3  A   It was closed, so he said to go in there so he could take
4  pictures.
5  Q   Who said to go in there?
6  A   My dad.
7  Q   What was closed?
8  A   The gym.
9  Q   Was anybody else at the gym besides you and your dad?
10 A   My sister.
11 Q   Was the time that you were there and that picture was
12 taken, was that a normal time for you to be at Spectrum Gym?
13 A   No.
14 Q   What was not normal about it?
15 A   There was no one else there.
16 Q   How was that different than usually when you were there?
17 A   Because when I was usually there, I was doing gymnastics.
18 Q   How are you dressed when you do gymnastics and other
19 people are there?
20 A   In a leotard.
21 Q   Have you ever been nude even once doing gymnastics with
22 other people in the gym?
23 A   No.
24 Q   Explain how it is that your clothes came off and that
25 picture was taken?

JANE DOE 2 - DIRECT/HELART          165

1  A   My dad told me to.

2  Q   What did he say about wanting to take your picture without

3  your clothes on in the dance room?

4  A   He said to go in there and take my clothes off so he could

5  take pictures.

6  Q   Did he say why?

7  A   No, to put them on the website.

8  Q   Do you remember your dad doing anything at the gym before

9  you took your clothes off?

10 A   No.

11 Q   Do you recall anybody else being at the gym besides your

12 dad, your sister and you?

13 A   No.

14 Q   Is Exhibit 4 an example of the time your dad paid you $70?

15 A   Yes.

16         MS. HELART:  We'd ask that Exhibits 3 and 4 be

17 admitted.

18         THE COURT:  Any objection?

19         MS. COOK:  No, Your Honor.

20         THE COURT:  Exhibits 3 and 4 are admitted.

21     (Government's Exhibits 3-4 received in evidence.)

22 BY MS. HELART:

23 Q   In Exhibit 4, the pose that you're in, did you do that?

24 A   No.

25 Q   Tell us about the pose that you're in.

JANE DOE 2 – DIRECT/HELART          166

1  A   I'm holding onto the bar and sticking my leg out.

2  Q   How did you get to be in that pose?

3  A   My dad said to do it.

4  Q   In September 2004 –– have you and I gone through the

5  timeline of when you were in different grades working

6  backwards?

7  A   Yes.

8  Q   And in September 2004 you started fifth grade.  Do the

9  pictures in Exhibits 3 and 4 generally look like you're in

10 fourth and fifth grades?

11 A   Yes.

12 Q   On the times when your dad took pictures of you and you

13 weren't wearing any clothing, or you were wearing bra and

14 pantie–type clothing, how did he direct you through the

15 picture–taking sessions?

16 A   He would say to do certain poses and stand a certain way.

17 Q   Give us some examples.

18 A   He would tell me to like put my leg up or move my head a

19 certain way or move my body a certain way.

20 Q   Sometimes were you on beds?

21 A   Yes.

22 Q   Sometimes were you on all fours?

23          MS. COOK:  Objection, leading.

24          THE COURT:  Sustained.

25 BY MS. HELART:

JANE DOE 2 – DIRECT/HELART          167

1  Q   Can you give us some examples of the kinds of poses that

2  your dad would direct?

3  A   I'd be on the bed or standing up or on the floor.

4  Q   Can you give us some examples of how he wanted your legs

5  or arms to be?

6  A   He would say, like, bend your leg and put your arm back.

7  Q   Did your dad ever tell you to keep this a secret?

8  A   Yes.

9  Q   What did he tell you to keep a secret specifically?

10 A   He said to not tell anyone.

11 Q   Did he tell you not to tell anyone specifically?

12 A   He said don't tell my mom especially.

13 Q   What about telling your mom did he not want to happen?

14 A   He said she wouldn't like it.

15 Q   Besides you and your sister, Jane Doe 1, did you see any

16 other websites that your dad operated of kids?

17 A   Yes.

18 Q   Who?

19 A   My stepsister.

20 Q   Is that Betsy's daughter?

21 A   Yes.

22 Q   I'd like to show you a picture, Exhibit 15.  Do you

23 recognize Exhibit 15?

24 A   Yes.

25 Q   What is that?

JANE DOE 2 – DIRECT/HELART        168

1   A   The picture of me in Jane Doe 1's room at Carmel.

2   Q   Is that where you slept at your dad's house?

3   A   Yes.

4   Q   What is significant about Jane Doe 1's bed?

5   A   It's SpongeBob.

6   Q   And is that things that she had on her bed when you were

7   living there, staying there with your dad on visits?

8   A   Yes.

9   Q   Then you had the other bed?

10  A   Yes.

11  Q   In the picture, does this look like the bedroom as it was

12  when you visited there?

13  A   Yes.

14          MS. HELART:  We ask that Exhibit 15 be admitted.

15          MS. COOK:  No objection.

16          THE COURT:  15 is admitted.

17      (Government's Exhibit 15 received in evidence.)

18  BY MS. HELART:

19  Q   Instead of me trying to describe this, Jane Doe 2, we're

20  going to show it on the camera.  This is Exhibit 15.  There's

21  a bed on the left and a bed on the right.  Whose is whose?

22  A   Mine is on the left and Jane Doe 1's is on the right.

23  Q   And the bed on the right, Jane Doe 1's bed, has the

24  SpongeBob things on it?

25  A   Yes.

1  Q   Jane Doe 2, I'd like to show you Exhibit 12.  I'd like to

2  show you Exhibit 12 and see if you recognize this.  And

3  specifically, turning your attention starting on page 9.  If

4  you could flip through 9, 10, 11, 12; do you recognize who's

5  on those pages?

6  A   Yes.

7  Q   Who's on the pages starting on page 9?

8  A   Me.

9  Q   Why do you recognize -- or excuse me, do you recognize

10 those?

11 A   Yes.

12 Q   Why do you recognize those?

13 A   Because it's me.

14 Q   And do you recognize anything else about the materials on

15 those pages starting at page 9?

16 A   Yes.

17 Q   What do you recognize about those?

18 A   They're clothes that I had at my dad's house.

19 Q   Are those examples of what your website looked like?

20 A   Yes.

21 Q   Is that an example of what you saw when you went to the

22 website on the couple of occasions?

23 A   Yes.

24 Q   Do those accurately reflect the kinds of clothing your dad

25 would have you wear?

JANE DOE 2 – DIRECT/HELART          170

1  A   No.

2  Q   In what way is that accurate or not accurate?

3  A   Well, a lot of them were with my clothes off.

4  Q   Okay.  So those pages just show the ones with your clothes

5  on?

6  A   Yes ––

7           MS. COOK:  Objection, leading.

8           THE COURT:  Overruled, she may answer that.

9  BY MS. HELART:

10 Q   So those pages show you with your clothes on?

11 A   Yes.

12 Q   And what you saw on your website in addition were some

13 with your clothes off?

14 A   Yes.

15 Q   On page 15, up in the right-hand corner, do you recognize

16 that picture of you?

17 A   Yes.

18 Q   Do you remember that photo-taking session?

19 A   Yes.

20 Q   And on page 15 in the top right corner, what were you

21 wearing in that photo session?

22 A   A, like, towel, bra and pantie set.

23 Q   There's a lot of indication that if a user goes to any of

24 those places, that they have to click to see more pictures; is

25 that what it was to get to your website?

JANE DOE 2 - DIRECT/HELART          171

1          MS. COOK:  Objection, leading.

2    A    Yes.

3          THE COURT:  Sustained.  Put it to her in a direct

4    format, please.

5    BY MS. HELART:

6    Q    Can you describe what a user had to do to access all the

7    pictures of your website?

8    A    You click on a section or a picture that had, like, an

9    album.

10   Q    Okay, keep going with the explanation.

11   A    So there's like different albums with different pictures.

12   Q    And keep going.

13   A    They were all like different times.

14   Q    Okay, was each album a different occasion?

15   A    Yes.

16   Q    So what we're seeing on those pictures is what?

17   A    Pictures of me at different times.

18   Q    But was it the opening part of the album?

19   A    Yes.

20   Q    So we're not seeing all the pictures behind it?

21   A    No.

22   Q    What's one example of how many pictures might be in an

23   album of you?

24   A    Well, this one says 111.

25          THE COURT:  Say that again.

JANE DOE 2 – DIRECT/HELART        172

1            THE WITNESS:  111.

2   BY MS. HELART:

3   Q    And what's another example?

4   A    52 and 84.

5   Q    Sometimes would a picture-taking session with your dad

6   start out with bra and panties and end with something else?

7   A    Yes.

8            MS. COOK:  Objection, leading.

9            THE COURT:  Overruled, she may answer.

10  BY MS. HELART:

11  Q    How would it start and end if the start was a bra and

12  pantie set?

13  A    It would end with me nude.

14  Q    Did you ever see any of Jane Doe 1's photo-taking

15  sessions?

16  A    Sometimes.

17  Q    What did you observe with Jane Doe 1's photo-taking

18  sessions?

19  A    They were the same.

20  Q    In what way?

21  A    She was usually nude.

22  Q    At the beginning or the end?

23  A    At the end.

24  Q    How did hers start out?

25  A    With her somewhat dressed.

JANE DOE 2 - DIRECT/HELART          173

1  Q   What kinds of clothing would she have on when you observed

2  her?

3  A   Bra and panties.

4  Q   Who took the pictures of Jane Doe 1 when they started out

5  in bra and panties and she ended up nude?

6  A   My dad.

7  Q   Do you see any other -- do you see any other websites in

8  that packet of 27 pages of people you recognize?

9  A   My sister.

10 Q   And what's her website name?

11 A   Kaseymodel.

12 Q   And then what's -- anybody else towards the end of that

13 packet of 27 pages?

14 A   Annabelle.

15 Q   Do you recognize that girl?

16 A   Yeah, Betsy's daughter.

17 Q   That wasn't her real name?

18 A   No, her real name was Amy.

19         MS. HELART:  If I could have just one moment, Your

20 Honor.

21         THE COURT:  You may.

22             (Off-the-record discussion.)

23         MS. HELART:  All right, thank you.  No other

24 questions.

25         THE COURT:  Cross-examine.

1     **CROSS EXAMINATION**

2   BY MS. COOK:

3   Q    Morning.

4   A    Good morning.

5   Q    As I understand your testimony, your parents divorced when

6   you were quite young?

7   A    Yes.

8   Q    And after the divorce, you lived with your mother?

9   A    Yes.

10  Q    But visited with your father?

11  A    Yes.

12  Q    At least initially on weekends, every other weekend?

13  A    Yes.

14  Q    And in addition to that, you would see him for longer

15  periods of time during the summer?

16  A    Yes.

17  Q    And during those summer visitations, did you sometimes

18  take vacations with him?

19  A    Yes.

20  Q    Did that continue after he married Betsy?

21  A    Yes.

22  Q    And on some of your vacations, did you travel outside the

23  state?

24  A    Yes.

25  Q    Did you go on a trip to Washington, D.C.?

1  A    Yes.

2  Q    On some of the trips that you took with your father and

3  Betsy, did you also visit places that were resorts for

4  naturists and nudists?

5  A    Yes.

6  Q    Did that happen on more than one occasion?

7  A    Yes.

8  Q    And when you went on those trips to resorts where you

9  could wear clothing or not wear clothing, you had an option to

10 either wear or not wear clothing?

11 A    Yes.

12 Q    And did you choose not to wear clothing?

13 A    Yes.

14 Q    Did your father and Betsy make that choice as well?

15 A    Yes.

16 Q    And at least when you were in those resorts, you didn't

17 feel uncomfortable about that, did you?

18 A    A little bit.

19 Q    But you had the choice to wear clothing or not?

20 A    Yes.

21 Q    And as I understand it, there came a point in time when

22 your visitation with your father stopped?

23 A    Yes.

24 Q    And that time would have been about five years ago?

25 A    Yes.

*JANE DOE 2 – CROSS/COOK*          176

1  Q    Since your visitation with your father stopped, you've not

2  seen him at all, have you?

3  A    No.

4  Q    And would that be true of your sister, Jane Doe 1, as

5  well?

6  A    Yes.

7  Q    That neither of you have seen him over the past five

8  years?

9  A    No.

10 Q    Now, during these past five years when you've not seen

11 your father, you've continued to live with your mother?

12 A    Yes.

13 Q    And during that period of time, there have been a number

14 of occasions when you've met with the attorneys from the U.S.

15 Attorney's Office?

16 A    Yes.

17 Q    You met with them in June of 2005?

18 A    Yes.

19 Q    And you met with them again in November of 2007?

20 A    Yes.

21 Q    And you met with them in January of 2008, a couple of

22 years ago?

23 A    Yes.

24 Q    When you met with them in January of 2008, you talked

25 about what your testimony would be when you appeared in front

*JANE DOE 2 - CROSS/COOK*          177

1  of the grand jury?

2  A    Yes.

3  Q    And you talked to them again after that testimony?

4  A    Yes.

5  Q    And most recently, you've spent quite a bit of time with

6  them?

7  A    Yes.

8  Q    Last Friday, you spent most of the day with them?

9  A    Yes.

10 Q    And a week before that, you spent some time with them?

11 A    I think it was a couple weeks.

12 Q    Okay, it might have been two weeks?

13 A    Yeah.

14 Q    That you spent several hours with them?

15 A    Yes.

16 Q    You spent some time with them yesterday as well?

17 A    Yes.

18 Q    And during these periods of time that you have spent with

19 the attorneys from the U.S. Attorney's office, you've

20 talked about what your testimony might be?

21 A    Yes.

22 Q    And specifically talked about what your testimony might be

23 today?

24 A    Yes.

25 Q    When you've had these discussions with them, they have

1  shown you some of the photographs that you've looked at today?

2  A   Yes.

3  Q   And shown you some of the photographs of Jane Doe 1?

4  A   Yes.

5  Q   That you haven't looked at today?

6  A   Yes.

7  Q   Now, you testified that your father set up a modeling

8  website for you?

9  A   Yes.

10  Q   And you knew that that website was for the purpose of

11  taking photographs of you?

12  A   Yes.

13  Q   And putting those photographs on the Internet?

14  A   Yes.

15  Q   And that he hoped by doing so to attract some modeling

16  jobs for you?

17  A   Yes.

18          MS. HELART:  Objection speculation.

19          THE COURT:  Overruled.

20  BY MS. COOK:

21  Q   You indicated that was correct?

22  A   Yes.

23  Q   And did he tell you that if there was income from that

24  modeling website, that he would share that income with you?

25  A   Yes.

*JANE DOE 2 – CROSS/COOK* 179

1  Q    And periodically from time to time, he gave you money?

2  A    Yes.

3  Q    And you understood that that money was for having

4  participated in the modeling website?

5  A    Yes.

6  Q    Now, when he originally set up this modeling website, you

7  were there to watch him set it up?

8  A    No.

9  Q    You did see him select, for example, the background --

10 A    Yes.

11 Q    -- for the website?

12 A    Yes.

13 Q    I think you said you may have helped him pick out some of

14 the colors?

15 A    Yes.

16 Q    But you didn't actually see him put photographs on the

17 website?

18 A    No.

19 Q    Now, you never logged on to this website from your

20 mother's home --

21 A    No.

22 Q    -- or from any computer at school?

23 A    No.

24 Q    But you testified today that there was at least one

25 occasion when you logged on to it?

*JANE DOE 2 – CROSS/COOK*          180

1   A    Yes.

2   Q    And would that have been at your father's home?

3   A    Yes.

4   Q    And you testified today that you were -- that you knew how

5   to log onto it?

6   A    Yes.

7   Q    And that you knew the name of the website that had to be

8   typed in?

9   A    Yes.

10  Q    And the name of the website and the manner in which you

11  would log onto it was something that you discussed with the

12  attorneys from the U.S. Attorney's Office?

13  A    Yes.

14  Q    And you discussed that recently when you were talking

15  about your testimony today?

16  A    Yes.

17  Q    Now, do you recall that you testified in front of a grand

18  jury in January of 2008?

19  A    Yes.

20  Q    And do you recall being asked certain questions during

21  your testimony and giving certain answers --

22  A    Yes.

23  Q    -- while you were under oath?

24  A    Yes.

25  Q    Page 13.

*JANE DOE 2 – CROSS/COOK*          181

1    And during that sequence of questions, do you

2    remember Ms. Helart asking you specifically what name was

3    associated with your pictures, and your answering "October"?

4    A   Yes.

5    Q   And her asking "October, was that the whole website?"  And

6    your answering "No, that was like my name"?

7    A   Yes.

8    Q   Her asking "What was the whole website called that was

9    yours?"

10       And your answering "I'm not sure"?

11   A   Yes.

12   Q   And her asking "But it had the word October in it?"  And

13   you nodding?

14   A   Yes.

15   Q   And then her asking you specifically "Would

16   'Octobermodeling.com' sound familiar"?

17   A   Yes.

18   Q   And your answering "yes"?

19   A   Yes.

20   Q   Now, you testified on direct examination that your father

21   sometimes called you a model?

22   A   Yes.

23   Q   And would he have said -- would he have called you a model

24   when he was taking photographs of you?

25   A   Yes.

1  Q   And he would have called you a model when he was taking

2  photographs of you for this modeling website?

3  A   Yes.

4  Q   And did you, in fact, consider that that's what you were

5  doing, you were modeling?

6  A   Yes.

7  Q   You testified on direct examination that your father

8  didn't take photographs of your brother in the same way that

9  he took photographs of you?

10  A   Yes.

11  Q   When your father took photographs of the whole family,

12  your brother would be included?

13  A   Yes.

14  Q   And was there a time when your father had a discussion in

15  your presence with your brother about whether or not your

16  brother wanted to participate in a modeling website?

17  A   Yes.

18  Q   And did your brother indicate that that was not his

19  choice?

20  A   Yes.

21  Q   And your father then didn't pursue that or --

22  A   Yes.

23  Q   Okay.  You testified that with the money your father

24  bought you -- gave you, you sometimes bought clothing?

25  A   Yes.

*JANE DOE 2 - CROSS/COOK*          183

1  Q   And you took some of this clothing home with you, didn't

2  you?

3  A   Yes.

4  Q   As well as some of the clothing that you received from

5  your father at his home?

6  A   Yes.

7  Q   There came a time when your father had a discussion with

8  you about taking the nude photographs?

9  A   Yes.

10 Q   And when that topic was raised, he asked you if you were

11 okay with his taking the nude photographs?

12 A   Yes.

13 Q   And you said you were?

14 A   Yes.

15 Q   You identified in court previously a camera that you said

16 your father used in photographing you?

17 A   Yes.

18 Q   Was that one of many cameras which he had?

19 A   I don't know how many he had.

20 Q   You know that he had more than one?

21 A   I don't know.

22 Q   He had photographed you with a video camera?

23 A   Yes.

24 Q   He photographed you with a large scale box camera that

25 would sit on a tripod?

*JANE DOE 2 – CROSS/COOK*          184

1  A   I think so.

2  Q   So this wasn't the only camera that was used to photograph

3  you?

4  A   Yes.

5  Q   And as you think back on your life with your father during

6  the periods of visitation, taking photographs of you and the

7  other members of the family was something that he regularly

8  did?

9  A   Yes.

10  Q   In your memory, he's done that your whole life?

11  A   Yes.

12  Q   With respect to the photographs that were taken in the

13  gym, when you went to the gym with your father, was there a

14  discussion between you, your father and your sister, about

15  what the real meaning of the word "gymnastics" was?

16  A   Yes.

17  Q   And what's the real meaning of the word "gymnastics"?

18          MS. HELART:  Objection, hearsay.

19          THE COURT:  Sustained.

20          MS. COOK:  If she knows.

21          THE COURT:  No, she would have gotten it from her

22  father by virtue of the way you positioned the question.

23          MS. COOK:  All right.

24  BY MS. COOK:

25  Q   Was there a discussion between you, your father and your

*JANE DOE 2 - CROSS/COOK*          185

1  sister about whether gymnastics would have any particular

2  meaning for nudists?

3          MS. HELART:  Objection.

4  A   Yes --

5          THE COURT:  Hold on.  If it's from another source,

6  then it's hearsay, Counsel.  That's my ruling.

7          MS. COOK:  I understand.  All right, I'll withdraw

8  the question.

9  BY MS. COOK:

10 Q   During the period of time that you were in the gym with

11 your father and your sister, were you playing around on the

12 equipment in the gym?

13 A   Yes.

14 Q   And on the mats?

15 A   Yes.

16 Q   And was it during the period of time when you were doing

17 so that he was filming?

18 A   Yes.

19 Q   While you were in the gym on that occasion, were you

20 practicing gymnastics moves that you had done previously?

21 A   Yes.

22 Q   Was your sister doing the same?

23 A   Yes.

24 Q   You testified about the photographs that were taken while

25 you were getting out of the shower?

*JANE DOE 2 – CROSS/COOK*          186

1  A   Yes.

2  Q   And a number of those photographs were admitted into

3  evidence and you looked at them today?

4  A   Yes.

5  Q   Were there many more photographs that were taken on that

6  occasion?

7  A   Yes.

8  Q   More than what were admitted into evidence?

9  A   Yes.

10  Q   But you've only had an opportunity to review the ones that

11  the Government gave you which were admitted into evidence?

12  A   Yes.

13  Q   And I believe you testified, and correct me if I'm wrong,

14  that someone else was in the bathroom with you at the time?

15  A   I think one of the times where he took pictures of me

16  coming out of the shower, Betsy was there.

17  Q   So it's not your testimony that on the occasion the

18  photographs that were introduced into evidence were taken,

19  that she was there?

20  A   I don't know which time it was.

21  Q   With respect to the photographs taken when you were

22  getting out of the shower, you indicated that your father

23  would say things to you about the manner in which you should

24  move around or what you should do?

25  A   Yes.

*JANE DOE 2 – CROSS/COOK*          187

1  Q   Was that similar to what he would say to you when you were

2  taking the other modeling photographs?

3  A   Yes.

4  Q   Whether you were clothed or unclothed?

5  A   Yes.

6          MS. COOK:  I have no further questions.

7          THE COURT:  Redirect?

8                    **REDIRECT EXAMINATION**

9  BY MS. HELART:

10  Q   Jane Doe 2, whose idea was it to go to nudist clubs on

11  vacations?

12  A   My dad's.

13  Q   How old were you when you remember going to these places?

14  A   Like seven or eight.

15  Q   Were you directing the activities of the vacation?

16  A   No.

17          MS. COOK:  Objection, leading.

18          THE COURT:  Overruled.

19  BY MS. HELART:

20  Q   Who was directing the activities of the vacation?

21  A   My dad.

22  Q   Did your dad ever talk to you about modeling for J.C.

23  Penney or Sears or any other catalog?

24  A   Yes.

25  Q   What did he say about that?

*JANE DOE 2 - REDIRECT/HELART*      188

1  A   He said that I might be able to.

2  Q   What else did he say about that?

3  A   That I would get paid to do it.

4  Q   Was that something he would say prior to taking some of

5  the picture-taking sessions?

6  A   Yes.

7  Q   Have you ever gotten a contract with Sears or J.C.

8  Penney's?

9  A   No.

10 Q   Any store?

11 A   No.

12 Q   During all the times that you've been speaking with us at

13 the U.S. Attorney's Office a year ago in January 2008, it's

14 actually been two years ago, and to prepare for this trial or

15 any other occasion that you've ever talked with law

16 enforcement, has anybody ever told you what to say?

17 A   No.

18 Q   Have we always told to you tell the truth?

19 A   Yes.

20         MS. COOK:  Objection, leading.

21         THE COURT:  Overruled.  She may ask and she may

22 answer.

23 BY MS. HELART:

24 Q   Have we always told you to tell the truth?

25 A   Yes.

1        MS. HELART:  Thank you.  No other questions.

2        THE COURT:  Recross?

3        MS. COOK:  Briefly, Your Honor.

4                    **RECROSS–EXAMINATION**

5    BY MS. COOK:

6    Q   Jane Doe 2, when you traveled on vacation to these resorts

7    that were nudist resorts or clothing optional resorts, Betsy

8    traveled with you?

9    A   Yes.

10   Q   And were these vacations vacations that were planned by

11   your father, or by Betsy, or both, or do you know?

12   A   My father.

13   Q   When you went to these resorts, were there other children

14   there as well?

15   A   Yes.

16       MS. COOK:  No further questions.

17       THE COURT:  Re-redirect?

18       MS. HELART:  Nothing, Your Honor.

19       THE COURT:  Jane Doe 2, thank you very much.  You

20   may step down.  Watch your step as you go, and give that

21   microphone here to Miss Schneeman on your way by.

22       MS. HELART:  Your Honor, I don't know what the

23   Court's schedule is, but we would ask that the Exhibits 3 and

24   4 be published to the jury at this time.

25       THE COURT:  Can we use the same procedure we did

*JANE DOE 2 – RECROSS/COOK*          190

1  yesterday, and have them reviewed in the jury room without

2  comment or discussion during the break?

3          MS. HELART:  Yes, I have no objection to that.

4          THE COURT:  Is that agreeable to you?

5          MS. COOK:  Yes, it is, Your Honor.

6          THE COURT:  All right.  We'll take our morning

7  recess at this time.  About 10 minutes into your recess, I'll

8  send up the exhibits so that you can review them as you did

9  yesterday.

10          Miss Schneeman carried the message from me to you at

11  that time directing you not to discuss them, not to talk about

12  them.  Don't form any opinions or conclusions with respect to

13  any of these matters.  Just review the exhibits and pass them

14  around so that all of you get an opportunity to familiarize

15  yourself with the exhibits.

16          As I've said previously, they'll come with you to

17  the jury room when it's time to deliberate, but this will

18  allow you to follow the testimony that's been presented to

19  you.

20          On all matters, not just these exhibits, refrain

21  from discussing them among yourselves or allowing anyone to

22  discuss them with you.  Don't form any opinions or conclusions

23  with respect to any of the issues in the case until it is

24  finally submitted to you for your verdict.

25          You may rise and depart.  We'll call you back when

1  you signal that you've finished reviewing the exhibits.

2                    (Jury excused)

3          (Recess taken from 10:58 a.m. to 11:27 a.m.)

4                 (Open court, jury present)

5            THE COURT:  You may be seated.

6            Miss Helart, who is your next witness?

7            MS. HELART:  Phillip Andrew Byers.

8            THE COURT:  Good morning, Mr. Byers.

9            THE WITNESS:  Good morning, Your Honor.

10           THE COURT:  Rise and be sworn.

11      **PHILLIP ANDREW BYERS, PLAINTIFF'S WITNESS, SWORN**

12                   <u>**DIRECT EXAMINATION**</u>

13           THE COURT:  You may be seated.

14  BY MS. HELART:

15  Q   Good morning, sir.  Can you please state your name and

16  your occupation?

17  A   Trooper Phillip A. Byers.  I go by "Andy," and I'm a

18  Detective with the Indiana State Police.

19  Q   How long have you been with the Indiana State Police?

20  A   Coming up on 15 years.

21  Q   Where are you currently assigned?

22  A   The Red Key District.

23  Q   Are you a detective there?

24  A   Yes, I am.

25  Q   Between 2000 and 2009, were you a member of the Indiana

BYERS - DIRECT/HELART              192

1  Internet Crimes Against Children Task Force?

2  A   Yes, I was.

3  Q   What was the focus of that Task Force's work?

4  A   Like the title, Crimes Against Children, specifically it

5  was child exploitation.  Most of those cases were Internet

6  related.

7  Q   During your time on the task force, did you become

8  involved in an investigation relating to Dale Russell?

9  A   Yes, I did.

10 Q   Do you know him today?

11 A   Yes, I do.

12 Q   Do you recognize him in court today?

13 A   Yes, ma'am, I do.

14 Q   Can you please point to him and tell us today what he's

15 wearing?

16 A   Sitting over there, the dark blazer, dark blue shirt,

17 goatee and mustache.

