REDACTED TRANSCRIPT

1              UNITED STATES DISTRICT COURT
              SOUTHERN DISTRICT OF INDIANA
2                 INDIANAPOLIS DIVISION

3

4    UNITED STATES OF AMERICA,        )
                                      )
5                  Plaintiff,         ) CAUSE NO.:
                                      ) 1:08-CR-004-SEB/KPF
6                                     ) Indianapolis, Indiana
            -v-                       ) **March 3rd, 2010**
7                                     ) 9:30 a.m.
     DALE RUSSELL,                    ) V O L U M E   I I I
8                                     )
                   Defendant.         )
9

10

11                 **Before the Honorable**
                 **SARAH EVANS BARKER, JUDGE**
12

13         OFFICIAL REPORTER'S TRANSCRIPT OF
                      JURY TRIAL
14

15

16

17

18

19

20   Court Reporter:     Laura Howie-Walters, CSR, RPR
                         Official Court Reporter
21                       United States District Court
                         46 E. Ohio Street
22                       Room 217
                         Indianapolis, Indiana  46204
23

24

25          PROCEEDINGS TAKEN BY MACHINE SHORTHAND
     TRANSCRIPT PRODUCED BY ECLIPSE NT COMPUTER-AIDED TRANSCRIPTION

REDACTED TRANSCRIPT               371

1                    **A P P E A R A N C E S**

2

3   **For Plaintiff:**        Gayle Helart, Esq.
                              A. Brant Cook, Esq.
4                              Assistant U.S. Attorney
                              United States Attorney's Office
5                              10 West Market Street
                              Suite 2100
6                              Indianapolis, IN  46204

7

8   **For Defendant:**        James C. McKinley, Esq.
                              Indiana Federal Community Defenders
9                              111 Monument Circle
                              Suite 752
10                             Indianapolis, Indiana  46204-3048

11                                 and

12                             Jessie A. Cook, Esq.
                              LAW OFFICE OF JESSIE A. COOK
13                             400 Wabash Avenue, Suite 212
                              Terre Haute, IN  47807

14

15

16

17

18

19

20

21

22

23

24

25

REDACTED TRANSCRIPT          372

## **I N D E X**

Instructions Conference......................373

PLAINTIFF'S WITNESSES                         PAGE

███████████, REBUTTAL

Direct Examination by Mr. Cook ...............393
Cross-examination by Ms. Cook ................396
Redirect examination by Mr. Cook .............402

TOM ROTHROCK, REBUTTAL

Direct Examination by Ms. Helart .............404
Cross-examination by Mr. McKinley ............408


Closing argument by Ms. Helart................411
Closing argument by Mr. McKinley..............430
Rebuttal argument by Mr. Cook.................446


Jury Instructions.............................461

Verdict.......................................491

REDACTED TRANSCRIPT          373

1          (Instructions Conference, in chambers)

2          THE COURT:  We'll go on the record and we'll get our

3   business done, and then you'll probably want a little bit of

4   time to gather yourselves.

5          So you have the Court's proposed instructions.  And

6   so I'll start with the Government.  Do you have any

7   objections?  Improvements?

8          MS. HELART:  I have no objections, and I noted only

9   one thing, that the Court gave the knowledge instruction, and

10  what I had sent over -- and the defense and I were talking

11  about this last week -- we had talked about whether we needed

12  the phrase "knowingly" as Jury Instruction No. 11.

13         And I don't necessarily think it's wrong, so I'm not

14  saying I have an objection to it, but I just wanted to point

15  out for the defense that we did have a discussion about this.

16  I don't think "knowingly" is in the statute.

17         MR. McKINLEY:  For what it's worth, I share that

18  view to Instruction No. 11, Your Honor.

19         THE COURT:  Okay, I'm getting there.

20         MS. HELART:  Now I do like the part, and I think

21  this helps -- well, I don't think this hurts either side, that

22  "he did not act through ignorance, mistake or accident."

23  That's definitely true.  So for that part of it, that's valid;

24  but just generally, we don't think the statute has the word

25  "knowledge," so we don't know if this was something that

REDACTED TRANSCRIPT          374

1   should be included was what our discussion was.

2          MR. McKINLEY:  I don't think the phrase "the

3   defendant knew" is used anywhere in the instructions.

4          THE COURT:  In the statute?

5          MR. McKINLEY:  In the statute.

6          THE COURT:  Let me look there.

7          I believe that's true.  I'm looking at the text of

8   2251.  It does say "If such person knows or has reason to

9   know."

10          MS. HELART:  "That the image would be transported in

11   interstate commerce."  That's true, it does show up there.

12          That's not our jurisdictional theory.  The materials

13   used to produce the pictures, and that the picture was

14   actually transported is our theory, but I understand what the

15   Court is saying.  It does appear in that phrase.

16          We're open to it either way, but I definitely wanted

17   to point it out to the defense if they had an objection.  I

18   don't know that it hurts anything.

19          THE COURT:  It doesn't show up in the essential

20   elements.  I mean, the word "know" does, "had reason to know

21   one or more of the following."  So it shows up in the

22   essential elements and in the statute, but it's a stipulated

23   element.  So I think I'll leave it in just because they don't

24   have to accept stipulations as you know.

25          So I think I'll leave it in.  It's probably in an

REDACTED TRANSCRIPT          375

1  excess of caution, but since the word's there, we'll give them

2  the instruction.

3            Anything else, Ms. Helart?

4            MS. HELART:  Nothing else by the Government, Your

5  Honor.

6            THE COURT:  Mr. McKinley?

7            MR. McKINLEY:  With regard to Instruction No. 8,

8  Your Honor, not an objection, but I think a correction.

9            THE COURT:  Good, I'm glad you caught it.

10           MR. McKINLEY:  The second paragraph where it states

11  the term "sexually explicit conduct is defined under the

12  applicable statute as," I think the colon should go after the

13  "as."  "Actual or simulated" only relates to sexual

14  intercourse --

15           THE COURT:  Wait.

16           MR. McKINLEY:  -- rather than to --

17           THE COURT:  Are we in the second paragraph, the

18  itemized things?

19           MS. COOK:  It begins the term "sexually explicit

20  conduct is defined," Instruction 8.

21           THE COURT:  Yeah, I have -- means actual or

22  simulated?  The term sexually explicit conduct means actual or

23  simulated?

24           MR. McKINLEY:  Yes, the term actual or simulated in

25  the statute, I think, only refers to sexual intercourse under

REDACTED TRANSCRIPT          376

1  A --

2          MS. HELART:  We agree with that.

3          MR. McKINLEY:  -- but not to the other items.

4          THE COURT:  Okay, that's good.  That's fine.  I'll

5  make that change.

6          Okay.

7          MR. McKINLEY:  Then on the second page of that same

8  instruction, Your Honor, next to last paragraph, last

9  sentence, "Not every exposure of the genitals or pubic area

10 constitutes lascivious exhibition."

11         I would ask the Court to consider to change that to

12 read "Not every exposure of the genitals or pubic area of

13 children constitutes a lascivious exhibition."

14         THE COURT:  As it is in the sentence before?

15         MS. COOK:  Yes.

16         MR. McKINLEY:  Yes.

17         MS. COOK:  Otherwise it kind of sounds like it

18 contrasts with the sentence before.

19         THE COURT:  Okay, I'll put that down there.  Do you

20 object, Government?

21         MS. HELART:  The facts of this case are that it is

22 the genitals or pubic area of a child, but generally, it could

23 be of any person.  The statute says "of any person."  But I

24 don't mind that phrase being put in this instruction because

25 we are talking about the girls, not an adult.

REDACTED TRANSCRIPT           377

1          MS. COOK:  Right.

2          THE COURT:  I'm putting it in for reasons of

3   consistency, so if I didn't put it in, I'd have to take it out

4   of the sentence before.  But let's put it in since those are

5   our facts.

6          Anything else, Mr. McKinley?

7          MS. COOK:  We have an objection to Instruction 19,

8   which deals with the statement made by the defendant before

9   trial that is inconsistent and think that the instruction

10  should read "A statement made by any witness before trial that

11  is inconsistent with the witness's testimony," because there

12  have been other witnesses who have made statements that have

13  been impeached with prior inconsistencies.  And I think that

14  in deciding the truthfulness or accuracy of any witness --

15         THE COURT:  Who are you thinking of?

16         MR. COOK:  Well, Dawn Russell, for example, made a

17  statement in court that was impeached with a prior

18  inconsistent statement that she had made in her grand jury

19  testimony.  Jane Doe 2 was impeached with a prior statement,

20  so --

21         THE COURT:  Okay.  This is the Government's proposed

22  instruction.  Perhaps when you proposed it, you didn't expect

23  the witnesses to have any inconsistencies.

24         MS. HELART:  We would not necessarily expect or not

25  expect because it's been a while since their grand jury

REDACTED TRANSCRIPT           378

1   testimony.

2        THE COURT:  So can I change it to generic without

3   objection from the Government?

4        MS. HELART:  That's fine.

5        THE COURT:  We'll do it as you say, with respect to

6   witnesses, so it's an inconsistent statement by witnesses, by

7   any witness I'll say.

8        Okay.

9        MS. COOK:  20 deals with the statement made by the

10  defendant's law enforcement, and I don't know that we have in

11  the record at this point any specific --

12       THE COURT:  There was a statement when he was being

13  investigated before he fled.

14       MR. COOK:  And I think the -- okay, I think the

15  Government intends to put on something like this.

16       MS. HELART:  The testimony that he gave -- I want to

17  be very accurate about this -- today, Your Honor, the

18  Government does intend to put on Tom Rothrock for a point in

19  the defendant's statement on June 29, 2005.  Specifically --

20       THE COURT:  This was that interview before which you

21  allege he fled?

22       MS. HELART:  Correct.  Well, there were two times

23  when he knew an investigation was going on, when a search

24  warrant was served on his house in 2005 and in July of 2007

25  when he came to our office.

REDACTED TRANSCRIPT            379

1          THE COURT:  So which one's this?

2          MS. HELART:  This would be the June 29, 2005,

3  statement, and it was at his house.  And what I wrote down

4  about his testimony was that in cross-examination, when

5  Mr. Cook asked the defendant "Did you talk about nude

6  pictures?"  Mr. Russell said, to the effect yesterday, "I

7  refuse to answer that question."

8          In fact, Tom Rothrock conducted the interview along

9  with Andy Byers, and the defendant was asked about the nude

10  gym video.  He answered that question, but then he was asked

11  about nude pictures.  And Mr. Russell, in fact, did not refuse

12  to answer that question.  He said, "I don't recall any nude

13  pictures."

14          So we'd like to put on that statement because

15  clearly there is Counts 1 through 4, plus the Exhibit 11,

16  which was not admitted but it was discussed with the suds and

17  shower pictures of Jane Doe 2.  So there were five occasions

18  of nude pictures that he forgot or didn't recall.

19          THE COURT:  Okay.  I'll leave it in then.

20          Anything else?

21          MR. McKINLEY:  Let me touch on that.  The Court

22  should anticipate an objection from me on that, that evidence

23  of his prior statement.  I think that the -- if I understand

24  the Government's line of questioning is going to be directed

25  toward Mr. Russell's prior statement concerning the video.

REDACTED TRANSCRIPT          380

1  There's nothing in the video that's charged in the case.  And

2  to the extent they're trying to impeach him with his statement

3  concerning uncharged conduct, or other conduct, I don't

4  believe that they should be permitted under Rule 608 to prove

5  the prior act or uncharged conduct with extrinsic evidence.  I

6  don't think that's permitted.

7        THE COURT:  The statement that the rebuttal will

8  relate to, as I understand it -- I mean I only heard it from

9  Ms. Helart, she'll have to explain it herself -- since I have

10 to process the objection, I'll tell you back what I think

11 she's intending to do.

12       The Government asked on cross-examination of the

13 defendant during that interview in June of '05, "Did the agent

14 discuss with you nude photos?"  But I didn't remember that it

15 was nude video.  It was just nude photos.

16       And he said, "I refuse to answer questions," that

17 was the gist of it about that.  So this is rebuttal that

18 apparently will say he did discuss it.  He said he didn't

19 remember.  So I don't think it has to do with the video.  I

20 didn't hear it to say that.

21       MS. COOK:  Okay.

22       MS. HELART:  Correct.  Earlier this morning, and it

23 is true that, in the interview, they did ask him about the

24 nude videotape taken in the gym.  That was the question

25 before.  And it was simply to provide the context of what

REDACTED TRANSCRIPT          381

1  would lead up to the next question, "How about any other nude

2  pictures, Mr. Russell?"

3          So I can leave out the nude videotape in the gym.  I

4  don't mind leaving out that question, but he never denied

5  that, and he didn't deny it in the interview, so in that sense

6  he was consistent, so that doesn't hurt the defense.  I can

7  definitely leave that out.

8          THE COURT:  Okay, do that then.  And I'll leave this

9  instruction in, No. 20.

10         Any other objections?

11         MS. COOK:  I don't have any other objections.  Do

12  you have any other, Jim?  I didn't see the new ones.

13         MR. McKINLEY:  No --

14         THE COURT:  24's the only new one, and --

15         MS. COOK:  And that's the flight?

16         THE COURT:  -- I indicated to you that I took out

17  the reference about having -- after the commission of a crime,

18  it said.  I took out that because he hadn't -- it didn't apply

19  to our case.  Now it just reads "The intentional flight by a

20  defendant immediately after he is accused of a crime that has

21  not been committed."

22         MS. HELART:  It has been committed.

23         THE COURT:  "That has been committed," I'm sorry.

24         MR. McKINLEY:  Judge, I'm sorry, I missed that.

25  Could you say that again?

REDACTED TRANSCRIPT          382

1          THE COURT:  Yes.  Well, do you have a copy?  Here's

2   a copy of the old 24.  Just compare.

3          MS. COOK:  We have it.

4          I didn't have it as the old 24.

5          LAW CLERK DAME:  Yes, sorry, it was not because

6   flight didn't come in until last night.

7          THE COURT:  It flew in last night.

8          MR. McKINLEY:  I should take my old --

9          LAW CLERK DAME:  Yes, I gave you 24 through the end

10  new, so you can toss those.

11         MR. McKINLEY:  That's out, and a new 24?

12         LAW CLERK DAME:  Yes, except for the verdict form is

13  the same.  That should be at the back.

14         MS. COOK:  So we would object to 24, the flight

15  instruction based on the fact that he may have left the

16  country after being accused of a crime isn't sufficient to

17  permit the jury to conclude that there is a nexus between the

18  accusation and the flight, or the flight and his guilt.  It's

19  my understanding that the 7th Circuit disapproves of flight

20  instructions.

21         THE COURT:  Well, in order to give a flight

22  instruction, you're going to have to show those inferences,

23  that the evidence gives rise to that -- those linkages

24  basically.

25         MS. COOK:  Our position is that the Government's

REDACTED TRANSCRIPT          383

1  evidence was that he had been questioned about it but that

2  there had been no formal accusation, no charges had been

3  filed, no case was pending against him at the time.

4           THE COURT:  The case you're referring to is U.S.

5  verses Xkozen, X-K-O-Z-E-N, the 7th Circuit 2005 case?

6           MS. COOK:  I have it back on my table if I might --

7           THE COURT:  Well, I recognize from your objection

8  that you've drawn to my attention the inferences that must be

9  drawn, the four inferences.  And your objection is that they

10 haven't all four been drawn.  They don't arise from the facts.

11          MR. COOK:  Yes.

12          THE COURT:  And the inferences are first that there

13 has to be an inference from the behavior to flight.  I believe

14 that's been shown.  From the flight to consciousness of guilt,

15 from consciousness of guilt to consciousness of guilt

16 concerning the crime charged, and from consciousness of guilt

17 concerning the crime charged to actual guilt of the crime

18 charged.

19          MS. COOK:  And I think the problem with any flight

20 instruction is that a person might very well flee the

21 jurisdiction, even if they are totally innocent, because they

22 are afraid of the accusation.  And I think that's what, you

23 know, gives the courts pause about a flight instruction, is

24 that there are wholly innocent reasons why someone might flee,

25 and we're making that leap from fleeing to fleeing because of

REDACTED TRANSCRIPT              384

1    consciousness of guilt.

2         THE COURT:  Yes, well the law permits that inference

3    to be drawn, and there's no other overarching fact that has

4    been presented in the evidence here of any fear or fright or

5    government overbearing oppression sort of thing.  And there is

6    a proximity in time, and there is a rather substantial flight

7    to another country, and the length of time that he stayed in

8    the country, and the means that had to be utilized to bring

9    him back.  So that's why I believe that it's a permissible

10   inference for the jury to reach, and there is evidence to

11   support that inference.

12        So I recognize that you have to go through the drill

13   and make sure that it's not an unfair imputation of guilt from

14   that fact, but it is one fact.  So I'll leave the instruction

15   in.  I don't know, I sort of respond on the basis of my own

16   analysis.

17        Does the Government want to add anything?

18        MS. HELART:  We agree with the Court's analysis, and

19   also given the chance to explain it yesterday, he didn't.  So

20   we definitely agree with the Court.  There's no fact that -- I

21   mean, he doesn't have to explain it, but right now there's

22   just nothing in the record.  Another witness could have

23   explained his leaving to Mexico and nobody else -- and nothing

24   else and no cross-examination touched on that fact.

25        Also, this jury instruction does not make the jury

1  draw the conclusion that it is meeting this guilt.  In fact,

2  it says, it's a cautionary, that having been committed is not

3  sufficient in itself to establish his guilt.  So we think it

4  gives cautionary language as well.  It's one factor, we'll

5  certainly be arguing it, but it's not everything itself.  So

6  we'd ask that the instruction be left in.

7           THE COURT:  I'll overrule that objection.

8           Any other objections from the defense?

9           MS. COOK:  I don't have anymore.

10          MR. McKINLEY:  None.

11          THE COURT:  Okay.  You checked the verdict form, I

12  hope, to just make sure that it sets out the options properly.

13  It's pretty straight forward.  It's not as hard as some of the

14  drug quantity computations questions, nor is it as hard to

15  capture one as it is when we have multiple defendants.

16          So if there's nothing else, that will conclude the

17  Court's instructions conference, but I have one more thing

18  further.

19               (Off-the-record discussion.)

20          THE COURT:  Good morning, all.  You may be seated.

21          We've convened at the request of the parties prior

22  to calling down the jury this morning for the Court to hear

23  and consider a proffer or an offer to prove by the defendant.

24          So Mr. McKinley?

25          MR. McKINLEY:  Thank you, Your Honor.

REDACTED TRANSCRIPT              386

1              Your Honor, in light of the Court's pretrial ruling

2     that the defense would not be permitted to call our intended

3     expert, I would offer the following offer of proof.