18        MS. HELART:  Let the record reflect that Detective

19 Byers has pointed to Mr. Russell who does have a black blazer

20 and a blue shirt.

21        THE COURT:  The record so reflects.

22 BY MS. HELART:

23 Q   Sometime in October 2004, did you first hear the name

24 "Dale Russell" because you got a call?

25 A   Yes, I did.

BYERS - DIRECT/HELART            193

1  Q    Who did you get a call from?

2  A    Detectives at Carmel Police Department.

3  Q    Is that Carmel, Indiana?

4  A    Yes, that's correct.

5  Q    What was the specific reason that Carmel, Indiana, called

6  you?

7  A    Part of my duties when I was working in the Child

8  Exploitation Unit, the Task Force, I did online investigations

9  which often required purchasing memberships to websites with

10 an undercover credit card.  And they contacted me that they

11 needed to gain access to search for some websites.  So they

12 contacted me, and I was able to purchase those, access to

13 those websites for them.

14 Q    Did you respond to Carmel Police Department?

15 A    Yes, I did.

16 Q    What did you give to any officer at Carmel Police

17 Department?

18 A    The undercover credit card and PIN number.

19 Q    Was this your investigation?

20 A    No, it was not.

21 Q    At that time?

22 A    No, it was not.

23 Q    Did you pay attention to what website they were accessing?

24 A    No, I did not.

25 Q    You knew the name Dale Russell was associated with their

1  investigation?

2  A    That's correct.

3  Q    Do you know what they purchased?

4  A    It was access to some key modeling websites.  That was the

5  extent of the information I received, other than the billing

6  statement that I took care of covering that monthly fee for

7  that month.

8  Q    Do you ever know what the result of their work was?

9  A    The detectives from Carmel contacted me the following

10 month and stated they didn't find any of the sites they were

11 looking for and wanted me to come make sure that they

12 terminated membership to that since I was paying the bill, as

13 well as giving me that information so I could do my paperwork

14 to cover those expenditures.

15 Q    Have you since learned a date of October 19th, 2004, as

16 another significant date in this investigation?

17 A    Yes.

18 Q    Do you remember if you were contacted by Carmel P.D.

19 before or after October 19th, 2004?

20 A    To my recollection and information, it was later.  It was

21 after that.

22 Q    The next year in June, specifically on June 29, 2005, did

23 you go to Dale Russell's residence in Carmel, Indiana?

24 A    Yes, I did.

25 Q    What was the address you went to?

1  A   664 Marana Drive in Carmel, Indiana.

2  Q   Did you go there with a search warrant?

3  A   Yes, I did.

4  Q   Did some of the information that you knew prior to the

5  search warrant come from Greenfield Middle School?

6  A   Yes, it did.

7  Q   During that time on June 29, 2005, did you take some

8  pictures in Mr. Russell's residence?

9  A   Yes, I did.

10 Q   I'd like to show you Exhibit 15.  Do you recognize Exhibit

11 15?

12 A   Yes, ma'am, I do.

13 Q   What is that?

14 A   This is a picture of one of the bedrooms that was in the

15 upper level of the home.

16 Q   And I'd like to show you Exhibit 14.  Do you recognize

17 Exhibit 14?

18 A   Yes, I do.

19 Q   What is that?

20 A   That's one of the computer desk work stations that was

21 there in the living room on the ground floor.

22 Q   Did you see another computer work station in the house?

23 A   Yes, I did.  If you were standing where we are looking at

24 this picture, the perspective where I took the photograph,

25 immediately to the left, there was kind of a walkway or an

BYERS – DIRECT/HELART          196

1  aisleway from the step down from the kitchen and there was

2  another work station there to the left.

3  Q    I'd like to show you Exhibit 13, do you recognize

4  Exhibit 13?

5  A    Yes, I do.

6  Q    What is that?

7  A    That is the other work station I just described to the

8  left of the last one.

9  Q    Were you able to, by the things that you saw, either on

10  the computer doing a preview or just things around the

11  computer, distinguish whose work stations these might be?

12  A    Yes, I did.

13  Q    Whose was work station 13?

14  A    It would be Betsy Russell.

15  Q    Is that Dale Russell's wife?

16  A    Yes.

17  Q    And then whose was Exhibit 14?

18  A    I believe –– surmised that was Dale's on the right.

19  Q    I'd like to show you Exhibit 16, and without covering your

20  view to the jury so they can see you, do you recognize

21  Exhibit 16?

22  A    Yes, I do.

23  Q    What is it?

24  A    This is a computer tower that belonged to Dale Russell

25  that was under that computer desk in the previous exhibit.

BYERS – DIRECT/HELART          197

1  Q   All right.  So Exhibit 14?

2  A   Yes, ma'am, it is.

3  Q   Was Exhibit 16 underneath this work station, just not

4  visible in this photograph?

5  A   Yes, that's correct.

6  Q   Was there anything significant or noteworthy about

7  Exhibit 16?

8  A   Yes, ma'am.  Here on the front, there's an open space, and

9  with a lock that is common to trays.  Some computers have

10 removable trays that you can put a hard drive in the tray and

11 push it in and lock it in, and that hard drive in that tray

12 was missing.

13 Q   Did you ever see it during the time you were there to do

14 the search warrant?

15 A   No, we did not.

16 Q   We can put that down, Detective Byers, if that's all right

17 with you.  Thank you.

18          In approximately February 2007, did you receive

19 information referred to the Indiana Internet Crimes Against

20 Children Task Force that made it to you from a Canadian

21 source?

22 A   Yes, I did.

23 Q   I'd like you to read Exhibit 5, and see if you recognize

24 the name National Child Exploitation Coordination Center?

25 A   Yes, I do.

BYERS – DIRECT/HELART              198

1  Q    What is that organization in Canada?

2  A    That is a law enforcement –– it's an agency that law

3  enforcement contacts to help identify, and kind of a

4  clearinghouse for child exploitation investigations.  They

5  help law enforcement agencies determine if victims of child

6  exploitation –– if they know their identity.

7  Q    And this information –– some information about the Dale

8  Russell case eventually made its way to you from them?

9  A    Yes, it did.

10 Q    Is this stipulation accurate in terms of the information

11 getting to the task force?

12            MR. McKINLEY:  Objection, relevance.

13            THE COURT:  Sustained.

14 BY MS. HELART:

15 Q    I'd like to show you Exhibits 1 through 4.  Were you part

16 of testifying in the federal grand jury proceedings in

17 January 2008?

18 A    Yes, I was.

19 Q    And you're familiar with the charges relating to Dale

20 Russell?

21 A    Yes, I am.

22 Q    Are the images charged in the present case the ones sent

23 by the Canadian organization in Exhibit 5?

24 A    Yes, for Count 1, and yes for Count 2, yes for Count 3,

25 and yes for Count 4.

BYERS - DIRECT/HELART            199

1   Q   Are the names that are associated with the images charged

2   in the indictment the names that were found on the Canadian

3   individual's computer?

4   A   Yes, they are.

5   Q   And that's how they were named in Canada, that's the names

6   we retained in the indictment?

7   A   That is correct.

8   Q   Are you familiar with the Spectrum Gym?

9   A   Yes, I am.

10  Q   Where is that located, what city?

11  A   In Carmel, Indiana.

12  Q   Is Carmel, Indiana, within the Southern District of

13  Indiana?

14  A   Yes, it is.

15  Q   Are you familiar with the Braeburn Apartments?

16  A   Yes.

17  Q   Are those within the Southern District of Indiana?

18  A   Yes, they are.

19  Q   All right.

20          MS. HELART:  The Government has no other questions.

21          THE COURT:  All right.

22          MS. HELART:  Oh, I'm sorry.  May I reopen?  Excuse

23  me.

24          I'd like to show you Exhibit 10.

25  Q   Taking you back to June 29, 2005; do you recognize

BYERS – DIRECT/HELART              200

1  Exhibit 10?

2  A   Yes, I do.

3  Q   What is that?

4  A   It is a Canon EOS10 camera, digital camera.

5  Q   Why do you recognize that?

6  A   Because when I conducted the search warrant, I recovered

7  this and seized it and documented it on my property record and

8  receipts.

9  Q   And although the bag isn't part of the exhibit tag, do you

10  recognize the bag that it came in with your exhibit tag?

11  A   Yes, I do.  And there's my tag here that I filled out to

12  document the evidence number to put into our evidence system.

13  And to protect the camera, I keep it inside the bag and secure

14  the bag.

15  Q   Exhibit 10 came from Mr. Russell's residence?

16  A   Yes, it did.

17  Q   Thank you.

18        MS. HELART:  And I think Exhibit 10 is admitted

19  already.  If not, we ask that it be admitted.

20        THE COURT:  Exhibit 10 is the camera and the bag?

21        MS. HELART:  Just the camera.

22        THE COURT:  Well then, take away the bag.

23        MS. HELART:  All right.  Then I will mark 10A as the

24  bag, and I would ask that 10A be admitted.

25        THE COURT:  Any objection, Mr. McKinley?

1          MR. McKINLEY:  Your Honor, may I confer with counsel

2  for a moment?

3          THE COURT:  Yes.

4                  (Off-the-record discussion.)

5          THE COURT:  10 is in, so the only question is 10A,

6  the bag.

7          MR. McKINLEY:  That's correct.  Could I look at it,

8  Your Honor?

9          THE COURT:  Yes.

10         MR. McKINLEY:  No objection, Your Honor.

11         THE COURT:  All right, Exhibit 10A is admitted.

12        (Government's Exhibit 10A received in evidence.)

13         THE COURT:  Pass the witness.

14         MS. HELART:  I failed to ask for Exhibit 16 to be

15  admitted into evidence, the computer tower.

16         THE COURT:  Any objection?

17         MR. McKINLEY:  No objection.

18         THE COURT:  Exhibit 16 is admitted.

19        (Government's Exhibit 16 received in evidence.)

20         MS. HELART:  One clarifying question, Detective

21  Byers.

22  BY MS. HELART:

23  Q   When I say the names of the pictures, I mean like "IMG,"

24  big long number "dot JPG."  Did that name, in conjunction with

25  each of the pictures, come from the Canadian individual?

1  A   Yes, it did.

2  Q   Are those names stamped on each one of the pictures in the

3  Exhibits 1 through 4?

4  A   Stamped or do you mean printed?

5  Q   Either way.  Are they associated --

6  A   The file names are printed on here next to that the way

7  they -- the way I received them from Canada.

8  Q   And is that the way they were when you testified to them

9  in the grand jury?

10  A   Yes.

11  Q   Okay.

12          MS. HELART:  Thank you.  Now no other questions.

13          THE COURT:  Cross-examine, Mr. McKinley?

14                          **CROSS EXAMINATION**

15  BY MR. McKINLEY:

16  Q   Morning, Detective Byers.

17  A   Morning.

18  Q   Let me preface my questions to you by just telling you

19  from time to time I will have to put these headphones on

20  because I have this hearing impairment, and my other set of

21  hearing aids is in the repair shop.  So I'm kind of fumbling

22  around here from time to time in an effort to hear the best I

23  can.  So I may need to ask you to repeat your answer from time

24  to time.

25  A   Okay.

1   Q   Detective Byers, your participation in the investigation,

2   as I understand it, commenced in October of 2004?

3   A   That's correct.

4   Q   And as a component of your investigation, you testified

5   that you were asked to access a number of pre-teen websites?

6   A   I purchased access.

7   Q   All right.  And that was the only way to access the

8   websites, correct?  You had to pay money to access them?

9   A   Can I ask you to clarify that question or can I clarify my

10  answer on that?

11  Q   Okay.  Did you pay a fee to be able to access the website?

12  A   Yes, I paid for them.

13  Q   And then you actually viewed the content of those

14  websites?

15  A   No, I did not.

16  Q   Other investigators viewed the contents of the websites?

17  A   They purchased access in an attempt to view that.

18  Q   Were they successful in viewing the websites?

19  A   They told me they weren't.

20  Q   Okay.

21  A   So not to my knowledge.

22  Q   You did not access any of the websites yourself?

23  A   No, I did not.

24  Q   Okay.  The website that you assisted in accessing, though,

25  one of the website was kaseymodel.com?

1   A   Yes.

2   Q   And to your knowledge, did your -- did the investigation

3   reveal the presence of any nude photos on that website?

4   A   The Carmel investigators told me it did not, or they did

5   not find --

6   Q   Again, you did not view it yourself?

7   A   No, I did not.

8   Q   One of the other websites that you assisted in accessing

9   was the octobermodel.com website?

10  A   Yes.

11  Q   Okay.  In fact, there were a number of websites that were

12  accessed at this stage of the investigation?

13  A   To my understanding, yes.

14  Q   Okay, but again, you did not view the contents?

15  A   No, I was not there.  I was not present at that time.

16  Q   Okay.  Now, you testified that you participated in the

17  execution of a search warrant at Mr. Russell's residence on

18  Marana Drive?

19  A   That's correct.

20  Q   That was in, I believe, in June of 2005?

21  A   That's correct.

22  Q   And did you actually participate in the search itself?

23  A   Yes, I did.

24  Q   And prior to executing the search, you interviewed

25  Mr. Russell?

1  A    Yes.

2  Q    He agreed to speak with you?

3  A    Yes, he did.

4  Q    And the search was conducted in an attempt to detect

5  evidence of criminal conduct?

6  A    That's correct.

7  Q    And you seized various items from the residence?

8  A    That's correct.

9  Q    Including the computer that's been introduced as

10  Government's Exhibit, I think, 16?

11  A    Correct.

12  Q    And you testified that I believe you found something

13  unusual about the computer with the removal of a drive of some

14  type?

15  A    That's correct.

16  Q    Okay.  Now, to your knowledge, does that computer operate

17  without that removable drive?

18  A    Yes.

19  Q    In fact, it's a backup drive that was removed from the

20  computer?

21  A    It was an additional drive.  I don't know the status of

22  the drive, if it was configured as a backup or just a

23  secondary storage drive.  That I do not know because it wasn't

24  there.

25  Q    Is it your understanding that what would be on that backup

1  drive would reflect what's on the fixed hard drive in the

2  computer?

3  A   I don't know.  It's possible if the user configured it to

4  be used that way.

5  Q   You don't know?

6  A   I don't know how it was configured to be used since we

7  don't have the drive.

8  Q   But as far as you know, the computer was still

9  operational?

10  A   Yes, there's still another hard drive that's contained

11  within the computer.

12  Q   And the computer hard drive has, in fact, been examined by

13  forensic experts?

14  A   Yes, it has.

15  Q   Going back to the first series of questions I asked you

16  about accessing these websites, was there any way to access

17  these websites, to your knowledge, without paying some fee?

18  A   I do not know.  I'm not aware of any.

19  Q   Now, going back to the search, you actually participated

20  in the search?

21  A   Yes, that's correct.

22  Q   You assisted in identifying evidence that would be seized?

23  A   Yes, I did.

24  Q   In addition to seizing various computers, you seized

25  compact disks?

*BYERS – CROSS/MCKINLEY*        207

1  A   Yes.

2  Q   DVDs?

3  A   Yes, I believe so.

4  Q   Magazines?

5  A   Yes.

6  Q   Books?

7  A   Yes.

8  Q   Books that portrayed nude images?

9        MS. HELART:  Objection, ask to approach the bench.

10       THE COURT:  You may.

11          (Bench conference on the record.)

12       MS. HELART:  I want to make this objection early.  I

13  don't know how far he's going to go with this witness, but I

14  believe he's going to try to introduce things that were

15  subject to the pretrial motion of this Court about books that

16  showed nude models and nude children.  So I wanted to stop

17  that line of questioning in front of the jury.

18       THE COURT:  Is that your intent?

19       MR. McKINLEY:  Your Honor, the ruling, the pretrial

20  ruling was that the books themselves are not going to be

21  permitted into evidence.  I was going to ask him about the

22  nature of the books, what the books depict.  I was going to

23  then proffer the books in, introduce the books outside of the

24  presence of the jury just at a bench conference.

25       THE COURT:  What's the relevance of the books?

1          MR. McKINLEY:  The relevance is it can be

2     conditional upon my client's testimony that, in fact, he had

3     many books, a very vast and complete art collection.

4          THE COURT:  What's the relevance of that?

5          MR. McKINLEY:  Well, it shows the context within

6     which his photography was influenced, and the style and the

7     manner in that he was participating.

8          THE COURT:  What's the relevance of that?

9          MR. McKINLEY:  Well, it goes --

10          THE COURT:  You'll have to take your headset off

11     your neck because they're creating feedback.

12          Thank you.

13          MR. McKINLEY:  It puts his photography in context,

14     Your Honor.

15          THE COURT:  What's the relevance of that?  You said

16     that before, and I don't understand the relevance of the

17     context for his photography.  Let's say he worked at Olan

18     Mills.

19          MR. McKINLEY:  Your Honor --

20          THE COURT:  Hang on, let me finish.  Can you hear

21     me?  All right?

22          MR. McKINLEY:  Yes, I guess I can.

23          THE COURT:  If he worked at Olan Mills and he took a

24     bunch of pictures, photographs of children, and he wanted to

25     introduce those, I don't see the relevance of that.  Does he

1  have other nude depictions of children besides the ones that

2  have come into evidence that he's created?

3          MR. McKINLEY:  Well, there are these artistic books.

4          THE COURT:  That he's created.  It doesn't matter if

5  other people in the world have created them, and he happens to

6  have bought them.  Apparently, he does have an interest in

7  this kind of material, so --

8          MR. McKINLEY:  Well he has --

9          THE COURT:  Just a minute, Mr. McKinley, but I don't

10  understand the relevance of that with respect to the charged

11  conduct here because as I understand the case, as it's -- I

12  haven't heard from the defendant, of course, but as I

13  understand the case, the Government is alleging and proving

14  through its evidence that whatever other photographs he took

15  or was interested in, or whatever other diversions he had with

16  respect to these photos, he went beyond the pale.  He violated

17  the statute.

18          So it's a rather narrow question.  It's not whether

19  he has an artistic interest in all of this and has other

20  recreational interests in nudism and so forth.  It's whether

21  with respect to these specified photos, they are violative of

22  the statute.  So that's why I don't understand why other

23  material is relevant.

24          MR. McKINLEY:  Your Honor, one of the factors the

25  jury is going to be asked to consider in determining whether

*BYERS - CROSS/MCKINLEY*          210

1  these images portray lascivious exhibition of the genitals is

2  the intent and the design of the photograph itself.  Many of

3  these are books.  Many of these charged images --

4          THE COURT:  Well, that's actually -- I happen to

5  have it in front of me.  Item 6 of the well-known factors that

6  reads "Whether the visual depiction is intended or designed to

7  elicit a sexual response in the viewer."  So it doesn't matter

8  what effect it has on him or what his motive is.

9          MR. McKINLEY:  Your Honor, the images have to be

10  created with the purpose of creating an image of lascivious

11  sexual conduct.  Our position is that this is not --

12          THE COURT:  I don't think that's a precise

13  restatement of the statute.  I read to you the exact quote,

14  Counsel.  And I assume that it's the final passage that's the

15  relevant one here, "whether the visual depiction is intended

16  or designed to elicit a sexual response in the viewer."

17          MR. McKINLEY:  Okay.  May I have just a moment, Your

18  Honor?

19          THE COURT:  Yes, you may, but listen, I have a noon

20  appointment.  It's five till noon.  Are you going to

21  cross-examine this witness?

22          MR. McKINLEY:  Let me finish my cross-examination of

23  the witness.  I'm going to attempt to reintroduce these

24  exhibits through my client this afternoon, and I will be

25  prepared to articulate the specific relevance.

1        THE COURT:  Can you finish your cross-examination of

2   this witness without --

3        MR. McKINLEY:  Yes.

4        THE COURT:  -- without going into --

5        MR. McKINLEY:  Yes, I can and I will.  If I ask the

6   Court, I'd like to -- intend to ask him if they recovered a

7   book, it's a technical book on photographing nudes.  I just

8   intend to ask them that question.

9        THE COURT:  Of nude children?

10       MR. McKINLEY:  No, photographing nudes.

11       THE COURT:  Is it -- does it include nude children?

12       MR. McKINLEY:  I think it does.  I'm not going to

13  seek to introduce the book itself.  I'm just going to ask

14  him --

15       THE COURT:  Well, it has to have to do with nude

16  children.

17       MS. COOK:  I'll look at it.

18       THE COURT:  Okay.  Let's finish up the cross on this

19  witness and then take our noon break.  Is this your last

20  witness?

21       MS. HELART:  No, we have one more.

22       THE COURT:  Who's that?

23       MS. HELART:  Mike Johnson.

24       THE COURT:  What's he going to testify to?

25       MS. HELART:  ExIf data, meta-data from the pictures

*BYERS - CROSS/MCKINLEY*        212

1   matching the Canon camera.  And then we have one last

2   stipulation.  The stipulation has to do with the camera and

3   Dale.  Mike shouldn't be lengthy.

4           MR. COOK:  We expect him to be brief, Your Honor.

5           MS. COOK:  It does not contain photographs of

6   children (indicating).

7           THE COURT:  It doesn't have photographs of

8   children --

9           MS. COOK:  It does not look to me.

10          THE COURT:  So it wouldn't be relevant.

11          MR. McKINLEY:  Because it is a book on taking

12  pictures and photographing nudes in particular, my client -- I

13  mean this was removed from his house.  He removed it from my

14  client's house, and I think the jury is -- it's appropriate

15  for the jury to hear about everything that --

16          THE COURT:  I don't understand what the relevance

17  is.

18          MS. COOK:  It's a technique which would just go to

19  the fact he's a professional imager, photographer, and he's

20  learning how to do this, and it's just a manual that he's

21  used.

22          THE COURT:  My ruling stands that the materials that

23  don't have anything to do with this case are ipso facto not

24  relevant, and a book on the techniques of nude photography,

25  unless it pertains to children, which would perhaps be

*BYERS - CROSS/MCKINLEY*          213

1   relevant, has no relevance to this.

2          I assume that there are all kinds of books out there

3   about photography, photographic techniques.  I assume there

4   are millions of images of photographs of nude people, nude

5   children, tied to this defendant.  That's relevant.  But

6   otherwise, generically, it's not relevant.

7          MS. COOK:  Just so that I understand the Court's

8   ruling, is the Court saying that books that were recovered

9   from his house of photography and nude children are relevant?

10          THE COURT:  I can't -- I don't know about those.

11   You haven't told me anything about those.  And I don't know if

12   there is a book about nude -- photography of nude children,

13   then that might be relevant.  But this book is the only one

14   you've told me about --

15          MS. COOK:  I understand.

16          THE COURT:  -- and the only one I've asked you

17   about.  So I'm not making a hypothetical ruling, but I am

18   telling you where the boundaries are in general.  Okay?

19          MR. McKINLEY:  We will save this for my client's

20   testimony then?

21          THE COURT:  Maybe.

22          MR. McKINLEY:  Maybe.

23          THE COURT:  Okay.

24          MR. McKINLEY:  We will attempt to offer it at that

25   time.

1          THE COURT:  Maybe.

2                    (Open court.)

3   BY MR. McKINLEY:

4   Q    Detective Byers?

5   A    Yes, sir.

6   Q    Let's go back to the items that were removed.  There were

7   several magazines that were removed?

8   A    Yes, I believe so.

9   Q    Did you determine or did you decide what magazines to

10  remove?

11  A    Yes, I did.

12  Q    And what drove your decision as to what magazines to

13  confiscate in that search?

14  A    The search warrant was a state search warrant, so it

15  covered nudity.  So I took -- there was a lot of things in the

16  house, so for -- it's easier to take less.  We took a sampling

17  of what we found, also trying to clear out of the house

18  quicker so the Russells could get back to their home.

19  Q    Okay.  And it included books, right?

20  A    Correct.

21  Q    And art books?

22  A    Correct.

23  Q    Photography books?

24  A    Yes.

25  Q    Okay, thank you.

1          MR. McKINLEY:  Nothing further.

2          THE COURT:  Redirect?

3          MS. HELART:  No, nothing further.

4          THE COURT:  Thank you, Detective.  You may step

5    down.  Watch your step as you leave.

6          Okay, ladies and gentlemen, let's take a noon recess

7    at this time.  We'll reconvene at 20 minutes after 1:00.  It's

8    an hour and 20 minutes from right about now.

9          During this period of recess, as at all times when

10   you're away from the courtroom and from these proceedings, you

11   must keep in mind and comply with the Court's directions to

12   you, which is to say you must not discuss the case among

13   yourselves or allow anyone to discuss it with you.  Don't form

14   any opinions or conclusions with respect to any of these

15   matters until the case is finally submitted to you.

16         We moved through several witnesses but you're not in

17   any position yet to try to pull it together.  So keep your

18   minds open and ready to receive all the rest of the evidence

19   as well as the lawyer's closing arguments and then my

20   instructions.

21         So let's be in recess and reconvene at 20 minutes

22   after one.  I hope you have a nice break.  I like that sun

23   coming through.  Maybe the temperatures did get up as high as

24   the weatherman predicted today.  That would be nice.  You may

25   rise and depart.

216

1                          (Jury excused)

2           (Recess taken from 11:59 p.m. to 1:30 p.m.)

1      **A F T E R N O O N   S E S S I O N**

2            (Open court, jury present)

3      THE COURT:  You may be seated.

4      Agent Michael Johnson?  Good afternoon, Mr. Johnson.

5      THE WITNESS:  Good afternoon, Judge.

6      THE COURT:  Would you be sworn?

7      THE WITNESS:  Thank you.

8      **MICHAEL JOHNSON, PLAINTIFF'S WITNESS, SWORN**

9                  **<u>DIRECT EXAMINATION</u>**

10     THE COURT:  You may be seated.

11     THE WITNESS:  Thank you.

12     MR. COOK:  May I proceed, Your Honor?

13     THE COURT:  Yes, you may.

14     MR. COOK:  Thank you.

15   BY MR. COOK:

16   Q   Would you please state your name for the record and spell

17   your last name for the court reporter?

18   A   Michael Johnson, J-O-H-N-S-O-N.

19   Q   Mr. Johnson, what do you do for a living?

20   A   I'm a special agent with ICE.

21   Q   For how long have you held that position?

22   A   I've been a special agent with ICE since February of 2006.

23   Q   And what did you do prior to becoming a special agent with

24   ICE?

25   A   Prior to my appointment with ICE, I was a police officer

JOHNSON - DIRECT/COOK          218

1   for the City of Indianapolis for approximately 11 years.

2   Q   I suppose we should probably define for the jury what the

3   acronym ICE stands for, if you would?

4   A   ICE is U.S. Immigration and Customs Enforcement.

5   Q   Is that part of a division --

6          THE COURT:  Is your mic on?

7   BY MR. COOK:

8   Q   Is ICE a division of Homeland Security?

9   A   It is.

10  Q   What are your duties with ICE?

11  A   My duties with ICE are that I'm assigned to the office of

12  the resident agent in charge of Indianapolis, which ends up

13  taking in all but three counties in Indiana, the three

14  farthest northwest counties.

15         As part of my duties, I investigate all

16  approximately four hundred statutes that U.S. Immigration and

17  Customs Enforcement is assigned to investigate and enforce;

18  but for the most part, I specialize in cyber-related crimes as

19  I'm trained as a computer forensics agent where I do

20  examination of digital evidence and the actual investigation

21  of the crimes in which that evidence comes from.

22  Q   Can you describe for the jury some of the trainings that

23  you've completed to do the digital forensics?

24  A   Yes, I spent approximately eight weeks at the Federal Law

25  Enforcement Training Center in Glencoe, Georgia, where I

JOHNSON – DIRECT/COOK          219

1  received the basic certification for computer forensics.  And

2  that training went into basic computer operations.  We

3  received the Microsoft A Plus Certification during that

4  training.