4              The defense had intended to call Mr. Jawn J. Bower,

5     the first name is spelled J-A-W-N, and I would proffer that

6     Mr. Bower would testify as follows:

7              He's a resident of Bloomington, Indiana.  He's a

8     member in good standing of the Indiana Bar.  He's been

9     self-employed as an attorney and has been so employed since

10    1981.  He has served as legal counsel for various regional

11    nudist organizations, as well as for the American Association

12    for Nude Recreation headquartered in Kissimmee, Florida.

13             He and his wife of 25 years have been members of the

14    American Association for Nude Recreation since approximately

15    1981, and both embrace the nudist philosophy.  They engage in

16    nudist activities and have raised their three sons as

17    practicing nudists.

18             He's familiar with and has specialized knowledge

19    about the nudist subculture in the United States, the

20    demographics of the American Association for Nude Recreation,

21    as well as the core values, philosophy and lifestyle of

22    nudists.

23             He could testify to the fact that the AANR was

24    established in 1931 and represents more than 50,000 members

25    and 260 clothing-optional or clothes-free clubs, resorts and

REDACTED TRANSCRIPT           387

1  campgrounds.  He could testify to the fact that the nudist

2  philosophy supports an ethical standard of behavior in a

3  wholesome family experience.  He could testify to the fact

4  that nude recreation is one of the fastest-growing segments of

5  the travel industry and is becoming increasingly accepted

6  among the population.  He could opine that self-esteem is

7  enhanced in the nudist environment where body acceptance is

8  the norm.

9          In Bower's opinion, relaxation, stress relief and

10 positive body image are among the reasons persons choose a

11 nudist lifestyle.  He could testify that recreational family

12 nudism is unrelated to sexual activity and that nudists have

13 views about sexual activity and child sexual activity and

14 abuse, which are similar to the views held by the general

15 population.

16         That is, in summary, what Mr. Bower would testify to

17 were we permitted to call him.

18         THE COURT:  And what would be the relevance of that

19 line of questioning?

20         MR. McKINLEY:  The relevance of that information,

21 Your Honor, would corroborate Mr. Russell's own testimony

22 concerning his experience in his history as a practicing

23 nudist.

24         THE COURT:  All right.

25         Mr. Cook, do you wish to respond?

REDACTED TRANSCRIPT          388

1           Ms. Helart?

2           MS. HELART:  Thank you, Your Honor.  We believe

3  under the plain language of what is relevant under Federal

4  Rule of Evidence 401 and the standard for admitting expert

5  testimony of Federal Rule of Evidence 702 that the testimony

6  by Jawn Bower does not come into evidence.

7           Jawn Bower cannot opine about the pictures or Dale

8  Russell's state of mind.  Jawn Bower cannot help the jury

9  understand the evidence to determine a fact in issue.  An

10 expert on nudism as a lifestyle does not hit the mark here in

11 this trial because the lifestyle or philosophy of nudism is

12 not the question here at this trial.

13          Validating nudism by attempting to convince a jury

14 that family nudist activities are healthy and that they

15 support wholesome family values is irrelevant.

16          Being a nudist is not a carte blanche defense to

17 taking pictures of child pornography, and Jawn Bower's

18 testimony is simply a back-door attempt by Mr. Russell to have

19 a legitimate face, an attorney who lives here in Indiana,

20 opine about the pictures and Mr. Russell's own purpose for

21 taking them.  We'd ask that this testimony be disallowed.

22          THE COURT:  All right.  The Court's pretrial ruling

23 will stand.  I'm not persuaded by the Offer to Prove, contrary

24 to the pretrial ruling that the Court made that the evidence

25 would be irrelevant to any of the issues that the jury is

REDACTED TRANSCRIPT                389

1   being asked to resolve, so it's not relevant under both of the

2   rules cited by the Government in their response.

3          My analysis tracks the analysis and logic that the

4   defense, or I'm sorry, that the Government has laid out in its

5   response; that is to say, this simply doesn't relate to any

6   issue that is before the jury as a fact in controversy that

7   they need to resolve.

8          Further, it would carry with it the high potential

9   of confusing the jury as to the issues that will be placed

10  before it suggesting that participation in nudism and such

11  related activities provides either a defense to these charges

12  or somehow make it less likely that the defendant would have

13  done this.  There's just no nexus there to suggest that, and

14  as I said, it will confuse the jury, if anything.  So my

15  ruling stands.

16         I believe where we left it last night was that we

17  were ready for the defense to rest, and that needed to be

18  stated in front of the jury, even though we had gotten through

19  the evidence.  So I assume that's the first thing that will

20  happen today, and then we'll move on to rebuttal.

21         Is that your intention, Mr. McKinley?

22         MR. McKINLEY:  Yes, it is our intention to rest at

23  this time.  We have no further evidence to present, Your

24  Honor.  But as a practical matter, we would like to state for

25  the record an objection to the Government's recalling Jane Doe

REDACTED TRANSCRIPT          390

1   1 as a rebuttal witness, and we thought it might be

2   appropriate to do at this time for the record rather than in

3   the presence of jury.

4          THE COURT:  Right, for the reasons that have been

5   previously argued with respect to the relevance of the sexual

6   contact?

7          MR. McKINLEY:  Yes.  For the record, we would object

8   for those reasons.  We do not believe that we have opened the

9   door for presentation of this evidence.

10          THE COURT:  All right.  Your objection is made and

11   considered, but the Court's ruling will remain the same.

12          MR. McKINLEY:  Thank you, Your Honor.

13          MS. COOK:  Just as a point of clarification, Your

14   Honor, based on the Court's ruling now with respect to the

15   objection to recalling her as a rebuttal witness, we

16   anticipate that the Government is going to specifically

17   inquire of her whether there's been any improper touching.

18          And would the Court then recognize our objection to

19   that question rather than having us remake the objection at

20   that point in time during her examination?

21          THE COURT:  Yes.

22          MS. COOK:  Thank you.

23          THE COURT:  And overrule the objection.

24          Ms. Helart.

25          MS. HELART:  The Government will have two rebuttal

REDACTED TRANSCRIPT             391

1   witnesses.  One is Special Agent Tom Rothrock on a point that

2   Mr. Russell made in his interview on June 29, 2005.  I spoke

3   with defense counsel, Jessie Cook, about the matter of the

4   nude gym videotape.  And for reasons that we've explained, she

5   understands why I'm going to ask that question.  So I didn't

6   want the Court to be surprised by that question.  Then I'll go

7   into what actually directly impeaches Mr. Russell's testimony.

8            THE COURT:  All right.  Thank you for that

9   clarification.  I would have arched an eyebrow based on our

10  conversation in chambers this morning as we did the

11  instructions.

12           Are we ready for the jury?

13           MR. McKINLEY:  Yes.

14           THE COURT:  Miss Schneeman, will you call them down,

15  please.

16               (Open court, jury present)

17           COURT CLERK:  Court is in session.

18           THE COURT:  You may be seated.

19           Good morning, all.  Good to see you.  I knew you

20  were up there.  I've been listening to you chatter.  I can't

21  hear anything really specifically.  I just hear that you're up

22  there, so that always makes me feel better.

23           Thank you again, once again, for being here right

24  ready to go.  We had one brief matter to resolve among us here

25  that didn't require you.  So that's why we're a tiny bit

REDACTED TRANSCRIPT          392

1  delayed in getting started today.  It didn't sound like you

2  minded that too much, so I trust that's true.

3          If you did mind it, you can blame me and don't blame

4  it on the parties because it's just the way things happen.

5  There are lots of things that are required to be addressed

6  during a trial as you can well imagine.

7          So we're ready to go now.  So we'll get started.

8  Who can believe it's March 3rd already?  I just want to say

9  that as we get started.  Hard to believe, isn't it?  We've

10 moved through the worst of winter anyway.  So let's get

11 started.  Again, this morning.

12         Mr. McKinley?

13         MR. McKINLEY:  Your Honor, the defense has no

14 further testimony or evidence to introduce.  At this time, the

15 defense would rest.

16         THE COURT:  All right.

17         Is there any rebuttal evidence, Mr. Cook?

18         MR. COOK:  There is, Your Honor.

19         THE COURT:  All right.  Would you call your first

20 rebuttal witness, please.

21         MR. COOK:  Yes, the Government would call -- recall

22 Jane Doe 1.

23         THE COURT:  All right.

24         Good morning, Jane Doe 1.  Come back over here where

25 you know you belong.  You may go ahead and be seated, and I'll

REDACTED TRANSCRIPT          393

1   remind you, Jane Doe 1, that for all your testimony you give

2   in this case, you're subject to the same oath you took the

3   first time, to tell the truth, the whole truth, and nothing

4   but truth.  Do you agree to that?

5           THE WITNESS:  Yes.

6           THE COURT:  Very good.  Thank you.

7           MR. COOK:  May I proceed, Your Honor?

8           THE COURT:  You may.

9       **JANE DOE 1, REBUTTAL, PLAINTIFF'S WITNESS, SWORN**

10                    **DIRECT EXAMINATION**

11  BY MR. COOK:

12  Q   Good morning, Jane Doe 1.

13  A   Good morning.

14  Q   We've recalled you this morning just to speak with you

15  about one very specific issue.  The question that I have is

16  between 2001 and 2004 when you were approximately nine years

17  of age till about 12 years of age, were there any times that

18  your father did any inappropriate sexual touching or contact

19  with you?

20  A   Yes.

21  Q   When is the first time that you disclosed that that had

22  occurred?

23  A   About three weeks ago.

24  Q   About three weeks ago?

25          Had you been asked about whether anything like that

JANE DOE 1, REBUTTAL - DIRECT/COOK   394

1   had occurred before?

2   A   Yes.

3   Q   And when was the last time, before three weeks ago, that

4   you had been asked that?

5   A   The last time I had met -- I think it was 2004.

6   Q   All right.  So some time ago?

7   A   Yeah.

8   Q   And what was your answer at that time when you were asked

9   that question?

10  A   I said no.

11  Q   Why did you say no previously and then three weeks ago you

12  were able to disclose what had occurred?

13  A   I had thought about it, and the first time -- or the first

14  couple of times I had been asked, I thought that it wasn't a

15  big deal.  And I thought about it since then and realized, you

16  know, I was confused before still having gone through

17  everything.

18  Q   This first time that you disclosed that this inappropriate

19  sexual touching occurred between 2001 and 2004, was that still

20  a hard thing for you to talk about?

21          MS. COOK:  Objection, leading.

22          THE COURT:  Overruled.

23  BY MR. COOK:

24  Q   You can answer the question.

25  A   Yeah, it was hard to talk about.

JANE DOE 1, REBUTTAL – DIRECT/COOK  395

1  Q   On the day that you disclosed that, who was in the room at

2  the time that you disclosed that that occurred?

3  A   Who was in the room?

4  Q   Yes.

5  A   It was you, Gayle –– maybe not Gayle.  I don't remember.

6  Q   And also an agent with Homeland Security?

7  A   Yeah.

8  Q   Mr. McKinley had spoken with you just prior to you

9  disclosing that to us, correct?

10  A   Yeah.

11  Q   And he had asked a similar question about ––

12         MS. COOK:  Objection, leading.

13         THE COURT:  Overruled.

14  BY MR. COOK:

15  Q   He had asked a similar question and what had your response

16  been at the time?

17  A   I said no.

18  Q   Why did you tell Mr. McKinley "no" at that time?

19  A   It wasn't very easy to talk about, and I didn't really

20  want to tell him about it.

21  Q   But then you were able to talk about it to us later on as

22  you got more comfortable?

23  A   Yes.

24  Q   Is this an easy thing to talk about even today?

25  A   No.

JANE DOE 1, REBUTTAL – DIRECT/COOK  396

1  Q   And is it, in fact, the case that between 2001 and 2004,

2  your father had inappropriate sexual contact with you?

3  A   Yes.

4        MR. COOK:  If I could have a moment, please, with

5  co-counsel.

6        THE COURT:  You may.

7            (Off-the-record discussion.)

8        MR. COOK:  Your Honor, I don't have any further

9  questions.

10       Jane Doe 1, I thank you for your testimony.  I

11  believe Ms. Cook may have some questions for you.

12       THE COURT:  Cross-examine?

13       MS. COOK:  Yes, Your Honor.

14       THE COURT:  Ms. Cook.

15  **CROSS EXAMINATION**

16  BY MS. COOK:

17  Q   Morning.

18  A   Morning.

19  Q   Jane Doe 1, you first discussed the general subject matter

20  of this case with a school counselor in the fall of 2004?

21  A   Yes.

22  Q   And that school counselor was a woman by the name of Kim

23  Kyle?

24  A   Yes.

25  Q   You did not tell Kim Kyle that there had ever been any

1  inappropriate sexual contact with your father?

2  A   Right.

3  Q   And in 2004, you spoke to a case worker with the welfare

4  department?

5  A   Yes.

6  Q   Her name was Laura Gentry?

7  A   I don't remember her name.

8  Q   But you remember speaking with the case worker?

9  A   Yes.

10  Q   And you didn't tell her the allegation that you've made

11  today?

12  A   No.

13  Q   It was also in 2004 that you were interviewed by law

14  enforcement officers?

15  A   Yes.

16  Q   And when those law enforcement officers talked to you

17  about this same general topic, you didn't tell them the

18  allegation that you've made here today?

19  A   No.

20  Q   And as I understand it, in 2006, there were some

21  proceedings in court that had to do with your father's

22  continued visitation; do you remember that?

23  A   No.

24  Q   Do you remember that your mother had asked the Court to

25  end your father's visitation with you?

*JANE DOE 1 - CROSS/COOK*        398

1  A    Yes.

2  Q    And during that process, did you have an opportunity to

3  speak to your mother's lawyer?

4  A    Yes.

5  Q    About what your wishes were?

6  A    I don't remember.

7  Q    Well, you talked to your mother's lawyer?

8  A    Yes.

9  Q    And that lawyer was a female?

10  A    Yes.

11  Q    You didn't tell that lawyer about the allegations that

12  you've made today?

13  A    Right.

14  Q    And as a matter of fact, you had an opportunity to speak

15  to the judge who was making the decisions in that court

16  proceeding?

17  A    Yeah.

18  Q    That would have been Judge MaryAnn Oldham?

19  A    Yeah.

20  Q    Also a female?

21  A    Yes.

22  Q    And she talked to you privately?

23  A    I don't remember.

24  Q    Back in her chambers in a closed room?  Not out in the

25  courtroom like this.

*JANE DOE 1 – CROSS/COOK*          399

1  A   Yes.

2  Q   And you didn't tell her?

3  A   Right.

4  Q   It was also in the year 2006 that you participated in

5  counseling?

6  A   Yes.

7  Q   And you had a number of sessions with a private counselor?

8  A   Yes.

9  Q   And that counselor was a woman by the name of Joyce

10  Lowery?

11  A   Yes.

12  Q   And you didn't tell her the allegation that you've made

13  today?

14  A   No, we didn't really talk about anything, though.  We

15  just -- I only went there a few times, and we never brought up

16  the case or anything about that.

17  Q   Well, the purpose of your going to that counseling was to

18  discuss the general subject matter, correct?

19  A   Right, but we had --

20  Q   I'm sorry?

21  A   We had just gone a few times and we had to get to know

22  each other first to build trust.

23  Q   And you saw her approximately four times?

24  A   Right.

25  Q   And you discussed with her your relationship with your

*JANE DOE 1 - CROSS/COOK*          400

1  father?

2  A   Briefly.

3  Q   That was the topic of the counseling, right?

4  A   Right, but we hadn't gotten into details or anything yet.

5  Q   You didn't tell her the allegation that you've made today?

6  A   No.

7  Q   And you've been interviewed by Ms. Helart on a number of

8  occasions?

9  A   Yes.

10  Q   Starting back in the summer of 2005?

11  A   Right.

12  Q   And when you met with her in the summer of 2005, you

13  didn't tell her the allegation that you've made today?

14  A   No.

15  Q   When you met with her in the fall of 2007, you didn't tell

16  her?

17  A   No.

18  Q   And when you met with her in January of 2008, you didn't

19  tell her?

20  A   No.

21  Q   And you had some pretty detailed conversations with her in

22  January of 2008, didn't you?

23  A   Yes.

24  Q   You spent a good deal of time with her then?

25  A   Yes.

*JANE DOE 1 - CROSS/COOK*          401

1  Q   And you didn't tell her the allegations that you've made
2  today?
3  A   Right.
4  Q   And during all these years, you have lived with your
5  mother, correct?
6  A   Yes.
7  Q   And not had any visitation with your father?
8  A   Right.
9  Q   And you didn't tell your mother this allegation?
10 A   No, I didn't tell anybody.
11 Q   Now, when you began the preparation for your testimony in
12 this case, you met again with the Government's attorneys?
13 A   Yes.
14 Q   And as recently as February the 5th of this year, you
15 spent hours with them --
16 A   Right.
17 Q   -- talking about the case and the subject matter of the
18 case?
19 A   Right.
20 Q   And never told them this allegation?
21 A   Right.
22 Q   Mr. Cook asked you about your meeting with Jim McKinley?
23 A   Yeah.
24 Q   You weren't required to meet with Mr. McKinley, were you?
25 A   No.

*JANE DOE 1 – CROSS/COOK*          402

1  Q   He specifically told you that you didn't have to speak to

2  him if you didn't want to?

3  A   Right.

4  Q   But you agreed to do so?

5  A   Uh-huh, yes.

6  Q   And you agreed to answer the questions honestly?

7  A   Yes.

8  Q   And when he specifically asked you whether there had ever

9  been any inappropriate touching, you didn't refuse to answer

10 that question?

11 A   I had a pause.  I had a long pause and I thought about it

12 and I shook my head no.

13 Q   Well, your answer to his question as to whether there had

14 ever been any inappropriate touching was no?

15 A   Right.

16         MS. COOK:  I have no further questions.

17         THE COURT:  Redirect?

18         MR. COOK:  Yes, just briefly, Your Honor.

19                    **REDIRECT EXAMINATION**

20 BY MR. COOK:

21 Q   Jane Doe 1, what's your relationship to -- Mr. Russell's

22 your father; is that correct?

23 A   Yes.

24 Q   Is it an easy or a hard thing to talk about your father

25 having sexual contact with you?

*JANE DOE 1 - REDIRECT/COOK*        403

1  A   Very hard.

2  Q   Were you comfortable as you sat with Mr. McKinley and he

3  asked you questions?

4  A   Not really.

5  Q   Are you very comfortable today answering questions about

6  this?

7  A   No.

8  Q   Miss Cook went through a list of folks that you didn't

9  tell this to.  Did all of those people ask you the specific

10 question?