5          We went on then to study and utilize many forensics

6  and information-gathering platforms, as well as some open

7  source free-ware-type stuff that can be used to gather

8  information on computer evidence.

9  Q   Now, did this training and digital forensics, did that

10  include training in how to examine digital images and digital

11  cameras?

12  A   Yes, it did.

13  Q   I want to talk to you about digital images, if I may.

14  Define for the jury what a digital image is.

15  A   A digital image, when you're talking about a camera, if

16  you'll think of a digital camera as we used to think of film

17  cameras back when people still used those -- I think they're

18  still around a little bit, but the digital cameras are what

19  most are using -- when the iris of the camera opens, the

20  information from the outside, the light, the shadows, all

21  those things that was introduced into a film camera still

22  comes in there, but instead of being put onto a piece of film,

23  it's put onto a microchip of sorts, which takes that

24  information and then converts it into digital information.

25          Those digital information -- that digital

1  information is called a bit, a bit of information.  That bit

2  of information -- those bits of information are then arranged

3  in a specific manner in which a computer, or a digital picture

4  frame, or your iPod, or whatever medium you're using to view

5  that interprets it, and then places those bits in order to

6  where the picture comes out.

7  Q   Is there a typical, I suppose, kind of file that a digital

8  image is stored as?

9  A   There are a number of types of files.  The most common are

10  JPEG and bitmap.  TIFF you will see sometimes.  They are

11  actually raw images.  There are many different types of files

12  in a camera, your camera phone.  Anything that can take a

13  digital image might make --

14  Q   And the term JPEG, that's shorthand for JPG; is that

15  correct?

16  A   Yes, JPG or JPEG depending on how your device writes it.

17  Q   Does a digital image, the -- I suppose the data that's put

18  into the bitmap and so forth as you explained, is it just the

19  digital image or is there other data that is also part of that

20  bitmap?

21  A   Depending on your device, there is data.  It's ExIf data,

22  it's what is called E-X-I-F, which is short for Exchange

23  Information Format.

24        What ExIf data is is certain types of cameras will

25  record information such as date, time.  They'll also record

1  internal information such as aperture setting all the way up

2  to personal, very personal information about the camera

3  itself, like maybe serial number, things like that.  Then that

4  is embedded in the actual information of the file itself.

5  Q   So an image file will have both the image and at least

6  some of the type ExIf data that will tell you some things

7  about the image?

8  A   Yes, sir, that is correct.

9  Q   I want to talk a little bit more about ExIf data.  Now,

10 when a person normally opens a "image" file, say a JPEG for

11 instance, all one normally sees is the picture, correct?

12 A   That is correct.

13 Q   How is this ExIf data observed?

14 A   The ExIf data can be observed a few ways and in a few

15 levels of detail.  Sometimes, depending on the program that

16 you're using to open the data, there may be a box on the side

17 that might show you some of the stuff:  The date/time taken,

18 some things like that.  Some cameras now are even having GPS

19 information where you can actually tell the exact location

20 where the picture was taken.

21        You can also do it if you're using Windows or

22 Macintosh.  If you can do the right click function that most

23 of us are familiar with with Windows, you can go to Properties

24 and can you see some ExIf data that way that Windows sees when

25 a file is just made on the process there.

JOHNSON – DIRECT/COOK          222

1          You can also use some higher-end ExIf data.  When I

2    say higher end, what I mean is more complete ExIf data from

3    some different types of programs.  IrfanView is one that I

4    often use when I'm viewing photographs that -- it pulls a lot

5    of it off.  That's actually an open source freeware-type thing

6    like I spoke of earlier when I described my training.

7          Some of the forensic platforms we use will extract

8    ExIf data.  So there are many ways you can view it.

9    Q   Just so we all understand open source freeware, that means

10   it's a program that can be found, I suppose, online and anyone

11   can download it and use it for free?

12   A   Yes, sir.

13   Q   I want to draw your attention to the images that were

14   charged in this case.  First of all, are you familiar with

15   those images?

16   A   I am, sir.

17          MR. COOK:  May I approach the witness, Your Honor.

18          THE COURT:  Yes, sir.

19   BY MR. COOK:

20   Q   I'm going to approach you with Government's Exhibits 1, 2,

21   3 and 4.

22   A   Yes, sir.

23   Q   Can you take a moment and flip through those and just

24   refresh your memory of what that is.

25   A   Yes, sir, I recall these.

JOHNSON – DIRECT/COOK            223

1   Q    Did you have an opportunity to examine those images in

2   digital form?

3   A    I did, sir.

4   Q    You'll note on Government's Exhibits 1, 2, 3 and 4, that

5   on each of the images, at the bottom is printed a date and

6   time, as well as a file name of the image.  Is that part of

7   the ExIf data as you've described it?

8   A    Yes, sir.

9   Q    And is the ExIf data accurately portrayed on Government's

10  Exhibits 1, 2, 3 and 4, each of the images there?

11  A    Yes, sir, it is.

12  Q    I suppose for clarity purposes, I should ask.  Essentially

13  what that means is that the date and time that is printed on

14  the image is the date and time that the ExIf data showed it to

15  be?

16  A    Yes, sir.

17  Q    Okay.  And that date and time is the date and time that

18  the camera stamped as the date and time that the image was

19  created?

20  A    Yes, sir.

21  Q    What software did you use to examine the ExIf data in

22  Government's Exhibit 1, 2, 3 and 4?

23  A    I used IrfanView.

24          THE COURT:  You used what?

25          THE WITNESS:  IrfanView.  That is I-R-F-A-N-V-I-E-W,

JOHNSON – DIRECT/COOK          224

1   IrfanView.

2   BY MR. COOK:

3   Q    Staying on the topic of Government's Exhibits 1 through 4,

4   was there additional ExIf data that was displayed by IrfanView

5   on each of the images there?

6   A    Yes, sir, there was.

7   Q    Did the data include the brand of the camera?

8   A    It did.

9   Q    What was the brand of the camera?

10  A    A Canon.

11  Q    Did it include the model of the camera?

12  A    It did, sir.

13  Q    And what was that?

14  A    A 10D.

15  Q    Did it include the serial number of the camera?

16  A    It did, sir.

17  Q    And do you recall what that is off the top of your head?

18  A    I don't specifically, sir.

19  Q    Is there anything that might refresh your recollection?

20  A    Yes, sir, any type of recording of the ExIf data would.

21          MR. COOK:  If I can approach the witness, Your

22  Honor?

23          THE COURT:  You may.

24  BY MR. COOK:

25  Q    Does that refresh your recollection?

1  A   It does, sir.

2  Q   And what was the serial number reflected on each of those

3  images in Government's Exhibits 1 through 4?

4  A   Serial number was 1120405650.

5  Q   Did the ExIf data that you were able to view through the

6  software IrfanView, did it also include other technical data

7  about the camera settings for each of those images in

8  Government's 1 through 4?

9  A   It did.

10       MR. COOK:  With the Court's permission, I'm going to

11  approach you with Government's Exhibit 1A, 2A, 3A and 4A, if I

12  may, Your Honor?

13       THE COURT:  You may.

14  BY MR. COOK:

15  Q   Would you please take a look at those exhibits?

16       THE COURT:  Hang on a minute.  If somebody's got a

17  cell phone, would you turn it off, please?

18       Go ahead.

19  A   Yes, sir, I'm familiar with these.

20  Q   Okay.  Describe for the jury what Government's Exhibit 1A

21  is, what it contains.

22  A   1A contains a copy of the count image from Count No. 1, as

23  well as two sheets --

24       THE COURT:  I'm sorry, I'm not hearing you, sir,

25  copy of the what?

JOHNSON – DIRECT/COOK          226

1          THE WITNESS:  Of the actual image itself ––

2          THE COURT:  A copy of the image.

3          THE WITNESS:  –– from Counts 1, the images from

4   Count 1, as well as two sheets of paper following that is the

5   ExIf data that I was able to recover from the file itself.

6   BY MR. COOK:

7   Q   And is that the ExIf data as observed through IrfanView?

8   A   Yes, sir, it does [sic].

9   Q   And is that ExIf data accurately reflected in the pages

10  that follows each of the images enclosed in Government's

11  Exhibit 1A?

12  A   Yes, it does [sic].

13  Q   And those images, do they correspond to Government's

14  Exhibit 1?

15  A   They do, sir.

16         MR. COOK:  I have my own copy of Government's

17  Exhibit 1A, if I may publish a portion of it to the jury, Your

18  Honor?

19         THE COURT:  Are you going to move its admission?

20         MR. COOK:  I suppose I should do that.

21         THE COURT:  I suppose you should.

22  BY MR. COOK:

23  Q   It does accurately reflect the ExIf data that you

24  observed?

25  A   It does, sir.

1        MR. COOK:  At this point, I would move for admission

2   of Government's Exhibit 1A.

3        THE COURT:  Any objection?

4        MR. McKINLEY:  No objection.

5        THE COURT:  1A is admitted.

6        (Government's Exhibit 1A received in evidence.)

7        MR. COOK:  If I may, I would like to publish a

8   portion of this to the jury.

9        THE COURT:  You may.

10  BY MR. COOK:

11  Q   Special Agent Johnson, I have placed on the image viewer

12  page three of Government's Exhibit 1A.

13  A   Yes, sir.

14       THE COURT:  Wait a minute.  Do you see the way

15  you've got the page turned, it's blocking the light there on

16  your left.  So you can either open it up all the way or move

17  it over towards the center.

18       MR. COOK:  Why don't I open it up all the way, just

19  to be simple, Your Honor.

20  BY MR. COOK:

21  Q   All right.  Government's Exhibit 1A, page three, does that

22  correspond to page three in Government's Exhibit 1A, what's on

23  your image viewer right now?

24  A   Yes, sir.

25  Q   We can see a line that's noted as "Make."  It says

JOHNSON - DIRECT/COOK          228

1  "Canon"?

2  A   Yes, sir.

3  Q   That's referring to what?

4  A   That is the make of the camera in -- which took the

5  picture, the file.

6  Q   The next line down reads "Model."  That's the kind of

7  camera that it is, I suppose, the model of the Canon camera?

8  A   Yes, sir.

9  Q   It reads Canon EOS-10D; is that correct?

10 A   Yes, sir.

11 Q   Going to page four.  Page four is a continuation of the

12 ExIf data as displayed by IrfanView; is that correct?

13 A   It is, sir.

14 Q   Relating to the first image of Count 1?

15 A   Correct.

16 Q   Towards the bottom, there's a line that reads "Camera

17 serial number"?

18 A   Yes, sir.

19 Q   1120405650?

20 A   Yes, sir.

21 Q   That's the serial number as read by IrfanView?

22 A   Correct.

23 Q   Special Agent Johnson, you had an opportunity to review

24 Government's Exhibit 2A?

25 A   Yes.

JOHNSON – DIRECT/COOK          229

1  Q   What is Government's Exhibit 2A?

2  A   Like Exhibit 1A, Government's Exhibit 2A is a copy of the

3  image from Count No. 2 as well as the corresponding ExIf data

4  that was recovered using IrfanView.

5  Q   And those two pages, do they accurately reflect the

6  IrfanView-read ExIf data from that image?

7  A   Yes, sir.

8          MR. COOK:  Your Honor, I would move Government's

9  Exhibit 2A into evidence.

10         THE COURT:  Is this true for 3A and 4A?

11 BY MR. COOK:

12 Q   Special Agent Johnson, is this true for 3A and 4A as well?

13 A   It is, sir.

14         THE COURT:  Why don't you move them all?

15         MR. COOK:  I would move Government's Exhibit 2A, 3A

16 and 4A into evidence.

17         THE COURT:  Any objection, Mr. McKinley?

18         MR. McKINLEY:  I have a question concerning

19 relevancy of these exhibits, at least I object on the grounds

20 of relevancy.

21         THE COURT:  Well, do you want to state the

22 relevancy?

23         MR. COOK:  If I may, Your Honor.  The relevance will

24 become clear when Special Agent Johnson speaks about a camera

25 recovered from the defendant's residence, and also

JOHNSON – DIRECT/COOK          230

1  Government's Exhibit 7, which is a stipulation from Canon

2  regarding some records they maintained about this camera.

3          THE COURT:  The objection's overruled.  Exhibits 2A,

4  3A and 4A are admitted.

5     (Government's Exhibits 2A, 3A, 4A received in evidence.)

6          MR. COOK:  May I approach the witness again, Your

7  Honor?

8          THE COURT:  Yes.

9  BY MR. COOK:

10 Q   Special Agent Johnson, approaching with Government's

11 Exhibit 1B.  Would you tell the jury what that is?

12 A   Yes, sir, these are a series of photos that, through my

13 examination of IrfanView, were taken using the same camera as

14 the previously-entered exhibits.

15 Q   There's a date and time that is noted on each of those

16 images; is that correct?

17 A   Yes, sir.

18 Q   Based on examining the ExIf data, is that an accurate

19 representation of the ExIf data that you viewed for those

20 images?

21 A   Yes, sir, it is.

22 Q   And the date and time reflects when the images were

23 created; is that correct?

24 A   That's correct.

25 Q   At least as stamped by the camera?

1   A    As stamped by the camera, yes, sir.

2   Q    I'll retrieve that from you.

3        Take a look at, Special Agent Johnson –– if I may

4   approach again, Your Honor?

5        THE COURT:  Yes.

6   BY MR. COOK:

7   Q    Special Agent Johnson, I'm approaching with Government's

8   Exhibit 10 and 10A.

9   A    Yes, sir.

10  Q    If you can take a look at those two exhibits, please.

11  A    Yes, sir.

12  Q    First of all, what is Government's Exhibit 10A?

13  A    10A is a camera bag.

14  Q    And what is Government's Exhibit 10?

15  A    Government's Exhibit 10 is a Canon EOS-10D camera.

16  Q    Have you had the opportunity to inspect that camera,

17  Special Agent Johnson?

18  A    I have, sir.

19  Q    First, does it contain any labels on it of any kind?

20  A    Yes, sir.  There is a after-market printed label stuck to

21  the bottom of the camera.

22  Q    What does that label say?

23  A    It says "Dale Russell" and then has a telephone number

24  (317)439-4601.

25  Q    In your examination of the Government's Exhibit 10 camera,

JOHNSON – DIRECT/COOK          232

1  were you able to find a serial number on it as well?

2  A   I was, sir.

3  Q   Where's the serial number located?

4  A   The serial number is located on the bottom of the camera

5  itself.

6  Q   Can you state what that serial number is?

7  A   The serial number is 1120405650.

8  Q   Is that the same serial number stated by the ExIf data on

9  each of the images that we've discussed today in the various

10 exhibits?

11 A   It is, sir.

12 Q   Did you have an opportunity to examine how Government's

13 Exhibit 10 works in conjunction with the IrfanView software?

14 A   I was, sir.

15 Q   Did you take test pictures?

16 A   I did.

17 Q   So I suppose first of all, is Government's Exhibit 10A

18 still an operable camera?

19 A   It is, sir.

20 Q   Did you view the ExIf data from those test pictures

21 through IrfanView?

22 A   I did.

23 Q   Were you able to determine whether the ExIf data as

24 reported from IrfanView was accurate?

25 A   Yes, sir, with regards to the serial number, the make, the

JOHNSON – DIRECT/COOK          233

1  model and the time I was.  I did not -- I did not record any

2  of the -- or I do not recall any of the internal settings of

3  the camera.

4  Q   But IrfanView you did observe on the test pictures, the

5  make, the model and the serial number?

6  A   Yes, I did observe those.

7  Q   You noted that the date and time that was on the test

8  photographs was correct.  What does that indicate about the

9  camera?

10  A   What that indicates is there's an internal battery on a

11  device such as this.  In a computer, it would be called the

12  BIOS battery.  I'm not familiar with the terminology that

13  photography folks would use, but it would do the same type of

14  thing with a BIOS battery, which is it sets the internal clock

15  and some of the internal settings on the camera so that they

16  do not change every time you cut the power off, or if you

17  change your operational battery or what have you.  So it would

18  indicate to me that that battery has remained good from the

19  last time that this was used.

20          MR. COOK:  Can I have just one moment with

21  co-counsel, Your Honor?

22          THE COURT:  You may.

23              (Off-the-record discussion.)

24          MR. COOK:  At this point, Your Honor, I would

25  propose to read into evidence Government's Exhibit 7, which is

JOHNSON – DIRECT/COOK          234

1   the stipulation.

2          THE COURT:  Is 1B in evidence?

3          MR. COOK:  It is, Your Honor.

4          THE COURT:  Okay.  Now Exhibit 7?

5          MR. COOK:  Government's Exhibit 7, which is a

6   stipulation.

7          THE COURT:  All right.  Is this your stipulation,

8   Mr. McKinley?

9          MR. McKINLEY:  Yes, it is, Your Honor.

10          THE COURT:  All right.  You may read the stipulation

11   to the ladies and gentlemen of the jury.

12          MR. COOK:  Thank you, Your Honor.

13          "Stipulation:  The United States of America, by and

14   through its counsel, Timothy M. Morrison, United States

15   Attorney for the Southern District of Indiana, and Gayle L.

16   Helart and A. Brant Cook, Assistant United States Attorneys,

17   and the defendant, by and through his counsel, James C.

18   McKinley, hereby stipulate and agree as follows:

19          "David Panetta, or another Canon USA, Inc.

20   representative, whose duties include being a custodian of

21   records of Canon, if called to testify would state the

22   following:  Canon, Inc., a Japan-based company, manufacturers

23   cameras, scanners, printers and other products relating to

24   photography, and the printing and storing of photographs.

25   Canon, Inc.'s products are offered for sale in the United

1   States of America through its exclusive authorized United

2   States importer and distributor, Canon USA, Inc., which is

3   headquartered in Lake Success, New York.

4          "Canon products are accompanied by warranty cards

5   that allow Canon to more efficiently and effectively provide

6   customer service and manage warranty claims relating to their

7   products.  At times relevant to the present case, warranty

8   cards could be returned to Canon for entry by customer service

9   staff into a database.

10          "Canon's database retains the information provided

11  in the warranty cards, which includes the name of the

12  registrant, any provided contact information of the registrant

13  and the serial number of the Canon product.

14          "On December 31, 2003, a warranty card for a Canon

15  EOS-10D digital camera, serial number 1120405650 was returned

16  to Canon and provided the following name and contact

17  information for registrant:  First name, Dale; last name,

18  Russell; Address 1, P. O. Box 2525; City, Indianapolis; State,

19  I-N for Indiana; zip code, 46206.

20          "Canon also retains a record of any warranty claims,

21  customer service inquiries and repairs, which include the name

22  and current contact information of the claimant.  In

23  January 2005, a Canon EOS-10D digital camera, serial

24  No. 1120405650 was shipped to Canon for repairs from the below

25  name and address.  Following repairs on February 7, 2005, the

JOHNSON – DIRECT/COOK          236

1   Canon EOS–10D digital camera, serial number 1120405650, was

2   shipped back to the same below name and address:

3          "Name, Dale Russell; Address, 664 Marana Drive,

4   Carmel, Indiana, 46032.

5          "Canon products are manufactured outside of the

6   state of Indiana.  Canon EOS–10D digital cameras are

7   manufactured to embed in each digital image information about

8   the photograph, including the make, model and serial number of

9   the camera, the date and time the picture was taken and other

10  technical features of the camera's settings.

11         "By affixing their signatures hereto, the Government

12  and defendant's counsel, with the consent of the defendant,

13  agree to this stipulation and that the stipulation may be

14  entered into evidence during the course of the trial in this

15  case.

16         "Respectfully submitted, signed Dale Russell, James

17  C. McKinley, attorney for Dale Russell, Gayle Helart,

18  Assistant United States Attorney, and A. Brant Cook, Assistant

19  United States Attorney."

20         THE COURT:  Your stipulation is admitted.

21         (Government's Exhibit 7 received in evidence.)

22         MR. COOK:  Your Honor, I have no further questions

23  of this witness.

24         THE COURT:  All right, Mr. McKinley, cross-examine?

25         MR. McKINLEY:  Thank you, Your Honor.

**CROSS EXAMINATION**

1

2   BY MR. McKINLEY:

3   Q    Good afternoon, Special Agent Johnson.

4   A    Good afternoon, sir.

5   Q    You have, in fact, examined that camera in the course of

6   this investigation, correct?

7   A    That is correct, sir.

8   Q    All right.  Were you able to determine the file size on

9   images that are made by that camera?

10  A    That's not something I looked for, sir.

11  Q    So you don't know the answer?

12  A    No, sir, I don't know.

13  Q    The file size of the images is not contained in the ExIf

14  data?

15  A    I don't specifically recall because that's not data that I

16  was looking for.

17  Q    I want to refer to Government's Exhibit 1A, pages three

18  and four I believe that Mr. Cook showed you.  I'll put them on

19  the screen.

20  A    Okay.

21  Q    I'm going to try to zoom out.  You reviewed that prior to

22  the hearing today, correct?

23  A    Yes, sir.

24  Q    Okay.  Is there anywhere on there where I can ascertain

25  the file size of the images that are made by the --

*JOHNSON - CROSS/MCKINLEY*        238

1  A    I will try.  If you could -- I don't know if it's you,

2  Mr. McKinley, or me.  I'm having trouble focusing on the --

3  Q    Perhaps it would be easier for me to just give you --

4  A    Please --

5  Q    -- the exhibit?

6  A    Thank you, sir.

7  Q    And Special Agent Johnson, my questions are going to

8  relate simply to the ExIf data that is related to the first

9  image charged in Count 1?

10  A    Yes, sir.

11  Q    I believe that's on pages three and four of the exhibit.

12  A    The only thing that I would see that would indicate any

13  type of size -- and when you're talking about size, it would

14  be relative to the amount of data in the image, not

15  necessarily the size of the image -- is what appears to be

16  some type of number that is assigned by the camera for

17  resolution at a specific focal length.

18        And I am not sure, because it doesn't give any type

19  of definition after that number, I don't know what that number

20  is referring to.  So that would be the only thing that would

21  indicate any type of size.

22        And it's not size in relation to how big a picture

23  would be to look at, but size as relative to how much

24  information is in a specific -- and again, that number to me

25  any way, appears to be arbitrary.  I don't know what it is

*JOHNSON - CROSS/MCKINLEY*        239

1  referring to.

2  Q   Okay.  Directing your attention to page four of

3  Government's Exhibit 1A.

4  A   Yes, sir.

5  Q   I'm going to put it up here on the screen as well.  The

6  image size that's referenced within the circle that I just

7  drew on your screen there --

8  A   Yes, sir, I do see that.

9  Q   It says "large"?

10  A   Yes.

11  Q   What does that refer to?

12  A   Again, that is, as far as I know, that is a -- to say what

13  it specifically means, I don't know.  It's an arbitrary size

14  that's assigned by camera -- by Canon itself.

15  Q   Okay.  Can you tell from the ExIf data whether this image

16  was taken with a normal lens or a wide-angle lens?

17  A   Just a moment, sir.

18          It was taken with a 50-millimeter lens, and it

19  appears, according to this, and that is off of page No. 3 when

20  it talks about focal length.  When I say 50-millimeter lens,

21  if I can explain that a little bit?

22  Q   Let me put the exhibit on the screen here.  You're talking

23  about focal length?

24  A   Focal length.

25  Q   50 millimeter?

1  A   Well, what I don't know with this camera –– what I found

2  through my testing is that every camera reports information

3  differently.  So I can't say specifically whether this camera

4  would be able to tell –– if I were to place an adjustable lens

5  at 50 millimeters, if it would be able to know that that's

6  50 millimeters or if it's actually ExIf data coming from the

7  lens that would indicate 50 millimeters.

8          All I can tell you from this is that the ExIf data,

9  the camera is telling that image, that that's 50 millimeters.

10 Q   If I can just get to my point here, Special Agent Johnson?

11 A   Yes, sir.

12 Q   Is it fair to say that you cannot tell from the ExIf data

13 whether the image has been modified since it was originally

14 taken?

15 A   No, sir, there's nothing that indicates that.

16 Q   There's no way to tell from this ExIf data whether or not

17 it has been modified?

18 A   No, sir.

19 Q   And stated differently, it could have been modified but it

20 wouldn't be reflected in the ExIf data?

21 A   There is no way for me to tell if it has been modified.  I

22 couldn't say if it has been or it hasn't.

23 Q   All right, thank you, sir.

24          MR. McKINLEY:  That is all, Your Honor.

25          THE COURT:  All right.  Redirect?

1            MR. COOK:  No questions, Your Honor.  Thank you.

2            THE COURT:  Thank you, sir.  You may step down.

3   Watch your step as you leave.

4            THE WITNESS:  Thank you, Judge.

5            THE COURT:  Mr. Cook?

6            MR. COOK:  Your Honor, the Government has no further

7   witnesses.

8            THE COURT:  The Government rests?

9            MR. COOK:  The Government rests.

10           THE COURT:  Lawyers, approach the bench for a

11  minute, please.

12                (Bench conference on the record.)

13           THE COURT:  Will the defense have a motion to make?

14           MR. McKINLEY:  At this time, Your Honor, the defense

15  would move for judgment of acquittal on Counts 2 and 4.

16           THE COURT:  2 and 4?

17           MR. McKINLEY:  2 and 4.  Those are the counts based

18  on the images that were taken at Spectrum Gym.  It's our

19  position, Your Honor, that those images portray simple nudity.

20  The jury could not reasonably find that those images rise to

21  the level of lascivious exhibition of the genitals or pubic

22  area.

23           With regard to 1 and 3, we concede the jury could

24  make such a finding, but not with respect to images supporting

25  Counts 2 and 4 as they portray simple nudity and don't rise to

1    the level of lascivious exhibition.

2            THE COURT:  Who will argue?

3            MS. HELART:  I can argue.  Your Honor, we would ask

4    the Court to deny this Rule 29 motion.  The girls said that

5    they got paid for photo shoots, so the verbs are all met even

6    for the gym pictures:  Used, employed, persuaded, enticed, any

7    of those verbs could be found by the jury.

8            The defendant took them in an unusual or secretive

9    place, covered the windows, and then directed them about

10   various poses to make.  And we think this is exactly what the

11   jury can infer the facts that he engaged -- had them engage in

12   sexually-explicit conduct for the specific purpose of

13   producing the image of them engaging in sexually-explicit

14   conduct.

15           So we think there's some evidence upon which it

16   should go to the jury for all four counts.

17           THE COURT:  Response?

18           MR. McKINLEY:  The issue -- the ultimate issue here,

19   Judge, is the images themselves.  The images speak for

20   themselves.  And I think the Court could view these images on

21   its own and conclude that there's some nudity here, that

22   there's no way that a jury could reasonably conclude that

23   these constitute lascivious exhibition.

24           THE COURT:  All right.  The Court will take the

25   motion under advisement, and direct the defense to go forward

*JOHNSON − CROSS/MCKINLEY*        243

1  with whatever evidence it intends to present, if any.

2          Do you?

3          MR. McKINLEY:  We are ready to proceed with the

4  defense, Your Honor.

5          THE COURT:  All right.  You may call your witness.

6              (Open court, jury present.)

7          THE COURT:  Ladies and gentlemen, you've heard the

8  Government lawyer, Mr. Cook, state to the Court that the

9  Government rests.  That means that the Government has

10 presented all of the evidence that it intends to present in

11 its case-in-chief.

12         So we've moved that far through the process as I

13 outlined it to you in the pretrial instructions.  So now I'll

14 ask Mr. McKinley what the defense intends.

15         MR. McKINLEY:  Your Honor, at this time, the defense

16 is prepared to proceed, and the defense would call the

17 defendant, Dale Russell.

18         THE COURT:  All right.  Mr. Russell.  Mr. Russell,

19 remain standing, be sworn by the Clerk.