11 A   I don't remember for sure.

12 Q   And how old are you now, Jane Doe 1?

13 A   17.

14 Q   Between 2001 and 2004, you were nine to 12 years old; is

15 that correct?

16 A   Yes.

17 Q   And you're now 17 years old?

18 A   Yes.

19 Q   About to be an adult?

20 A   Uh-huh.

21         MR. COOK:  Can I have a minute with co-counsel, Your

22 Honor?

23         THE COURT:  Yes.

24             (Off-the-record discussion.)

25         MR. COOK:  I thank you for your testimony.

*JANE DOE 1 - REDIRECT/COOK*        404

1          Your Honor, I don't have any further questions at

2    this time.

3          THE COURT:  Recross?

4          MR. COOK:  No, Your Honor, thank you.

5          THE COURT:  Jane Doe 1, thank you.  You may step

6    down.  Watch your step as you leave.

7          Any further rebuttal evidence, Ms. Helart?

8          MS. HELART:  Yes, Tom Rothrock.

9          THE COURT:  Mr. Rothrock, come forward, please.

10   Good morning to you.

11         Remain standing, raise your right hand, and be sworn

12   by the Clerk.

13   **TOM ROTHROCK, REBUTTAL, PLAINTIFF'S WITNESS, SWORN**

14                    **<u>DIRECT EXAMINATION</u>**

15         THE COURT:  You may be seated.

16   BY MS. HELART:

17   Q   Good morning.

18   A   Good morning.

19   Q   Can you please state your name?

20   A   It's Tom Rothrock, R-O-T-H-R-O-C-K.

21   Q   What is your current occupation?

22   A   As I testify today, I am retired.  I retired on

23   December 31, 2009, as a Senior Special Agent with Immigration

24   and Customs Enforcement under the Department of Homeland

25   Security.

ROTHROCK, REBUTTAL – DIRECT/HELART   405

1  Q   At the present time, are you attempting to get back on

2  with Immigration and Customs Enforcement as a contract

3  employee?

4  A   Yes, that is correct.  Under the law enforcement series in

5  government employment, they have a mandatory retirement age.

6  I have reached that age, and then have requested a special

7  waiver to come back in and continue my duties as a special

8  agent.  I've yet to have an answer from the Government on that

9  request.

10  Q   For the past couple of years, have you been trained

11  specifically in computer forensics?

12  A   Yes, ma'am, I have.

13  Q   And how long have you been a senior –– or how long have

14  you been a special agent with Immigration and Customs

15  Enforcement?

16  A   I have been an agent with Immigration and Customs

17  Enforcement or its predecessor, U.S. Customs, since 1988.

18  Q   Where were you before that?

19  A   Prior to my employment with U.S. Customs, I was a special

20  agent with the Drug Enforcement Administration out of New York

21  City.  And then prior to that, I was five years with the, at

22  the time, Indianapolis Police Department.

23  Q   Up until your mandatory retirement in December, were you a

24  member of the Indiana Internet Crimes Against Children Task

25  Force?

1 A   Yes, ma'am, I was.

2 Q   How long have you been a member of the task force?

3 A   Approximately 10 years.

4 Q   How many child exploitation cases have you been the case

5 agent for or assisted other officers and agents on?

6 A   During the course of my career, I have been involved in

7 hundreds of investigations involving child exploitation.

8 Q   Is it true that the Indiana Internet Crimes Against

9 Children Task Force is made up of federal, state and local

10 officers who come together investigating crimes against

11 children cases?

12 A   Yes, ma'am, that is correct.

13 Q   On June 29, 2005, did you and Detective Andy Byers,

14 another member of the task force, interview Dale Russell?

15 A   That is correct.

16 Q   Did you interview him at his house on Marana Drive in

17 Carmel, Indiana?

18 A   That is also correct.

19 Q   Was a search warrant that Detective Byers had obtained

20 through the state served there the same day?

21 A   That is correct.

22 Q   Approximately how long was your interview with

23 Mr. Russell?

24 A   The interview itself lasted maybe 30, 45 minutes at the

25 most.  We were there longer than that for the execution of the

ROTHROCK, REBUTTAL – DIRECT/HELART   407

1  search warrant.

2  Q    Did you –– have you been present during the entire trial

3  as the Government's representative from the law enforcement

4  side here at the table?

5  A    Yes, I have.

6  Q    Did you hear Mr. Russell's testimony yesterday with

7  respect to Mr. Cook asking on cross–examination about the

8  June 29th, 2005, interview?

9  A    Yes, I was present for that.

10  Q    And did you hear Mr. Cook's question whether the officers

11  on June 29th, 2005, you and Detective Byers, had asked if he

12  had produced any other nude photos and Mr. Russell's answer

13  was "I know I specifically refused to answer that question"?

14  A    Yes, ma'am, I did hear that question and the response.

15  Q    On June 29, 2005, did your interview of Mr. Russell

16  include the subject of Mr. Russell taking a nude videotape of

17  his daughters in a gym?

18  A    That is correct.

19  Q    Did he admit to doing that?

20  A    Yes, ma'am, he did.

21  Q    Did your interview then include whether Mr. Russell had

22  taken any other nude pictures?

23  A    Yes, ma'am, I did ask him that question.

24  Q    What was his answer?

25  A    And his response was that he did not recall taking any

1  other nude photographs.

2  Q    Is it true that during the June 29th, 2005 interview, that

3  Mr. Russell did refuse to answer some questions?

4  A    Yes, ma'am, that is correct.

5  Q    That was not, however, an example of a question he refused

6  to answer?

7  A    That is also correct.  He did answer that question.

8  Q    Thank you.

9          MS. HELART:  No other questions.

10         THE COURT:  Cross-examine.

11         MR. McKINLEY:  Thank you, Your Honor.

12                    **CROSS EXAMINATION**

13  BY MR. McKINLEY:

14  Q    Very briefly.  Special Agent Rothrock, when you appeared

15  at Mr. Russell's residence back in 2005, did you indicate to

16  him that you wanted to speak with him?

17  A    That is correct.

18  Q    He was not required to speak with you?

19  A    That is correct.

20  Q    You didn't tell him that he had any obligation to speak

21  with you?

22  A    No, we did not.

23  Q    It was optional on his part?

24  A    Yes, sir.

25  Q    And he voluntarily agreed to speak with you?

1  A   Yes, he did.

2          MR. McKINLEY:  Okay, thank you.  Nothing further,

3  Your Honor.

4          THE COURT:  Redirect?

5          MS. HELART:  No.

6          THE COURT:  All right.  You may step down, sir.

7          Any other rebuttal evidence?

8          MS. HELART:  There will be no other rebuttal

9  evidence on the Government.

10          THE COURT:  The Government rests on rebuttal?

11          MS. HELART:  Yes.

12          THE COURT:  Any surrebuttal?

13          MR. McKINLEY:  No, no surrebuttal, Your Honor.

14          THE COURT:  Have the lawyers placed before the Court

15  and the jury all the evidence you intend to present in this

16  case?  Ms. Helart?

17          MS. HELART:  Yes, by the Government.

18          THE COURT:  Mr. McKinley?

19          MR. McKINLEY:  Yes, for the defense.

20          THE COURT:  Lawyers, will you approach for a minute,

21  please.

22          (Bench conference on the record.)

23          THE COURT:  It's 10:28.  I just can't let them go

24  this early so I think we're just going to forge ahead, and

25  I'll try to look at a convenient fair time to break.  But we

*ROTHROCK - CROSS/MCKINLEY*        410

1   have to use the time we have.

2           So are you ready for your closing arguments?

3           MS. HELART:  Yes.

4           THE COURT:  Are you?

5           MR. McKINLEY:  Yes.

6           THE COURT:  Okay, very good.  We'll move ahead then.

7   Thank you.

8                   (Open court, jury present.)

9           Ladies and gentlemen, you've heard the lawyers state

10  to me in answer to my questions, and therefore in your

11  presence, that all the evidence now has been presented.

12          You remember my explanations to you at the beginning

13  of the trial, my instructions about how things would unfold.

14  So you may remember, and in case you don't, I'm refreshing

15  your memories now by telling you that the next thing

16  procedurally that has to occur is for the lawyers to make

17  their closing arguments.

18          Their closing arguments are intended to give you the

19  benefit of their interpretations, their recollections of the

20  evidence to help you think about it, and remember it as well,

21  prior to your retiring to deliberate on your verdict.  So

22  we'll move now to that stage of the proceedings.

23          Because the Government has the burden of proof in

24  the case, it has the opportunity under our rules to go first

25  and last in the final arguments, just like it did in the

ROTHROCK – CROSS/MCKINLEY        411

1   evidence here.

2        The rebuttal argument is intended to be narrow in

3   its scope and just respond to any new issues that the defense

4   may have raised.  But in any event, the Government counsel

5   will go first, then defense counsel.  Then on rebuttal

6   argument, Government counsel will return to the podium.  So

7   that will be our procedure.

8        Who will make the opening closing argument for the

9   Government?  Ms. Helart?

10       MS. HELART:  Yes.

11            **CLOSING ARGUMENT BY: GAYLE HELART**

12       Good morning again, ladies and gentlemen.

13       In October 2004, Dawn Russell learned through her

14   daughters' school that websites existed of both of her

15   daughters.  She did not learn this from the person she should

16   have learned this from.  She should have, of course, learned

17   this from Dale Russell, not from school officials, not from

18   police officers, who were all very concerned about the

19   pictures they saw of these 10 and 12-year-old girls.

20       This was unfortunate for her and also not the

21   conduct that Dale Russell's been charged with.  However, his

22   act of secrecy in not telling Dawn Russell about the websites

23   and the pictures of their daughters in their underwear is an

24   unfortunate fact for you to know overall in analyzing whether

25   Dale Russell used, employed or enticed his daughters into

CLOSING ARGUMENT / HELART        412

1   engaging in sexually-explicit conduct for the purpose of

2   producing a visual depiction, a picture, of the

3   sexually-explicit conduct of the pictures that are charged in

4   this case.

5           Dale Russell would have you believe that his

6   lifestyle of nudism, plus his interest in photography, equals

7   no intent to take a picture of a minor engaging in

8   sexually-explicit conduct.  Apparently, he looks at naked

9   children's bodies differently, and so he takes pictures of his

10  minor-age daughters without any sexual focus on them at all.

11          In fact, they're so insignificant, these pictures

12  are, that they end up backed up on a CD and they go into a

13  box.

14          This trial is not about Dale Russell being a nudist.

15  This case is not putting the lifestyle of nudism on trial.

16  The Government does not care if Dale Russell walks around nude

17  all day every day.  Dale Russell, however, is trying to

18  convince you that because of his lifestyle of nudism, he had

19  no intent to take pictures of his daughters that were illegal,

20  so I guess that means they weren't, says Dale Russell.

21          Dale Russell, in contrast to another individual who

22  takes sexually-sexually explicit conduct pictures of their

23  daughters, is simply celebrating the artistry of his naked

24  daughters' bodies.  That's all he's doing.

25          There's no double standard in the law for nudists

1  who take illegal pictures of children versus other people who

2  take illegal pictures of children.  In other words, nudists

3  don't get to say "Well, I just think differently about

4  children than other people do, so these pictures are just

5  quite artsy to me."

6          People who take illegal nude pictures, for example,

7  for a purely economic motive, with absolutely no sexual

8  attraction to a child at all, is still guilty.  There's no

9  double standard for that person either.

10         But in this case, frankly, is the whole combination

11  defense Dale proposes to you of "I'm a nudist; plus, I'm a

12  photographer, so therefore I had no intent to engage these

13  children into taking a picture of sexually-explicit conduct

14  that is child pornography" is just a plain big bunch of

15  baloney.

16         You have plenty of evidence to dispense of his silly

17  defense and infer his sexual attraction to his daughters

18  providing the motive for taking these pictures by looking at

19  the pictures themselves, considering how this case came to

20  light, considering his daughters' testimonies, and considering

21  his own testimony.

22         When Dawn Russell got to the school, she saw

23  Exhibit 12.  You will see Exhibit 12, and you will see the

24  cause for concern.  But more importantly, and again for your

25  purposes of analyzing this case, you see at least one

CLOSING ARGUMENT / HELART          414

1  important driving factor for Dale Russell's conduct.  He's got

2  a commercial motive to take the pictures of his daughters.

3  There's a payment method on here, cash or debit cards, $22.95

4  for the first month, then $17.95 a month thereafter will

5  automatically be rebilled, $1.50 service charge, money order,

6  cash is $20 a month.  You can conveniently pay with a credit

7  card.

8          There's galleries.  You can look at all the photo

9  shoots of his girls.  See the enticing first pages in their

10 thong underwear, their bra and pantie sets, their little

11 leotards.  This is an economic motive driving at least one

12 factor into taking these pictures.

13         This was a commercial motive that he was not willing

14 to share with his ex-wife, who out of respect would have been

15 an important person to share this with because she's the other

16 legal parent.  And remember, she doesn't know about the other

17 bank accounts or other bank account put into her daughters'

18 name, hidden bank accounts hiding the money from provocative

19 pictures of his daughters in this underwear bra and panties

20 posing.

21         He calls it for sponsorship.  The people who join up

22 these websites, they're just sponsoring these girls.  That's a

23 nice euphemism.  They're sponsoring, not really paying for

24 these pictures.

25         Dale Russell has a lot of euphemisms for "I am

1  sexually attracted to my daughters, and the collateral benefit

2  I get is that I get money for these pictures that I keep

3  taking, because I am sexually attracted to them.  They just

4  get sponsored, and that's just different than getting paid for

5  their nude pictures."

6         Regular access to them on his visitation week and

7  regular time in front of the camera for both clothed and

8  unclothed photo sessions, all of this normalized to them the

9  fact that they were really models and that this was fun.  The

10 fact that they were compliant in not telling their mother

11 about the pictures of them nude or in inappropriate underwear

12 garments enabled Dale Russell to be successful for several

13 months, and to continue on taking pictures of them to fuel his

14 sexual fantasies toward them.

15        Now, Dawn Russell believes the sites were taken down

16 after the hearing.  An investigation started.  A search

17 warrant served in June 2005 at Dale Russell's residence found

18 a Canon camera and a computer with a missing hard drive.  The

19 Canon camera was a score.  The meta-data from it showed that

20 this camera took the pictures that are charged in this case

21 that were later recovered off a Canadian individual's computer

22 unrelated to this case in 2007.

23        That computer in Canada held the pictures that are

24 charged in this case in Counts 1 through 4.  Those are the

25 pictures you're going to be deciding if they are illegal.

1          And so now is the work in front of you.  I told you

2   at the beginning that I expected that one main issue the

3   parties would be arguing is the content of the pictures.  It

4   is true that the content of the pictures is the only issue you

5   have left to decide because the parties have stipulated to the

6   fact that these girls were minors, and have also stipulated to

7   the fact that interstate nexus or the federal power for

8   charging these statutes has been met two ways.

9          One way is that a Canon camera was used to take the

10  pictures, and Canon cameras are not manufactured in Indiana.

11  And the other way is that the pictures charged in this case

12  ended up in Canada, were taken here in Indiana, and so had to

13  cross state and foreign commerce lines in order to get to

14  Canada.

15         So those two issues, those two elements have been

16  met; thus, the only issue you have left to decide is whether

17  Dale Russell did one of the verbs that the law talks about:

18  Use, persuade, employ, entice, et cetera, these minors to

19  engage in sexually-explicit conduct for the purpose of

20  producing a visual depiction or a picture of such conduct.

21         So manipulating the minors is what this crime is

22  about for the purpose of producing sexually-explicit conduct

23  pictures.  Now, you have to agree on one of those verbs that

24  he did.  For example, you do not have to agree on all of the

25  verbs and all of the verbs don't have to be met.  It's an "or"

1  not an "and."  In this case, the most straight-forward verb

2  that you have in the statute is "used."  A minor is used to

3  produce a visual depiction of sexually-explicit conduct if the

4  minor is the subject of a picture.

5          In this case, though, the 12 of you might agree on

6  another verb:  Employ, because he paid them money for the

7  photo sessions; entice, because of all the story line that he

8  had leading up to "you're going to be a model" and all of

9  that.  But you just have to agree on one of those verbs.

10         So it's manipulating the minor.  It's how he's using

11  them, using one of those verbs, to engage them to produce

12  sexually-explicit conduct pictures.

13         So remember in this case that Dale Russell is not

14  contesting he took the pictures.  He is contesting that the

15  pictures are illegal, and by inference with his testimony of

16  being a nudist and a photographer contesting the intent with

17  which he took the pictures.

18         Now, you know that Dale Russell is a photographer.

19  So absorb that fact a lot during your deliberations.  Being a

20  photographer, a lifelong love of it since he was eight years

21  old, all the cameras that he got, all the excitement that he

22  got from being a photographer, Dale Russell's pictures are not

23  an accident.  They're not a mistake.  The lighting is set.

24  The room is set.  The clothing is set.  The picture in the

25  person is set.  The theme is set.

1      He aims for a specific result like photographers do,

2   and for Count 1, he got the specific result 86 times.  He got

3   the results he wanted in the gym for Counts 2 and 4 by

4   directing the hand stand and directing the pose with Jane Doe

5   2 holding on to the bar in the dance studio.

6      He got the just coming out of the fake shower with

7   my leg propped up on the edge of the bathtub and the towel not

8   covering the genital area of Jane Doe 2 in Count 3.  He got

9   the specific result that he aimed for each time that he took

10  the pictures.

11     And why else do we know that?  He's got a digital

12  camera.  The pictures that he does not want could be easily

13  deleted.  And you know that none of them were because each of

14  the pictures charged in Counts 1 through 4 were found on an

15  individual's computer in Canada.  They weren't deleted off of

16  Mr. Russell's computer.  The end result pictures therefore

17  were exactly what he designed the pictures to look like.

18     Addressing the one red herring, the expression "the

19  red herring," a distraction issue that Mr. Russell has brought

20  up to you, is that to him they looked cropped.  "They look

21  like different pictures than what I took."  "I took those

22  pictures," he said, "with a wide angle lens."  There was more

23  of the room, I guess.

24     First of all, that may not even be true, but so what

25  if it is.  So what.  You can still see what his intent was in

CLOSING ARGUMENT / HELART          419

1  taking the picture by just looking at the picture.  The
2  corners of the room in a wide-angle lens would not change the
3  fact that both girls are still nude in rooms and settings that
4  were staged and set by their father, and their genitals and
5  pubic areas were the focal point of the pictures considering
6  how their legs were spread, towels or blankets draped
7  strategically, and in Count 1 especially, the rather
8  striptease appearance that the 86 pictures together can be
9  judged.