20         **DALE RUSSELL, DEFENDANT'S WITNESS, SWORN**

21                  **<u>DIRECT EXAMINATION</u>**

22         THE COURT:  You may be seated.

23 BY MR. McKINLEY:

24 Q   Sir, would you state your full legal name?

25 A   Dale Irvin Russell.

1  Q   And how old are you, Mr. Russell?

2  A   48.

3  Q   Where were you born?

4  A   In Indianapolis.

5  Q   And you've lived in and around Indianapolis most of your

6  life?

7  A   Yes, I have.

8  Q   Did you attend high school here?

9  A   Yes.

10  Q   Where did you attend high school?

11  A   At Manual High School.

12  Q   Did you graduate?

13  A   Yes.

14  Q   What year did you graduate from high school?

15  A   1980.

16  Q   What did you -- did you further your education after

17  graduating from high school?

18  A   Yes, after graduating high school, I went to IUPUI.

19  Q   What year did you attend IUPUI?

20  A   1980.

21  Q   And how far did you go at IUPUI?

22  A   Part of the first semester.

23  Q   Did you leave after your first semester?

24  A   Yes.

25  Q   What did you study?

RUSSELL – DIRECT/MCKINLEY       245

1   A   I started electrical engineering.

2   Q   What did you do after you left IUPUI that year?

3   A   I left IUPUI to go to work for RCA Corporation.

4   Q   What did you do for RCA?

5   A   I was an electrical –– electronic component test

6   technician.

7   Q   How long did you work at RCA?

8   A   Approximately two years.

9   Q   Did you eventually return to college?

10  A   Yes.

11  Q   When did that happen?

12  A   I went back to IUPUI in 1985.

13  Q   What did you study at IUPUI?

14  A   I continued electrical engineering.

15  Q   How long did you attend IUPUI on that occasion?

16  A   Until 1987.

17  Q   Did you graduate?

18  A   Yes, in 1989.

19  Q   From IUPUI?

20  A   Yes.

21  Q   At any time, did you transfer schools?

22  A   Yes, while I was still at IUPUI, I switched from

23  electrical engineering to sports science, which is a division

24  of physical education.

25  Q   Okay.  So you obtained a degree in physical education?

RUSSELL – DIRECT/MCKINLEY          246

1   A   Correct.

2   Q   From Indiana University?

3   A   Right, Bloomington.

4   Q   All right.  What did you do after graduating from Indiana

5   University with a degree in physical education?

6   A   I looked for jobs in gymnastics but there weren't any

7   available at that time.  So I finally ended up getting a job

8   at American Monitor Corporation.

9   Q   What's American Monitor Corporation?

10  A   They build blood analysis equipment for hospitals.

11  Q   All right.  And what did you do for them?

12  A   I was a quality control test technician.

13  Q   All right.  Where is American Monitor?  Is it here in

14  Indianapolis?

15  A   Yes, they went out of business.

16  Q   All right.  And you commenced work there about 1990?

17  A   Yes.

18  Q   All right.  And you were also married that same year?

19  A   Correct.

20  Q   To Dawn Russell?

21  A   Right.

22  Q   We've heard testimony in the course of the trial that you

23  and Dawn were married in 1990, divorced in 1998?

24  A   That's correct.

25  Q   You had three children by that marriage?

RUSSELL – DIRECT/MCKINLEY          247

1   A    Yes.

2   Q    A son, Aaron?

3   A    Uh-huh.

4   Q    Yes?

5   A    Yes.

6   Q    And then two daughters, Jane Doe 1 and Jane Doe 2, who's

7   testified at trial here?

8   A    Correct.

9   Q    We also heard testimony that you were separated in about

10  1996?

11  A    Yes.

12  Q    So you were separated about two years before your divorce

13  was final?

14  A    About a year and a half, year and three-fourths.

15  Q    All right.  And upon the separation, you moved out of the

16  house?

17  A    Yes.

18  Q    All right.  Where did you move to?

19  A    I moved into a friend's house in Greenfield.

20  Q    All right.  I believe that there was a -- well, there was

21  a stipulation introduced that you eventually moved and lived

22  at the Braeburn Apartments?

23  A    Right.

24  Q    That was from August 2003 to August 2004?

25  A    Right.

1  Q   Who did you live there with?

2  A   With my at the time fiance, Betsy.

3  Q   Betsy?

4  A   Uh-huh.

5  Q   Anyone else?

6  A   Her daughter, Amy.

7  Q   And you eventually married Betsy?

8  A   Yes.

9  Q   When did you marry Betsy?

10 A   In October of 2004.

11 Q   All right.  So you were living at Braeburn from

12 August 2003 to August of 2004.  Where did you move after you

13 left Braeburn?

14 A   To Marana Drive in Carmel.

15 Q   So you moved there approximately August of 2004?

16 A   Yes.

17 Q   And then you were married in October 2004?

18 A   Correct.

19 Q   And you lived on Marana Drive with Betsy and her daughter?

20 A   Right, and my kids, you know, visiting.

21 Q   So you did have visitation during this period?

22 A   Correct.

23 Q   Going back to the separation period, 1996 to 1998, did you

24 have regular visitation with your daughters?

25 A   I was supposed to, but it was sporadic.

1   Q   Were there times when they just spent the weekend with

2   you?

3   A   Yes.

4   Q   Were there times when they spent weeks at a time with you?

5   A   Yes.

6   Q   And then what about after the divorce, say 1998 up and

7   through, say, 2004, how was the visitation structured during

8   that period?

9   A   It varied between every other weekend and, you know, one

10  or two days during the week, up to roughly half of the time

11  between the two households.

12  Q   Now, I want to take you back to 1996 when you were just

13  separated from your ex-wife, Dawn.

14  A   Okay.

15  Q   Were you employed at that time?

16  A   Yes.

17  Q   And where were you employed?

18  A   At Master Lab.

19  Q   What is Master Lab?

20  A   It's a photo studio and photo lab all in one.

21  Q   And where is Master Lab located?

22  A   On the east side of Indianapolis.

23  Q   What did you do there at Master Lab?

24  A   I was a lab technician.  I kept the equipment and

25  computers working.

RUSSELL - DIRECT/MCKINLEY        250

1   Q    And you eventually left Master Lab?

2   A    Yes.

3   Q    When did you leave Master Lab?

4   A    After Christmas 1996.

5   Q    And what did you do for a living after you left Master

6   Lab?

7   A    I did photography, you know, weddings, portraits and any

8   kind of freelance photography I could.

9   Q    Were you working for some other photographer or were you

10  just working on your own?

11  A    I was completely on my own.

12  Q    You said you did portraiture work and other types of

13  photography projects?

14  A    Right, I continued that from -- I had done it for quite a

15  while.

16  Q    Well, let's talk a little bit about your work as a

17  photographer.  When did you first take an interest in

18  photography?

19  A    I got my first camera at about eight years old.

20  Q    And from then, did you continue on in developing your

21  photographic skills?

22  A    Yes, I got, between age eight and around sixth grade, I

23  had a couple other new cameras, and I continued through high

24  school.

25  Q    Has it been a lifelong endeavor for you?

RUSSELL – DIRECT/MCKINLEY          251

1  A    Yes.

2  Q    Did you work doing any photography work while you were in

3  high school?

4  A    Yes, I was on the yearbook staff and the newspaper staff.

5  Q    Did you have any other specialized training, any projects,

6  clubs, workshops, that type of thing?

7  A    Yes, I was selected to go to Ball State University for a

8  photo journalism workshop.  I was the only photographer out of

9  six in the school that was selected.

10 Q    Did you, in fact, obtain any credit towards a fine arts

11 degree?

12 A    Yes.

13 Q    Now over the years, have you developed a subject of choice

14 in your photography?

15 A    Yes, most of my pictures are of people.

16 Q    And any particular -- well, strike that.

17         In addition to photographing people, you have

18 photographed events, landscapes, sunsets.  Any other areas of

19 interest or expertise?

20 A    Yes, a lot of my work, my paid work, is sporting events,

21 weddings, and other occasions where people need photography.

22 Q    Okay.

23 A    I do a lot of soccer games and, you know, gymnastics meets

24 and so forth.

25 Q    Mr. Russell, I'm going to hand you what's been marked for

RUSSELL – DIRECT/MCKINLEY        252

1  purposes of identification as Defendant's Exhibits A, B, C, D,

2  E, and F.  I'm just going to ask you if you can identify what

3  these are?

4  A   Okay.

5          MR. COOK:  May we approach, Your Honor?

6          THE COURT:  What's the objection, relevance?

7          MR. COOK:  Yes, the objection is to relevance as

8  to –– at least as to Defendant's Exhibits C and F, I'll make a

9  general relevance objection as to A through E as well.

10         THE COURT:  Counsel, you'll have to ask more

11  questions to establish the relevance, time ––

12         MR. McKINLEY:  Your Honor, could I at least have him

13  see if he can identify the exhibits?

14         THE COURT:  Well, yes, but you –– there's a

15  relevance objection no matter what he says apparently.

16         MR. McKINLEY:  Okay.  Could I establish for the

17  record what the ––

18         THE COURT:  Yes, you may do that.

19         MR. McKINLEY:  Okay.

20  BY MR. McKINLEY:

21  Q   Mr. Russell, have you had an opportunity to review

22  Defendant's Exhibits A, B, C, D, E and F?

23  A   Yes, I have.

24  Q   And could you describe what they are?

25  A   Those are photos I took of my kids between probably

RUSSELL – DIRECT/MCKINLEY          253

1  2002-2003, as well as a photo of a nude mother and her child

2  while she was pregnant, as well as a nude of one of my

3  children.

4  Q   All right.

5           MR. McKINLEY:  Your Honor, at this time, I would

6  offer Defendant's Exhibits A through F.

7           THE COURT:  What is the relevance, Counsel?

8           MR. McKINLEY:  I'm sorry?

9           THE COURT:  What is the relevance, Counsel.

10           MR. McKINLEY:  May I approach, Your Honor?

11           THE COURT:  Yes.

12               (Bench conference on the record.)

13           MR. McKINLEY:  Your Honor, it's relevant as

14  background information.  Rule 401 only requires minimal

15  probative value for introduction of evidence.  This is --

16           THE COURT:  I'm looking for minimal probative value.

17  What would that be?

18           MR. McKINLEY:  Background, Your Honor, is in fact --

19           THE COURT:  Background what?

20           MR. McKINLEY:  Background for taking the photos that

21  are at issue here, and the background for all of the incidents

22  that have been described.

23           THE COURT:  What's the point you want to make?  I

24  don't think -- is it in dispute that he took the photos?

25           MR. McKINLEY:  Your Honor --

RUSSELL - DIRECT/MCKINLEY          254

1          THE COURT:  Is it in dispute that he took the

2     photos?  I mean, that's just a yes or a no.

3          MR. McKINLEY:  What is the yes or no question again?

4          THE COURT:  I said, is it in dispute that he took

5     the photos that have been charged here?

6          MR. McKINLEY:  No, it was conceded in opening

7     statement, Your Honor.

8          THE COURT:  So is there a dispute that he's taken

9     photographs, he's taken photographs and been a photographer

10    all his life?  Is that in dispute?

11         MR. McKINLEY:  I don't think it is in dispute, no.

12         THE COURT:  So I don't see the relevance of

13    photographs that are pictures that he's taken in the course of

14    his interest in his career as a photographer.  That's what I'm

15    trying to get at, and when I have asked this question before,

16    you haven't been able to tell me what the relevance is of

17    these kinds of materials, so I'm waiting to hear, sir.

18         MR. McKINLEY:  Your Honor, I submit that this is

19    relevant to show or dispel the notion that the only photos

20    he's ever taken are of naked kids, particularly his own

21    children.  The fact of the matter is he has taken tens of

22    thousands of photographs over the years.  The Government has

23    spent two half days of testimony vilifying him, castigating

24    him and attempting to --

25         THE COURT:  Counsel, that doesn't answer the precise

1  question before the Court or the jury --

2          MR. McKINLEY:  Your Honor --

3          THE COURT:  -- and that is with respect to these

4  precise photos.  So it's not in issue whether he was a

5  photographer, and he took tens of thousands of photos

6  generally on a variety of things.

7          MR. McKINLEY:  Your Honor, I'm merely trying to

8  remove, to the extent I can, this shroud of perversion that

9  the Government has spent two half days presenting evidence

10  about by presenting evidence as to these websites, the girls

11  being paid, the clothes that were being purchased.

12          THE COURT:  If these have relevance, you're not

13  there yet, Mr. McKinley.  And you've got to establish through

14  his testimony these things that you say are true with respect

15  to his doing lots of different kinds of photography.  And if

16  you want to put in six examples of things he's done, you have

17  to at least lay the foundation for that.

18          Based on what you've told me here, although it's

19  barely satisfying the relevance issue, but it might if you

20  lead up to it and ask those kinds of questions, but you're not

21  there yet.

22          MR. McKINLEY:  All right.  Thank you very much.

23                  (Open court.)

24          THE COURT:  At this point, I'll sustain the

25  objection.

RUSSELL – DIRECT/MCKINLEY          256

1          MR. McKINLEY:  Mr. Russell —

2          THE COURT:  Is your mic on, sir?

3   BY MR. McKINLEY:

4   Q   Mr. Russell, over the course of your professional

5   photography career, have you ever won any awards for your

6   photography?

7   A   Yes, I have.

8   Q   Could you describe what kind of awards you've won?

9   A   Some awards — various awards from small festivals to

10  larger art showings.  One was in a small festival in

11  Greenfield called Riley days, a photography contest.  One in

12  Cincinnati called, I think, Cincinnati Art Show or Art Fair.

13  I got Best in Show there.  I got an award for my art showing

14  in Texas and one in Miami.  I don't recall the names of those

15  shows.

16  Q   Are any of the images that you described as contained in

17  Defendant's Exhibits A through F, have any of those won awards

18  for you?

19  A   Yes.

20  Q   Do you know which ones?

21  A   The nude —

22  Q   Without describing it, perhaps you could just identify it

23  by the exhibit number.

24  A   Exhibit D and A and also F.

25  Q   Exhibits A, D and F?

RUSSELL - DIRECT/MCKINLEY          257

1          THE COURT:  A?  I thought he said E.

2          THE WITNESS:  D, like David.  I'm sorry, I have a

3   little cold.

4          THE COURT:  Me, too.

5   BY MR. McKINLEY:

6   Q   I'm confused now, too.  Which ones, A, D and E?

7          THE COURT:  F.

8   A   A, D and F.

9   Q   Okay.  And with respect --

10          MR. McKINLEY:  Well, first of all, I would move to

11   introduce those exhibits.

12          THE COURT:  And what's the purpose of the offer?

13          MR. McKINLEY:  The purpose is to show the background

14   concerning his photography and that these are the typical

15   types of photos --

16          THE COURT:  He didn't say that, Counsel.

17   BY MR. McKINLEY:

18   Q   Do Exhibits A, B, C, D, E, and F represent the typical

19   type photos that you have submitted for the art shows.

20   A   Yes.

21   Q   And photography shows?

22   A   Yes.

23   Q   And some of them, in fact, have won awards?

24   A   Yes, they have.

25          MR. COOK:  I'm going to object as to relevance as to

1   what particular photos won awards, what were submitted to what

2   show.  It's not in dispute that Mr. Russell's a photographer,

3   so I don't see the relevance of this at all.

4            THE COURT:  Do you want to explain it to the Court?

5            MR. McKINLEY:  Again, these are offered simply for

6   background information.

7            THE COURT:  Background what, counsel?  That he is a

8   photographer?

9            MR. McKINLEY:  It's background information

10  concerning his practice, his experience and his --

11           THE COURT:  That's not in evidence.  You haven't

12  elicited any of that.

13           MR. McKINLEY:  All right.

14           THE COURT:  Is it stipulated that he was a

15  photographer over the course of his career.

16           MR. COOK:  It's stipulated, Your Honor.

17           THE COURT:  And that he was a professional

18  photographer?

19           MR. COOK:  He did photography for money and in that

20  sense, he was a professional.  So stipulated.

21           THE COURT:  Not in dispute, Counsel.

22  BY MR. McKINLEY:

23  Q   Mr. Russell, the photographs that you've won awards for in

24  the past, you consider fine art photography?

25  A   Yes.

1  Q    Primarily portraiture work?

2  A    Yes, artistic portraits.

3  Q    I'm sorry?

4  A    Artistic portraits.

5  Q    Did you do portraits of your children?

6  A    Yes.

7  Q    And portraits of others?

8  A    Yes, I have.

9  Q    Have you ever photographed subjects in the nude?

10  A   Yes, I have.

11  Q   Adults?

12  A   Yes.

13  Q   Children?

14  A   Yes.

15  Q   Have any of your portraits of nude children won awards?

16          MR. COOK:  Objection.

17          THE COURT:  What's the objection?

18          MR. COOK:  The objection is that it's irrelevant

19  whether any of his photos won awards.  That goes to other

20  people's views of their worth --

21          THE COURT:  I can't hear you, sir.  Do you have a

22  cold?

23          MR. COOK:  I do have a bit of a cold as well, Your

24  Honor.

25          THE COURT:  Well, then, you have to compensate like

RUSSELL – DIRECT/MCKINLEY        260

1  the rest of us.

2          MR. COOK:  It kind of caught up to me for a moment

3  when it had not before.

4          The objection is that other people's evaluation of

5  Mr. Russell's work is not relevant in this case.  Those people

6  aren't here to be cross-examined.  It's just simply not

7  relevant to the issue that is here.

8          THE COURT:  Do you want to respond?

9          MR. McKINLEY:  Well, it's certainly more relevant

10  than all of the uncharged images that have been introduced in

11  this case, including Government's Exhibit's 1A that is not

12  charged.

13          THE COURT:  Counsel, the Court made a ruling on

14  those and those are in evidence.  So your response to the

15  pending objection is inappropriate.

16          MR. McKINLEY:  My --

17          THE COURT:  Do you want to respond to the pending

18  objection?

19          MR. McKINLEY:  My response then, Your Honor, is that

20  the -- what I'm attempting to elicit here and introduce is

21  relevant as far as background, and that is the sole basis

22  for --

23          THE COURT:  I'll sustain the objection because I

24  don't understand what "background" means when the apparently

25  relevant facts are stipulated.

RUSSELL – DIRECT/MCKINLEY          261

1  BY MR. McKINLEY:

2  Q   Mr. Russell, any specific training in the art of

3  photographing nude subjects?

4  A   Yes.

5  Q   And could you describe what kind of training or education

6  you've received in that regard?

7  A   Had a photograph workshop at Herron Art School and

8  included in that was a small section on photographing nude

9  subjects.

10          I also have roughly probably 50 or 60 photographic,

11  you know, manuals on how to photograph and probably 10 percent

12  of those are related to nude subjects.  I've also researched

13  and looked at other artists, their photography, and --

14  Q   Okay.  What other artists have you researched with respect

15  to the art of photographing nudes?

16  A   Anne Geddes, Jacque Sturges, Saliman, and Ron Oliver are

17  the main ones.

18  Q   Have you collected works or photography records of any of

19  these various artists that you've described?

20  A   Yes, I have.

21  Q   Which ones?

22  A   All of them.  I have books from all of them.  A couple of

23  artists I have actually prints from them, signed prints.

24  Q   Could you tell the jury what the primary subject matter of

25  photography of Jacque Sturges is?

RUSSELL - DIRECT/MCKINLEY         262

1  A   Jacque Sturges --

2          MR. COOK:  Object to the primary subject matter of

3  another photographer.

4          THE COURT:  I'll sustain that objection, Counsel.

5  BY MR. McKINLEY:

6  Q   Do you recall there being testimony about a search that

7  was conducted at your house on I think it was June 27th, maybe

8  2005?

9  A   Yes.

10 Q   All right.  And you were present when that search

11 occurred?

12 A   Yes, I was.

13 Q   And, in fact, some of those books that you had accumulated

14 or acquired over the years were taken in the search?

15 A   Yes.

16          MR. McKINLEY:  Your Honor, may we approach?

17          THE COURT:  Yes.

18          (Bench conference on the record.)

19          MR. McKINLEY:  I recognize Your Honor has already

20 made a preliminary ruling about the admissibility of the books

21 that were removed in the search, but to perfect the record, I

22 have labeled Defendant's Exhibit I, which for the record is a

23 photographic collection of Jacque Sturges portraying nude

24 children, and I would offer that at this time.

25          THE COURT:  What's the purpose of the offer?

RUSSELL – DIRECT/MCKINLEY          263

1          MR. McKINLEY:  I'm sorry?

2          THE COURT:  What's the purpose of the offer?  What

3    fact in dispute does it go to prove?

4          MR. McKINLEY:  Your Honor, the purpose of this is to

5    assist the jury in making the ultimate determination in this

6    case.  I don't think there's any dispute that nudity by itself

7    is not a defense.

8          THE COURT:  That's true.

9          MR. McKINLEY:  The range of photographs portraying

10   nudity rate everywhere from a baby in the bathtub to lude and

11   disgusting photos that are far above the spectrum than what is

12   contained in this case.

13         The relevance here, Your Honor, is two-fold.  Number

14   one, the images that are contained in this book could assist

15   the jury in establishing where that line is drawn because this

16   book, like the other images, are books that can be acquired in

17   Border's Bookstore.

18         THE COURT:  Counsel, it's a matter of law.  It's not

19   a matter of art or a matter of taste.  It's a matter of law.

20   And unless you have something you haven't told me yet, I don't

21   know anything about this book.

22         So is it something that's legitimate?  I don't know

23   if that's true.  And I assume, because I haven't been told

24   otherwise, that there's been no legal determination as to the

25   acceptability of those published photographs under the

RUSSELL - DIRECT/MCKINLEY          264

1  statutes in question here.

2          So there's just not enough of a foundation, and it

3  would mislead the jury into thinking that their role is to

4  compare these photographs to what will be represented as

5  legitimate art.  And I don't know if it is legitimate art

6  frankly.

7          It could be -- I say this for making the point more

8  clearly that it could be that it's more important or of some

9  importance that it was accessible to the witness and that he

10 used that as his stand.  So the comparison that you're asking

11 the jury to make by putting in allegedly -- asserting

12 apparently -- legitimate art is beyond the purview of the jury

13 and it will confuse them if they have to make a legal

14 determination in light of the other instructions that I give

15 them.

16         MR. McKINLEY:  If I may be permitted just for the

17 record, Your Honor, also, to submit that this is relevant to

18 assist the jury in establishing what are and are not

19 appropriate settings, what are and are not appropriate poses

20 to be photographed -- of children to be photographed in the

21 nude?

22         THE COURT:  And how could they be helped by that

23 particular exhibit in making that determination?

24         MR. McKINLEY:  I'm sorry?

25         THE COURT:  How would they be helped in making that

 1  decision, assuming that's correct, in viewing that exhibit

 2  that you have in your hand?  What do you say, if he had done

 3  it like in this book, would it be okay?

 4          MR. McKINLEY:  Yes, Your Honor.

 5          THE COURT:  I'll sustain the objection --

 6          MR. McKINLEY:  I understand.

 7          THE COURT:  -- and prohibit you from putting that

 8  before the jury for this purpose.

 9              (Open court, jury present.)

10  BY MR. McKINLEY:

11  Q   Mr. Russell?

12  A   Yes.

13  Q   Have you ever personally subscribed or embraced a nudist

14  lifestyle?

15  A   Yes.

16  Q   When did you begin subscribing to that lifestyle or

17  philosophy?

18  A   Probably the day I was born.

19  Q   How would you describe your nudist philosophy?

20  A   Well, when I was about four years old, I asked my mom, you

21  know, why do we need to wear clothes if it's hot or whatever,

22  and she just said "because."  And I didn't think that was a

23  good enough answer.  So it's just continued from there.

24          I feel that in certain situations it's not

25  necessary.  And, in fact, probably more psychologically

RUSSELL – DIRECT/MCKINLEY          266

1  harmful to hide things and therefore highlight them than to

2  just be open and free.

3  Q   Mr. Russell, have you ever tried to keep your views

4  towards nudism a secret from anyone?

5  A   No.

6  Q   Was your first wife, Dawn, aware that you embraced such a

7  philosophy or lifestyle?

8  A   Yes.

9  Q   What about Betsy, does she share your views toward nudism?

10  A   Yes.

11  Q   We have had heard testimony from at least one of your

12  daughters, I think both, that you visited a nudist resort on

13  some occasions?

14  A   Yes.

15  Q   Have you ever visited -- well, let me ask you this:

16       How many times do you think you've been to a nudist

17  resort, or a clothing-optional beach, or any facility that

18  invites people to go without clothing?

19       THE COURT:  Is this over his lifetime or is this

20  during the years --

21       MR. McKINLEY:  Just over his lifetime.

22       THE COURT:  Wait a minute -- or during the years in

23  question that are raised by this case, which was in 199- --

24  2004?

25       MR. McKINLEY:  I was going to start originally

1  overall.

2  Q    I mean, do you have an estimate how many times you visited

3  such facilities?

4  A    In my life?

5  Q    In your life.

6  A    Maybe 100, 50 to a hundred.

7  Q    And since meeting Betsy -- well, when did you meet Betsy?

8  A    Around 1999, 2000.

9  Q    Have you ever visited nudist resorts with Betsy?

10 A    Yes.

11 Q    And Betsy has a daughter?

12 A    Yes.

13 Q    What's her name?

14 A    Amy.

15 Q    Has Amy ever accompanied you and Betsy to such facilities?

16 A    Yes.

17 Q    Have you ever been a member of any nudist organizations?

18 A    Yes, several.

19 Q    Could you identify what those are?

20 A    AANR.

21 Q    What is AANR?

22 A    American Association for Nude Recreation.

23 Q    Any other nudist organizations?

24 A    INA, International Naturists Association; TNS, The

25 Naturist Society.  And another that I can't recall what their

RUSSELL – DIRECT/MCKINLEY          268

1  name was.

2  Q   Okay.  And with regard to your own children, with regard

3  to Aaron, Jane Doe 1 and Jane Doe 2, have you ever tried to

4  conceal your nudist philosophy or practices from them?

5  A   No.

6  Q   Have your children, in fact, accompanied you and Betsy to

7  any nudist resorts?

8  A   Yes.

9  Q   On how many occasions?

10 A   Maybe 10 to 20.

11 Q   Two or three?

12 A   10 to 20.

13 Q   Oh, 10 to 20?  Okay.

14 A   Or 10 to 15.

15 Q   During this time period, say 2000 to 2004, did you attend

16 any facilities here in Indiana?

17 A   Yes.

18 Q   Which ones?

19 A   A place in Valparaiso called Lake of the Woods, a place in

20 Bloomington called Fern Hills, a place in Centerville near

21 Ohio called –– it's in Indiana but near the Ohio border called

22 Sunshower.  I think that's all in Indiana.

23 Q   All right.  Have you attended –– well, let's go back to

24 testimony we heard earlier about taking vacations with your

25 daughters, with Jane Doe 2 and Jane Doe 1.  I think they

1  referred to a vacation to Washington, D.C.  Do you remember

2  taking a vacation to Washington, D.C.?

3  A    Yes.

4  Q    And who went on that vacation?

5  A    That was me, and all three of my kids:  Aaron, Jane Doe 1

6  and Jane Doe 2.

7  Q    How long were you in Washington, D.C.?

8         THE COURT:  When was that?

9  Q    Do you recall what year that was?

10 A    200- –- probably 2003 or 2004.

11 Q    All right.

12 A    I think it was 2003.

13 Q    All right.  Did you visit any nudist resorts or nudist

14 recreational facilities?

15 A    Yes.

16 Q    And I believe there's also testimony about a vacation in

17 Florida?

18 A    Yes.

19 Q    When did that occur in relation to the vacation to

20 Washington, D.C.?

21 A    That was after Washington.

22 Q    All right.  And did you visit a nudist resort or nudist

23 beach in Florida?