10         So are these pictures illegal as defined by federal
11  law?  The Court will give you some guidance as to what is a
12  lascivious exhibition of the genitals.  One piece of guidance
13  is a list of factors that is not exhaustive.  In other words,
14  a list provides some common sense things that you can
15  consider, but not every one of those factors have to be
16  present for every picture.  And, in fact, you can decide some
17  other factors are present in the pictures.

18         For example, the girls' ages.  They're 10 and 12
19  years old.  Jane Doe 1 has entered puberty.  Their ages can be
20  considered in whether it's just appropriate to be taking these
21  pictures.  Likewise, as a collective jury, you may think of
22  many other factors that are not on the list.

23         You are all free to decide what is important in
24  determining whether these pictures charged in Counts 1 through
25  4 are a lascivious exhibition of the genitals or pubic areas

 1  of these girls.

 2           One factor you can consider is whether the focal

 3  point of the picture is on the minor's genitals or pubic area.

 4           Another is whether the minor is in a setting

 5  generally associated with sex.

 6           Another is whether the minor's pose is unnatural.

 7           Another is whether the minor is in an inappropriate

 8  attire considering her age.

 9           Another is whether the minor is fully or partially

10  clothed or nude.

11           Another is whether sexual coyness or willingness to

12  engage in sexual activity is suggested.

13           Another is whether the visual depiction is intended

14  to elicit a sexual response in the viewer of the material.

15  Now, this does not mean a viewer who is not sexually attracted

16  to children, right?  A person like that would look at that

17  picture and cast it aside.  I'm talking somebody who's

18  sexually attracted to this material.  Is this picture designed

19  for a person with that attraction?

20           In Count 1, Jane Doe 1 is in her bedroom nude

21  surrounded by her kid-focused Sponge Bob-themed items.  So

22  far, a viewer who was sexually interested in children would

23  find this enticing.

24           Jane Doe 1 then appears to wake up, dress at the

25  end, and in the middle, she acts salaciously by taking her

CLOSING ARGUMENT / HELART        421

1   blanket on and off five times strategically showing, during

2   those times that blanket is down, strategically showing just

3   snippets of her body, the top part of her buttocks, parts of

4   her vaginal area, her right breast.

5           It's so ridiculous for Dale Russell to claim that

6   this is nonsexual.  It's just hard to believe he would expect

7   you to keep a straight face over it.  She is 12-years-old.

8   Her body's just beginning to develop.  She does not sleep in

9   the nude normally.  This photo session was suggested by her

10  father, the nudist photographer, who has no sexual interest in

11  her whatsoever at 11:30 in the morning, long after she's woke

12  up for the day.

13          She's in a place associated with sex, a bedroom and

14  a bed, another factor.  She's looking back at the camera

15  several times, another factor, to see if her face suggests a

16  sexual coyness or willingness to engage in sex.

17          On the charged counts, her legs are spread or her

18  genitals are strategically uncovered drawing a viewer's eyes

19  straight to her genitals and pubic area.

20          Count 1 is child pornography, meeting the statute in

21  this case.  Exhibit 1B is 86 pictures taken in six minutes,

22  and it tells you the entire story of that count, that photo

23  session, and it shows you that those charged images were not

24  an accident.

25          Counts 2 and 4 were taken in the gym where Dale

1    Russell worked, and had keys for after hour sessions.  So many

2    facts of the context of this help you to judge the intent with

3    which he took these pictures and manipulated these minors into

4    engaging in sexually-explicit conduct.

5             He took them to the gym at the off hours.  Nobody

6    else was there.  He covered the windows with covering so that

7    nobody else could see.  Very creepy, and again, very, very

8    secretive.

9             He directed them to take their clothes off.  He

10   videotaped and photographed them for about 45 minutes.  He

11   directed them to do gymnastics.

12            Count 2 captures Jane Doe 1 from behind,

13   inappropriate and crass; not just that, but illegal as a

14   display of her genitals and pubic area.  He did not do this by

15   accident.  The picture was not deleted.  It made it to Canada.

16            Count 4 captures Jane Doe 2 with her legs spread at

17   the dance bar.  A viewer's eyes go directly to her spread legs

18   because of her pose.

19            Counts 2 and 4 are again child pornography made so

20   by the final product that you see in the pictures themselves

21   and understanding the context under which they were taken.

22            He manipulated his daughters by his directives to

23   engage them in sexually-explicit conduct for the purpose of

24   taking the picture of the conduct.  He kept the result.  He

25   did it on purpose.

1          For your analysis, he manipulated these minors.  He

2     used them, employed them, enticed them to engage in

3     sexually-explicit conduct for the purpose of producing the

4     images you see charged in Counts 2 and 4.

5          Count 3 is a similar analysis.  A viewer of this

6     material sees a prepubescent girl coming out of the shower, a

7     place reasonably associated with adult sexual activity.  She

8     is posed with her leg propped up on either the bathtub or the

9     toilet seat, and the towel is not covering her genital area or

10    her chest, but instead it's covering her leg, drawing

11    attention to the area of her genitals or pubic area because

12    the towel isn't acting as the covering.

13          Another fact of why you know Dale Russell's pictures

14    were very purposeful to capture images of his daughter

15    engaging in sexually-explicit conduct is that he spent an

16    inordinate amount of time normalizing this behavior to them.

17    He normalized this by seducing them several ways.

18          Dale Russell seduced his daughters into taking his

19    pictures with money.  Jane Doe 1 said $20, Jane Doe 2 said

20    $70.  They bought clothes and other things they wouldn't have

21    otherwise had the money for, and money to a kid who has little

22    means of getting her own is a pretty powerful seducer.  Monies

23    being paid them enabled him to get more and more photo

24    sessions of them.

25          Dale Russell seduced his daughters into taking

1  pictures by calling them models.  That has status.  A model,

2  to a girl, typically means someone who is pretty and sought

3  after.  What girl or woman do you know who doesn't want those

4  titles and those things?

5        He called them models each time of their photo

6  shoots.  It is unclear what legitimate modeling they were

7  doing, though, other than for his own commercial gain because

8  there was certainly not any evidence of any Sears catalog or

9  J.C. Penney catalog coming forth.

10       He called them models to normalize this and to make

11  this fun and glamorous to them.  Dale Russell seduced his

12  daughters as their father, a person with tremendous influence

13  on them, also with his time and attention in addition to the

14  gift of money.  He taught his daughters that naked pictures of

15  their bodies were valuable to him and others, that is, the

16  special people that Jane Doe 1 spoke of that would pay for the

17  naked pictures.

18       He talked about this both in terms of the time he

19  spent with them on photo sessions and the money they received

20  afterward.  His seduction worked.  They did the photo sessions

21  for him repeatedly and at his request.

22       You can infer that Dale Russell knew this was

23  illegal based on at least five facts that you heard.  He

24  changed their names on the websites, not because he wanted to

25  protect their safety, but because he didn't want their true

1  identities to be traced back to him.

2         If he truly wanted to protect their safety, we

3  wouldn't be in this courtroom because Exhibit 12 wouldn't

4  exist.  It wouldn't be placed on the Internet for everybody to

5  see.  He just didn't want their real identities put on there

6  because someone might figure out who he was, and that would

7  get him into trouble as the photographer.

8         He fled to Mexico after a meeting at the U.S.

9  Attorney's Office hearing that the Government might move

10 forward on the charges indicating and evidencing his

11 consciousness of guilt.

12        He has touched Jane Doe 1 in a

13 sexually-inappropriate way between 2001 and 2004, a relevant

14 time period for when these pictures were taken, specifically

15 negating his "I'm a nudist photographer" defense.  He has a

16 sexual interest in his daughter.

17        He lied to investigators on June 29th, 2005, when he

18 said he did not recall any other nude photo sessions.  He did

19 not recall 86 pictures in Count 1?  He didn't recall Count 2?

20 He didn't recall Count 3?  And 4?  Didn't recall the sudsy

21 Jane Doe 2 pictures and 114 pictures in that photo-taking

22 session?  He just didn't remember about all that.

23        He told Jane Doe 1 and Jane Doe 2 not to tell their

24 mother who he correctly believed would be angry.  He was

25 right.  She was very angry.

1          And Dawn Russell is angry, but the law makes even a

2    graver statement, that the pictures charged in Counts 1

3    through 4 are illegal.  The charged pictures, plus the

4    completely offensive testimony of Dale Russell when he said

5    that if the girls would have said no to the photo shoots, they

6    wouldn't have happened.

7          This shows you why the law doesn't put the burden on

8    10 and 12-year-old girls to say no to nude pictures.  The law

9    would totally be turned on its head if that were true.  The

10   law would totally be turned upside down if children had to be

11   the ones to tell adults no to this illegal behavior, behavior

12   they don't even know is wrong.

13         We see that as adults by looking at the statutes.

14   Dale Russell would have you believe that it mattered that Jane

15   Doe 1 or Jane Doe 2 were agreeable to taking the pictures.  It

16   doesn't matter.  The law doesn't put that burden on them to

17   say no.  Dale Russell, as the adult, and all adults have the

18   responsibility to keep control of themselves and not take

19   illegal nude pictures of children.

20         Because the result here is that Dale Russell

21   produced permanent recordings of his daughters engaging in

22   sexually-explicit conduct, specifically engaging in a

23   lascivious exhibition of their genitals or pubic areas, their

24   bodies and faces were completely exposed, and their nude

25   genitals, what children should learn are private areas of

1   their bodies, are not private any longer for these girls.

2          They were made into commodities through the pictures

3   taken of them and placed on their websites.  Dale Russell told

4   his daughters by Counts 2 and 4 "I don't value you for your

5   gymnastics.  I value you for nude gymnastics.  I'm taking

6   pictures of your exposed, nude genitalia to prove that point."

7          Dale Russell told Jane Doe 1 and Jane Doe 2 "You are

8   an object and I can take a picture of you.  And what is good

9   for me and bad for you doesn't matter as long as I pay you

10  money for it."

11         Dale Russell told Jane Doe 1 in Count 1 "I'll buy

12  you Sponge Bob things, but I'll turn them into something

13  sexual because I'm going to have you do a salacious striptease

14  with your kid items that you have on your bed."  It should be

15  the safest place a kid should experience.  Dale Russell told

16  Jane Doe 2 by Count 3 that "Showers at Dad's house are a place

17  I can walk into and invade your privacy, and let's do a photo

18  shoot."

19         Dale Russell is guilty of producing child

20  pornography pictures involving his children.  We are asking

21  for verdicts of guilty on all four counts.  Thank you.

22         THE COURT:  Thank you, Miss Helart.

23         Lawyers, just come up here for a second.

24            (Bench conference on the record.)

25         THE COURT:  After our Instructions Conference this

CLOSING ARGUMENT / HELART        428

1   morning, in looking back at the statute where "knowingly"

2   appears and what it modifies, Miss Dame has determined and has

3   shown me now and I agree, that we have the "knowingly" in the

4   wrong place as the modification.

5           So she has a clean copy of that.  I don't know if

6   that's what you want to use in your closing argument, so I

7   want you to have the corrected copy.

8           MR. McKINLEY:  Okay.  Wonderful, thank you, Your

9   Honor.

10          THE COURT:  I saw the notes passed from the marshal.

11          MR. McKINLEY:  I'm sorry?

12          THE COURT:  I saw the note passed from you to the

13  marshal.  Do you need something that I need to know about?

14          MR. McKINLEY:  No.

15          THE COURT:  Okay, good.  Thank you.  The change is

16  in the third element and in Instruction No. 7.

17          MR. McKINLEY:  I wanted to have a clean copy of the

18  Instruction 7 and No. 8 just to use.

19          THE COURT:  Okay.  So now you have them.  Okay?

20          MR. McKINLEY:  All right.

21          MS. COOK:  But we don't have it right now?

22          THE COURT:  We have it.  We're just about to give it

23  to you.  Do you want to see it?

24          MS. COOK:  We'll go ahead with the remainder of the

25  final arguments now?

1           THE COURT:  Yes, I'm hoping to.

2           MS. COOK:  Do you still want a break after his

3    argument?  We just hate to break and just have the rebuttal in

4    the afternoon.

5           THE COURT:  Well, we can break now.  It's 11:00.

6    Tell me what you prefer.  Break now?  I can go till noon.  I'm

7    supposed to be there at noon, but if you take your 45 minutes

8    and you take 10 minutes of rebuttal, I can do it.

9           MR. McKINLEY:  I'm guessing I'll take 30 minutes,

10   Judge.

11          THE COURT:  Okay, let's keep going.

12          MR. McKINLEY:  That's my best guess.

13          MR. COOK:  Depending on the time, I apologize, I

14   feel like my four-year-old-son here, I think I can make it

15   through Jim's closing, but I've got a biological urgency to

16   hit the restroom to be quite frank.  Depending on Jim's time,

17   if there is time --

18          THE COURT:  Why don't you go right now?

19          MR. COOK:  Go right now?

20          THE COURT:  Then you wouldn't be missing too much.

21   He'll be warming up to the jury.

22                    (Open court.)

23          THE COURT:  Mr. McKinley, you may give the jury your

24   closing argument.

25          MR. McKINLEY:  Thank you, Your Honor.

CLOSING ARGUMENT / MCKINLEY        430

1        **CLOSING ARGUMENT BY: MR. McKINLEY**

2             May it please the Court?

3             THE COURT:  Mr. McKinley.

4             MR. McKINLEY:  Ms. Helart, ladies and gentlemen of

5  the jury, this is going to be the only opportunity that I have

6  to address you, and I'm not going to spend this only

7  opportunity going back through and telling you what you saw

8  and heard over the last couple days.  I am going to share some

9  thoughts with you and some ideas and some principles that you

10  may choose to consider during the course of your

11  deliberations.

12             Then I'm going to ask you to resist the temptation

13  to judge Mr. Russell for views that you may consider to be

14  unconventional views towards nudity, to resist the temptation

15  to judge him based on modeling websites, and the intentions

16  that were disputably involved in running those websites.

17             I'm going to ask you to judge Mr. Russell really for

18  what he's charged with, and that is the specific images that

19  are listed in the indictment.  Then I'm going to ask you to

20  abide by your oath, and I'm going to ask you to follow the

21  law, and I'm going to ask you to return a verdict of not

22  guilty on these charges.  As uncomfortable as that might be

23  for some of you, that's what I'm going to ask you to do.

24             Sometimes the law is a bitter pill to swallow, and

25  sometimes the right decision is the hardest decision.  But

CLOSING ARGUMENT / MCKINLEY      431

1   that's all I'm going to ask you to do today.

2          I would venture to guess that if you would take a

3   poll among most lawyers and ask them about their first year in

4   law school, that most of them would tell you that's probably

5   one of the most strenuous or anxious times in their life, and

6   I was no exception to that.

7          I had left a career in a pretty good-paying job to

8   go to law school, and I had two kids at home and a third on

9   the way.  I had a fair amount at stake.

10          And I'm wandering around law school with people that

11   I'm thinking are a lot smarter than me, and I'm very anxious

12   come final exam time because that's -- you know, your final

13   exam grades in law school are going to determine whether

14   you're going to get a good job.  And I felt like I had a lot

15   at stake.  I was very anxious.  I was very concerned.

16          The night before my first law school exam, which was

17   to occur at 9:00 the next morning was a very restless night, a

18   night where I'm having trouble sleeping, I'm very anxious

19   about being on time, and being able to repeat all this

20   information.

21          I had this very vivid dream that I couldn't get to

22   my law school exam on time.  I was subjected to barriers and

23   there were like rubber bands and bungee cords on my back and I

24   just couldn't get to the exam.

25          The time had passed where I was supposed to be

1  there, and it's getting to be toward the end of the exam.  I

2  walk into the exam finally, and people are finishing their

3  exam.  They all look up and they start smirking, and I look

4  down and I don't have any clothes on.

5          I woke up in a state of absolute panic, almost

6  terror; sweating, heavy breathing.  And I took a couple of

7  deep breaths and thought about it for a moment, and I couldn't

8  help but laugh.  What a silly dream.  What is it, though,

9  about my own nudity that would strike terror in my heart?

10 What would cause that?

11         I guess, you know, the answer is that, you know, I'm

12 a product of my culture; I'm a product of my society where

13 nudity is not a widely-accepted situation.  It evokes a lot of

14 different thoughts, emotion, images among every person.  It

15 stands in stark contrast to many other cultures and people in

16 our own society.

17         I represented a woman some years ago in a civil

18 matter who's a fundamentalist Muslim.  She's Palestinian.  I

19 represented her for two years.  She always had the scarf, the

20 full-face veil, long dress.  Every part of her body was always

21 covered except for her hands and her eyes.

22         I was never permitted to be in a room alone with

23 her.  Her husband always had been to there.  It's a custom I

24 respected, and stands in stark contrast to the customs of many

25 other cultures where nudity, female breasts, exposure of male

CLOSING ARGUMENT / MCKINLEY      433

1  and female genitalia, are commonplace, and not given a second

2  thought, much like the subculture of nudism.

3       Now, there is a lot of emotion that is generated

4  because of the way our conventional norms affect our thinking.

5  There's no dispute, though, that the nude body can generate a

6  lot of different emotions.  To some looking at a specific

7  image, it might generate loathing or disgust.  The same image

8  in someone else might stir passion or sex.  And still another

9  person, that image might stir a sense of wonder or a sense of

10  beauty.

11       There's no question that it has a lot of power.  And

12  perhaps that's why nudity is an essential theme and most

13  common theme for artists, artisans, sculptors, painters,

14  photographers, over the history of mankind.

15       It's naturally so because no one can question that

16  the human body, the nude body, it's as natural as the water we

17  drink, the food we eat, the air we breathe.  In fact, the word

18  "nude" comes from the Latin nudist, which means mere or plain

19  or simple.

20       And the simplicity of the human body grows complex,

21  particularly in our society.  Because of this almost

22  inextricable combination of nudity and sex, when we think of

23  nudity, everyone wants you to think sex.  They're two separate

24  concepts.  And they really generate two separate emotions.

25  But nonetheless, they are the broadest range of emotions that

CLOSING ARGUMENT / MCKINLEY          434

1  you can think of.

2          This case, like other cases involving this subject

3  matter, I think is made more difficult because it calls for

4  the jury to make a decision that is made more difficult

5  because you need to set aside the emotions that you have, the

6  emotions that are evoked by images of nudity, and you need to

7  focus on applying what the law states, and the law as the

8  judge will instruct you following the arguments in this case.

9          Child pornography is a subset of sexual

10 exploitation, sexual abuse, documenting underlying acts.  And

11 producing images of nudity is far different from creating

12 child pornography.  Indeed creating images of nudity, there's

13 nothing wrong with that.  Whether it's an inference, whether

14 it's a prepubescent child, infant, a child entering puberty, a

15 child in puberty or an adult, it's not a crime.