24 A    Yes, both.

25 Q    You went to one of each?

RUSSELL – DIRECT/MCKINLEY          270

1  A   Yes.

2  Q   Okay.  And Jane Doe 1 and Jane Doe 2 accompanied you?

3  A   Yes.

4  Q   To your knowledge –– well, did the nudist resort in

5  Florida, were there other families attending or other families

6  in attendance at that resort?

7  A   Quite a few.

8  Q   Children?

9  A   Yes.

10  Q   And how about the resorts in Indiana, other families in

11  attendance?

12  A   Yes.

13  Q   Children?

14  A   Uh–huh, yes.

15  Q   Is that typical of every resort you've ever been to?

16  A   Yes.

17  Q   And what about –– and what about beaches, is that

18  typically the situation where you have a wide variety of

19  people?

20  A   Yes, there's a pretty wide variety and all ages and sizes.

21  Q   Is clothing –– is going without clothes mandatory or is

22  that an optional choice?

23  A   It's optional.

24  Q   So people can wear clothing at a nudist resort if they

25  choose?

RUSSELL – DIRECT/MCKINLEY          271

1   A   Correct.

2   Q   When attending these in Indiana with your daughters, did

3   you always go in the nude?

4   A   Myself, yes.

5   Q   And what about your son, Aaron?

6   A   Yes.

7   Q   And Jane Doe 2?

8   A   Yes.

9   Q   And Jane Doe 1?

10  A   Yes.

11  Q   Did you ever tell them they had to?

12  A   No.

13  Q   To your knowledge, was your ex-wife, Dawn, aware at that

14  time that you had taken the children to any such facility?

15  A   No, she wasn't.

16  Q   And did you ever instruct any of your children to keep it,

17  you know, to keep it a secret?

18  A   No, I've never told them to keep it a secret from them.

19  Q   I'm sorry?

20  A   I never told them to keep a secret from her, no.

21  Q   Well, you heard testimony a little earlier, I believe,

22  from one of your daughters about you directing them to keep

23  things a secret, particularly with respect to nude photo

24  shoots?

25  A   Yes.

RUSSELL – DIRECT/MCKINLEY          272

1  Q   Did you ever tell them to keep that a secret from their

2  mother?

3  A   No, I did not.

4  Q   Did you ever tell them to keep the existence or the

5  content of the various websites that they described secret

6  from their mother?

7  A   No, I did not.

8  Q   Let's talk a little bit about this, these websites, and

9  this –– this kid's modeling agency.  When was that first

10 created, Mr. Russell?

11 A   The modeling agency or the websites?

12 Q   Well, the modeling agency.

13 A   The modeling agency started around early 1997.

14 Q   Okay.  And what was the –– what was the setup on this

15 original modeling agency that you created in 1997?

16 A   It was called Kid Models, and its original intent was to

17 get jobs for models in local Indiana, the Indianapolis area.

18 So what I did was take comp cards from current models and, you

19 know, hand them out to businesses and basically try to get

20 them work.

21 Q   So at this stage, there was no online modeling agency or

22 online websites for ––

23 A   No.

24 Q   Then how did the modeling agency evolve into creating

25 websites and going online?

1  A   Well, after the –– after I started the modeling agency, it

2  was, you know, it was all off-line.  I noticed others online,

3  so in an attempt to get more work for them, I decided to get a

4  wider audience and put it on line.  Basically an online

5  version was just a single page of, you know, little head

6  shots, and names, not their real names, but, you know, a name

7  they had chosen to protect their identity.

8          And if you click on their picture, a little comp

9  card pops up.  I don't know if you're familiar with comp

10  cards, but it's basically, oh, a five-by-eight card that's got

11  usually five or six pictures in various outfits, you know, a

12  dress, formal, sportswear, along with information on, you

13  know, their age, their sizes, and what type of work they're

14  looking for.

15  Q   Did that stage of the business then evolve into something

16  more?

17  A   Yes, we got a few inquiries on that, but not many.  One of

18  the girls on that site, after it went online, she was involved

19  in pageants.  And I don't know if you're familiar with kids'

20  pageants, but they go to these –– they dress them up like

21  princesses or whatever, and they go to the pageants and they

22  compete for various prizes as far as poise, their dress, you

23  know, how well they –– how well they carry themselves and so

24  forth.

25          Anyway, she wanted to get her kid on this, too, her

RUSSELL – DIRECT/MCKINLEY        274

1  daughter.  So I created a separate website for her with, you

2  know, several portfolios because she had probably 50 or 60

3  portfolios, in other words, sets of pictures in various

4  outfits and so forth that she's done for these pageants.

5       So I basically made that an expanded portfolio from

6  my main kid model sites.  So if you clicked on her picture, it

7  went to a separate site that had a whole slew of portfolios.

8  Just like the pageants, they –– basically they go around to

9  businesses and individuals and hand out their little brochures

10 with their pictures and information, and ask for sponsors to

11 cover their expenses in competing in these pageants and for

12 their clothing and any other expenses they have.

13      And she suggested her mom –– the pageant girl's mom

14 suggested we do the same thing with her online portfolio.  So

15 I set it up to accept sponsors.  Anyone could donate $20 to

16 sponsor her in her pageants or in her modeling career.  And,

17 you know, we got a few, a few sponsors.

18      THE COURT:  When was this?

19 A   (No response.)

20 BY MR. McKINLEY:

21 Q   Another question, Mr. Russell.

22      THE COURT:  When was this?

23      MR. McKINLEY:  I'm sorry?

24      THE COURT:  I said when was this, Counsel?  You've

25 got to put it in time and so forth.  He's sort of rambling

1  along.

2  BY MR. McKINLEY:

3  Q   The existence of this modeling agency online lasted from

4  what, 1999 to about 2005?

5  A   Yes, it went online in 1999.  And the modeling agency

6  itself, Kid Models or kidmodelsagency.com, was online until

7  around 2005.

8  Q   Now, you've heard testimony about your daughters'

9  involvement with these modeling -- on these modeling websites?

10 A   Yes.

11 Q   So at some point, they became involved with this

12 enterprise, right?

13 A   Right.

14 Q   And how did that -- how did their participation come

15 about?  Did you invite them, or tell them, or what happened?

16 A   When I was working on the first online expanded portfolio,

17 not the kidmodelsagency, but her own separate portfolio, the

18 pageant girl -- her name is Leah, by the way, on the site --

19 my oldest daughter, Jane Doe 1, noticed me working on her

20 pictures and setting up the pages, and so forth, and asked

21 what I was doing, and I explained to her.

22 Q   Did this occur at your residence while she was visiting?

23 A   Yes.

24 Q   Do you remember about when that was?

25 A   That was probably 200- -- early 2003.

RUSSELL – DIRECT/MCKINLEY          276

1  Q    Okay.  Tell what happened next.

2  A    She asked if she could do that, and I said, "Sure, I can,

3  you know, I can set it up for you."  And I told her we had to

4  take some pictures, it might take a while to get good enough

5  pictures taken for her portfolio.

6           So we started working on that.  And meanwhile,

7  Leah's site, the first online expanded portfolio, her mom

8  suggested that -- she had seen another site online called, I

9  think it was Little Amber, or something like that, basically

10  it was the same type of setup, people could pay money to

11  sponsor her in her modeling ventures.

12           Once the sponsors paid $20 or $25 to sponsor, they

13  also got to see the full portfolio.  Instead of just one

14  representative picture, they'd click on it and see 20 or 50 or

15  80 pictures or whatever happened to be in the photo set.

16  Q    So anyone could subscribe to these websites then and

17  access them for a fee?

18  A    Right.

19  Q    And we talked a little bit about Jane Doe 1's involvement

20  and how that started.  What about Jane Doe 2, your youngest

21  daughter, how much later was it before she became involved?

22  A    Well, when Jane Doe 1 -- when I talked to Jane Doe 1 about

23  it, I asked Jane Doe 2 if she wanted to do the same thing.

24  And at first she said no, but after a few photo shoots with

25  Jane Doe 1, she said she wanted to do it, too.

RUSSELL – DIRECT/MCKINLEY        277

1  Q   Then what about your son, Aaron?  Was he invited to

2  participate?

3  A   Yes, I asked him, and he said he wasn't sure, so we tried

4  a couple of photo shoots, and he said he didn't really like

5  it.

6  Q   He didn't like it?

7  A   No.

8  Q   You never established a website for him?

9  A   Correct.

10  Q   The websites that we've heard testimony about, I believe

11  one was octobermodel.com?

12  A   Right, october/model.com.

13  Q   Who selected that name?

14  A   That name was one that -- I had picked a few names out of

15  available names online that had the format, you know,

16  name-model.com.

17  Q   So you selected that name?

18  A   I selected that one to purchase, and I gave her a list of

19  about four or five, and that was the only one that she thought

20  was halfway decent.

21  Q   What about Jane Doe 2, she was --

22  A   That was Jane Doe 2.

23  Q   One of them was featured on kaseymodel.com and the other

24  one was on octobermodel.com?

25  A   Yes, Kasey was Jane Doe 1 and October was Jane Doe 2.

RUSSELL – DIRECT/MCKINLEY        278

1   Q    All right.

2   A    And Jane Doe 1 chose the name Kasey herself.

3   Q    And you testified just a moment ago about using names to

4   protect identities?

5   A    Yes.

6   Q    Why was that important to you?

7   A    Just so no one could, you know, find out her real name or

8   where they lived.

9          I also blotted out house numbers, street signs,

10  anything that would indicate a location or name or anything

11  like that.

12  Q    Did you compensate your daughters for participating on

13  these websites?

14  A    Yes.

15  Q    How did you compensate them?

16  A    For anybody who, you know, sponsored them or subscribed,

17  they got half, and I took the other half and put in a bank

18  account for their education fund.  And also told them that

19  anything extra that they wanted to save, I would match it so

20  they could conceivably get up to one and a half times of what

21  their original sponsor amount was.

22  Q    So if I understand correctly, let's say you received a

23  hundred dollars' worth of income on one of your daughters.

24  They would receive $50 of that?

25  A    Correct.

1  Q   And then a portion of the balance would go into an account

2  on their behalf?

3  A   Right.

4  Q   All right.  And then they could contribute to that account

5  also?

6  A   Yes, and anything they would contribute, I would match.

7  Q   Now, what other payments were provided to your daughters

8  for their participation on the websites?

9  A   That was it.

10 Q   Now, you heard testimony from, I think, Jane Doe 2 that

11 she would receive a certain amount of money, I believe $70 for

12 doing a particular photo shoot.  Was that an arrangement that

13 you set up?

14 A   No, I think she said that she got $70 for doing a nude

15 photo shoot, and that's absolutely not correct.

16 Q   Have you ever paid them money for specifically doing a

17 nude photo shoot?

18 A   No, never.

19 Q   Either daughter?

20 A   No.

21 Q   The only money that they received for anything having to

22 do with photography was in connection with the income

23 generated by their modeling websites?

24 A   Yes, except sometimes I would give them an advance if they

25 wanted to buy something now that they didn't have the money

1  for, to get something ahead of time.

2  Q    To your knowledge, was your ex-wife, Dawn, aware of these

3  websites or the existence of these websites?

4  A    No, as far as I know, she didn't know.

5  Q    Did you ever tell either of your daughters, either Jane

6  Doe 1 or Jane Doe 2, to keep it a secret from their mother?

7  A    Absolutely not.  I told them it's probably not a good idea

8  to tell other friends at school because then someone's going

9  to know, you know, who they are and where they live and so

10 forth.  I didn't want to compromise their security, but I

11 never told them to keep it from their mom, no.

12 Q    Now, every one of the -- at the peak of the volume of this

13 modeling agency between 1999 and 2005, what were the most

14 modeling sites that you had up and running at any one time?

15 A    Totaling mine and others?

16 Q    Yes.

17 A    Probably a maximum of 25.

18 Q    And what were the age ranges of the models that were

19 featured on these websites?

20 A    Anywhere from 5 to 16, 17.

21 Q    And were you the exclusive photographer for all of these

22 websites?

23 A    No.

24 Q    But you operated the websites?

25 A    Yes.

1  Q    Were you responsible for reviewing all photos before they

2  were posted on these websites?

3  A    Yes, I was.

4  Q    But some photos were submitted to you from other

5  photographers?

6  A    Yes, after I had the sites online, I was contacted by

7  other -- you know, other models or people who wanted to be

8  models or their photographers or their parents asking how they

9  can get their own site.  And usually people sent in their own

10  photos in groups according to outfits, like one photo set

11  would be an outfit.  I would review the pictures and create

12  their website.

13  Q    Are there any occasions when you rejected photos that had

14  been submitted?

15  A    Yes, definitely.

16  Q    For what reason would you reject them?

17  A    I didn't consider the pose appropriate or sometimes it

18  would be out of focus or technical errors, but a lot of time

19  it was just --

20  Q    Now, you saw the exhibit yesterday that was introduced,

21  Government's Exhibit 12 that had been introduced through your

22  wife, Dawn.  Did you see that exhibit?

23  A    Yes.

24  Q    Did you take those photographs of Jane Doe 2 and Jane Doe

25  1 that are contained in this exhibit?

RUSSELL – DIRECT/MCKINLEY        282

1  A    Yes, I did.

2  Q    I believe there's also images of Betsy's daughter, Amy?

3  A    Yes.

4  Q    Did you take those photos also?

5  A    Yes, I did.

6  Q    You've never denied that?

7  A    Correct.

8  Q    Did you ever post a photo, a nude photo of Jane Doe 1 on a

9  website?

10  A    Absolutely not, never.

11  Q    Have you ever posted a nude photo of any model for general

12  viewing on any modeling website?

13  A    No.

14  Q    We talked about your photography of nude subjects.  I

15  don't know if I have asked you this before, but just to

16  clarify, have you photographed your own children in various

17  stages of nudity?

18  A    Yes.

19  Q    I'll ask if you can identify that photo?

20  A    Yes.

21  Q    Can you -- did you take this photo?

22  A    Yes, I did.

23  Q    Does this photo portray your children?

24  A    Yes.

25  Q    Does your photo portray your children in the nude?

1   A   Yes.

2          THE COURT:  When was it taken?

3   BY MR. McKINLEY:

4   Q   Yes, can you tell me when it was taken?

5   A   Roughly 2001, 2002.

6   Q   And is this one of many photos that you've taken of your

7   children in the nude?

8   A   Yes.

9   Q   Does this photograph depict one kind of series of

10  photographs that you were accustomed to taking of your

11  children?

12  A   I don't understand.

13  Q   Well, let me withdraw the question because I'm not sure I

14  understood it either.

15         MR. McKINLEY:  At this time, I would tender and

16  offer into evidence Defendant's Exhibit G.

17         MR. COOK:  Your Honor, I would object as to

18  relevance.  The time frame is long before the photos at issue

19  here.  And there's nothing else reflecting back to that time

20  frame making it relevant.

21         THE COURT:  What's the relevance of the photo?

22         MR. McKINLEY:  Your Honor, just to show in contrast

23  to the photos that Mr. Russell has admitted to taking that we

24  conceded that he took in our opening statement, I wanted to

25  show that there's also a different genre of nude photos that

1  he's taken of his children.

2          THE COURT:  These were two years before the

3  photographs in evidence here or at issue here?

4          MR. McKINLEY:  That is approximately correct, yes.

5          THE COURT:  I'll let it in for what it's worth.

6          (Defendant's Exhibit G received in evidence.)

7          MR. McKINLEY:  May I publish this exhibit to the

8  jury, please?

9          THE COURT:  Put it on the overhead, please.

10 BY MR. McKINLEY:

11 Q   Do you see the exhibit that I've posted on the screen

12 here?

13 A   Yes, I do.

14 Q   And that portrays who?

15 A   From the left is Aaron, Jane Doe 1 and Jane Doe 2.

16 Q   All right.  Where was this photograph taken?

17 A   In the living room on the floor.

18 Q   How many photographs of this general image did you take at

19 the time?  Was this the only one or was this one of a series?

20 A   Of this pose, for lack of a better word?  You mean of this

21 particular pose?

22          THE COURT:  He said do you mean of this particular

23 pose?

24 BY MR. McKINLEY:

25 Q   Of this particular pose, yes.

RUSSELL – DIRECT/MCKINLEY          285

1  A    I think I took four.

2  Q    All right.  And what kind of a camera did you use to take

3  that photograph?

4  A    A large format camera.

5  Q    Could you describe for the jury what that is?

6           THE COURT:  What's the relevance of that, Counsel?

7           MR. McKINLEY:  I'm sorry?

8           THE COURT:  What is the relevance of that, the

9  camera he used in 2002 and --

10          MR. McKINLEY:  Just to show that he has a variety of

11 cameras.

12          THE COURT:  Well, ask him that question then.  We

13 don't have to get into all the specifications of irrelevant

14 cameras.

15          MR. McKINLEY:  I'll withdraw the question, Your

16 Honor.

17 BY MR. McKINLEY:

18 Q    That photo, Defense Exhibit G, you posed that photo?

19 A    Yes.

20 Q    It was staged --

21 A    Yes.

22 Q    -- correct?

23          Is it fair to say that sometimes you have to take a

24 number of photos of the same image or the same scene to get

25 one that you like?

1    A    Yes, frequently.

2    Q    I want to turn now, Mr. Russell, to the images that are

3    charged in Counts 1 through 4 of the indictment.  You've seen

4    these pictures prior to trial, haven't you?

5    A    Yes.

6    Q    Referring, first of all, to the exhibits contained in

7    Count 1, you've reviewed all nine of those pictures?

8    A    Yes.

9    Q    Did you take these pictures?

10   A    Not in the way it's pictured there.

11   Q    How is the way that it's pictured here different from the

12   pictures that you took?

13   A    The pictures that are printed on those pages are like a

14   small portion of the pictures that I took, like they have been

15   zoomed in or cropped or something.

16   Q    When you say "cropped," what do you mean by "cropped"?

17   A    Cropping is where I take an image that's -- let's say you

18   have an image this size, and you only want a picture of this

19   person, so you cut out of rest of it either by zooming in or

20   making a big picture and physically cutting it.

21   Q    Now, you heard Special Agent Johnson testify about ExIf

22   data or data that's connected to your camera somehow?

23   A    Yes, I did.

24   Q    As I understand, in every image that's made, there's

25   certain ExIf data that's attached to the image?

RUSSELL – DIRECT/MCKINLEY        287

1  A    Correct, it's embedded in the file.

2  Q    And have you had an opportunity to review that ExIf data

3  prior to the trial?

4  A    Yes, I have.

5        MR. COOK:  Your Honor, I'm going to object.  There's

6  been no basis put into the record that he has any knowledge of

7  ExIf data.

8        THE COURT:  Lay the foundation if you're going to

9  inquire about that.

10  BY MR. McKINLEY:

11  Q    Well, you're familiar with the term ExIf data?

12  A    Very much so.

13  Q    All right.  And based on your experience as an experienced

14  photographer, you're aware of the specifications of the camera

15  that's been introduced?

16  A    Yes.

17  Q    In fact, the camera that's been introduced, Government's

18  Exhibit 10, you don't dispute that that's your camera, right?

19  A    Correct.

20  Q    When did you buy that camera?

21  A    That one I got in December of 2003.

22  Q    And was this the camera that was used to take the

23  photographs that are charged in Counts 1, 2, 3 and 4 of this

24  case?

25  A    Yes, it was.

RUSSELL – DIRECT/MCKINLEY        288

1    Q    There's no dispute about that?

2    A    Correct.

3    Q    You're familiar with the dimensions of this camera and the

4    specifications?

5    A    Yes, very well.

6    Q    You're familiar with the term ExIf data?

7    A    Yes.

8    Q    Have you had occasion to review the ExIf data that was

9    introduced in this case as Government's Exhibits 1A, 2A, 3A

10   and 4A?

11   A    Yes, I have.

12   Q    And with respect to the ExIf data that was introduced

13   that's in evidence as Government's Exhibit 1A, did you draw

14   any conclusions from an examination of that data concerning

15   these pictures that are charged?

16            MR. COOK:  I'm going to object.  Again, there's

17   still not a basis for his knowledge of ExIf data and his

18   technical aspects.

19            THE COURT:  Sustained.

20            MR. McKINLEY:  He has a history —

21            THE COURT:  Counsel, you have had him say that he

22   read all of that and he has some knowledge, so you have to

23   explain how he comes to certain conclusions and how that data

24   or his experience or his knowledge leads him to know things.

25   You're just leaving some stuff out.

1  BY MR. McKINLEY:

2  Q   Let me just hand you what has been introduced into

3  evidence as Government's Exhibit 1A, pages 3 and 4, which is

4  the same pages that I showed to Special Agent Johnson when he

5  testified.  Have you seen that before?

6  A   Yes.

7  Q   Is there any data that you see on that ExIf information

8  that is inconsistent with the pictures that you say you

9  originally took?

10  A   Yes, there are several things.

11  Q   I'm sorry?

12  A   There are several --

13       THE COURT:  Counsel, you know that you have to go

14  step by step.  So you say to him "Can you interpret this

15  data?"

16  BY MR. McKINLEY:

17  Q   Can you interpret this data?

18       THE COURT:  Assuming he says "Yes," you say "On what

19  basis?  How have you come to that knowledge," and what does

20  it -- what does something mean in here generally before you

21  ask him to testify to whatever specifics.  You've got to just

22  go in incremental steps.

23  Q   Have you reviewed that data?

24  A   Yes.

25  Q   Are you familiar with the terminology that's used in the

RUSSELL - DIRECT/MCKINLEY          290

1    ExIf exhibit that's been introduced?

2    A    Yes, very much so.

3              THE COURT:  How are you familiar with it?

4              THE WITNESS:  I've been working on digital

5    photography since 1995 when the first digital camera came out,

6    and I delved into it very deeply, into every aspect of it.

7              THE COURT:  Was this part of your work when you

8    worked for that camera photo lab place?

9              THE WITNESS:  Yes, that was one of the aspects.

10             THE COURT:  So in conjunction with those

11   responsibilities, you came to know this sort of data in

12   detail?

13             THE WITNESS:  Kind of the other way around because I

14   knew about digital photography, I got to work setting it up.

15             THE COURT:  We're not talking about digital

16   photography generally.  We're talking about this kind of

17   photography in detail.  You came to know about it and

18   developed it and used your knowledge in conjunction with your

19   photo lab work; is that right?

20             THE WITNESS:  That's correct.

21             THE COURT:  So with respect to the individual terms

22   on those pages, do you have an understanding of what they mean

23   and how they reflect certain data?

24             THE WITNESS:  Yes, I know almost all of these.

25             THE COURT:  All right.  There.  I helped you out,

RUSSELL - DIRECT/MCKINLEY        291

1   Mr. McKinley.

2            MR. McKINLEY:  You did.  Thank you very much, Your

3   Honor.

4            THE WITNESS:  Thank you, Your Honor.

5   BY MR. McKINLEY:

6   Q   On the second or -- on the second page that you have

7   before you, there's a reference to the image size; is that

8   correct?

9   A   Yes.

10           THE COURT:  Image size?

11           MR. McKINLEY:  Image size.

12  A   Yes.

13  BY MR. McKINLEY:

14  Q   What does that refer to?

15  A   That's the setting of the camera as far as what it

16  refers to, as far as the resolution of the picture, how sharp

17  it is, how much data is contained in that image.  There are

18  three settings, small, medium and large, on that particular

19  camera and this one is set to large.

20  Q   Is that reflection of the image size consistent with your

21  recollection of the setting you have on the camera when you

22  took the original photos that are contained in Government's

23  Exhibit 1?

24  A   Yes, I always shot at large size, the highest resolution.

25  Q   All right.  And going back to the first page, it refers to

RUSSELL – DIRECT/MCKINLEY          292

1  the focal length?

2  A   Yes.

3  Q   Do you see that?  What does focal length refer to insofar

4  as the ExIf data is concerned?

5  A   Focal length was what the lens was set to.  That was a

6  adjustable lens, a zoom lens that went from 28 to

7  135 millimeters.  And if you're familiar with zooming, you

8  know if you're far away from the subject, 28 millimeters would

9  give you a wide angle like the whole room, and 135 would give

10 you a small area.  This is set to 50, which is supposedly

11 according to, you know, standards, 50 millimeters is supposed

12 to be what your hand and eye sees.

13 Q   So 50 millimeters is consistent with what I understand is

14 a wide-angle lens?

15 A   50's low-medium --

16 Q   Okay.

17 A   Angle.  It's kind of a normal lens.

18 Q   And the images that are portrayed in Count 1, are they

19 consistent with images that were taken with that lens?

20 A   With this setting?

21 Q   Yes.

22 A   The pictures that are printed there, no, they are not

23 consistent with this setting.

24 Q   How are they -- how is it inconsistent?

25 A   With this setting, the camera would have gotten in a

1  majority of the entire wall of the room.  You know, the angle

2  would be roughly 90 degrees from the viewer.  That would

3  encompass an entire wall, or in this case, the subject and

4  everything around and behind her.

5  Q    I'm handing you what has been introduced as again

6  Government's Exhibit 1A, page two, which is the first image

7  that's charged in Count 1 of the indictment.

8  A    Yes.

9  Q    At the bottom of that image, it refers to a file name and

10 a file size; do you see that?

11 A    Yes, I do.

12 Q    Does that have any particular meaning to you as far as the

13 information that would have been attached to the original

14 image?

15 A    I'm sorry, could you repeat that?

16 Q    Does this data that it reflects, 106.5, 85KB, have any

17 significance to you insofar as the image that was originally

18 taken?

19 A    Yes, that's very, very much smaller than the original

20 image.

21 Q    When you say it's much smaller, what do you mean by that?

22 A    The KB designation, kilobytes or a thousand bytes of data,

23 and that's 106.  At the large setting on this camera, that's

24 six megapixels or six million, which produce a file at least

25 2,000 KB minimum up to 6,000.

RUSSELL – DIRECT/MCKINLEY          294

1  Q   Do you conclude from that that the image that is contained

2  in or the charged images in Count 1 have been modified from

3  the images that you originally took?

4  A   Yes, all of them have.

5  Q   Would you agree that the image that's depicted in the

6  images in Count 1 were part of the larger image that you took?

7  A   Yes.

8  Q   Okay.  Now, with respect to Counts 2 and 4, these are the

9  images that portray your daughters nude at Spectrum Gym.  You

10 know the images I'm referring to?

11 A   Yes.

12 Q   You heard your daughters testify that you took those

13 photos?

14 A   Yes, I did.

15 Q   You don't dispute that?

16 A   Correct.

17 Q   All right.  You were employed at Spectrum Gym at the time?

18 A   Yes, I was.

19 Q   Who was present when the photos were taken?

20 A   Just me and the two girls.

21 Q   This was after hours?

22 A   Yes.

23 Q   All right.  And as an employee, did you have access to the

24 gym facility after hours?

25 A   Yes, I did.

RUSSELL – DIRECT/MCKINLEY        295

1  Q   Did you have a key?

2  A   Yes.

3  Q   All right.  Did you believe you were doing anything

4  inappropriate when you took these photos?

5  A   Absolutely not.

6  Q   After you took these photos -- well, let's go back.

7          There's two images that are charged, one in Count 2

8  and one in Count 4 that were both taken at the gym.  Do you

9  remember how many photographs you took with your Canon camera

10  that evening?

11  A   I would guess probably between one to 200 was my typical

12  range of setting for any particular set.

13  Q   Did you direct your -- strike that.

14          What did you do with the photos after you took them?

15  A   I copied them to a CD and put them in a box of --

16  basically a shoebox of random pictures.

17  Q   What else was in the shoebox, other pictures?

18  A   Yeah, pictures from, you know, forever, a collection.

19  Q   Do you take a lot of photographs?

20  A   Yes.

21  Q   How many photographs would you take in an average year

22  would you think?

23  A   Since 2002, 2003, roughly anywhere from 50 to 70,000

24  pictures a year.