16         It is not a crime.  The issue you are being asked to

17 decide in this case is in one sense simple and another sense

18 complex.  It's simple in this notion.  The issue in this case

19 is has the Government proven beyond a reasonable doubt that

20 these images, the images that Dale Russell admits to creating

21 here, portray sexually-explicit conduct.

22         Because the law provides, and the judge will tell

23 you, any person who uses a minor to engage in

24 sexually-explicit conduct shall be punished in accordance with

25 the law, if that image or that depiction travels across state

1    lines or foreign lines.

2             There's no question here that the images portray

3    minor children.  We've stipulated to that.  There's no

4    question here that these images traveled across a foreign

5    border, into Canada.

6             How that happened or why that happened isn't an

7    issue for you.  It's not anything for you to be concerned

8    with.  The simple question here is:  Do these images portray

9    sexually-explicit conduct, not nudity, sexually-explicit

10   conduct?

11            Now, the Court is going to instruct you, what is

12   sexually-explicit conduct?  Well, it's actual or simulated

13   sexual intercourse, bestiality, masturbation, sadistic or

14   masochistic abuse, or lascivious exhibition of the genitals or

15   pubic area.  Lascivious exhibition.

16            Lascivious means "marked by lust or exciting sexual

17   desires."  That's what it means.  "Lascivious exhibition"

18   means that this depiction, these images, were created to

19   display or bring to view the pubic area of children in order

20   to excite lustfulness, in order to excite sexual stimulation

21   in the viewer.

22            Not every portrayer or depiction of a minor's

23   genitals is a lascivious exhibition.  And I think it's

24   important to note that the test here isn't whether the image

25   could excite sexual stimulation in some pedophile.  I mean,

1   there is -- there's no secret, there's this element of

2   pedophilia that's in this society, and that's why the law

3   prohibits this type of activity.

4          There are people who can be excited or stimulated by

5   an image of a young girl doing a handstand at the gym or doing

6   gymnastic events.  Those people can probably get excited by

7   looking at children modeling underwear and bras and tights,

8   the type of images that you'd see in an advertisement for

9   Kohl's or Target or Sears in your Sunday newspaper.  There are

10  those people that can find sexual attraction and satisfaction

11  in viewing such things, just like people that can be attracted

12  to the images that were on these modeling websites.

13         That's not what we're dealing with here.  The issue

14  doesn't have anything to do with these modeling websites.

15  That's not what you're being called upon to do.  You're being

16  asked to look at these images that are charged, images of

17  young girls naked, nude.

18         The law draws that very distinct difference.

19  Lascivious exhibition of the genitals is what's required.  And

20  the question then is this:  Has the Government proven that

21  these images charged in the indictment display or bring to

22  view to attract notice of the genitals or pubic area in order

23  to excite lustfulness, sexual stimulation of the viewer.  And

24  I'd suggest to you the simple answer is no.

25         That's the simple answer, a young person engaging in

CLOSING ARGUMENT / MCKINLEY       437

1   gymnastics.  Gymnastics comes from the Latin "gymnotes."

2   Gymnotes means naked sport.  It comes from the fact that in

3   early ancient times, people competed and people performed

4   gymnastics in the nude.  That's where the word comes from.

5            That's what we've got here.  We've got two girls

6   performing gymnastics in the nude.  Lascivious exhibition?

7   No.

8            But I suggest that is what -- when I say this issue

9   is simple yet complex, the simple answer is no.  These do not

10  portray lascivious exhibition.  Even under the factors that

11  the Court is going to invite you to consider, that were

12  enumerated by Ms. Helart, and that's the defense theory.  The

13  defense theory that I think Ms. Helart referred to as just a

14  big bunch of baloney.

15           Well, it's not just a big bunch of baloney.  The

16  defense, or the issue here, I say is also complex; it's been

17  complicated by the Government in this case.  It's been

18  complicated by all of this additional evidence that the --

19  that they want you to consider.  Dale Russell's a bad father.

20  How could he take his daughters to nudist camps.  Dale Russell

21  operated these websites, and he had a commercial motive.  He's

22  going to pay them money.  Does that change the images that I'm

23  asking you to look at?  Does it change these pictures at all?

24  No, of course not.

25           The Government doesn't want you to draw that simple

1  conclusion, make that simple determination.  And that's why

2  they have brought in all of this other evidence of purported

3  activity, including Hannah's testimony this morning.  Some of

4  you may be troubled, and I'll tell you what, I am troubled

5  with the whole thing.  And that's why the Government brought

6  it in.

7          I'm troubled with it because, first of all, I know

8  from my own experience, I know from having done this for 25

9  years, but more so from raising three kids myself, that there

10  is no more forceful power on the human psyche than the power

11  of suggestion.  A man by the name of Thomas Carlisle who wrote

12  a famous treatise on the French Revolution published in 1937,

13  I read several years ago, and he makes this observation, which

14  I found very astute.  He said, "Fear in crisis in people

15  creates two things.  It creates courage, of course, and the

16  ability to recall things that never happened but were merely

17  told."

18          He's talking about the power of suggestion, and I've

19  seen it in my own life.  You probably have seen it, too.

20  About 21 years ago, I lost a dear friend in a horrific

21  motorcycle accident.  He was very close to my son who was

22  about 10 years old.  His name was Bobby, and my son referred

23  to him as Uncle Bobby, and it was a terrifying experience.  It

24  was a crisis.

25          We went to the funeral to pay our respects.  Took my

1   son.  He wanted to pay his respects to Uncle Bobby.  Uncle

2   Bobby had been burned and disfigured to the point where we had

3   a closed casket.  His casket was very distinctive, a black,

4   glossy casket with a Harley Davidson insignia.  Very cool.

5            My son asked me "Where's Uncle Bobby?"

6            I said, "Uncle Bobby's in the casket."

7            "What's he look like?  Why can't I see him?"

8            I said, "You can't see him.  He's in the casket."

9            "Why can't I see him?"

10            I said, "He's sleeping in the casket."

11            "What does he look like?"

12            I said, "Well, he looks like Uncle Bobby sleeping."

13            "What's he wearing?"

14            I said, "He's wearing probably his motorcycle

15   jacket."

16            Years later, my son was 21 years old, I don't know

17   how he got on the topic, but he says -- it was a topic of

18   when's the first time you ever saw a dead body.  And he said,

19   "You know, the first time I saw a dead body was Uncle Bobby."

20            I said, "What do you mean?"

21            He said, "Yeah, at Uncle Bobby's funeral.  I

22   remember the Harley Davidson casket, and I remember Uncle

23   Bobby looked like he was sleeping.  I remember Uncle Bobby was

24   wearing his motorcycle jacket."

25            I told him "You didn't see that."  He believes that

CLOSING ARGUMENT / MCKINLEY      440

1   he saw that.  The power of suggestion.

2            How is that power working here?

3            Well, it is working here.  Children in crisis, like

4   all people, are affected by fear, and that, in turn, produces

5   two things, courage and the power to recall things that never

6   happened but were only told.  And did that happen here?  You

7   know, I'm not going to suggest for a moment that Hannah's

8   lying.  And I'm not going to suggest for a moment that there

9   was any inappropriate conduct on the part of the prosecution

10  here.  I'm not going to suggest that.

11           I know Mr. Cook.  I know Ms. Helart.  They are

12  honorable people.  But was the testimony and recollection of

13  Jane Doe 1 affected by crisis?  By fear?  You know, Jane Doe 2

14  testified yesterday that she remembers the modeling website

15  named "octobermodel.com."  She testified and admitted on

16  cross-examination she didn't know that website name two years

17  ago when she testified to the Grand Jury.

18           Did it happen here with regard to now Jane Doe 1's

19  recollection?  The timing of the disclosure coming to light

20  here after all this time and after repeated inquiries and

21  denials to counselors, to mothers, to police investigators, to

22  judges, and to me, it's troubling.

23           She had no obligation.  She said she was hesitant.

24  I -- I understand her concern.  I only wanted to know the

25  truth.  I think she told me the truth, right there in front of

CLOSING ARGUMENT / MCKINLEY      441

1   the Government, only to change her story later for reasons I

2   can only speculate about.  But it's troubling to me because I

3   can't understand why the subject matter was even discussed

4   again, why it was even brought up again.

5          It's, indeed, troubling me also because it is not

6   relevant to the issue you're being asked to decide.  Does it

7   change the images?  No.  Does it modify these photographs that

8   you're being asked to look at and judge?  No.

9          He's not on trial for molesting his daughter.  He's

10  not on trial for going to Mexico.  Does that change the images

11  in this case?  No.

12         The Government has spent an extraordinary amount of

13  time vilifying Mr. Russell for matters that really don't

14  relate to the issue that you are being called upon to decide.

15         What's clear and undisputed is that Dale Russell

16  subscribes to a view, to a philosophy, a lifestyle that falls

17  outside the view or the philosophy or the lifestyle of what I

18  would call mainstream America.

19         Many of you may find, you know, his formation of a

20  modeling agency or a modeling website distasteful.  I might

21  add, where do you think Kohl's and Target and Sears get their

22  models?  But that's really not an issue either.

23         Many of you may well find the images that were

24  posted on these various websites inappropriate, distasteful.

25  Believe me, if the Government had any forensic evidence that

1   there was ever a nude photo of a child posted on any of those

2   websites, that would have come in.  The reason it didn't come

3   in, there is no such forensic evidence.

4           Many of you might find that Mr. Russell's philosophy

5   towards nudism, his acceptance of nudity, his attempt to bring

6   his daughters to view nudity in his perspective, there's

7   simply nothing wrong with that.  You might find it

8   distasteful.  You might find it inappropriate.  But it's not a

9   crime.

10          And I'm not asking you to ratify or give your stamp

11  of approval to that website.  I'm not asking you to ratify or

12  give your stamp of approval to Mr. Russell's photographing his

13  daughters in the nude.

14          I'm not doing that.  I'm not asking you to ratify or

15  give your stamp of approval to these websites or for nude

16  photography or the influences of other artists on

17  Mr. Russell's photography.

18          I'm not.  What I'm asking for is just a fair,

19  objective assessment by adults of these images here in light

20  of the law and the legal principles that the Court is going to

21  give you.  And you might not like some of these legal

22  principles, but as jurors, you have a sworn duty to follow

23  them.

24          Now, you, jurors, you 14 people were selected, as

25  you know, from a large group of individuals, and you were

1 collectively chosen for this job because of a mutual belief by

2 the lawyers in this courtroom that you're good citizens,

3 you're intelligent, you have an ability to be fair.  You have

4 the ability to be objective, and you have the ability to take

5 the law and apply these legal principles to the question

6 that's before you.

7          Notwithstanding the Government's attempt to confuse

8 the issue, the question is this:  Has the Government met its

9 burden to prove beyond a reasonable doubt that Dale Russell

10 used minors to engage in sexually-explicit conduct, including

11 sexual intercourse, masturbation, bestiality, sadism,

12 masochism or lascivious exhibition of the genitals?  And the

13 answer's no.

14          Now, a couple of things I just want to touch on

15 before I close here.  I disagree with Ms. Helart's description

16 of our position as just a plain big bunch of baloney.  I'm

17 asking you simply to follow the law.

18          The defense here is that these images portray

19 nudity, but not lascivious exhibition of genitals.  They say

20 "Well, what about this cropping issue?  It's a red herring."

21 It's not a red herring.  If things had been modified, that's

22 something for you to consider.  And there's no evidence

23 whatsoever to refute Mr. Russell's description of that.

24          They say "Well, you should look at all 86 images of

25 1B."  Certainly, it's in evidence.  You can look at all 86

CLOSING ARGUMENT / MCKINLEY        444

1  images.  And you can conclude from that what?  What the

2  charged images portray?  No.  The charged images don't change

3  as to what they portray.

4          The shots in the gym that they would cast as being

5  taken during this, you know, crass and sinister episode.  It

6  might be crass and sinister to some, but not for someone who's

7  a nudist for nudism is perfectly natural.  There's nothing

8  inappropriate.

9          Ladies and gentlemen, this is my last chance, my

10 only chance to address you.  I'm not going to have an

11 opportunity to respond to whatever Mr. Cook or Ms. Helart

12 might have to say and I'm sure they are going to have a lot of

13 comments.  They're going to have a lot to say about what I've

14 just told you.

15         They have a distinct advantage, of course, in

16 addressing every point that I've made during the course of my

17 argument, and I'm not going to have any opportunity to

18 respond.

19         When you begin your deliberations, I would ask that

20 you be thinking about how I might respond if I had the

21 opportunity.  But I don't.  And I'm sure when I sit down here,

22 there's going to be about 25 things that roll through my mind

23 that I wished I would have said, that I wish I would have

24 brought up, but again, I'm not going to repeat all the

25 evidence for you.  You saw it.  You heard it.  What the issue

CLOSING ARGUMENT / MCKINLEY        445

 1   is are the charged images.

 2           One other point before I sit down, and I promise I

 3   will.  If I have said anything, done anything during the

 4   course of this trial that you have found irritating or that

 5   has somehow reflected unfavorably or irritated you at all,

 6   please accept my apology and don't hold it against my client.

 7           I have had struggles in the courtroom with

 8   technology, and some of the questions I think might have been

 9   a little bit long or gone off onto an area that I don't think

10   there was much interest in the jury, and to that extent,

11   again, I apologize for any errors that I have made.

12           I want to express a great deal of thanks to all of

13   you because this is not an easy job.  You're being called upon

14   at this time to judge another person.  It is not an easy job.

15   I don't know what they pay jurors but whatever they pay jurors

16   isn't nearly enough, but there is a very important

17   responsibility you have today.  And as a participant in this,

18   all of us who work in this system day in and day out know you

19   are the people that breathe life into our whole constitutional

20   system here.  Trial by jury, the presumption of innocence,

21   guilt beyond a reasonable doubt.

22           It's pretty lofty terms.  I don't think a lot of

23   people appreciate them until either they find themselves or

24   have a loved one that find themselves in the cross hairs of

25   the prosecution, but it's an incredibly important function.

1  These are very important principles that you are giving some

2  life to.

3          I appreciate very much you listening to me, and all

4  I can do at this point is put my client, Dale Russell, in your

5  hands.  Thank you.

6          THE COURT:  Thank you, Mr. McKinley.

7          The Government's rebuttal argument.

8          **CLOSING REBUTTAL ARGUMENT BY: MR. COOK**

9          MR. COOK:  Thank you.  I will deliver that if that

10 pleases the Court.

11         THE COURT:  Mr. Cook.

12         MR. COOK:  Ladies and gentlemen, you've just sat

13 through approximately an hour of argument.  I will try to be

14 brief and respect your time.

15         The law protects real children like Jane Doe 1 and

16 Jane Doe 2 from exploitation.  Not statutes and drawings and

17 paintings that may be the theme of art.  Look at these real

18 children when you get back to the jury room.  Government's

19 Exhibits 1, 2, 3 and 4, or Counts 1 through 4, Government's

20 Exhibit 1B.

21         These images are about one thing.  They're about the

22 defendant depicting his daughters as sexually available.

23 They're about the defendant enticing others with a commercial

24 motive on his part for special people who pay more for nude

25 photos.  They're about the defendant trying to make money off

CLOSING REBUTTAL ARGUMENT / COOK     447

1   of the objectification of his daughters.

2           Government's Exhibit 1B clearly shows the

3   defendant's intent in taking these photos.  If you look at the

4   entirety of that photo shoot –– and we went through a part of

5   that in Mr. Russell's testimony.  I know you've already had

6   the opportunity to review that exhibit up in the jury room

7   following this publication to you, but look through that

8   exhibit.

9           What you're going to see is a photo shoot whose only

10  purpose, the only purpose for that photo shoot can reasonably

11  be is to depict Jane Doe 1 as being sexually available,

12  sleeping in the nude, waking up, holding a blanket about

13  herself and taking it off, holding it about herself and taking

14  it off, resituating it so that parts of her genitals are

15  displayed, then parts of her breast looking alluringly back

16  over her shoulder at the defendant's direction.

17          Clearly shows his intent, and intent they carry to

18  the other nude photo shoots, such as at the gym.  The nude

19  photo shoot in the shower of Jane Doe 2 from Count 3.  One of

20  two photo shoots in the shower that he did despite the fact

21  that he did not recall any when asked about it in the family

22  court.

23          I find it interesting that defense likes to make the

24  point that Mr. Russell is apparently a very honest individual

25  who admits that he took these images and asked that you just

CLOSING REBUTTAL ARGUMENT / COOK    448

1   judge the images.

2          What I would ask you to recall is that now he admits

3   that he took nude images, now when we have this ExIf data that

4   you have learned about in the course of this trial that more

5   or less embeds his name in the photo through the camera serial

6   number —— he had done the registration with Canon —— the

7   camera serial number on the camera that was taken from his

8   home.

9          Now he's willing to admit that he took nude photos,

10  despite the fact that he told Special Agent Rothrock and

11  Detective Andy Byers "No, no, no other nude photos.  Yeah, I

12  did that nude gymnastics video, but no, there are no other

13  nude photos that I recall," despite the multiple nude photo

14  shoots of 86 pictures, over a hundred pictures.  He just does

15  not recall.

16         He takes responsibility after being —— having seen

17  these pictures in the July 2007 meeting when he was informed

18  that the Government would be likely going forward with the

19  prosecution.  That's when he flees to Mexico, and doesn't come

20  back until the Mexican government puts him on a plane, sends

21  him to Los Angeles where he's immediately re-arrested.

22         Mr. McKinley goes over the lascivious exhibition

23  definition.  Let's talk about that a little bit.  I just want

24  to be clear in case it was lost on you that sexually-explicit

25  conduct, the definition of that, it can include sexual

1  intercourse, but in this case, everyone agrees that one of the

2  definitions of sexually-explicit conduct is a lascivious

3  exhibition of the genitals or pubic area of any person, okay?

4  And that's what is at issue here.

5         Now, Miss Helart discussed with you that there will

6  be a number of factors that you can consider in determining

7  whether these images are, in fact, lascivious exhibition of

8  the pubic area of a minor.

9         Let's talk about some of those factors; whether the

10  focal point of the picture is the minor's or other person's

11  genitalia.  What is the purpose of the picture?  What is the

12  picture attempting to depict?

13         Again, I direct you to Government's Exhibit 1.  What

14  other purpose in taking those photos in Government's Exhibit

15  1, the Sponge Bob series as we've called it, what you've seen

16  as the whole thing in Government's Exhibit 1B.  What other

17  purpose than for the depiction of his daughter Jane Doe 1's

18  vagina, her genital or pubic area.  What other purpose can

19  there be?