25  Q   All right.  Do you typically download all of those images

RUSSELL - DIRECT/MCKINLEY          296

1   on to a disk and save them?

2   A    They usually –– my memory card gets full.  There's a

3   memory card in the camera that stores all the images.  When

4   it's full, I just pop it in the computer, transfer it to a CD

5   and toss the CD into a box and clear the card to use again.

6   Q    Do you keep them online somewhere cataloged in any way or

7   just keep them on CD and thrown in a box?

8   A    They are in a random fashion in a box.

9   Q    I want to turn, then, to pictures that are charged in

10  Count 1, the pictures of, I believe, your oldest daughter,

11  Jane Doe 1 ––

12  A    Yes.

13  Q    –– this so-called SpongeBob picture that they have

14  described, right?

15  A    Yes.

16  Q    Did you take those photos?

17  A    Yes, I did, but as I said, not in the way they are

18  pictured there.

19  Q    I understand you maintain these were cropped, but you took

20  the largest image from which these images were created?

21  A    Yes.

22  Q    And do you know how many photos were taken altogether in

23  that photo session?

24  A    Probably around a hundred.

25  Q    Around a hundred?  I believe Government's Exhibit 1 had 86

1  or 89 photos complete.  Were there more than that that you

2  took?

3  A   Yes, several of those images are duplicates, so --

4  Q   Did you ever post any of those for public access on any

5  websites?

6  A   Of the nude photos?

7  Q   Of those photos.

8  A   No, absolutely not.

9  Q   Do you believe they are inappropriate?

10 A   No, but not suitable for, you know, publishing online

11 obviously.

12 Q   What did you do with those photos after you took them?

13 A   Same as almost everything else, toss it in a box.

14 Q   With respect to Count 3, there were two images, I believe,

15 portraying Jane Doe 2 coming out of the bathtub, I believe?

16 A   Yes.

17 Q   You heard Jane Doe 2 testify about those this morning?

18 A   Yes, I did.

19 Q   Did you take those images?

20 A   Yes.

21 Q   Where?

22 A   They were in the -- our bathroom at the Braeburn

23 Apartments.

24 Q   Okay.  And again, were those two images from a larger set

25 of photos you took that day?

RUSSELL – DIRECT/McKINLEY          298

1  A    Yes.

2  Q    What did you do with those photos after you took them?

3  A    The same as the others, tossed them in the box.

4  Q    Do you believe there was anything inappropriate about

5  them?

6  A    No.

7  Q    Did you ever post those photos for public access on any

8  websites?

9  A    No, never.

10 Q    Were any of the photos charged in this indictment, Counts

11 1, 2, 3 and 4, posted on either of your daughters' modeling

12 websites?

13 A    No.

14          MR. McKINLEY:  May I have a moment, Your Honor?

15          THE COURT:  Yes, you may.

16              (Off-the-record discussion.)

17          MR. McKINLEY:  No more questions.

18          THE COURT:  All right.  Let's take a recess since it

19 seems to be a natural pause in the action, ladies and

20 gentlemen.  We'll take a 20-minute recess.  During this period

21 of time, as at all times, please remember and follow my

22 directions to you as if you heard them for the first time.

23          You may rise and depart.

24                  (Jury excused)

25                  (Recess taken)

 1                 (Open court, no jury present.)

 2          THE COURT:  You may be seated.  We've convened prior

 3  to calling down the jury because I was informed that you have

 4  two matters that may require proffers before the Government

 5  can go into the matters on cross-examination.

 6          So is that true, Mr. Cook?

 7          MR. COOK:  Yes, Your Honor.

 8          THE COURT:  Okay.  So do you wish to make your

 9  proffers or do you -- what do you want to do?  Do you want to

10  make an argument or what?

11          MR. COOK:  I'll make a proffer.

12          THE COURT:  Well, if you're going to do it with the

13  defendant's testimony, there are facts you have to elicit from

14  him so that I know about the admissibility.  So the proffer

15  ought to be by questioning the defendant.

16          MR. COOK:  Okay.  I'll question the defendant.

17          THE COURT:  Okay.

18  BY MR. COOK:

19  Q   Mr. Russell?

20  A   Yes.

21  Q   You were aware of an investigation of your websites and

22  images of your daughters as long ago as June 29th, 2005,

23  correct?

24  A   No.

25  Q   Well, there was a search warrant that was executed on your

1  house on June 29th, 2005, correct?

2  A    Right.

3  Q    At the time that search warrant was executed, you spoke

4  with Special Agent Tom Rothrock and Detective Andy Byers who

5  earlier testified, correct?

6  A    Yes.

7  Q    And they spoke to you about a video depicting your

8  daughters' nude acts at the Spectrum Gym; is that correct?

9  A    Uh-huh.

10  Q    Okay.  And they seized a number of items as you discussed

11  with your attorney, Mr. McKinley?

12  A    Right.

13  Q    So you're aware that those things were being looked into;

14  that your website was being looked at, that the video about

15  the gymnastics was being looked at, right?  Yes?

16  A    Uh-huh.

17  Q    I want to fast forward in your mind, in your memory, to

18  July of 2007.  Do you recall sitting in a meeting with

19  Assistant United States Attorney Miss Helart at her office in

20  the United States Attorney's Office?

21  A    Yes.

22  Q    And you were seated in that meeting with legal counsel,

23  correct?

24  A    Yes.

25  Q    And it was described to you that the Government had made a

RUSSELL – DIRECT/MCKINLEY        301

1    determination on images such as the ones charged today?

2         MR. McKINLEY:  Your Honor?

3         THE COURT:  Mr. McKinley?

4         MR. McKINLEY:  Your Honor, I recognize this is a

5    questioning outside of the presence of the jury, but it would

6    be appropriate for me to object to any statements made during

7    the course of plea discussions and negotiations.  It's

8    inadmissible under Rule 14.

9         THE COURT:  I assume this is the proffer with

10   respect to flight, right?

11        MR. COOK:  Yes, it is.

12        THE COURT:  So he can elicit the testimony that he

13   would otherwise be able to put before the jury to establish

14   whatever he wants to in order to show his entitlement to

15   present those matters to the jury, but he can't bring up

16   things he can't present to the jury.

17        MR. McKINLEY:  Right.  And any statements made in

18   the course of plea discussions, the meeting that Mr. Cook is

19   referring to, is not admissible before the jury.  I believe

20   that is inadmissible.

21        THE COURT:  Well, the question that's pending is

22   were you aware as of such and so date that he was the object

23   or the subject of an investigation.  That's what -- and I

24   understand that if he had answered yes, back in June of '05,

25   that we wouldn't be having this elaboration.  This is an

RUSSELL – DIRECT/MCKINLEY          302

1  attempt to get him to remember what was going on; is that

2  right?  Is that right, Mr. Cook?

3          MR. COOK:  Well, it's additional follow-up to lay

4  the foundation for his leaving for Mexico very shortly after

5  the meeting with the Government in July of 2007.

6          THE COURT:  Okay.

7          MR. COOK:  I will note for the Court that part of

8  the substance of that meeting with the Government was

9  discussed –– was about what to do with the case.  Could a

10  pre-indictment agreement be reached.

11          However, what the Government will be seeking to

12  elicit through very careful questioning was "Mr. Russell, were

13  you aware that the Government had determined that it would

14  prosecute the case," period, the end, and then proceed to,

15  "And Mr. Russell, shortly thereafter, you went to Mexico, and

16  did not return until put on a plane and sent to Los Angeles."

17          THE COURT:  Go ahead.  Ask those questions and make

18  your proffer.

19          MR. COOK:  Okay.

20  BY MR. COOK:

21  Q   Mr. Russell, do you recall the meeting with Assistant

22  United States Attorney Gayle Helart in July of 2007?

23  A   Yes.

24  Q   And you were represented by legal counsel at that meeting?

25  A   Correct.

RUSSELL – DIRECT/MCKINLEY          303

1  Q   At that meeting, you were shown a number of images,

2  including the images that are charged in Counts 1 through 4 in

3  this case, correct?

4  A   Right.

5  Q   And you were informed that the Government was going to be

6  going forward with the prosecution, correct?

7  A   That's what they said, yes.

8  Q   And that's what they said.

9          Shortly after that meeting, you went to Mexico and

10 did not return until the Mexican authorities put you on a

11 plane to Los Angeles late in 2009, correct?

12 A   Correct.

13 Q   And then you were arrested at Los Angeles International

14 Airport?

15 A   Yes.

16         MR. COOK:  That's the proffer, Your Honor.

17         THE COURT:  Do you object to that, Mr. McKinley,

18 that line of questioning?

19         MR. McKINLEY:  Yes, I would, Your Honor.  It's –– I

20 say it's irrelevant.  It's immaterial to the issue that is

21 going to be before the jury, that is he has admitted on his

22 direct that he took these images.  The jury's going to be

23 asked simply in light of that admission, are these images

24 illegal or not, do they cross the line that's defined by the

25 law.  Whether he went to Mexico does not bear on that ultimate

1   issue, so I'd submit it's irrelevant.

2          THE COURT:  What's the purpose of the offer?

3          MR. COOK:  The purpose of the offer, Your Honor, is

4   that it is evidence of flight by the defendant and is

5   therefore evidence of his consciousness of guilt.  Fleeing the

6   country, knowing that a prosecution is pending of this nature,

7   being gone for two years and not returning until put on a

8   plane by authorities, is evidence of flight.

9          THE COURT:  Do you wish to respond?

10          MR. McKINLEY:  No, I'll rest with what I've got --

11   with what I've argued already, Your Honor.

12          THE COURT:  In the pretrial submissions that you

13   made to the Court, part of the defendant's objection was that

14   there were ameliorative facts that Mr. Russell and his then

15   wife intended to go to Mexico before all of this happened,

16   that they inquired as to whether or not charges had been

17   brought, that sort of thing.  Do you remember that?

18          MR. McKINLEY:  I do, Your Honor.

19          THE COURT:  All right.  So because this testimony

20   has come up or is being proffered as part of the

21   cross-examination of the defendant, I'm assuming that -- which

22   is to say he's testified, it doesn't come up in the

23   case-in-chief of the Government, but there will be an

24   opportunity and you will use that opportunity to supply the

25   additional facts; is that right, Mr. McKinley?

1          MR. McKINLEY:  I expect I will, yes, Your Honor.

2          THE COURT:  It is relevant as evidence that the jury

3  can consider under the flight legal paradigm.  It does, in my

4  opinion, satisfy the requirements of the four inferences that

5  the Court has to decide whether they can be drawn from the

6  evidence under the U.S. versus Skoczen case, S-K-O-C-Z-E-N,

7  405 Fed 3d 537, 7th Circuit, 2005.

8          So I will allow the questioning to go forward and

9  provide an additional instruction to the jury with respect to

10  this particular kind of evidence, taking into account the

11  pattern instructions on flight.  And the defense, of course,

12  will be able to elicit testimony that they think casts those

13  facts in a slightly different light or perhaps even a major

14  different light.

15          So you may ask, you may cross-examine.  The

16  objection's overruled.

17          Now, there's another matter that better be raised

18  with the Court in a proffer because the admissibility of it

19  has to do with facts that aren't otherwise known to the Court,

20  and that has to do with the other instances of alleged

21  molestation or sexual touching by the defendant.

22          Do you intend to elicit that testimony?

23          MR. COOK:  Depending on responses by the defendant,

24  yes.  I expect, given what the defense is, those responses

25  will be forthcoming.  And that --

RUSSELL - DIRECT/MCKINLEY          306

1          THE COURT:  What does that mean?

2          MR. COOK:  What that means is, Your Honor, that the

3     defendant is claiming in this case that -- effectively, the

4     defense appears to be "I'm a nudist, and I had no intent to --

5     that my daughters' engage in sexually-explicit conduct for

6     these images, and these images don't depict sexually-explicit

7     conduct."

8          What I would suggest that puts in issue before the

9     Court is is the defendant, does he have a sexual attraction to

10    his daughters, or more specifically, to his daughter, Jane Doe

11    1, his older daughter.

12         Depending on the defendant's answer to that

13    question, which I suspect strongly would be no, I think that

14    puts at issue his credibility because Jane Doe 1 can be

15    recalled to testify about these molestation events,

16    specifically, if the Court's prepared to hear about these.

17         THE COURT:  I am.  That's why I want you to tell me

18    about them outside the presence of the jury.

19         MR. COOK:  Following a photo shoot when Jane Doe 1

20    was nine or ten years old, the fourth or fifth grade, when the

21    defendant lived with the family friend, as he mentioned for a

22    number of years following his divorce, lived with a family

23    friend.

24         THE COURT:  In Greenfield?

25         MR. COOK:  In Greenfield, yes.  The defendant

1  engaged all three of his children in a nude photo shoot that

2  included their being covered by powdered sugar.  The photo

3  shoot took place in the kitchen and a drop cloth was used to

4  kind of, I suppose, make an appropriate background.

5          Following this photo shoot, while the powdered sugar

6  was still on the children, the defendant had Jane Doe 2, and

7  his son, Aaron, Jane Doe 2 being his younger daughter, get

8  into the shower, and before Jane Doe 1 got into the shower,

9  the defendant lifted her onto a standing position on top of

10  the toilet and proceeded to lick the powdered sugar off of her

11  genitals, thereby eliciting, I would suggest, a sexual

12  attraction to his daughter.

13          Additionally, what it does is it puts –– it's

14  evidence the defendant did a nude photo shoot which ended with

15  sexual contact with his daughter, showing that there's some

16  connection between taking nude photos of his daughter and

17  having sexual acts between –– showing the sexual purpose of

18  that.

19          So what I would suggest is, given what his defense

20  is, given the expected testimony that no, he doesn't have a

21  sexual attraction to her –– I could be wrong, perhaps he'll

22  admit that –– it becomes very relevant for both impeachment

23  and to show his intent.

24          THE COURT:  So it would be your intention, if the

25  Court permitted you to go forward, to ask him about it or to

1   call Jane Doe 1 to testify on rebuttal?

2        MR. COOK:  Yes, I suppose I should clarify.  I threw

3   a bunch of ideas in there.  The intention would be to ask the

4   defendant about it, and should he deny that --

5        THE COURT:  Ask about the particulars of that

6   incident?

7        MR. COOK:  Yes.  Should he deny that conduct, the

8   Government is prepared to recall Jane Doe 1 in rebuttal

9   evidence.

10       THE COURT:  Any other incidents of sexual touching

11   or molestation that the Government intends to elicit?

12       MR. COOK:  Yes, again, depending on the defendant's

13   answer, if he says, if he denies a sexual attraction.  The

14   defendant also held a vibrating object against Jane Doe 1's

15   genitals.  This happened at the Braeburn Apartments, which

16   would have her in, I believe, the 10 to 11-year-old age,

17   approximately a year before the charged images.  He held a

18   vibrating object against her genitals when they were bare,

19   when she was nude.

20       THE COURT:  How old was she, or when about in time

21   did that happen?

22       MR. COOK:  He lived in Braeburn from August 2003 to

23   August 2004.  Her recollection --

24       THE COURT:  So it would have been after the incident

25   with the sugar?

1          MR. COOK:  Yes.

2          Finally, around the same time the powdered sugar

3   incident happened, that same fourth or fifth grade, fourth or

4   fifth-grade time span when Jane Doe 1 would have been nine or

5   ten years old, approximately two years before the charged

6   conduct, when she was nine or ten years old, when she was

7   taking a shower, the defendant, I suppose, opened the shower

8   curtain and proceeded to "assist" her in washing her genitals

9   and her behind, and most of the rest of her body, too.

10         He apparently did so with a washcloth, but this was

11   very out of character since it's a nine or ten-year-old girl.

12   Her normal practice, in fact every other time, was to bathe

13   herself.  And the defendant said to her, words to the effect

14   of -- she doesn't remember precisely -- words to the effect of

15   "Wouldn't it be nice to have your own body scrubber?"  And

16   then proceeded to do the acts.

17         THE COURT:  That was with Jane Doe 1, too?  All

18   three were with Jane Doe 1?

19         MR. COOK:  All three were with Jane Doe 1.

20         THE COURT:  Is that everything?

21         MR. COOK:  That is everything, Your Honor, yes.

22         THE COURT:  Mr. McKinley?

23         MR. McKINLEY:  Your Honor, first of all, the Court

24   made a preliminary ruling, and I need not probably remind the

25   Court, but just for the record, the Court ruled that any

RUSSELL – DIRECT/MCKINLEY        310

1  probative value that such evidence would have was greatly

2  outweighed by the prejudicial impact.  And the Court cautioned

3  the defense not to open the door to this line of questioning

4  to this evidence.

5        It's my understanding that they are proffering this

6  evidence to show motive and intent.  And we specifically

7  omitted in Mr. Russell's direct examination any questions

8  about why he took these photos.

9        Mr. Cook's description of the defense, I think he

10  misapprehends the defense if he's suggesting that the defense

11  is that Mr. Russell didn't intend to photograph

12  sexually-explicit conduct.  The fact of the matter is that's

13  not the defense.

14        THE COURT:  What is your defense?

15        MR. McKINLEY:  Our defense is that those photos on

16  their face do not constitute lascivious exhibition of the

17  genitals.  The photos speak for themselves.

18        I'm going to be asking the jury to draw that

19  conclusion based on their examination of the photos.  My

20  client's motive and intent --

21        THE COURT:  Well, you did touch on it to this extent

22  by eliciting testimony from him that, first of all, he's an

23  enthusiast of the nudist lifestyle and activities, and has

24  done this on many occasions with the rest of his family and

25  with the children, and in particular, with the two girls who

1  were involved in this case; and that he is a photographer and

2  has photographed all of them, including the two girls, in a

3  variety of contexts innocently without regard to any of the

4  proscriptions in the statute, suggesting from that questioning

5  that what he took here were similarly innocuous and

6  appropriate photographs.  As he testified himself, he thought

7  these were appropriate.

8          So to that extent, he's at least inched up to his

9  intentions in his motive in taking the pictures, that is to

10  say it was harmless, professional and recreational activity.

11          MR. McKINLEY:  If I may, another point, Your Honor?

12          THE COURT:  Yes, sir.

13          MR. McKINLEY:  The acts that they allege occurred

14  here of child molest do not tie into the charged images.

15  These occurred not close in time to these incidents, and

16  again, the number of incidents are --

17          THE COURT:  Well, close enough into time for your

18  photograph to put in evidence, which was '01 to '0- something,

19  but a couple years before the charged conduct, and that was an

20  evidentiary proffer you made.

21          So it's still within that time frame.  In fact,

22  arguably, I haven't decided, I'm thinking out loud here,

23  arguably it happened about the time the photograph came into

24  evidence that you -- or I should say happened about the time

25  the photograph was taken that you put in evidence.  Isn't that

RUSSELL – DIRECT/MCKINLEY          312

1   true?

2          MR. McKINLEY:  I believe that is –– I believe that

3   is accurate.  I believe he testified that the photograph that

4   we introduced of the image of his children was taken about

5   2001 or 2002.

6          THE COURT:  That's what I remembered.

7          MR. McKINLEY:  The other point ––

8          THE COURT:  And one act of molestation, alleged,

9   happened in that time frame, and another one happened closer

10  to the 2004 time frame.

11         So when you say it wasn't the same time, I'm not

12  sure that's true, but I'm just responding to what you're

13  saying.

14         MR. McKINLEY:  Well, again, I'd also ask to

15  consider –– the Court to consider the 403 issue.  Again, the

16  devastating impact of this, at this stage in the game, him

17  having admitted to taking these photographs, and we've

18  stipulated to the other two elements, the only issue for the

19  jury to decide at this point is do these images rise to the

20  level of lascivious exhibition.  Do they portray

21  sexually–explicit conduct?

22         THE COURT:  What was the purpose of the line of

23  questioning that you pursued with respect to his professional

24  activities and legitimacy?

25         MR. McKINLEY:  Background, Your Honor, and to try to

1  portray him in a light –-

2        THE COURT:  Background?  Where is that in the rules

3  of evidence?  What does that mean?  Background of what?

4  Background that he was a professional?  That he didn't molest

5  children?  Background of what, Counsel?

6        MR. McKINLEY:  His personal background to dispel the

7  image that the Government has tried to portray that all he's

8  ever done is take pictures of nude children.  It's to give the

9  jury a fair portrait of who my client is, and who he is, all

10  of that, is relevant for the jury's consideration.

11        THE COURT:  I know, but if I use background as the

12  reason, I would put these acts of alleged molestation in

13  evidence because that's background.  That gives a fuller,

14  truer picture.  So that can't be your reason, Counsel.

15        MR. McKINLEY:  Your Honor, don't confuse my argument

16  in regard to relevance with my argument with regard to 403.

17        THE COURT:  I'm not, but you were, I think, because

18  you were justifying relevance on the grounds of background.

19  And I'm saying you've got to be careful about background

20  because it's sort of all encompassing.  It's this big net.

21  Your argument really is 403, isn't it?

22        MR. McKINLEY:  Well, that's my fall-back position,

23  yes, 403.

24        THE COURT:  What's your primary position?

25        MR. McKINLEY:  Again, my primary position is its

RUSSELL – DIRECT/MCKINLEY          314

1  irrelevant at this point to the issue that the jury is

2  required to decide; that is, are the images lascivious

3  exhibition of the genitals?  That's the sole issue that the

4  jury is going to be facing.

5          THE COURT:  If the jury's going to be led to believe

6  that these were innocent, girl-like, natural activity poses,

7  they were just doing things, and sometimes the defendant said,

8  "Move your arm over here" or "your leg over there," that sort

9  of thing, but it was generally just children's activity,

10 that's different than posing the children out of some prurient

11 interest that this man has in them of a sexual nature.  That's

12 different.

13         So when you argued at the bench for a directed

14 verdict on Counts 2 and 4, and you said, "It's just nudity,

15 and nudity's not a violation of the statute," which I agree

16 with, it's not -- it's not just nudity.

17         MR. McKINLEY:  Well, to be illegal, of course, they

18 have to be more than nudity.

19         THE COURT:  Right, right, right, but those pictures

20 are not just nudity.  That was your argument.  I'm repeating

21 it.  So if you intend to make that argument to the jury, that

22 it's just nudity, it's just children's activities, just one of

23 the kids trying to get into a hand stand and that sort of

24 thing at the gym, they're just doing things that kids do at

25 the gym, that's not all the facts, is it?

RUSSELL - DIRECT/MCKINLEY          315

1          MR. McKINLEY:  I'm sorry, Judge?

2          THE COURT:  If that's your argument, that's not all

3   the facts.  And the Government may have a firm footing for

4   putting another picture before the jury of what was really

5   going on.

6          MR. McKINLEY:  Judge, I'm not going to withdraw my

7   relevance objection.  I've made my record, but I'd ask the

8   Court, if the Court concludes it is relevant, to balance the

9   evidence in light of 403 and conclude that the prejudicial

10  impact in this case grossly outweighs any probative value it

11  has at this point, given his admission to taking the images

12  and the stipulation as to the other elements.

13         THE COURT:  Well, part of the Court's analysis and

14  decision making with respect to relevance turns on your theory

15  of defense, and so that's what I'm trying to get a bead on

16  here.  Exactly what are you going to argue to the jury as your

17  theory of defense?  Then I'll be able to decide whether this

18  is relevant to that, whether the inclusion of this evidence is

19  too prejudicial.

20         MR. McKINLEY:  My argument to the jury quite frankly

21  is going to be the Government hasn't met its burden to

22  establish the second element of the offense, that they have

23  not established that these images portray sexually-explicit

24  conduct.

25             That's all I have as a defense, Your Honor.  That's

RUSSELL – DIRECT/MCKINLEY          316

1  the only defense there is at this point.  We've admitted that

2  he's taken photographs.

3          Now, whether –– if he crossed the boundaries, you

4  know, obviously he does so at his own peril.  Whether he

5  intended for these images to be pornographic is really

6  irrelevant.  If they, in fact, are across the line here, then

7  whether he intended them to be or not, if he thought he was

8  doing something innocent, that doesn't matter, that is not a

9  defense, I accept that.

10         The only defense to this case is these images don't

11 portray sexually-explicit conduct.

12         THE COURT:  Well, you shot wide of the mark then on

13 your direct examination of the defendant, because first of

14 all ––

15         MR. McKINLEY:  I did everything to enable my client

16 to help the jury see who he is in making their ultimate

17 decision.

18         THE COURT:  Right.  Who he is is the issue that the

19 Government wants to respond to in cross-examination because

20 he's not exactly as you portrayed him.  That's the point.

21         MR. McKINLEY:  According to the allegations, but

22 they're just that, allegations.  My client does not admit to

23 engaging in any of those and adamantly deny that any of those

24 incidents occurred.

25         THE COURT:  Well, of course those are factual

RUSSELL – DIRECT/MCKINLEY       317

1   questions the jury decides.

2           MR. McKINLEY:  I understand.

3           THE COURT:  Okay, Mr. Cook.  What do you want to say

4   in response?

5           MR. COOK:  I suppose as a preliminary matter, Your

6   Honor, what counsel for the defendant may or may not be

7   planning to argue to the jury as he proffers to the Court now,

8   he put evidence in front of the jury through the direct

9   examination quite a long time, I mean he elicited what, 15

10  minutes' worth of evidence, alleged evidence, from the

11  defendant about the fact that he engages in a nudist lifestyle

12  and that his daughters engaged in that with him as well.

13          They put that evidence in front of the jury.  That

14  evidence, whether he wants to argue in closing or not, that

15  evidence could go to negate intent because the intent has to

16  be, you know, that the minors are engaging in

17  sexually-explicit conduct.

18          So what we're attempting to do with that line of

19  questioning, okay, and the probable or possible rebuttal

20  testimony from Jane Doe 1 is to rebut that defense.

21          Additionally, again, I expect strongly that the

22  defendant is going to deny that he had a sexual interest in

23  his daughters, and it then becomes impeachment evidence as

24  well.

25          THE COURT:  Well, it has to be not just that he had

1  a sexual interest in them but was the picture-taking pursued

2  because of that or as part of that.  Is that what he was

3  doing?  You have to make sure you close the loop here.

4        MR. COOK:  And I can tell you that that is the

5  anticipated line of questioning.  I mean, to be quite frank,

6  the anticipated line of questioning is going to be directed

7  towards -- effectively what I expect the defendant is going to

8  say is that the SpongeBob pictures, for instance, were not

9  taken because he has a sexual interest in his daughters, is

10  what I expect to happen.

11        A follow-up question:  "Were any of your nude photo

12  shoots done because you had a sexual interest in your

13  daughter?"

14        Expected answer, "No."

15        Anticipated follow-up that I would suggest is quite

16  relevant both for impeachment and to negate this phantom,

17  whether it's argued or not, defense of nudism, is that, in

18  fact, he did do a photo shoot with his daughter at Mary Kay's

19  house when she was nine or ten years old, and where she was

20  covered in powdered sugar and he licked her genitals.

21        Additionally, when he then denies that he has a

22  sexual interest in his daughter, I think that the other

23  incidents that weren't necessarily a part of the photo shoot

24  become relevant as well for impeachment purposes.

25        Now, as the Court is aware, we argued at pretrial

1    that we think this evidence ought be admitted under Rule 414

2    in any event.  I won't revisit that, and I understand the

3    Court's ruling, but I just -- these things are relevant, Your

4    Honor.  They go -- these things being the evidence about the

5    molest, and both the cross-examination of the defendant and

6    the probable rebuttal evidence, they go right to his intent in

7    taking these pictures.

8         THE COURT:  Did you want to say something else?

9         MR. McKINLEY:   Your Honor, if I understand the

10   Government's position correctly, they're suggesting that his

11   nudist lifestyle is being posited as a defense, and it's not.

12   The fact that --

13        THE COURT:  Why was it posited?

14        MR. McKINLEY:  I hate to say background, Your Honor,

15   but to show my client's history and explain why nudity and

16   photographing his girls and his girls' willingness to be

17   photographed is a component of this nudist subculture.