20         Now, the defendant comes in and he says, I suppose,

21  if you believe him, that "Well, that was actually a

22  wider-range photo."  So I suppose he must be asking you to

23  believe that he was just taking a nice photo of a room in his

24  house, and my goodness, there in the image is also his

25  daughter who happens to have her legs open exposing her

CLOSING REBUTTAL ARGUMENT / COOK    450

1   genital or pubic area.  What a big accident or mistake.

2   Whoops.  That's ridiculous.  We know what his purpose was.

3          And that's particularly the case when we hear that

4   between 2001 and 2004, he engaged in inappropriate sexual

5   touching with Jane Doe 1.  Why is that relevant?  Mr. McKinley

6   wants to say it's not relevant at all.  It's relevant because

7   it puts squarely in front of you what his intent was in taking

8   these pictures; puts squarely in front of you that the focal

9   point of these images was intended to be Jane Doe 1's

10  genitalia.

11         One factor that you may consider is whether the

12  setting or pose is customarily associated with sexual

13  activity.  Again, this is a bedroom.  He had Jane Doe 1

14  pretend like she slept in the nude and was just getting up.

15  Pretend like she slept in the nude and was just getting up in

16  her bedroom, and the bathroom of the home.

17         Now, remember, this is just one factor.  It

18  doesn't -- as you'll hear in the instructions, all these

19  factors don't need to be met.  I suppose in the gymnastics

20  scene, one does not normally associate sex with that, but even

21  with that picture, consider the fact that again, the focal

22  point of the picture, pictures that the defendant did not

23  delete, that found their way to Canada, the focal point of

24  that picture, those pictures, is again the genital or pubic

25  area of both of his daughters in Counts 2 and 4.

CLOSING REBUTTAL ARGUMENT / COOK    451

1       One of the factors is whether the minor is fully or

2  partially nude.  You heard plenty of testimony of these

3  images, fully nude, partially nude.  That's what's happening

4  in all of these images.

5       You may recall as I was questioning the defendant

6  yesterday that I asked him the question of whether the images

7  in the Sponge Bob series, as we call it, depicted sexual

8  coyness or a willingness to engage in sexual activity.  What

9  that question was anticipating, ladies and gentlemen, is one

10  of the factors that you can consider in determining whether

11  that is -- whether the image is, in fact, a lascivious

12  exhibition of the genital or pubic area.  It's just one of the

13  factors, whether sexual coyness or willingness to engage in

14  sexual activity is suggested.

15       I point to you again to Government's Exhibit 1B.

16  Review these photos.  Take a look at them.  Take a look at the

17  blanket going up and down in different positions at least five

18  times, resituated for different photos, Jane Doe 1 looking

19  back over her shoulder, looking down at her breast, looking

20  down at her genital or pubic area.  Whether we like to

21  acknowledge the horrific fact that some people would view that

22  as sexual, that's entirely what the intent of these pictures

23  was.  It's just clear.  It may be horrific to acknowledge

24  that, but to look at these pictures, you can really reach no

25  other conclusion.

CLOSING REBUTTAL ARGUMENT / COOK    452

1          Whether the visual depiction -- here's another

2   factor, whether the visual depiction is intended or designed

3   to elicit a sexual response in the viewer.  The argument is

4   similar, but I think what's striking about that factor is you

5   need to keep in mind Mr. Russell's commercial motive in doing

6   these nude photo shoots.  As Jane Doe 1 tells us, they're

7   special people who would pay more.

8          Now, are these special people who are gymnastics

9   fans or special people who really like Sponge Bob?  Maybe

10  special people who really think showers are really cool.  No.

11  Look at these pictures.  The special people who would pay more

12  have a sexual interest in children.  It's designed to elicit a

13  sexual response from those sorts of people.

14         Speaking of the gym, first of all, this is not

15  ancient times, and these are children, not some sort of

16  Olympians who are taking part in ancient games of gymnastics.

17         Mr. Russell took them to the gymnasium.  He's the

18  adult here, remember.  He's the adult.  They're 10 and 12

19  years old.  He takes them to the gymnasium where he has a key,

20  closes the door, puts a blanket over the glass door, directs

21  photos, has both a video camera and a regular still shot

22  camera, takes video, stops every now and then and takes still

23  pictures.  Tells Jane Doe 1 "Jane Doe 1, go do a handstand up

24  against the wall there," and as she's doing that, we see the

25  image in Count 2 of her getting ready to do a handstand with

CLOSING REBUTTAL ARGUMENT / COOK    453

1  her genital and pubic area fully exposed to the camera.  Who

2  took that picture?  Mr. Russell.  Who kept that picture?

3  Mr. Russell.  Who downloaded it to a CD, as he said?

4  Mr. Russell.

5          We have images in Count 4 of Jane Doe 2.  Again, who

6  took her there?  Mr. Russell.  Who directed her to the special

7  dance room apart from the gymnasium?  Mr. Russell.  Who

8  directed her to do a ballet move in which she raised a leg

9  fully exposing her genital and pubic area for the picture that

10 he took and he kept?  Mr. Russell.

11         Mr. McKinley brings up Jane Doe 1's testimony about

12 this inappropriate sexual touching that her father did to her

13 between 2001 and 2004.  He suggests that -- I suppose, that

14 she misremembers.  This is not an easy thing for a young woman

15 to talk about, particularly so it would not be an easy thing

16 for a 12-year-old to talk about, a 13, 14, 15-year-old to talk

17 about.  It's not an easy thing for anyone to talk about.

18         Keep in mind that this is her father.  Her father.

19 Keep in mind that this is the man who manipulated her into

20 doing nude photo shoots, who manipulated her into being naked,

21 who taught her to keep secrets that may harm him.  And now, as

22 she is some years between that manipulation and the present

23 day as she begins to enter adulthood and make her own

24 decisions, to grow into the young woman that she's becoming,

25 she's taken that step of courage to tell the Government, and

CLOSING REBUTTAL ARGUMENT / COOK    454

1  then to tell you what that man did to her, what that man did

2  to her in the time context of when he produced these images of

3  her that are child pornography that are lascivious exhibition

4  of the genitals and pubic area.

5          Mr. McKinley says that surely if the Government had

6  evidence that the websites of Jane Doe 1 or Jane Doe 2 contain

7  nude photos, that we would bring that to your attention.

8  Well, he's right, we would, and we did through Jane Doe 2's

9  testimony.  Keep in mind that this is a photo website.

10 Pictures can be put up, taken back down, different photos

11 cycled through, and also, that these websites were taken down

12 before law enforcement had the opportunity to review them --

13 before law enforcement had the opportunity to review them.

14         Now Carmel P.D. tried.  Apparently, they weren't

15 able to get in.  But we gave you Jane Doe 2's testimony.

16         THE COURT:  Two minutes, Counsel.

17         MR. COOK:  Thank you.  Let's just talk about what

18 the bottom line is here.  This was a multi-stage crime.

19 Mr. Russell set the scene.  He staged the pictures.  He told

20 Jane Doe 1 and Jane Doe 2 what to do.  He caused the pictures

21 to exist.  He told them what to wear and what not to wear.  He

22 controlled the timing.  He decided when to take the picture.

23 He decided to keep the picture.  He decided to make copies of

24 them.  And he decided to tell them to keep it a secret.

25         Well, that secret has been revealed during the

CLOSING REBUTTAL ARGUMENT / COOK    455

1  course of this trial, ladies and gentlemen.  It's now come

2  into the light of day.  It's now coming before you, and you

3  are making a decision about whether Counts 1, 2, 3 and 4, the

4  images charged there, are a lascivious exhibition of the

5  genital or pubic area, and therefore sexually-explicit

6  conduct.

7       I would submit to you that the answer to that is

8  quite clear.  I thank you very much for your service.  The

9  Government does request a guilty verdict in this case, and

10  again, I thank you.

11       Thank you, Your Honor.

12       THE COURT:  Thank you, Mr. Cook.

13       Ladies and gentlemen, we're going to take a noon

14  recess before I give you my instructions to guide you in your

15  deliberations.  So even though we've moved through the

16  substantial portions of the trial, it's not finally packaged

17  up for you and ready to give to you for you to do your work

18  and to come to a verdict with respect to the issues that are

19  going to be submitted to you.

20       We'll take our noon recess.  So make a special

21  effort now, even though we're pretty far into the trial to

22  leave the matter here.  You don't have to decide it.  You

23  don't have to mull it over.  You certainly should refrain from

24  discussing it.  Don't let anyone discuss it with you.  Don't

25  form any opinions or conclusions with respect to any of these

456

1   matters.  I tell you the truth, you need the Court's

2   instructions on the law to know how to process this, and you

3   don't have that yet.  So there's an important step yet to be

4   accomplished.

5          We'll reconvene at 1:20.  1:20.  I have an

6   appointment over the lunch hour that requires my judicial

7   attention.  So I'll be doing that, but I'll be back and ready

8   to go at 1:20.  Will you please also be here at 1:20 ready to

9   go.

10         Have a nice lunch break.  We'll see you afterwards.

11  The case will be submitted to you this afternoon.  You may

12  rise and depart.

13                        (Jury excused)

14                        (Recess taken.)

15

16

17

18

19

20

21

22

23

24

25

**A F T E R N O O N   S E S S I O N**

(Open court, jury present)

THE COURT:  You may be seated.

Good afternoon.  Ladies and gentlemen, I'm about to give you the Court's instructions on the law to guide you in your deliberations.  Let me speak to you informally about this part of the proceeding so you can understand what we're doing and why we're doing it, the importance of what we're doing.

If you think of some other activities that you want to embark upon, some project that you're undertaking in your everyday lives and activities, when in order to get through the project successfully, you follow instructions, there are all kinds of examples that probably come to mind when I put that thought out there for you to consider.

If you are -- if you're a carpenter or if you work in a workshop and you want to put together something, like, let's say, what would you put together this time of year?  A bicycle perhaps for some kid you know who's going to be able to ride it this spring and this summer and enjoy it.  In my experience, the bicycles that you buy come knocked down in a box.

So you have to take them home and pull them out of the box, and they're in pieces and parts, and the bolts and nuts and washers and so forth are in little plastic pieces, bags, sealed up, and you lay it all out on the basement floor

1   or the garage floor so you see what you have.  And then there

2   comes a set of instructions.  And you can intuit those

3   instructions, and run whatever risks you want to by doing it

4   that way, or you can follow them because in a methodical way,

5   they'll take you through the process of constructing that

6   bicycle so that when it gets finished, when you're done with

7   the project, the handlebars are going the right way and the

8   pedals are on there and they work and so forth.  It works as a

9   bicycle.  That's what you wanted.

10          So you followed the instructions to get there.  Even

11  if you're able to intuit it, you're going through a mental

12  process.  If you're a cook, if you use a recipe, even if you

13  cook with a microwave, you get the step, step, step off the

14  box to tell you how long to microwave it, whether to take off

15  a cover, that sort of thing.

16          If you sew, you use a pattern, and you have to lay

17  it out on the fabric just so, and cut it just right so that

18  you get the movement of the fabric to work with the way you're

19  going to wear that item.

20          This is so common an experience in our everyday

21  lives that we even have an expression, don't we?  We say when

22  all else fails, what?  Read the instructions.

23          So what I'm going to give you are instructions to

24  guide you in this project that's about to be given to you for

25  you to consider and to ultimately move through in order to

1   reach a verdict.  Just as in all those other situations and

2   experiences you have a special language that goes with the

3   kitchen or the workshop or the sewing room, whatever, here you

4   have a special language.

5          One of the things the lawyers and I did early this

6   morning was go over these instructions that the Court has

7   drafted to make sure that they match up with the legal

8   principles and that we've told you about the principles of law

9   that apply to this case.

10         So you don't need to be put off by this even though

11  you're not lawyers just because you're not a lawyer.  We have

12  made a sincere effort to simplify the language and to tell

13  these principles to you in ways that you can understand, and

14  I'm confident that with appropriate attention, you can use

15  these for their intended purpose to guide you through the

16  process of deciding on a unanimous verdict.

17         So I'm telling you this so you won't be intimidated

18  by this part of the process or put off by it, that you'll see

19  these as a useful tool and you'll use them.  When you get to

20  place in your deliberations, if you're stuck or if you're

21  stumped, you're not sure what to do next or what to make of

22  certain factors or evidence, that sort of thing, go back to

23  the instructions just like you would on any other project.

24  Give yourself a running start and they'll carry you through to

25  the desired end, whatever that is as you've decided it.

460

1          So I'm going to read them to you now.  I'm also

2    going to project them on the monitors because what we know

3    about ourselves and each other is that some of us take in this

4    information better if we read it for ourselves, and some of us

5    take it in better if we hear it, if it's read to you.  So this

6    will hopefully maximize your absorption, and you can listen

7    and read along as I read them to you.

8          That's the title of the case (indicating).  That's

9    just the cover page.  That's how we carry the case, and the

10   way we identify it in the Court's records.  And you can see it

11   says the title of the case and then Jury Instructions.  So

12   we'll go to the first instruction.

13

14

15

16

17

18

19

20

21

22

23

24

25

461

1          JURY INSTRUCTIONS

2

3   INSTRUCTION NO. 1

4

5   Members of the Jury:

6          In accordance with my duty as judge of this court, I

7   will now submit this case to you for your verdict and will

8   instruct you upon the rules of law that should guide you in

9   reaching your conclusion.

10          It will be your duty as jurors to follow the law as

11   the court states it to you in these instructions.  It is the

12   duty of the jury to determine the facts of the case, and for

13   that purpose, to consider and weigh the evidence.  Do so

14   without bias or prejudice against, or sympathy for, any party.

15   You are to perform your final duty in an attitude of complete

16   fairness and impartiality.

17          The fact that the prosecution is brought in the name

18   of the United States of America entitles the government to no

19   greater consideration than that accorded to any other party to

20   a litigation.  By the same token, it is entitled to no less

21   consideration.  All parties, whether government or

22   individuals, stand as equals at the bar of justice.

23          The case is important to the government, for the

24   enforcement of criminal laws is a matter of concern to the

25   community.  It is equally important to the defendant, who is

1   charged with serious crimes.

2          The court by these instructions will endeavor to

3   explain to you the issues; to notice the positions taken by

4   the parties; to explain the principles of evidence and their

5   application so far as the case may require it; and to declare

6   what rule or rules of law will be applicable to any state of

7   facts which may be found in the evidence.  You will have a

8   written copy of all of these instructions when you deliberate

9   on your verdict, and you should read them when necessary in

10  your deliberation for some of you may not remember them from

11  the court's oral recitation.  You must follow the Court's

12  instructions on the law whether you agree with them or not.

13

14  INSTRUCTION NO. 2

15         If in these instructions any rule, direction or idea

16  be stated in varying ways, no emphasis thereon is intended by

17  me and none must be inferred by you.  For that reason you are

18  not to single out any certain sentence or any individual point

19  or instruction and ignore the others, but you are to consider

20  all the instructions, as a whole, and you are to regard each

21  instruction in the light of all the others.

22

23  INSTRUCTION NO. 3

24         This is a criminal case brought by the United States

25  of America by way of a grand jury indictment.  The indictment

1   in this case is the formal method of accusing the defendant of

2   an offense and placing him on trial.  It is not evidence

3   against the defendant and does not create any inference of

4   guilt.  The jury must not be prejudiced against the defendant

5   because an indictment has been returned against him, nor

6   because he has been arrested and placed on trial.

7           The defendant, Dale Russell, has pled not guilty to

8   the charges.

9                              INDICTMENT

10  Counts 1-4

11  (Production of Child Pornography)

12  The Grand Jury charges that:

13          In or between approximately 2004, within the

14  Southern District of Indiana and elsewhere, DALE RUSSELL, the

15  defendant herein, did employ, use, persuade, induce, entice

16  and coerce any minor to engage in sexually explicit conduct

17  for the purpose of producing any visual depiction of such

18  conduct, and the defendant knew and had reason to know that

19  such visual depiction would be transported in interstate or

20  foreign commerce or mailed, or that such visual depiction was

21  produced using materials that had been mailed, shipped, or

22  transported in interstate or foreign commerce by any means,

23  including by computer, or such visual depiction has actually

24  been transported in interstate or foreign commerce or mailed,

25  to wit: on the occasions indicated below, DALE RUSSELL

1  employed, used, persuaded, induced, enticed or coerced Jane

2  Doe 1 (born in 1992), and Jane Doe 2 (born in 1994), to engage

3  in sexually-explicit conduct for the purpose of producing a

4  visual depiction of such conduct as defined in Title 18,

5  United States Code, Section 2256(2), and did aid and abet such

6  conduct, for the purpose of producing images of Jane Doe 1 and

7  Jane Doe 2 as follows:

8           Count 1, I'll read across the box;

9           The Date:  Approximately in or about 2004;

10          General Description:  Jane Doe 1 depicted with

11 "Sponge Bob" themed items;

12          File:  And there are listed there, as you can read

13 them and as they are in the indictment and in these

14 instructions, the nine .jpg references.

15          Is that acceptable to parties if I don't read all

16 those .jpgs?

17          MR. McKINLEY:  That's fine.

18          MR. COOK:  Yes, Your Honor.

19          THE COURT:  Moving down to Count 2; having occurred

20 approximately in or about 2004.

21          The General Description is Jane Doe 1 in gym near

22 red mats.

23          And the file that's referenced there, as you can

24 see, is another .jpg reference.

25          Count 3 is alleged to have occurred approximately in

1    or about 2004.

2            The General Description is Jane Doe 2 in bathroom

3    with white towel.

4            And the two .jpg files are listed there, as you can

5    see, and as are contained in these instructions.

6            And Count 4 also occurred approximately in or about

7    2004.

8            The General Description is Jane Doe 2 in gym near

9    bar.

10           And the .jpg reference is listed there as well.

11           Each of which, meaning these offenses, is a separate

12   violation of Title 18, United States Code, Section 2251(a) and

13   (d) and 2.

14           Signed by the United States Attorney, and the

15   Assistant United States Attorney, Miss Helart.

16

17   INSTRUCTION NO. 4

18           The defendant is presumed to be innocent of the

19   charges against him.  This presumption remains with the

20   defendant throughout every stage of the trial and during your

21   deliberations on the verdict, and is not overcome unless from

22   all the evidence in the case you are convinced beyond a

23   reasonable doubt that the defendant is guilty as charged.

24           The government has the burden of proving the guilt

25   of the defendant beyond a reasonable doubt, and this burden

466

1  remains on the government throughout the case.  A defendant is

2  never required to prove his innocence or to produce any

3  evidence at all.

4          In these instructions you will sometimes find the

5  phrase "if you find."  Wherever it occurs, such phrase means

6  "if you find beyond a reasonable doubt."