18        THE COURT:  Well, be careful.  That's just what

19   Mr. Cook just said, that that's the hook that he wants to

20   latch on to in putting this other testimony in.

21        MR. McKINLEY:  Well, the nudist lifestyle has no

22   relationship to molest.  It's separate and distinct.

23        THE COURT:  Then why did we put it in?

24        MR. McKINLEY:  I'm sorry?

25        THE COURT:  Why do we put it in?  What does it have

RUSSELL - DIRECT/MCKINLEY          320

1   to do with the photographs exactly?

2            MR. McKINLEY:  It was put in for reasons that the

3   Government didn't object to at the time that I introduced the

4   evidence.  Now, if the Court concludes I opened the door,

5   then, you know, shame on me.  All I want is a fair shake for

6   my client.  I want him to get a fair trial and a fair image

7   portrayed before this jury.  I'm not trying to mischaracterize

8   anything.  I've just elicited what, I believe, were the facts.

9            THE COURT:  Okay.  Is that all the argument?

10           MR. McKINLEY:  Yes.

11           THE COURT:  Okay.  I'll step down from the bench and

12   come back when the jury is recalled.  I have the matter under

13   advisement.

14                    (Recess taken.)

15           THE COURT:  You may be seated.  I need to rule on

16   this before the jury comes back, so I'm prepared to do that at

17   this time.  I want to say that I'm -- I have in mind the

18   teachings of the 7th Circuit, and the other related case law

19   with respect to Federal Rule of Evidence 403, and also 414 --

20   is that right, 414?  Where did Sarah Dame go?

21           In any event, and in particular, the United States

22   versus Burt case decided by the 7th Circuit in July 2007, and

23   here's how I think we ought to balance the interests and take

24   into account the nature of the testimony that the Government

25   wants to adduce and place before the jury with respect to the

RUSSELL - DIRECT/MCKINLEY        321

1  three acts of alleged improper touching or molestation by the

2  defendant.

3          One of the things that makes this so difficult an

4  issue is because, of course, it's inherently problematic

5  evidence, and it has the potential to pull the jury from

6  deciding the legal issues before it with respect to the nature

7  of these photographs.

8          On the other hand, the defense has, through its

9  direct examination of the defendant, portrayed the defendant

10 as a person who is a professional photographer who engages in

11 recreational activities that include nudism, and has taken his

12 family, and in particular the two girls who were involved in

13 this case, with him on those trips, suggesting that the family

14 and he, in particular, has a different view of nudism than

15 others might have, and a higher level of tolerance of that

16 sort of display of the body.  And that while it may not be

17 everybody's shared interest, it's his, and it puts in context

18 what he was doing when he photographed the children; that is

19 to say, that what the jury would conclude based on his

20 testimony and based on his theory of defense is that there was

21 nothing inappropriate about it.  He said that, in fact,

22 nothing inappropriate about the photographs or -- either the

23 photographs or taking the pictures.

24          That suggests that the Government's evidence that

25 there may be something else going on here, and that is, the

1  defendant's sexual interest in his daughters, and that in part

2  his photography was a reflection of that interest; to that

3  extent, the door has been opened for the Government to suggest

4  that, in conjunction with the photography that was occurring

5  by the defendant, there were some instances of

6  sexually-related or inappropriate sexual contact with the

7  girls.

8          So because the nature and circumstances of the

9  contact are graphic and inflammatory almost in any setting,

10  but particularly with young girls and daughters, the Court

11  will direct the Government to -- will permit the Government to

12  pursue this line of testimony, but only in these ways:  and if

13  you get outside the boundaries, I may have to declare a

14  mistrial.  That's how serious it is that you stay within these

15  boundaries.

16          You may inquire of the defendant on

17  cross-examination as to whether he ever had any inappropriate

18  sexual contact or engaged in sexual touching of his daughters.

19  Assuming that he says he didn't -- you probably ought to

20  confine it to Jane Doe 1 because that's all your evidence

21  shows.  And if he testifies he never did, then you can say

22  during the period of time in question here, and you can go

23  back to '01, up until and around 2004, were there any times of

24  inappropriate sexual contact between you and the girls, which

25  includes touching, inappropriate and sexual touching.  And you

1    have to refer to it that way.  I'm not going to let you talk

2    about vibrators or the mouth to genitals contact or the

3    bathroom content, but you have to group them together and talk

4    about it in those sort of generic ways.

5            And assuming that he denies it and you want to rebut

6    it by recalling Jane Doe 1, you have to ask her the single

7    question "Were there ever any times during this time period

8    when at your home in conjunction with the photography

9    sessions, that your father engaged in inappropriate sexual

10   contact or touching of you?"

11           If she answers yes to that, that will be that, and

12   you can't cross-examine as to any of the particulars.  Neither

13   can the defense.

14           The defense can go into the fact that these were

15   rather belated disclosures by the girls suggesting that

16   perhaps their memories aren't as good or the time has –– time

17   and circumstances between their testimony today and when this

18   happened aren't consistent with fact.

19           So you can ask about the sharpness of their recall,

20   but I'm not going to let you go into the particular acts,

21   either on your direct examination or on cross-examination, to

22   try to get into evidence before the jury the particulars of

23   the inappropriate contacts.

24           In my opinion, this holding is obviously an attempt

25   to balance, takes into account the rules of evidence that

1  apply, and the broader discretion that the Court has in

2  allowing a jury to consider such evidence when it's relevant.

3  And it is relevant here, and it is prejudicial, but I think

4  the prejudice can be cabined or contained with fairness to

5  both sides without running the risk of distorting the jury's

6  views in considerations of the evidence and the weighing and

7  balancing that they have to do on the essential elements.

8          It is evidence that's relevant because it relates to

9  a possible reason that it was not innocent, or would not be

10  viewed as innocent, that Mr. Russell had for taking the

11  pictures and posing the children in the ways that they

12  testified that he did.

13         And he's testified, too, to a certain extent that he

14  had them pose as models.  So it gives –– it places that in a

15  truer light, at least without making the jury's decision as to

16  how they'll consider it, but it's a more rounded–out picture,

17  and the Government's entitled to present that evidence in the

18  way that I've specified.

19         So the Government, of course, has the burden of

20  proving that the photos violated the statute.  And the

21  defendant's actions and preferences and desires, they have

22  evidence to suggest something other than just his interest in

23  nudism and photography.

24         So they are entitled to put that evidence before the

25  jury for the jury's consideration.  I want to mention that in

1    the Burt case, at page 741, the 7th Circuit cites there the

2    various factors that made the Trial Court's decision that it

3    was relevant and affirmable, that is to say correct, because

4    it went to rebut the question of whether Burt, in that case,

5    was a "hard-working professional photographer taking pictures

6    for a legitimate non-pornographic website" as the

7    defendants -- as the defense had stated in its opening

8    statement; or whether he took pictures of naked children

9    because they "elicited a sexual response in him or his online

10   partners."

11          So the 7th Circuit found that the District Court did

12   not abuse its discretion in admitting the testimony.  I hope

13   that if it's on review before the 7th Circuit, that they'll

14   agree with the District Court's opinion in this case as well.

15          It's a tough call because of the nature of the

16   evidence and the critical nature of the issues that the jury

17   has to decide, but I believe it's a correct decision, and so

18   that will be my ruling.  And I trust you'll all abide by it.

19          Okay.  Shall we call down the jury?

20          MR. COOK:  Your Honor, I just -- I just want to make

21   sure I understand because it is such a sensitive issue.  The

22   Court's ruling is that Government needs to confine itself in

23   Mr. Russell's cross-examination to effectively one question,

24   and that is, "In conjunction with taking photographs of your

25   daughters between 2001 and 2004, when they were nude, did you

RUSSELL – DIRECT/MCKINLEY        326

1   engage Jane Doe 1 in any sexual touching?"  The end?

2            THE COURT:  Right.

3            MR. COOK:  And whatever his response is, his

4   response is, and that may open the ability to call Jane Doe 1

5   in rebuttal to answer simply "yes" or "no" to a similar

6   question?

7            THE COURT:  Yes.

8            MR. COOK:  Okay.

9            THE COURT:  Mr. McKinley, any questions you want to

10  ask me?

11           MS. COOK:  If I might, Judge?

12           THE COURT:  Miss Cook, you may.

13           MS. COOK:  When the question is in conjunction with

14  the photography between those times, is the Court assuming

15  that the alleged touchings occurred within some proximity of

16  the photography sessions?

17           THE COURT:  Well, from what's been told to me, one

18  of the instances occurred with the sugar.  I don't want to

19  tell all the sordid details, but with the sugar at the

20  conclusion of a photography shoot.

21           And so that one was for sure.  I don't know about

22  the time he came into the bathroom, but I know there was

23  another incident when shots were taken in the bathroom, and

24  the child was staged to step out of the shower and to depict

25  certain things.  So that would say to me in conjunction with

RUSSELL – DIRECT/MCKINLEY          327

1    as well that that was a theme of the photography.

2         MS. COOK:  I don't know that there's an allegation

3    that an incident occurred at that time.

4         THE COURT:  No, I'm just saying that it's in the

5    context of his engaging them as a photographer, and that it

6    was in conjunction with the shower incident.  So I assume that

7    in similar fashion, that that was what was going on.  I may be

8    wrong about that one.  I don't know the particulars.  And I

9    don't know exactly when the vibrator incident happened either.

10   When was that?

11        MR. COOK:  Your Honor, that occurred sometime in

12   between August 2003 and August 2004.  My impression from

13   speaking with Jane Doe 1 is that it was more towards

14   August 2003 than it was August 2004.

15        THE COURT:  It doesn't have to be directly related

16   to a photo shoot because the evidence, if true, believed by a

17   fact-finder, would suggest that it might be a reason why he

18   staged the photographs, that he did because he had this

19   interest in the children beyond photography and beyond

20   nudists.  So it doesn't have to be necessarily in conjunction

21   with the photo shoot, but that one, I think, as I was told

22   about it, did.

23        MS. COOK:  Just so that I'm clear, so the Court's

24   ruling is it happened between two dates, but it doesn't have

25   to have anything to do with the photography?

RUSSELL - DIRECT/MCKINLEY        328

1          THE COURT:  Right.  The question won't elicit that.

2   It will just be "During that period of time did you ever

3   engage in any sexually-related touching or conduct with your

4   daughters or with Jane Doe 1?"  You should confine it to Jane

5   Doe 1.  So that's -- those are the parameters on the question.

6          MR. COOK:  Understood, Your Honor.

7          THE COURT:  Okay, Miss Cook, do you understand?

8          MS. COOK:  I understand the Court's ruling.

9          THE COURT:  Okay.  Very good.  Let's bring down the

10  jury.

11              (Open court, jury present)

12          THE COURT:  You may be seated.  Thank you, ladies

13  and gentlemen.  We were working on a legal issue, so it wasn't

14  necessary for you to return as promptly as I thought you'd be

15  able to, but we've got it all resolved now, so we can move

16  ahead.

17          Mr. Cook, cross-examine?

18          MR. COOK:  Yes, Your Honor, thank you.

19                   **CROSS-EXAMINATION**

20          MR. COOK:  May I proceed, Your Honor?

21          THE COURT:  You may.

22  BY MR. COOK:

23  Q   Mr. Russell, let's start with a couple of things that we

24  all agree about.  You owned and operated octobermodel.com and

25  kaseymodel.com; is that correct?

*RUSSELL – CROSS/COOK*          329

1   A    Yes.

2   Q    You managed the websites?

3   A    Yes.

4   Q    Collected the funds?

5   A    Yes.

6   Q    Posted all the photos that were posted on them?

7   A    Yes.

8   Q    Took all the pictures that were posted upon them?

9   A    Yes.

10  Q    Included among those photos that were posted on those

11  websites -- well, again, octobermodel.com depicted images of

12  your daughter, Jane Doe 2; is that correct?

13  A    Yes.

14  Q    And kaseymodel.com depicted your daughter, Jane Doe 1 --

15  A    Correct.

16  Q    -- yes?

17          Among the images that were on that site were

18  images -- or on both those sites were images of Jane Doe 2 and

19  Jane Doe 1 in underwear; correct?

20  A    I think there was one, yes.

21  Q    Included in the octobermodel.com website, at one point you

22  had images of Jane Doe 2 with a pacifier in her mouth and a

23  large cloth diaper on, correct, posed as you posed her?

24  A    Yes.

25  Q    And you took those photos --

1  A   Correct.

2  Q   -- and posted them?

3        Do you think those photos were appropriate?

4  A   Given the way they were taken, yes.

5  Q   I see.

6        Do you agree that you took the pictures that are the

7  subject of Counts 2 and 4 that were taken at the Spectrum Gym,

8  correct?

9  A   Correct.

10 Q   And also a companion video that was taken that same

11 evening?

12 A   Yes.

13 Q   And those were of your 10 and 12-year-old daughters, Jane

14 Doe 2 and Jane Doe 1?

15 A   Yes, I think they were 9 and 12, 9 and 11, somewhere in

16 that range approximately.

17 Q   9 and 10, 11 and 12, somewhere around there.

18        Now, it was your idea to go to the Spectrum Gym that

19 night, was it not?

20 A   Yes.

21 Q   It was your idea for Jane Doe 2 and Jane Doe 1 to take off

22 their clothing?

23 A   No.

24 Q   So you're claiming to this jury that Jane Doe 2 and Jane

25 Doe 1 decided on their own to take off their clothing?

1  A   They asked, yes.

2  Q   I want to talk to you a little bit about the video from

3  that evening.  About how long was that video, to your

4  recollection?

5  A   I don't remember.  Are you talking about any video taken

6  or just −−

7  Q   I'm talking about the video taken at Spectrum Gym on the

8  night that you produced the images in Counts 2 and 4.

9  A   I don't remember exactly.

10 Q   Does 42 and a half minutes sound about right?

11 A   No.

12 Q   How long were your daughters nude in the video?  Were they

13 nude for all of the video or part of the video?

14 A   Part of the video.

15 Q   How many minutes were they nude in that video?

16 A   Probably somewhere between 30 and 35 minutes.

17 Q   Somewhere between 30 and 35 minutes?

18          Now, do you recall being in a separate court

19 proceeding on October 17th of 2006, the family law court, do

20 you recall being in a hearing there?

21 A   Yes.

22 Q   Do you recall that hearing involved bits about the video

23 we just discussed, the video you took of your daughters?

24 A   Yes.

25 Q   And do you recall saying in that court hearing that the

1  nude portion of the video was only five to ten minutes of a

2  45-minute video?

3  A   I don't recall exactly what I said, but I may have been

4  guessing on it.

5  Q   Guessing at it?  Guessing downward five to 10 minutes from

6  the 45 minutes you just testified about?

7  A   You've got to remember that was several years earlier.

8  Q   Do you agree that you took the photographs in what we've

9  been referring to as the SpongeBob series of photographs in

10 Count 1, you took those photographs?

11 A   Yes.

12 Q   Now, it was your decision to do that photo shoot, correct?

13 A   Correct.

14 Q   You set the scene?

15 A   Yes.

16 Q   You stage the pictures?

17 A   When you say "set the scene," what you do mean?

18 Q   Well, how about this:  Did you tell Jane Doe 1 what to do

19 for that photo shoot?

20 A   Specifically or generally or what?

21 Q   I don't know, sir.  Did you tell Jane Doe 1 what to do for

22 that photo shoot generally?

23 A   I told her the theme.  I didn't direct her.

24 Q   What did you tell her the theme was?

25 A   You know, typical day, wake up, get ready to go to school.

1  Q   A typical day.  Typical day.

2         Now, your daughter did not typically sleep in the

3  nude at your house, did she?

4  A   She did quite frequently.

5  Q   She was apparently mistaken when she told the jury that

6  she didn't sleep nude at your house as a practice?

7  A   Mistaken or influenced possibly.

8  Q   You caused the pictures to exist, correct?

9  A   Yes.

10 Q   You told Jane Doe 1 what to wear, to put on the SpongeBob

11 underwear?

12 A   Yes.

13 Q   At the very end of the shoot?

14 A   Correct.

15 Q   You told her to hold the blanket around herself?

16 A   No.

17 Q   You controlled the timing of the shoot, is that correct?

18 A   I'm sorry?

19 Q   You controlled the timing of the shoot, when it would

20 happen, how many pictures were taken, that sort of thing?

21 A   Not entirely.

22 Q   What do you mean by that?

23 A   I asked her if she wanted to do a photo shoot and

24 described it to her, and she said sure.  If she had said no,

25 it wouldn't have happened.  She somewhat controlled the

1  timing.

2  Q   I see.  So your 12-year-old daughter, your daughter was 12

3  at that point, right?

4  A   Yes.

5  Q   So your 12-year-old daughter controlled the timing and the

6  subject of a nude photo shoot.

7        THE COURT:  Is that a question?

8  Q   Did your 12-year-old daughter control the timing and

9  subject of a nude photo shoot?

10  A   As to the extent if she wanted to do it.  If she didn't

11  want to do it, then it wouldn't happen.  In other words, she

12  could opt out.

13  Q   You took the photos, correct?

14  A   Yes.

15  Q   Do you agree that you took the pictures of Jane Doe 2

16  coming out of the shower that was the subject of Count 3?

17  A   Yes.

18  Q   Is that correct?

19  A   Correct.

20  Q   We just discussed a series of nude photo shoots that you

21  did with your girls that are the subject of the counts here;

22  is that correct?

23  A   Yes.

24  Q   Do you recall the October 17th, 2006, court hearing we

25  discussed just a couple of moments ago?

*RUSSELL - CROSS/COOK*          335

1   A    Yes.

2   Q    The family law hearing?

3   A    Yes.

4   Q    Do you recall -- and this is page 30 -- being asked a

5   question along the lines of "Did your camera catch the girls

6   coming out of a shower at any point?"  Do you recall a line of

7   questioning along those lines?

8   A    Yes.

9   Q    And your response was "I don't think so."

10  A    Well, first of all, you have to define "catch," like

11  accidently catch someone coming out of the shower.  If that's

12  the case, then the answer's no.

13  Q    So you're parsing the words of the attorney who's asking

14  the question?

15  A    I'm answering the question you asked me.

16  Q    How many photo shoots did you do of Jane Doe 2 coming out

17  of the shower or even in the shower?

18  A    One.

19  Q    You did one photo shoot of Jane Doe 2 in the shower?

20  A    Yes.

21          MR. COOK:  If I could have a moment, Your Honor.

22              (Off-the-record discussion.)

23          THE COURT:  What are we waiting for here?

24          MR. COOK:  Your Honor, I presented the defense with

25  what's been marked for courtroom purposes as Government's

*RUSSELL — CROSS/COOK*          336

1   Exhibit 11.  It is a photo shoot of a certain nature.

2          THE COURT:  So are you going to ask questions about

3   it?

4          MR. COOK:  I am, and I was giving them an

5   opportunity to review Government's Exhibit 11.

6          THE COURT:  So can we go?

7          MR. McKINLEY:  Your Honor, I don't remember ever

8   seeing Government's Exhibit 11 in any of the pretrial

9   discovery.  This has been obviously marked as an exhibit and I

10  have no recollection of it.

11         THE COURT:  Was it disclosed in discovery?

12         MR. COOK:  Yes.

13         THE COURT:  Why don't you step aside and tell him

14  when you disclosed it in discovery and maybe that will refresh

15  his memory.

16         Lawyers confer off the record.  Come on, let's go.

17  You don't have to leave the courtroom.  Just right there.

18  Turn off your mics and confer.

19                (Off-the-record discussion.)

20         THE COURT:  Okay, obviously it didn't lend itself to

21  a quick resolution.  So Mr. Cook, go to the next topic, and

22  we'll circle back and resolve this later.

23         MR. COOK:  Your Honor, I believe we have resolved

24  the discovery issue.  Mr. McKinley recalls this set of images.

25         THE COURT:  All right.

*RUSSELL - CROSS/COOK*            337

1          MR. McKINLEY:  And I believe I did misspeak, Your

2    Honor.  I said I had never seen this; I did not recall seeing

3    it.  Miss Helart explained the details of a prior meeting, and

4    I did, in fact, have an opportunity to review Government's

5    Exhibit 11.  I had a misunderstanding about what it had

6    represented.

7          THE COURT:  All right.  Then go ahead with your

8    questioning.

9          MR. COOK:  Thank you.

10   BY MR. COOK:

11   Q   Mr. Russell, you just testified that there was one

12   occasion that you took photographs of your daughter in the

13   shower and coming out of the shower; is that correct?

14   A   Yes.

15         MR. COOK:  I'm going to approach -- if I may, Your

16   Honor?

17         THE COURT:  Yes.

18   BY MR. COOK:

19   Q   -- with what's been previously marked for courtroom

20   purposes as Exhibit 11, and ask you to take at look at

21   Exhibit 11.  I'll note for the record that Exhibit 11 has a

22   cover sheet followed by 114 images.

23         What's in Exhibit 11, Mr. Russell?

24   A   A photo shoot of Jane Doe 2 in the shower.

25   Q   A photo shoot of Jane Doe 2 in the shower?

*RUSSELL – CROSS/COOK*                338

1          You'll note a date that is stamped, that is printed

2 as part of that image at the bottom of it.  What is the date?

3 A   6/21/2004.

4 Q   6/21/2004?

5          MR. COOK:  Can I approach the witness again, Your

6 Honor?

7          THE COURT:  Yes.

8 BY MR. COOK:

9 Q   I'm showing you what has been previously marked as

10 Government's Exhibit 3.  Take a look at that, please, sir.

11 Now, that depicts Jane Doe 2 on a different date coming out of

12 the shower, doesn't it?

13 A   Yes.

14 Q   So there's now two photo shoots of Jane Doe 2 in the

15 shower and coming out of a shower; is that correct?

16 A   Yes, apparently.

17 Q   If I can have those back please, sir.

18 A   One moment.

19 Q   Now that you've had a chance to look at Government's

20 Exhibit 11, does it accurately reflect a photo shoot you did

21 of Jane Doe 2 in a shower?

22 A   Which one, 11?

23 Q   Yes, Government's Exhibit 11, the big thick book.

24 A   Yes, that would be considered a photo shoot, yes.

25 Q   She was nude?

*RUSSELL − CROSS/COOK*          339

1   A    Yes.

2   Q    Covered in suds?

3   A    Yes.

4   Q    And then not covered in suds?

5   A    Yes.

6   Q    Do you recall the interview that you did with Special

7   Agent Rothrock and Detective Andy Byers on June 29th of 2005?

8   A    Yes, I do.

9   Q    Now, on that day, all that they had in hand at that point

10  was the nude video of the gymnastics at Spectrum Gym, correct?

11  A    Yes.

12  Q    And they asked you at that time, "Sir, have you produced

13  any other nude photos?"  Correct?

14  A    Yes.

15  Q    And you told them "No"?

16  A    No, I think I refused to answer that.

17  Q    Sir, you told them "No"?

18  A    That may be your take on it.  I know I specifically

19  refused to answer any specific questions that they asked other

20  than the video.  That's my recollection.

21  Q    While we're on the topic of June 29, 2005, you've been

22  aware since at least that date that you were under

23  investigation on subjects surrounding your daughter and nude

24  images you've created, correct?

25  A    Yes.

1  Q   I want to draw your attention to July of 2007.  In July of

2  2007, do you recall meeting with Assistant U.S. Attorney Gayle

3  Helart?

4  A   Yes.

5  Q   Now, you met with Miss Helart, and the United States

6  Attorney's Office is downtown, correct?

7  A   Yes.

8  Q   You came to that meeting with a lawyer, correct?

9  A   Correct.

10 Q   You were shown that day the images that comprise Counts 1,

11 2, 3 and 4, correct?

12 A   Yes.

13 Q   And you were informed that the United States Government

14 would be going forward with the prosecution, correct?

15 A   No, I don't remember them saying that they would be, that

16 that was a possibility, yes.

17 Q   You were told that the United States Government would be

18 going forward with a prosecution in July 2007?

19 A   Were you there?  Are you telling me, or are you asking me?

20         THE COURT:  Now wait a minute.  You answer the

21 lawyer's questions.

22         THE WITNESS:  I answered.  I said that they said it

23 was a possibility.  They didn't tell me for sure.

24         THE COURT:  Just answer the question.  No back talk.

25         THE WITNESS:  Okay.

1  BY MR. COOK:

2  Q   Aware that this possibility existed that you may be

3  prosecuted by the United States Government, you shortly

4  afterwards left and went to Mexico, correct?

5  A   Correct.

6  Q   You returned from Mexico in late 2009 when the Mexican

7  government put you on an airplane, correct?

8  A   Yes.

9  Q   Put you on an airplane to Los Angeles?

10 A   Correct.

11 Q   At which point you were arrested?

12 A   Right.

13 Q   Sir, you talked about how you're interested in the nudist

14 lifestyle and nudist philosophy because "it's psychologically

15 harmful to hide things" like I suppose one's body; is that

16 correct?

17 A   Correct.

18 Q   Yet you hid from Jane Doe 1 and Arielle's mother, when

19 they were 10 and 12 years old, that you were taking them to

20 nudist resorts, right?

21 A   No –– you see hid?  An intentional hiding?  No.

22 Q   I see.  You failed to mention that you took them to nude

23 resorts?

24 A   Correct.

25 Q   Do you think that might be an important factor for a

1  mother of a 10 and 12-year-old to know?

2          MR. McKINLEY:  Objection, Your Honor, relevance.

3          THE COURT:  Sustained.

4  BY MR. COOK:

5  Q   You talked about how your children, when they were at

6  these resorts, made the choice to take off their clothing.

7  Now, sir, you're their father, correct?

8  A   Correct.

9  Q   At this point, they were nine and 10 years old, 11 and 12

10 years old; is that correct?

11 A   Yes.

12 Q   Who was responsible for making important decisions for

13 their nine and ten-year-old daughters, their 11 and

14 12-year-old daughters, their parents, correct?

15 A   Correct.

16 Q   And when you went to these nudist resorts, you, yourself,

17 were naked, yes?

18 A   Yes.

19 Q   And you were going to be naked whether or not your

20 daughters were naked as well?

21 A   Right.

22 Q   And yet it was their choice to be naked is your testimony?

23 A   Correct.

24 Q   Sir, are any of the images in Counts 1 through 4 images

25 that were produced at a nudist resort?

1  A    No.

2  Q    Not a single one, correct?

3  A    No.

4  Q    You talked about on the websites for your daughters, Jane

5  Doe 2 and Jane Doe 1, how it was important to use these fake

6  names, October and Kasey.  Why was it important to use these

7  fake names?

8  A    To avoid any possible stalkers or any other danger.

9  Q    Avoid any possible stalkers and some kind of danger?

10        Now, that danger might exist because there were

11  images of them on there in their underwear, yes?

12  A    No.

13  Q    There weren't images of them on there in their underwear?

14  A    No.  Your question was did that danger exist because of

15  the underwear and the answer is no.

16  Q    Why does the danger exist?

17  A    Because they are on the website, period.  Not just the

18  underwear pictures, any of the pictures.

19  Q    Just so that we understand each other, there were pictures

20  of them in underwear, including thong underwear?

21  A    No.

22  Q    There were images of them in underwear?

23  A    Yes.

24  Q    You're denying that there were images in thong

25  underwear --

1  A    Yes.

2  Q    -- is that correct?

3  A    Yes.

4  Q    There were images of them in leotards pulled up tightly

5  against their crotch, correct?

6  A    Pulled tightly against their crotch, leotards by nature

7  are tight.

8  Q    There were images of them in leotards pulled up tightly

9  against their crotch.  Yes or no?

10  A    I want to say you're implying that pulled up is an

11  intentional thing.