7

8  INSTRUCTION NO. 5

9          The indictment charges that the offense was

10  committed "in or about" or "in or between" certain dates.  The

11  evidence need not establish with certainty the exact dates of

12  the alleged offense.  It is sufficient if the evidence in the

13  case establishes beyond a reasonable doubt that the offenses

14  were committed on dates reasonably near the alleged dates.

15          It is necessary that every essential element of the

16  crimes charged in the Indictment in this case be proved by

17  evidence beyond a reasonable doubt, but it is not necessary

18  that each subsidiary or non-essential fact be proved beyond a

19  reasonable doubt.

20

21  INSTRUCTION NO.    6

22          The indictment charges, in Counts 1 through 4, the

23  defendant with the crime of sexual exploitation of a child, in

24  violation of Title 18, United States Code, Section 2251(a).

25  At all relevant times alleged in the Indictment, the following

1  statute of the United States was in effect:

2  Title 18, United States Code, Section 2251(a) provides, in

3  pertinent part, as follows:

4           (a) Any person who employs, uses, persuades,

5  induces, entices, or coerces any minor to engage in . . . any

6  sexually explicit conduct for the purpose of producing any

7  visual depiction of such conduct . . . shall be punished [in a

8  manner provided by the statute], if such person knows or has

9  reason to know that such visual depiction will be transported

10 or transmitted using any means or facility of interstate or

11 foreign commerce or in or affecting interstate or foreign

12 commerce or mailed, if that visual depiction was produced or

13 transmitted using materials that have been mailed, shipped, or

14 transported in or affecting interstate or foreign commerce by

15 any means, including by computer, or if such visual depiction

16 has actually been transported or transmitted using any means

17 or facility of interstate or foreign commerce or in or

18 affecting interstate or foreign commerce or mailed.

19

20 INSTRUCTION NO. 7

21          To sustain the charge of sexual exploitation of a

22 child, as charged in Counts 1 through 4, the government must

23 prove the following propositions:

24          First:  At the time the visual depictions were

25 produced, Jane Doe 1 (Counts 1 and 2) and Jane Doe 2 (Counts 3

1   and 4) were each under the age of eighteen years;

2          Second:  That the defendant employed, used,

3   persuaded, induced, enticed, or coerced Jane Doe 1 (Counts 1

4   and 2) and Jane Doe 2 (Counts 3 and 4) to take part in

5   sexually explicit conduct for the purpose of producing a

6   visual depiction of such conduct; and

7          Third:  Either that the visual depiction was

8   produced using materials that had been shipped or transported

9   in interstate or foreign commerce, or that the defendant knew

10  or had reason to know that such visual depiction would be

11  transported in interstate or foreign commerce or mailed, or

12  that the visual depiction was actually transported in

13  interstate commerce across state lines or in foreign commerce.

14         The parties have stipulated that, at the time the

15  visual depictions of Jane Doe 1 and Jane Doe 2 were made, each

16  girl was under the age of eighteen years, so you may regard

17  the first element above as proven as to each count.

18         The parties have also stipulated that the visual

19  images were produced using materials that had been shipped or

20  transported in interstate or foreign commerce, and that the

21  visual depictions were actually transported across state lines

22  or in foreign commerce, so you may also regard the third

23  element above as proven as to each count.

24         If you find from your consideration of all the

25  evidence that the second element has been proved beyond a

1 reasonable doubt, then you should find the defendant guilty.

2 If, on the other hand, you find from your consideration of all

3 the evidence that the second element has not been proved

4 beyond a reasonable doubt, then you should find the defendant

5 not guilty.

6

7 INSTRUCTION NO. 8

8        With regard to the second element in each count, the

9 government has the burden of establishing beyond a reasonable

10 doubt that the defendant used, persuaded, induced, enticed, or

11 coerced a minor to engage in sexually explicit conduct, and

12 did so for the purpose of producing a visual depiction of such

13 conduct.

14        The term "sexually explicit conduct" is defined

15 under the applicable statute as:

16        (A) actual or simulated sexual intercourse,

17 including genital-genital, oral-genital, anal-genital, or

18 oral-anal, whether between persons of the same or opposite

19 sex;

20        (B) bestiality;

21        (C) masturbation;

22        (D) sadistic or masochistic abuse; or

23        (E) lascivious exhibition of the genitals or pubic

24 area of any person.

25        In this case, only subparagraph (E) of the

1 definition of sexually explicit conduct is at issue.  In

2 applying the portion of the definition referring to

3 "lascivious exhibition of the genitals or pubic area of any

4 person," there are a number of factors you may consider.

5 Those factors include but are not limited to: (1) whether the

6 focal point of the picture is the minor's or other person's

7 genitalia; (2) whether the setting or pose is customarily

8 associated with sexual activity; (3) whether the minor's pose

9 is unnatural given his or her age; (4) whether the minor is

10 fully or partially nude; (5) whether sexual coyness or

11 willingness to engage in sexual activity is suggested; and (6)

12 whether the visual depiction is intended or designed to elicit

13 a sexual response in the viewer.

14         The government is not required to prove that each of

15 these factors is present.  The importance which you give to

16 any one factor is up to you to decide.  The question is

17 whether there is a visual depiction that amounts to a

18 "lascivious exhibition of the genitals or pubic area" of a

19 person.

20         The word "lascivious" is defined as "of or marked by

21 lust" or "exciting sexual desires."  The term "lascivious

22 exhibition" means a depiction which displays or brings to view

23 to attract notice to the genitals or pubic area of children in

24 order to excite lustfulness or sexual stimulation in the

25 viewer.  Not every exposure of the genitals or pubic area of

1  children constitutes a lascivious exhibition.

2         In deciding whether the government has proven that

3  the defendant acted for the purpose of producing a visual

4  depiction of sexually explicit conduct, you may consider all

5  of the evidence concerning the defendant's conduct.

6

7  INSTRUCTION NO. 9

8         When used in these instructions, the word "minor"

9  refers to any person under the age of eighteen years.  A minor

10 is "used" to produce a visual depiction of sexually explicit

11 conduct if the minor serves as a subject of the depiction.

12        The term "producing" means producing, directing,

13 manufacturing, issuing, publishing, or advertising.

14 In this case, "visual depiction" includes photographs,

15 pictures, film, undeveloped film and videotape, and data

16 stored on computer disk or by electronic means which is

17 capable of conversion into a visual image, whether or not

18 stored in a permanent format.

19

20 INSTRUCTION NO. 10

21        A number of pieces of evidence have been introduced

22 relevant to each of Counts 1 through 4, including a number of

23 visual depictions of Jane Doe 1 and Jane Doe 2.

24        For Count 1, the only images you are called on to

25 determine whether they amount to visual depictions of

1  "sexually explicit conduct" are labeled as Exhibit 1, pages 2

2  through 10.  The government is not required to prove that all

3  nine exhibits are visual depictions of sexually explicit

4  conduct.  However, to find that the government has met its

5  burden of proof on the second element for producing visual

6  depictions of sexually explicit conduct, all twelve jurors

7  would need to agree that at least one of the nine is a visual

8  depiction of sexually explicit conduct, and all jurors would

9  need to agree that the same image amounts to a visual

10 depiction of sexually explicit conduct.

11      For Count 2, the only image that you are called on

12 to determine whether it amounts to a visual depiction of

13 "sexually explicit conduct," is labeled as Exhibit 2, page 2.

14 To find that the government has met its burden of proof on the

15 second element for producing visual depictions of sexually

16 explicit conduct, all twelve jurors would need to agree that

17 Exhibit 2, page 2, is a visual depiction of sexually explicit

18 conduct.

19      For Count 3, the only images that you are called on

20 to determine whether they amount to visual depictions of

21 "sexually explicit conduct," are labeled as Exhibit 3, pages 2

22 through 3.  The government is not required to prove that both

23 exhibits are visual depictions of sexually explicit conduct.

24 However, to find that the government has met its burden of

25 proof on the second element for producing visual depictions of

sexually explicit conduct, all twelve jurors would need to agree that at least one of the two is a visual depiction of sexually explicit conduct, and all jurors would need to agree that the same image amounts to a visual depiction of sexually explicit conduct.

For Count 4, the only image that you are called on to determine whether it amounts to a visual depiction of "sexually explicit conduct," is labeled as Exhibit 4, page 2. To find that the government has met its burden of proof on the second element for producing visual depictions of sexually explicit conduct, all twelve jurors would need to agree that Exhibit 4, page 2, is a visual depiction of sexually explicit conduct.


INSTRUCTION NO. 11

When the word "knowingly" or the phrase "the defendant knew" is used in these instructions, it means that the defendant realized what he was doing and was aware of the nature of his conduct, and did not act through ignorance, mistake or accident.  Knowledge may be proved by the defendant's conduct, and by all the facts and circumstances surrounding the case.


INSTRUCTION NO. 12

The evidence consists of the sworn testimony of the

474

1   witnesses, the exhibits received in evidence, and stipulated

2   or admitted or judicially noticed facts, if any.  Opening

3   statements of counsel are for the purpose of acquainting you

4   in advance with the facts counsel expect the evidence to show.

5   Closing arguments of counsel are for the purpose of discussing

6   the evidence.  Statements and arguments of counsel are not

7   evidence unless made as an admission or stipulation of fact.

8   A stipulation is an agreement between both sides that certain

9   facts are true.

10          You are to consider only the evidence received in

11   this case.  You should consider this evidence in the light of

12   your own observations and experiences in life.  You may draw

13   such reasonable inferences from facts that you find to be

14   proved.  An inference is a deduction or conclusion dictated by

15   reason and common sense.

16          During the course of trial it often becomes the duty

17   of counsel to make objections and for me to rule on them in

18   accordance with the law.  The fact that counsel made

19   objections should not influence you in any way.  You are to

20   disregard any evidence as to which I sustained an objection or

21   which I ordered stricken.  You should not be concerned with

22   the reason the court decided that certain evidence should or

23   should not properly be admitted.

24          You must completely disregard any press, television

25   or radio reports that you may have read, seen or heard.  Such

475

1  reports are not evidence; therefore, you must not be

2  influenced in any manner whatsoever by such publicity.

3

4  INSTRUCTION NO. 13

5          There are, generally speaking, two types of

6  evidence.  One is direct evidence--such as the testimony of an

7  eyewitness.  The other is indirect or circumstantial

8  evidence -- that is, proof of a certain fact or facts from

9  which you reasonably may deduce another fact.  In other words,

10  circumstantial evidence is simply that situation in which the

11  proof of one fact also tends to prove another, according to

12  the common experience of mankind.

13          The law makes no distinction between the weight to

14  be given either direct or circumstantial evidence.  You should

15  decide how much weight to give to any evidence.  All the

16  evidence in the case, including the circumstantial evidence,

17  should be considered by you in reaching your verdict.

18

19  INSTRUCTION NO. 14

20          You are the sole judges of the credibility of the

21  witnesses, and of the weight to be given to the testimony of

22  each of them.  In considering the testimony of any witness,

23  you may take into account his or her intelligence, ability and

24  opportunity to observe, memory, manner while testifying, any

25  interest, bias or prejudice he or she may have, and the

476

1  reasonableness of his or her testimony considered in the light

2  of all the evidence in the case.

3          You may find the testimony of one witness or a few

4  witnesses more persuasive than the testimony of a larger

5  number.  You need not accept the testimony of the larger

6  number of witnesses.

7

8  INSTRUCTION NO. 15

9          Inconsistencies or discrepancies in the testimony of

10  a witness or between the testimony of different witnesses, may

11  or may not cause you to discredit such testimony.  Two or more

12  persons witnessing an incident or a transaction may see or

13  hear it differently; an innocent misrecollection, like failure

14  of recollection, is not an uncommon experience.  In weighing

15  the effect of a discrepancy, always consider whether it

16  pertains to a matter of importance or an unimportant detail,

17  and whether the discrepancy results from innocent error or

18  intentional falsehood.

19          It is proper for an attorney to interview any

20  witness in preparation for trial.

21

22  INSTRUCTION NO. 16

23          You have heard a witness give opinions about matters

24  requiring special knowledge or skill.  You should judge this

25  testimony in the same way that you judge the testimony of any

1  other witness.  The fact that such a person has given an

2  opinion does not mean that you are required to accept it.

3  Give the testimony whatever weight you think it deserves,

4  considering the reasons given for the opinion, the witness's

5  qualifications, and all of the other evidence in the case.

6

7  INSTRUCTION NO. 17

8           The testimony of a law enforcement official is

9  neither more nor less entitled to belief than any other

10  witness simply because the witness holds that position.  Law

11  enforcement officials are to be evaluated as to their

12  credibility in all respects similar to all other witnesses,

13  without special weight being given to their testimony or the

14  weight of their testimony diminished simply because they are

15  employed as law enforcement officials.

16

17  INSTRUCTION NO. 18

18           You have heard evidence of wrongful acts of the

19  defendant other than those charged in the indictment.  You may

20  consider this evidence only on issues of motive, intent,

21  identity, or absence of mistake or accident in reference to

22  the offenses charged in the indictment.  You must consider

23  this evidence only for these limited purposes.

24

25  INSTRUCTION NO. 19

1              A statement made by any witness before trial that is

2      inconsistent with the witness's testimony here in court may be

3      used by you as evidence of the truth of the matters contained

4      in it, and also in deciding the truthfulness and accuracy of

5      the witness's testimony in this trial.

6

7      INSTRUCTION NO. 20

8              You have received evidence of a statement said to be

9      made by the defendant to law enforcement.  You must decide

10     whether the defendant did in fact make the statement.  If you

11     find that the defendant did make the statement, then you must

12     decide what weight, if any, you feel the statement deserves.

13     In making this decision, you should consider all matters in

14     evidence having to do with the statement, including those

15     concerning the defendant himself and the circumstances under

16     which the statement was made.

17

18     INSTRUCTION NO. 21

19             A defendant has an absolute right not to testify.

20     Since the defendant has chosen to testify, you must evaluate

21     his testimony in all respects as you would any other witness.

22

23     INSTRUCTION NO. 22

24             You have heard testimony regarding the

25     identification of the defendant.  Identification testimony is

1  an expression of belief or impression by the witness.  You

2  should consider whether, or to what extent, the witness had

3  the ability and the opportunity to observe the person at the

4  time of the offense and to make a reliable identification

5  later.  You should also consider the circumstances under which

6  the witness later made the identification.

7         The government has the burden of proving beyond a

8  reasonable doubt that the defendant was the person who

9  committed the crime(s) charged.

10

11 INSTRUCTION NO. 23

12        The defendant's ignorance or mistake of the law is

13 not a defense.

14

15 INSTRUCTION NO. 24

16        The intentional flight by a defendant immediately

17 after he is accused of a crime that has been committed is not,

18 of course, sufficient in itself to establish his guilt; but it

19 is a fact which, if proved, may be considered by the jury in

20 light of all the other evidence in the case in determining

21 guilt or innocence.

22

23 INSTRUCTION NO. 25

24        Each count of the indictment charges the defendant

25 with having committed a separate offense.

1        Each count and the evidence relating to it should be

2   considered separately, and a separate verdict should be

3   returned as to each count.  Your verdict of guilty or not

4   guilty of an offense charged in one count should not control

5   your decision as to any other count.

6

7   INSTRUCTION NO. 26

8        I instruct you that the matter of the penalty to be

9   imposed or the disposition to be made of this case if a

10  verdict of guilty is reached is not before you, the jury, but

11  that this is a matter for the court to determine or fix.

12

13  INSTRUCTION NO. 27

14       In determining your verdict, you may consider your

15  experiences as persons of ordinary affairs, and you may

16  consider the evidence as you have heard and seen it in light

17  of your experience.

18       In other words, you will retire to your jury room

19  armed, not only with the evidence, but also with your

20  experiences as men and women of ordinary affairs.

21

22  INSTRUCTION NO. 28

23       The verdict must represent the considered judgment

24  of each juror.  Your verdict, whether it be guilty or not

25  guilty, must be unanimous.

1          You should make every reasonable effort to reach a

2   verdict.  In doing so, you should consult with one another,

3   express your own views, and listen to the opinions of your

4   fellow jurors.  Discuss your differences with an open mind.

5   Do not hesitate to re-examine your own views and change your

6   opinion if you come to believe it is wrong.  But you should

7   not surrender your honest beliefs about the weight or effect

8   of evidence solely because of the opinions of your fellow

9   jurors or for the purpose of returning a unanimous verdict.

10  The twelve of you should give fair and equal consideration to

11  all the evidence and deliberate with the goal of reaching an

12  agreement which is consistent with the individual judgment of

13  each juror.

14          You are impartial judges of the facts.  Your sole

15  interest is to determine whether the government has proved its

16  case beyond a reasonable doubt.

17

18  INSTRUCTION NO. 29

19          Upon retiring to the jury room, select one of your

20  number to preside over your deliberations.  I suggest that the

21  person you select be someone who will be a good discussion

22  leader, is fair in encouraging discussions among all jurors,

23  is a good listener and speaker, will be able to keep

24  deliberations focused on the evidence and the law and will

25  notify the court when a verdict has been reached.  Despite

1  these responsibilities, I remind you that the presiding

2  juror's opinion is not more important than any other juror's

3  opinion.  All count equally.

4          There are no set rules on how best to deliberate,

5  but I suggest that after you have gotten reacquainted with one

6  another, you adopt a process that will allow and encourage all

7  to participate, that you show respect to each other, and that

8  you review all the evidence, both exhibits and witness'

9  testimony, in light of my instructions on the law. After full

10 discussions, votes should be taken on the charge at issue, and

11 when a unanimous decision is reached, record that decision on

12 the verdict form, which has been prepared for you.

13                    [Form of verdict read.]

14         Take this form to the jury room and, when you have

15 reached unanimous agreement on the verdict, your presiding

16 juror will fill in, date, and sign the form.

17

18 INSTRUCTION NO. 30

19         During your deliberations, you must not communicate

20 with or provide any information to anyone by any means about

21 this case.  You may not use any electronic device or media,

22 such as a telephone, cell phone, smart phone, iPhone,

23 Blackberry, or computer; the Internet, any Internet service,

24 or any text or instant messaging service; or any Internet chat

25 room, blog, or website, such as Facebook, MySpace, LinkedIn,

1   YouTube, or Twitter, to communicate to anyone any information

2   about this case or to conduct any research about this case

3   until I accept your verdict.

4          I do not anticipate that you will need to

5   communicate with me during your deliberations, and, in any

6   event, after the case is submitted to you, the assistance that

7   I am able to provide to you is extremely limited.  I have no

8   additional evidence or instructions to give you; you have now

9   all that is appropriate and available for you to reach a

10  verdict.  Nonetheless, if you do feel a need to communicate

11  with me, the only proper way is in writing, signed by the

12  presiding juror, or if he or she is unwilling to do so, by

13  some other juror, and given to the bailiff.  The bailiff will

14  then communicate with me, if necessary.