12        THE COURT:  Can you answer the question yes or no?

13  A    No, not pulled up tight.

14  Q    I see.  Defense Exhibit G, a photograph of your three

15  children, I suppose for lack of a better word, laying across

16  each other or spooning one another.  When was that photograph

17  taken?

18  A    Approximately 2001.

19  Q    2001.  Did you tell Jane Doe 1 and Jane Doe 2 and Aaron's

20  mother, Dawn, about that picture?

21  A    No.

22  Q    Any of the nude photo shoots?

23  A    No.

24  Q    I want to talk to you about some of these images

25  specifically.

1          MR. COOK:  And, Your Honor, I'm going to ask

2  permission to move this podium a bit so that this image -- I'm

3  sorry, so the screen is not viewable in the back?

4          THE COURT:  Yes, you may.

5          MR. COOK:  I'm not sure how successful I can be in

6  that.

7          THE COURT:  You have to --

8          MR. COOK:  Or perhaps just move the screen.

9          THE COURT:  I'm sure glad you didn't have to move my

10  bench.

11          MR. COOK:  Your Honor, I work out quite a bit but

12  not quite that much.

13          THE COURT:  We'd be here late in the evening I'm

14  afraid.

15          MR. COOK:  Your Honor, I would like to approach the

16  witness with what's previously been marked as Government's

17  Exhibit 1B.

18          THE COURT:  You may.

19  BY MR. COOK:

20  Q   Mr. Russell, you're familiar with Government's Exhibit 1B?

21  A   Yes.

22  Q   Government's Exhibit 1B is a binder.  It has a cover page

23  and about 86 images.  Does that sound right, more or less?

24  A   Yes.  It looks like there's about that many.

25  Q   Again, you took these photos?

1   A    Yes.

2   Q    Of your 12-year-old-daughter, Jane Doe 1?

3   A    Correct.

4   Q    They were taken at your house in Carmel?

5   A    Right.

6   Q    On a bed you provided, yes?

7   A    Yes.

8   Q    Now, you got -- you planned a photo shoot around this

9   time, correct?

10  A    Correct.

11  Q    And the time was around -- I don't know.  If you look at

12  the first image, Mr. Russell, you can see it's stamped with a

13  time of 11:23.  Does that seem about right to your

14  recollection?

15  A    Yes.

16  Q    Now, Jane Doe 1 had already gotten up for the day at that

17  point, right?

18  A    Correct.

19  Q    So she's not actually asleep in bed getting ready to get

20  out of bed?

21  A    No.

22  Q    This is staged for a photo shoot?

23  A    Correct.

24  Q    A photo shoot that you took the pictures of?

25  A    Yes, I already said that.

*RUSSELL – CROSS/COOK*            347

1   Q   You told her to, and at the very end of this 86-picture

2   session, you told her to put on the SpongeBob theme panties?

3   A   Correct.

4   Q   I want you to turn to page 22.  I'll put this on the image

5   viewer for the jury.

6            Now on page 22, she's covered by the SpongeBob theme

7   blanket; is that correct?

8   A   Correct.

9   Q   Turn to page 23, please, Mr. Russell.  Jane Doe 1's now

10  uncovered, and you can see your 12-year-old daughter's vagina

11  and her right breast, correct?

12  A   I wouldn't characterize it as vagina.

13  Q   What would you characterize it as, sir?

14  A   Genital area.

15  Q   Okay.  We'll call it her genital area.  How about genital

16  or pubic area?  Is that agreeable to you?

17  A   Yes.

18  Q   Now, pages 24 through 28, if you want to flip through

19  those for a minute.  Government's Exhibit 24 -- I'm sorry,

20  page 24, Government's Exhibit 1B.  25, 26, and 27 and 28 show

21  her similarly covered with a SpongeBob blanket, correct?

22  A   Correct.

23  Q   All the pictures that we looked at so far, they are

24  pictures you took?

25  A   Yes.

RUSSELL − CROSS/COOK          348

1  Q   And they were poses that you suggested that Jane Doe 1 do,

2  correct?

3  A   No, not specifically.

4  Q   You say not specifically.  Well, let's look at page 29.

5  So after page 22 when she was covered with a SpongeBob

6  blanket, page 23, she's uncovered.  You took a picture of

7  that, too, correct?

8  A   Yes.

9  Q   Pages 24 through 28, she's covered up.  And again, page

10  29, the blanket's off again.  Yes?

11          MR. McKINLEY:  Your Honor, I'll object to the extent

12  that the photographs all speak for themselves.

13          THE COURT:  Is this leading someplace?

14          MR. COOK:  Your Honor, it goes to the defendant's

15  intent to capture what he's depicting.  What this is leading

16  to is that, as we'll see, the blanket goes up and down about

17  five times through this series of photographs.  Pictures are

18  taken with it up and then with it down.  The blanket is

19  re-situated a number of times for different poses.

20          The defendant has suggested that these photos

21  somehow were edited in some way, and he's claiming that

22  they're not child pornography.  But the way that the photos

23  are taken, as we're going through, the blanket coming up,

24  going back down, the blanket being re-situated to capture a

25  breast here, or a genital or pubic area there, shows squarely

1 his intent and exactly what was going on in this photo shoot.

2          MR. McKINLEY:  Again, Your Honor, the exhibits have

3 all been published to the jury.  They all speak for

4 themselves.  There's nothing that he can add to them other

5 than what he's already said about the photos having been

6 cropped.

7          THE COURT:  The Government lawyer can develop the

8 evidence with respect to the overall theme of the composite

9 photos.  So he may proceed.  The objection's overruled.

10 BY MR. COOK:

11 Q   Looking at page 29, we can see your 12-year-old daughter's

12 genital and pubic area and her breast, correct?

13 A   Correct.

14 Q   That's a photograph you took?

15 A   Yes.

16 Q   And a pose you suggested?

17 A   No.

18 Q   So again, she was mistaken?

19 A   Correct, she was mistaken or influenced.

20 Q   Looking at pages 30 and 31, and of 32, and of 33 and 34,

21 again, now after the nude picture, the blanket is once again

22 concealing her body; is that correct?

23 A   Yes.

24 Q   I want to draw your attention to page 36.  That's your

25 daughter, Jane Doe 1, correct?

1  A    Correct.

2  Q    You took that picture?

3  A    Correct.

4  Q    You directed that pose where she's looking back over her

5  shoulder, has a blanket just covering the upper portion of her

6  buttocks?

7  A    Directed, no.

8  Q    You're claiming you didn't direct it?

9  A    By directing, are you saying told her exactly how to pose

10  or what?

11  Q    Yes, you told her to pose?

12  A    No, I did not.

13  Q    Your testimony is you did not?

14  A    No.

15  Q    I get that.

16        Sir, would you agree that that picture's intended to

17  elicit a sexual response from the viewer?

18  A    I actually would not agree with that.

19  Q    Would you agree that that image is intended to indicate

20  sexual coyness, almost an invitation?

21        MR. McKINLEY:  Objection, Your Honor.  It's

22  irrelevant.  My client's view on sexual coyness to the extent

23  it portrayed sexual coyness is the issue for the jury to

24  decide.

25        THE COURT:  He can ask whether that's his intention.

1  He has testified previously on direct to the contrary, so this

2  is a permissible line of questioning.

3  BY MR. COOK:

4  Q   So what's your answer?  Is that picture intended or

5  designed to elicit a sexual response in the viewer?

6  A   No, it does not.

7  Q   Does it suggest a sexual coyness or a willingness to

8  engage in sexual activity as she looks over her shoulder with

9  the blanket barely covering her behind?

10  A   Absolutely not.

11  Q   Let's go ahead and skip to page 38.  Why don't you

12  describe that picture to the jury, Mr. Russell?

13  A   Describe it to the jury?

14  Q   Yes, please.

15          MR. McKINLEY:  Your Honor, I object.

16          THE COURT:  Sustained.

17          MR. McKINLEY:  The picture speaks for itself.

18          THE COURT:  The picture speaks for itself.

19  BY MR. COOK:

20  Q   Mr. Russell, this is a posed picture, is it not?

21  A   Posed?  Are you saying did I pose her that way?

22  Q   Is your daughter in a pose that you suggested?

23  A   That I suggested?  No.

24  Q   So she, of her own accord, just took that pose?  Is that

25  your testimony?

*RUSSELL – CROSS/COOK*              352

1   A   I'm sorry?

2   Q   She decided to do that pose on her own; is that your

3   testimony?

4   A   Yes, it was in the sequence of poses.

5   Q   In a photo shoot that you suggested, she then decided to

6   just do this pose?

7   A   Correct.

8   Q   Let's look at Government's Exhibit 41.  A couple of

9   pictures later.  I'm sorry, Government's Exhibit 1B, page 41,

10  excuse me.

11          Now, this is one of the charged images from Count 1,

12  correct?  Do you recognize that?

13  A   Yes.

14  Q   And the blanket has been re-situated again around her

15  shoulders, correct?

16  A   Correct.

17  Q   And she's standing in such a way that her genital and

18  pubic area is visible?

19          MR. McKINLEY:  Again, objection, Your Honor, I think

20  the picture speaks for itself.

21          THE COURT:  Sustained.

22  BY MR. COOK:

23  Q   You took this picture?

24  A   Yes.

25  Q   You directed this pose, didn't you?

1  A    No.

2  Q    Your 12-year-old daughter picked it out herself?

3  A    Picked it out?  I don't know.  It was in the series.

4  Q    Page 42, once again, one of the charged images.  Your

5  daughter is holding her right leg out to the side and you can

6  see her genital and pubic area.  You directed that pose,

7  didn't you?

8  A    No.

9  Q    So again, your 12-year-old daughter decided to hold her

10 right leg out to the side exhibiting her genitals in a photo

11 shoot?

12        MR. McKINLEY:  Your Honor, he's already asked the

13 question.

14        THE COURT:  Sustained.

15 BY MR. COOK:

16 Q    Mr. Russell, going through Government's Exhibit 1B and

17 looking at that entire photo shoot, and you've been through

18 that exhibit before, correct?

19 A    Yes.

20 Q    You saw it before trial, you've seen it this afternoon?

21 A    Correct.

22 Q    Five times during the course of that photo shoot, Jane Doe

23 1 goes from covered with the blanket to uncovered, correct?

24 A    I didn't count them.  If you say so.

25 Q    Does that sound about right?  Would that be fair to say?

RUSSELL – CROSS/COOK          354

1  A    Yes.

2  Q    The blanket's re-situated a number of times.  Does that

3  sound fair to say?

4  A    Yes.

5  Q    I want to draw your attention to page 55, Government's

6  Exhibit 1B.  Who instructed Jane Doe 1 to bear her right

7  breast?

8  A    No one.

9  Q    Who instructed her to look down at her bare right breast?

10 A    No one.

11 Q    Your 12-year-old daughter made that decision all on her

12 own?

13        MR. McKINLEY:  Your Honor, this is argumentative.

14 Objection.

15        THE COURT:  I think -- are you done with that

16 exhibit?

17        MR. COOK:  I'll be done with this exhibit, Your

18 Honor, or at least looking at the specific images.  I have one

19 or two final questions here.

20 BY MR. COOK:

21 Q    Mr. Russell, you said that you believed that some of these

22 images had been edited to be closer up.  That was your belief?

23 A    Yes.

24 Q    Yes or no?

25 A    Yes.

*RUSSELL – CROSS/COOK*          355

1  Q    Does editing move the blanket around?

2  A    No.

3  Q    Does editing cause the blanket to cover in some pictures

4  and then not in others?

5  A    No.

6  Q    Does editing cause your 12-year-old daughter to bare her

7  right breast and stare down at it?

8           MR. McKINLEY:  Argumentative, Your Honor, objection.

9           THE COURT:  Sustained.

10 BY MR. COOK:

11 Q    Mr. Russell, let's just be blunt here.  You have a sexual

12 attraction to your daughter?

13 A    Absolutely not.

14 Q    I want to make sure I understand your testimony on that

15 point.  Between 2001 and 2004, did you engage in any sexual

16 touching with Jane Doe 1?

17 A    No, not in any way.

18 Q    So I understand your testimony, your answer is no?

19 A    Correct.

20 Q    I've got my notes shuffled.  Give me one moment, please.

21          MR. COOK:  I'm going to take back Government's

22 Exhibit 1B.  If I can approach the witness again, Your Honor?

23          THE COURT:  You may.

24          MR. COOK:  May I approach the witness with

25 Government's Exhibit 3?

1          THE COURT:  Yes.  Did you intend to move the

2     admission of 11?

3          MR. COOK:  At some point, yes.

4          THE COURT:  Okay.

5     BY MR. COOK:

6     Q   What's Government's Exhibit 3?  We've talked about it a

7     little bit today.

8     A   It's Jane Doe 2 getting out of the shower.

9     Q   You took those pictures, correct?

10    A   As I said before, yes.

11    Q   It was your decision to take the pictures?

12    A   Correct.

13    Q   You staged the scene, you decided it would be done in the

14    shower?

15    A   No, not this.

16    Q   You didn't decide that that photo shoot would be done in a

17    shower or coming out after shower?

18    A   I did not stage the scene, no.

19    Q   So you didn't decide to take this photo shoot in the

20    bathroom, it just happened?

21    A   This isn't a photo shoot.  This is two pictures.

22    Q   Are those part of a larger photo shoot?

23    A   No.  Not that I recall.

24    Q   Not that you recall?

25         MR. COOK:  Your Honor, I would move into admission

1   Government's Exhibit 11.

2          THE COURT:  Any objection?

3          MR. McKINLEY:  I'm sorry, is he offering

4   Government's Exhibit 11?

5          THE COURT:  Yes.

6          MR. McKINLEY:  Then I would object.  They are not

7   charged exhibits.  They are only likely to confuse the jury,

8   obscure the issue that the jury's required to decide in this

9   case.

10          THE COURT:  What's the purpose of the offer?

11          MR. COOK:  It goes to two things, Your Honor.  First

12   of all, it goes to the defendant's credibility.  He stated

13   that he had only done one photo shoot in the shower coming out

14   of the shower.  He later admitted two.  This, of course,

15   corroborates two.

16          Secondly, it does corroborate that he did in fact --

17   that I did in fact have a photo shoot of a shower scene.  Now

18   he wants to claim that Count 3 wasn't a photo shoot, and only

19   this was.

20          Finally, the images towards the end of this go very

21   squarely to his intent in his photo shoots.

22          THE COURT:  I don't -- I haven't seen the exhibit so

23   I don't know what that refers to.

24          MR. COOK:  Shall I describe them or show them to the

25   Court?

1          THE COURT:  Show them to me, please.

2             (Bench conference on the record.)

3          THE COURT:  Looking at page 106, Exhibit 11, 107,

4  108, 109, 110, 111, 112, 113, 114.  Now what's the purpose?

5          MR. COOK:  The purpose is to show his intent in

6  taking pictures in the shower.  He's just suggested that those

7  two pictures weren't part of a photo shoot, that they were

8  almost casual shots.  This goes squarely to show.

9          THE COURT:  Are the exhibits in Exhibit 3 part of

10  this sequence?

11          MR. COOK:  No, they are not.

12          THE COURT:  So how does it show that they are part

13  of a photo shoot?

14          MR. COOK:  This shows his intent in that photo

15  shoot.  In taking those photos, this shows his intent because

16  we have this, you know, wider group to draw from rather

17  than --

18          THE COURT:  I'll sustain the objection.  If you have

19  individual exhibits in there that you can authenticate and

20  establish, you might want to pull it apart, but you can't use

21  it for what you've just said.

22          MR. COOK:  Okay.

23          THE COURT:  How much longer do you think?  It's 10

24  till six.  I kept thinking this was going to wrap up.

25          MR. COOK:  I'll try to wrap it up, Your Honor.

1        THE COURT:  Can we expect to excuse the jury at six?

2   Are you going to do redirect?

3        MR. McKINLEY:  Probably no redirect, Your Honor.

4        THE COURT:  Can you wrap it up so we can go by six?

5        MR. COOK:  I don't have much, but there's things

6   that I would want to discuss.

7        MS. HELART:  We can probably wrap up if you don't

8   have much more.

9        THE COURT:  Okay.

10        MR. COOK:  I think we can probably be done by six or

11   shortly thereafter.

12        THE COURT:  Let's try to get it done.  Thank you.

13                  (Open court.)

14   BY MR. COOK:

15   Q   Mr. Russell, I don't think I understand.  You earlier

16   stated to the jury, I believe even twice, that Government's

17   Exhibit 3 were pictures that were part of a photo shoot that

18   you did with Jane Doe 2.

19        THE COURT:  Is that a question?

20        MR. COOK:  Are those part of a photo shoot, yes or

21   no?

22   A   No, I don't consider two pictures a photo shoot.

23   Q   So your testimony now is that they weren't part of a photo

24   shoot?

25   A   Correct.  Originally, I thought this was part of that set.

1  Q   I see, even though they were taken on entirely different

2  days, correct?

3  A   I didn't look at the date.  These are apparently what I

4  would call snapshots.

5  Q   But you decided to take those pictures?

6  A   Correct.

7  Q   Your daughter's fully nude?

8  A   Yes.

9  Q   Her genital and pubic areas visible on the image?

10          MR. McKINLEY:  Your Honor, asked and answered.

11          THE COURT:  It's not before the jury so he can ask

12  that question.

13  A   Correct.

14          MR. COOK:  Can I have a moment, please, Your Honor.

15              (Off-the-record discussion.)

16          MR. COOK:  If I may approach the witness, Your

17  Honor?

18          THE COURT:  All right.

19  BY MR. COOK:

20  Q   Mr. Russell, I want to approach you with Government's

21  Exhibits 2 and 4.  I'll take back 3.

22          Those are photographs that you produced, correct?

23  A   Correct.

24  Q   Government's Exhibit 2 is a photo of Jane Doe 1?

25  A   Correct.

1  Q    She's fully nude?

2  A    Yes.

3  Q    One can see her genital and pubic area on the image?

4        MR. McKINLEY:  Objection, Your Honor, the photo

5  speaks for itself.

6        THE COURT:  It's not visible to the jury and so the

7  lawyer may ask the question and ask the witness to answer.

8  A    Yes.

9  Q    Her genital and pubic area is visible from behind,

10 correct?

11 A    Correct.

12 Q    And again, you took that picture?

13 A    Yes.

14 Q    It was at the gym that you were manager at and had a key

15 to?

16 A    Correct.

17 Q    And you took your children there after hours?

18 A    Yes, we've established that.

19 Q    When no one else was around?

20 A    Correct.

21 Q    Except now it's their idea that they get nude, even though

22 you took them there after hours; is that your testimony?

23 A    Yes.

24 Q    Government's Exhibit 4, that's an image of your daughter,

25 Jane Doe 2, yes?

*RUSSELL – CROSS/COOK*                 362

1   A   Correct.

2   Q   How old was she when that image was produced?

3   A   Probably nine or 10.

4   Q   She's fully nude in the image, correct?

5   A   Correct.

6   Q   Her genital or pubic area fully visible in the image,

7   correct?

8   A   Correct.

9   Q   Her leg is lifted up in a ballet position, her

10  genital/pubic area is fully visible, correct?  You took that

11  picture?

12  A   Yes.

13  Q   You took Jane Doe 2 to the gym that night?

14  A   Yes.

15  Q   A gym that you had key for?

16          MR. McKINLEY:  Asked and answered, Your Honor.

17          THE COURT:  Sustained.

18          MR. COOK:  If I could have a moment with co-counsel,

19  Your Honor?

20          THE COURT:  All right.

21              (Off-the-record discussion.)

22          MR. COOK:  Your Honor, I don't have any further

23  questions at this time.

24          THE COURT:  Redirect?

25          MR. McKINLEY:  No redirect, Your Honor.

 1          THE COURT:  Mr. Russell, you may step down, sir.

 2          THE WITNESS:  Thank you.

 3          THE COURT:  Watch your step.

 4          Lawyers, approach so I can discuss logistics,

 5  please.

 6          (Bench conference on the record.)

 7          THE COURT:  Are you ready to rest?

 8          MR. McKINLEY:  We have an offer of proof on the

 9  expert testimony that the Court has excluded.  We can do that

10  out of the presence of the jury.  Other than that, we would

11  rest, yes.

12          THE COURT:  So you probably don't want to say you

13  rest before everything's wrapped up.  So you can do that in

14  the morning.

15          Are you going to have rebuttal?

16          MS. HELART:  We have -- we have one witness,

17  rebuttal, Jane Doe 1.  She's been here this afternoon.  I know

18  we just have one question for her.  Two, maybe, at the most.

19          MR. McKINLEY:  I can't hear.  You need to speak

20  louder.

21          THE COURT:  So do we want to call in the rebuttal

22  witness or what do you want to do?  What do you want to do?

23  We're trying to figure out if we can wrap it up tonight.

24          MS. COOK:  Well, I'm going to anticipate what the

25  question is, and I can tell you that the cross-examination on

1   it's pretty lengthy.

2          THE COURT:  Okay.  We'll do it in the morning then.

3   I'd like to have an instructions conference in the morning, so

4   that we're ready to go and get on the glide path.  So if you

5   come at 8:30, having reviewed the instructions, do you think

6   we'll be ready to go by 9:30?

7          MS. HELART:  Yes.

8          MS. COOK:  Yes.

9          THE COURT:  I'll tell the jury to come at the

10  regular time then.

11         MS. HELART:  Very good.

12         THE COURT:  Okay.

13                    (Open court.)

14         THE COURT:  Ladies and gentlemen, thank you for your

15  patience and for your attention even up until this late hour.

16  As you could probably intuit, I was trying to get to a place

17  where the action broke naturally.  So we were able to get all

18  the way through Mr. Russell's testimony, which is important.

19  And it doesn't require you to remember part of it and come

20  back tomorrow and finish it out.  So now have you it, along

21  with the other testimony, in a single episode.

22         The case will come to you tomorrow for your

23  decisions.  That's what I was talking to the lawyers about,

24  how much more evidence.  So I have a couple of additional

25  instructions.

1          First of all, we'll start again at 9:30.  That's our

2   customary time.  You please aim to be here about 9:15 so we

3   don't worry about you and about your availability to allow us

4   to get started.

5          Tomorrow morning when you come, park someplace where

6   it doesn't matter what time it is that you get your car out at

7   the end.  Some parking lots have a 6 o'clock close up time, or

8   something like that.  Miss Schneeman can tell you where they

9   don't have that if you want to park there.  But you should

10  park where you don't need to move your car because we don't

11  know how long it will take to get the case submitted to you or

12  how long you'll be deliberating, and you don't want to be

13  worried about your car.  And I sure don't want it towed while

14  you're deliberating.  So that's request No. 1.

15         Request No. 2 is that you alert your families, or

16  whoever it is that will be expecting you to come at a specific

17  time tomorrow to come home, that you won't know exactly when

18  it will be.  I'll have your cell phones at that point so you

19  can't call them.

20         If there's a family emergency or some concern, they

21  can call my chambers and we will field the message and get it

22  to you right away.  It's unlikely we will interrupt the

23  deliberations to deliver such a message.  In all my years of

24  doing this, we haven't had to do that.

25         So we'll get the message to you right away if there

1  is something you need to attend to.  But give them the

2  reassurance that the fact that you're out of touch doesn't

3  mean that they are unable to reach you or we can't get the

4  message to you promptly when you're finished.  So that's

5  request No. 2.

6          Request No. 3 is my standing request.  And that is

7  leave the matter here.  We'll resume here at 9:30 in the

8  morning and finish up our case.  Even though you've come quite

9  a distance in the trial, and you've heard a lot of evidence,

10 you're not equipped yet.  You're not prepared yet to make the

11 decisions that are entrusted to you.

12         So the best thing for you to do tonight is to leave

13 it here and go do anything else but this.  Don't talk about

14 the case to anyone or allow anyone to talk to you about it.

15 Don't read anything, listen to anything, view anything about

16 the case.  Don't form any opinions or conclusions until the

17 case is finally submitted to you.

18         When it's finally submitted to you, you'll have

19 everything you need to make the decisions that will be

20 required of you, but wait until then.  That will be soon

21 enough.

22         So have a pleasant evening.  Have safe driving home

23 tonight and back in the morning.  We'll see you on another

24 day.  You may rise and depart.

25                    (Jury excused)

1          THE COURT:  You may be seated.  Gather up the

2    exhibits as you've been using them back and forth and get them

3    over to the exhibit table so we don't lose track of them

4    tonight.  I'm see you in chambers at 8:30.  Clients won't need

5    to be there for that.  It's just our conference on the legal

6    principles.

7          You have a set of proposed jury instructions.  Maybe

8    you've already had a chance to go through them, but if not, I

9    hope you will.

10          Preparing the instructions, as you all well know, is

11    sort of a work in progress.  So we may not need all of these,

12    but I put in some extras in an excess of caution not knowing

13    exactly how things would ultimately evolve.  So we may need to

14    pull a few.

15          So I'll probably catch on to that myself by my own

16    review.  What I need the lawyers, you lawyers, to pay

17    attention to is any base I've left uncovered, something that

18    I've failed to notice that needs to be included in the set of

19    instructions.  So when you read through them again, read with

20    that eye as well as to whether there's something that isn't

21    already encompassed in the proposed instructions.

22          Anything else tonight?

23          Miss Helart?

24          MS. HELART:  Will the Court be instructing prior to

25    the arguments or after?

1          THE COURT:  After.

2          MS. HELART:  After?  Okay, thank you.

3          THE COURT:  How long do you think you'd like for

4  closing argument?

5          MS. HELART:  40 minutes.

6          THE COURT:  Okay.  How about defense?  How long for

7  closing arguments?

8          MR. McKINLEY:  40 minutes will be good.

9          THE COURT:  I'll give you 45, which is a sort of an

10  easy way to split it, 30 and 15 or something like that,

11  however you intend to do it.

12          At 45, somebody at your table should be giving you a

13  hi sign.  It's better if they give you a hi sign than I do

14  because it looks like you violated the Constitution or

15  something.  So give somebody that authority to move a book or

16  cough loudly.  Actually, if coughing loudly were my signal,

17  you'd be misled the entire trial.  So we'll see you at 8:30 in

18  the morning.  Anything else tonight?

19          MR. McKINLEY:  Is the Court equipped with a Taser or

20  anything like that to get counsel's attention?

21          THE COURT:  Yes, I do have one of those.  I haven't

22  had to use it, but I do have that.

23          MR. McKINLEY:  I will be mindful of that.

24          THE COURT:  I have all the weapons I need,

25  Mr. McKinley.

1          MS. HELART:  The Government said one rebuttal

2   witness.  We think two rebuttal witnesses.

3          THE COURT:  Okay.

4          MS. HELART:  Just for clarification.

5          MR. COOK:  They'll be brief.

6          THE COURT:  Very good.  I should alert you that I am

7   obligated to give a speech over the lunch hour tomorrow at

8   noon.  So I'm going to be trying to work that into the day.

9          The speech is written.  I know that will be a relief

10  to you.  But I do have to get there close to the time, and it

11  will be done by one.  So I think we can do that all right.

12          MR. McKINLEY:  You envision closing arguments before

13  the lunch hour?

14          THE COURT:  Yes, I'm hoping for that.  It depends on

15  how long your rebuttal evidence goes.  Miss Cook says she's

16  got a lengthy cross-examination, and now the Government says

17  they've got two rebuttal witnesses.  So I don't know how long

18  it's going to go.  We'll just play it by ear as we say.

19          Okay, see you in the morning.  Good night, all.

20                (Court adjourned at 6:04 p.m.)

21

22

23

24

25

CERTIFICATE OF COURT REPORTER


        I, Laura Howie-Walters, hereby certify that the
foregoing is a true and correct transcript from reported
proceedings in the above-entitled matter.



/S/LAURA HOWIE-WALTERS   September 9th, 2010

LAURA HOWIE-WALTERS, RPR/CSR
Official Court Reporter
Southern District of Indiana
Indianapolis Division