15         That completes the Court's instructions.  As I

16  indicated to you, we'll batch them up here, and I'm going to

17  correct a couple of typos I found, but no substantive changes.

18  We will send these up to your jury room along with the

19  exhibits and the verdict form.

20         At this point, let me turn to our Jurors 13 and 14,

21  ███████████ and ██████████████, and allow you to step aside at

22  this time.  We impaneled you as alternates for very good

23  reasons; namely, that if something had happened to any of our

24  jurors, we would have still had enough.  We wouldn't have had

25  to start over or run the risk that the trial might otherwise

484

1   end that way.

2          So I don't want you to feel like your being here was

3   for no good reason.  It was essential.  We know that the flu

4   season has been in full play, and colds and so forth, and we

5   know some jurors travel a distance.  So there are always

6   uncertainties when we impanel a jury.  And so for safety and

7   security, we add some extra jurors.

8          So you've done everything that we needed to have you

9   do and we expected you to do.  You've really done commendably,

10  and you've been here just like all the other jurors to do your

11  duty.  So I'll let you step aside with our thanks.  You can

12  step down now if you want to, and come around this way and go

13  out the door you're used to going out.  And you can wave to

14  your fellow jurors on the way by.

15         The Court will place you, ladies and gentlemen of

16  the jury, in the care, custody and control of the bailiffs.

17  Both of these are deputy marshals, and they are well skilled

18  in these procedures of being the bailiff.  I'll swear them

19  when they come forward.  Mr. Mowell is the first one and

20  Mr. Pappas is the second one.

21         Thank you for your service, gentlemen.  As soon as

22  I've impaneled them, they'll take responsibility for you,

23  ladies and gentlemen.  Probably just one at a time will be

24  positioned at the top of the stairs to respond to any needs

25  that you may want to entrust to them.  And then when you've

485

1   reached a verdict, you can notify the bailiff and the bailiff

2   will notify me.  So gentlemen, will you be sworn, please.

3                  (The bailiffs were sworn)

4                  Thank you again, both, very much for your service.

5                  Is there anything else?  Would you gentlemen just

6   step over that way so I can talk to Mr. McKinley as well as

7   Ms. Helart.

8                  Is there anything further that needs to be raised

9   with the jury before we recess the trial?

10                  MR. McKINLEY:  No, Your Honor.

11                  MS. HELART:  No.

12                  THE COURT:  Ladies and gentlemen, the case is

13   entrusted to you now.  We'll get the exhibits for you and send

14   them up along with these instructions and the verdict form as

15   we said.  And when all of that has arrived, you can commence

16   your deliberation.  We will be in recess and we will await

17   your verdict.  You may rise and depart.

18                  (Jury excused)

19                  THE COURT:  The jury's departed.  You may be seated.

20   Just a couple of words of instruction and request.  Would you

21   please check your list to make sure that only the

22   duly-admitted exhibits are gathered up, but certainly all of

23   the duly-admitted exhibits are gathered up and made ready for

24   transporting to the jury.

25                  As I said, I'm going to change the typo that's

1   found.  They were minor matters, changing a plural to singular

2   in one place and so forth.  I'll tell you where they are if

3   you want to know that.  Do you want to know?  In Instruction

4   6, line two at the end where it says "Sections 2251A."  It's

5   just one section, as you can see, so I'll delete the plural

6   reference.

7          On Instruction 22, the last line where it says

8   "Defendant was the person who committed the crime," I'm going

9   to put "(s) charged."

10          And on Instruction 24, we had an extra word in

11   there.  In the second line after the word "sufficient," the

12   word "to," T-O, should be deleted, which I intend to do so it

13   reads "sufficient in itself."

14          So those are the typos that I intend to -- the

15   corrections that I intend to make.  Does anybody have an issue

16   with any of those?

17          MR. McKINLEY:  No, Your Honor.

18          MS. HELART:  No.

19          THE COURT:  I know Miss Schneeman has collected your

20   cell phone numbers and so forth.  And you know the drill.

21   You've done this many times before.  But will you please first

22   leave your cell phone numbers or your cell phones on, so we

23   can reach you; and secondly, stay in reasonable proximity to

24   the court so that if there's a question, or when they have

25   returned, they have notified us they are ready to return their

1  verdict, we can get that done promptly without making everyone

2  wait too long and be in particular wait for any of you.

3         Miss Cook, it's my understanding that you need to

4  depart in order to attend to your teaching responsibilities?

5         MS. COOK:  Yes, Your Honor.

6         THE COURT:  That's fine.

7         MS. COOK:  Thank you.

8         THE COURT:  You go with the Court's thanks for your

9  service and our admiration.

10        MS. COOK:  Thank you, Judge.

11        THE COURT:  You're a fine lawyer, and you did an

12 excellent job, and I know Mr. McKinley is glad to have you as

13 a colleague assisting him.

14        So, is there anything further then that we need to

15 attend to before we recess?

16        Miss Helart?

17        MS. HELART:  Your Honor, the Government is going to

18 make a motion at the end of jury deliberations to substitute

19 photographs for Exhibits 10 and 16.  We'd like those -- and

20 10A.  And we'd like those exhibits to just go up to the jury

21 as they are, but then we will substitute photographs.

22        THE COURT:  That will be fine.  Any objection to

23 that?

24        MR. McKINLEY:  No, Your Honor.

25        THE COURT:  Anything further, Mr. McKinley, from the

488

1   defense?

2          MR. McKINLEY:  No, Your Honor, thank you.

3          THE COURT:  All right.  We will be in recess and we

4   will all await the jury's verdict.

5          (Jury deliberations begin.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

489

1                      (In Chambers)

2          THE COURT:  Are you both there?

3          MR. McKINLEY:  This is Jim McKinley, Your Honor.

4          MS. HELART:  This is Gayle.

5          THE COURT:  We're on the record, as of course we

6    must be.  We had a note handed to the bailiff just as things

7    were getting settled up there.  But I need to know,

8    Mr. McKinley, do you want to have the defendant participate in

9    this conversation or do you want to use our usual procedure of

10   apprising him of the note and the intended response and

11   getting his input?

12         MR. McKINLEY:  I would go with the latter, Your

13   Honor.  That's fine.  If I know what the question is, I could

14   run right over and talk to him.

15         THE COURT:  Okay.  The question is "Where is

16   Exhibit 11?"  Signed ▬▬▬▬▬, Juror No. 10.

17         I'm prepared to respond saying "Members of the jury,

18   I've received your note asking for Exhibit 11 to be sent up to

19   your jury room.  The Court determined that that exhibit would

20   not be admitted into evidence.  As I told you in my

21   instructions, I have given you all the exhibits that are

22   available to you."

23         I was going to lift that last line from the

24   instruction but I don't have the text right in front of me,

25   but that will be the ending line, and nothing more.  Just

1   signed "Judge Barker."

2         MR. McKINLEY:  Your Honor, I would have no objection

3   to that response.

4         MS. HELART:  From the Government, no objection

5   either.

6         THE COURT:  Okay.  Shall I wait till you get a

7   chance to show it to Mr. Russell?

8         MR. McKINLEY:  Yeah, I suppose we better do that,

9   Your Honor.

10        THE COURT:  Okay.  Would you come by chambers and

11  get it, please?

12        MR. McKINLEY:  I will get it right now.  I'm on my

13  way right now.  I'll be there within five minutes.

14        THE COURT:  Okay, very good.  Thank you.

15        MR. McKINLEY:  Thank you.

16        MS. HELART:  Thank you.

17          (Recess taken.  Jury deliberations continue.)

18

19

20

21

22

23

24

25

491

1                          **VERDICT**

2                   (Open court, jury present.)

3          THE COURT:  You may be seated.  Ladies and

4    gentlemen, I've been advised that you've reached a verdict.

5    Have you reached a verdict?  Yes?  █████████, are you the

6    presiding juror?

7          Okay, would you hand the verdict form, please, to

8    Miss Schneeman.  And Miss Schneeman, would you take your place

9    in the well of the court and read the verdict.

10         COURT CLERK:  "In the case of the United States of

11   America versus Dale Russell, Cause No. 1:08-CR-4, defendant

12   No. 1, the Verdict.

13         Count 1:  With respect to the charge in the

14   indictment of sexual exploitation of a child as alleged in

15   Count 1, we, the jury, unanimously find the defendant, Dale

16   Russell as follows:  guilty.

17         Count 2:  With respect to the charge of sexual

18   exploitation of a child as alleged in Count 2, we, the jury,

19   unanimously find the defendant, Dale Russell, as

20   follows:  guilty.

21         Count 3:  With respect to the charge in the

22   indictment of sexual exploitation of a child as alleged in

23   Count 3, we, the jury, unanimously find the defendant, Dale

24   Russell, as follows:  guilty.

25         Count 4:  With respect to the charge in the

1  indictment of sexual exploitation of a child as alleged in

2  Count 4, we, the jury, unanimously find the defendant, Dale

3  Russell, as follows:  Guilty."

4          The verdict is dated March 3, 2010, and is signed by

5  the presiding juror.

6          THE COURT:  Is the verdict, as Miss Schneeman has

7  read it, your verdict, ladies and gentlemen?

8          Would you show it to Mr. McKinley and he can show it

9  to Mr. Russell.

10          And will you show it to Ms. Helart and Mr. Cook,

11  please, and they can show it to their agent.

12          And now will you hand it to me, please.

13          Mr. McKinley, would you like me to poll the jury?

14          MR. McKINLEY:  Yes, I would, Your Honor.

15          THE COURT:  Ladies and gentlemen of the jury,

16  beginning with you, ████████, is this your verdict as it's

17  recorded here and has been read by Miss Schneeman?

18          A JUROR:  Yes.

19          THE COURT:  ██████, is this your verdict?

20          A JUROR:  Yes, it is.

21          THE COURT:  ████████, is this your verdict?

22          A JUROR:  Yes, Your Honor.

23          THE COURT:  █████████, is this your verdict?

24          A JUROR:  Yes, Your Honor.

25          THE COURT:  ████████, is this your verdict?

493

1          A JUROR:  Yes.

2          THE COURT:  ███████, is this your verdict?

3          A JUROR:  Yes, it is.

4          THE COURT:  ███████, is this your verdict?

5          A JUROR:  Yes, ma'am.

6          THE COURT:  ███████, is this your verdict?

7          A JUROR:  Yes, Your Honor.

8          THE COURT:  ███████, is this your verdict?

9          A JUROR:  Yes, Your Honor.

10         THE COURT:  ███████, is this your verdict?

11         A JUROR:  Yes, Your Honor.

12         THE COURT:  ███████, is this your verdict?

13         A JUROR:  Yes, Your Honor.

14         THE COURT:  ████████, is this your verdict?

15         A JUROR:  Yes, Your Honor.

16         THE COURT:  I have polled the jury and each has

17    answered in the affirmative that the verdict that's recorded

18    here and has been read reflects the individual judgment of

19    each juror, as well as their combined judgment.  And so I

20    accept the verdict.  I will receive it and cause a judgment to

21    be entered on the Court's docket in accordance with this

22    verdict.

23         Ladies and gentlemen, let me speak a word of

24    appreciation to you for your service, for the carefulness with

25    which you've brought your attention and given your time to

1   this important task.  And also say out loud a word of

2   acknowledgment, I think on behalf of everyone who's been a

3   part of this case in whatever capacity, that this was a tough

4   one, that this one had emotionally-charged issues and

5   exhibits, a family dynamic that tugs as well, that there were

6   lots of aspects of this that kept it from being probably

7   anything like any matter you've had to deal with before.

8           And in light of that, you could tell when we went

9   through the voir dire process that there were some people who

10  reported for duty who just didn't think that it was in them to

11  do this.  And so from wherever your capacity came from, each

12  of you individually, to take on this challenging case and

13  these difficult questions, and wherever that willingness came

14  from and that commitment to do the hard work of serving on a

15  jury, on any jury, but especially this jury in light of these

16  facts and this law, you deserve to be commended for that and

17  thanked for that.

18          Obviously it's a result that carries serious

19  consequences for Mr. Russell, and the Court will deal with

20  those in due course at another time.

21          I'm sure that the lawyers will authorize me to speak

22  on their behalf a personal word from all of them.  I can tell

23  you that these are four mighty fine lawyers, and they

24  presented this case in a way that reflects their skill and

25  their dedication, their experience.  They're all quite

1  experienced lawyers.  But I think it's okay if I speak on

2  their behalf in saying to you their own thank yous to you for

3  coming to meet them in terms of your responsibilities, in

4  listening and paying careful attention, being here on time,

5  ready to go, et cetera, all the ways in which we measure good

6  juries.

7          One final word without unduly prolonging these

8  proceedings, and that is to say to you that I know for some of

9  you, this is the first time you've ever served on a jury.  And

10 in that sense, it will probably be -- it will no doubt be

11 memorable, sort of a life experience that's special to you.

12         Not everybody gets this opportunity.  Not everyone's

13 called into service.  But you've had this unique opportunity

14 to know what it means to be on a jury so when you read about

15 other juries and listen to news coverage and so forth, you'll

16 be able to connect with them on what they're having to go

17 through.

18         You know, some juries get a panel for four or five

19 months at a time because of the complicated case, so we didn't

20 need all of that time but we still needed all of your skills

21 and your attention over these three days that you've been

22 pressed into service.

23         What I'm hoping is that apart from the difficult

24 assignment that you face as a jury, and any jury does, that

25 you'll see in this a rare opportunity to provide service as a

1  citizen of this country, and to respond to the call of the

2  courts to do your part to make the system of justice a

3  reality, to give life to this.

4          As Mr. McKinley said in his closing argument, it's

5  people like you who breathe life into these promises in the

6  Constitution.  And so you do and so you have.  And I hope that

7  as you are out and about talking to your friends and family

8  members, when they get a summons to come for jury service,

9  that you'll encourage them to do what they need to do, too, to

10  do their part, and give them a little window into your own

11  experiences as to the fact that it was meaningful and

12  important.

13          I hope you feel like you were appropriately

14  respected for the role you must play as you came and went.  So

15  give the cause a little boost if you get a chance because, as

16  I've said from the very beginning, when we first spoke before

17  you were ever impaneled, we can't do this work without you.

18  And when we have the opportunity to do it with you and with

19  people of your commitment and your dedication, it's a good

20  thing from our side of the bench as well.

21          So ladies and gentlemen, I will dismiss you for the

22  last time.  Thank you once again for your service.  You may

23  rise and depart, and the bailiff will accompany you one last

24  time.

25                      (Jury excused)

497

1            THE COURT:  The jury has departed.  You may be

2    seated.  The Rule 29 motion that the Court previously took

3    under advisement is now denied and the record will reflect

4    that ruling.

5            The verdict, as I said to the jury, will be recorded

6    on the docket.  This will set the stage for the Probation

7    Department to prepare a Presentence Investigation Report.  And

8    that's an important procedure as well, Mr. Russell, so with

9    Mr. McKinley's assistance, and perhaps Ms. Cook's assistance

10   as well, you should anticipate that you'll be meeting with the

11   Probation Department to get that interview done and get the

12   report underway.

13           Is there anything else that needs to be raised with

14   the Court before we adjourn?

15           MS. HELART:  No.

16           MR. McKINLEY:  One other matter, Your Honor.  You

17   may recall we proffered Defendant's A through F during the

18   course of the trial.  Those exhibits were not admitted, and we

19   would propose to substitute those exhibits with photographs of

20   the exhibits, and I'd move the Court for permission to do

21   that.

22           THE COURT:  The permission's granted.  You may

23   withdraw the originals.

24           MR. McKINLEY:  Thank you, Your Honor.  Nothing

25   further.

1          MS. HELART:  We have our photographs done as well,

2    and we've advised Miss Schneeman we will bring those down and

3    substitute, so we can take 10, 10A and 16 away.

4          THE COURT:  Okay.  That will be good.

5          My thanks, my personal thanks to you, lawyers, and

6    you can convey it to Ms. Cook as well, Mr. McKinley, when you

7    connect up with her again.  You did an excellent job, all of

8    you, in presenting what I characterized, I think fairly to the

9    jury, as a sensitive case.  And it's sensitive not just

10   because of the subject matter and the exhibits and that sort

11   of thing, although that's certainly one aspect of it, but the

12   law that underlies these charges and the evidentiary issues

13   that arise is complicated, and it's not -- these are not

14   statutes that we have a lot of experience in managing in the

15   same way we do some of the other offenses that get tried more

16   frequently in our courts.

17         So you made it possible for the Court to understand

18   the issues, I think, clearly and to make correct applications

19   of the law, at least I guess there will be another day when

20   that's finally decided, but in any event, it was helpful to me

21   to have not only the good lawyering you did on your feet in

22   front of the jury, but the good lawyering you did in briefing

23   these matters and teeing up the legal issues so that correct

24   rulings could be made.

25         I think I need to say a special word to Jane Doe 1

1  who's back there along with Mrs. Russell, and say that it was

2  obvious to all what courage it really took for you to come

3  forward and testify and to present the evidence that you did.

4          That's a hard way to grow up, but it's an

5  unmistakable sign that you have grown up.  And the fact that

6  you're able to do the difficult task of testifying to very

7  difficult facts and very difficult circumstances about your

8  family and so forth is really a very special thing.  And even

9  though all of us wish that somehow none of this was necessary,

10  when it became necessary, you did what was required of you.

11          And so I want you to take pride in that, in the fact

12  that you were able to step up and do the courageous thing.

13  Life isn't easy, as you can probably teach me better than I

14  can teach you, Jane Doe 1, but the challenge is to meet the

15  challenges as they come and to try to deal the best you can

16  with them, getting the help that you need, and being truthful

17  to yourself about some of these otherwise awkward

18  circumstances.

19          What happened is not about you.  It happened to you,

20  but it didn't happen because of anything that you caused or

21  that you did.  This is activity that occurred to you when you

22  were a young girl with your sister, and it's not something you

23  brought about.

24          So when the jury said guilty on these counts, it's

25  not you who they found guilty.  It's your father.

500

1          So we'll let it sit there, but I hope you don't ever

2     have to go through this again.  It will be better days ahead

3     if you don't have to.

4          So lawyers, again, thank you very much.  We'll

5     adjourn.

6                    (Court adjourned.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CERTIFICATE OF COURT REPORTER


        I, Laura Howie-Walters, hereby certify that the
foregoing is a true and correct transcript from reported
proceedings in the above-entitled matter.



/S/LAURA HOWIE-WALTERS   September 9th, 2010

LAURA HOWIE-WALTERS, RPR/CSR
Official Court Reporter
Southern District of Indiana
Indianapolis Division