REDACTED TRANSCRIPT

1              UNITED STATES DISTRICT COURT
            SOUTHERN DISTRICT OF INDIANA
2                INDIANAPOLIS DIVISION

3

4   UNITED STATES OF AMERICA,        )
                                     )
5                Plaintiff,          ) CAUSE NO.:
                                     ) 1:08-CR-004-SEB/KPF
6                                    ) Indianapolis, Indiana
           -v-                       ) **May 17th, 2010**
7                                    ) 10:00 a.m.
    DALE RUSSELL,                     )
8                                    )
                 Defendant.          )
9

10

11              **Before the Honorable**
              **SARAH EVANS BARKER, JUDGE**

12

13        OFFICIAL REPORTER'S TRANSCRIPT OF
                SENTENCING HEARING

14

15

16

17

18

19

20  Court Reporter:    Laura Howie-Walters, CSR, RPR
                       Official Court Reporter
21                     United States District Court
                       46 E. Ohio Street
22                     Room 217
                       Indianapolis, Indiana  46204
23

24

25           PROCEEDINGS TAKEN BY MACHINE SHORTHAND
    TRANSCRIPT PRODUCED BY ECLIPSE NT COMPUTER-AIDED TRANSCRIPTION

REDACTED TRANSCRIPT            2

1              **A P P E A R A N C E S**

2

3   **For Plaintiff:**        Gayle Helart, Esq.
                              A. Brant Cook, Esq.
4                             Assistant U.S. Attorney
                              United States Attorney's Office
5                             10 West Market Street
                              Suite 2100
6                             Indianapolis, IN  46204

7

8   **For Defendant:**        James C. McKinley, Esq.
                              Indiana Federal Community Defenders
9                             111 Monument Circle
                              Suite 752
10                            Indianapolis, Indiana  46204-3048

11                                    and

12                            Jessie A. Cook, Esq.
                              LAW OFFICE OF JESSIE A. COOK
13                            400 Wabash Avenue, Suite 212
                              Terre Haute, IN  47807

14

15

16

17

18

19

20

21

22

23

24

25

REDACTED TRANSCRIPT          3

1

2                          **I N D E X**

3

4   <u>PLAINTIFF'S WITNESSES</u>                           <u>PAGE</u>

5

6   MICHAEL JOHNSON

7   Direct Examination by Mr. Cook ..................25
    Cross-examination by Ms. Cook ..................29

8

9   ANDY BYERS

10  Direct Examination by Ms. Helart ...............30
    Cross-examination by Ms. Cook ..................43

11  Redirect examination by Ms. Helart ............50
    Recross-examination by Ms. Cook ...............51

12

13  JANE DOE 1

14  Direct Examination by Mr. Cook .................63
    Cross-examination by Ms. Cook ..................73

15

16

17

18  **<u>PLAINTIFF'S EXHIBITS</u>**

19  A.............................................65
    B.............................................65

20  C.............................................71

21

22

23

24

25

REDACTED TRANSCRIPT          4

1                        (Open court.)

2          THE COURT:  Good afternoon, all.  You may be seated.

3   Counsel, nice to see you all of you.

4          MR. COOK:  Nice to see you, Your Honor.

5          THE COURT:  Miss Schneeman, call the matter before

6   the Court, please.

7                   (Call to order of the Court)

8          THE COURT:  This matter's on the Court's calendar

9   for sentencing today following the jury's verdict on

10  March 3rd, 2010, in which the verdict concluded that the

11  defendant was guilty of the four counts of production of child

12  pornography as alleged against him in the indictment.

13  Following that trial and the receipt of the jury's verdict, we

14  assigned the matter to the Probation Department for

15  preparation of a Presentence Investigation Report.

16         Miss Fitzgerald drew that assignment, and has

17  prepared a report.  Mr. Schoettmer is here to assist the court

18  as the probation officer today, so we will use that report now

19  and move ahead with this sentencing hearing that will

20  hopefully, and I expect it to, position the Court to have the

21  requisite understanding to impose -- to determine and impose a

22  reasonable sentence.

23         So Ms. Cook, Mr. McKinley, are you going to come to

24  the podium?

25         MR. McKINLEY:  I will, Your Honor, if I may.

REDACTED TRANSCRIPT          5

1          THE COURT:  Then, Counsel, will you escort

2     Mr. Russell to the podium, please.

3          MS. COOK:  Yes, Your Honor.

4          THE COURT:  Good afternoon, sir.  I remember you

5     from the trial, but I need to establish for the record that

6     you are Dale Russell, the same person who is named in this

7     cause that was just called by the Clerk?

8          THE DEFENDANT:  Yes, I am.

9          THE COURT:  How old are you now, Mr. Russell?

10         THE DEFENDANT:  I'm 48.

11         THE COURT:  You need to speak into that mic so the

12     court reporter can hear you.

13         48?

14         THE DEFENDANT:  Yes.

15         THE COURT:  I know you can read and write the

16     English language?

17         THE DEFENDANT:  Yes.

18         THE COURT:  Prior to coming to the court today, I

19     know as well that you've been in custody, but have you

20     consumed any substance, alcohol, medicine or narcotic, that

21     would interfere with your ability to understand and

22     participate in this trial -- this hearing, I'm sorry?

23         THE DEFENDANT:  No, Your Honor.

24         THE COURT:  Are you under the care of a doctor for

25     any condition that might interfere?

REDACTED TRANSCRIPT            6

1          THE DEFENDANT:  No.

2          THE COURT:  As I mentioned preliminarily, following

3    your conviction of these four counts, the probation office

4    prepared a Presentence Investigation Report to present in that

5    format the issues that the Court must consider in imposing a

6    reasonable sentence today.  So let me just ask you some

7    preliminary questions about the report.

8          First of all, did you read it?

9          THE DEFENDANT:  Yes, I did.

10          THE COURT:  And did you have sufficient time to read

11    it and review it with Ms. Cook or Mr. McKinley?

12          THE DEFENDANT:  Yes.

13          THE COURT:  Miss Cook, have you had sufficient time

14    to review the report and consult with Mr. Russell?

15          THE DEFENDANT:  Yes, Your Honor, I have.

16          THE COURT:  Mr. McKinley, I inquire of you

17    separately, too, or have you also read the report?

18          MR. McKINLEY:  I have read the report, yes, Your

19    Honor.

20          THE COURT:  Miss Helart, have you or Mr. Brant Cook,

21    have you had sufficient time to review the report and prepare

22    for the hearing today?

23          MR. COOK:  Your Honor, both myself and Ms. Helart

24    have had sufficient time.

25          THE COURT:  Okay.  Let me just highlight a couple of

REDACTED TRANSCRIPT          7

1  things about the report so that you grasp these.  Having read

2  it I suspect you've noticed this, but I want to make sure for

3  the record you've noticed it.

4          The report consists of two kinds of information,

5  Mr. Russell.  One part has to do with you in a personal way.

6  It's a biographical summary of you and your life, your

7  education, your health, your work history, your family, that

8  sort of thing.

9          The other part of the report has to do with these

10 offenses that you've been found guilty of, and how the

11 sentencing guidelines apply to calculate the sentencing ranges

12 and the sentencing considerations.

13         So did you notice that about the report, it has

14 these two kinds of information?

15         THE DEFENDANT:  Yes, I did.

16         THE COURT:  This is a document that is tailor-made

17 to you in these circumstances.  There are a few other uses

18 that can be made of it by the courts and by the Bureau of

19 Prisons, by the probation office, but they're basically

20 limited to those.

21         It is kept in the court's records under seal, we

22 say, which means that it's kept in a confidential status and

23 it's not available to the public or to the media simply upon

24 request by them.  So you don't need to worry about it getting

25 out in that way or some unauthorized way.  It will be used

REDACTED TRANSCRIPT          8

1  only for the limited official uses that it is authorized for

2  use; do you understand that, sir?

3          THE DEFENDANT:  Yes.

4          THE COURT:  Besides the report itself, I have the

5  written memorandum, one which was filed by Ms. Cook on your

6  behalf, but also a submission by the Government.  These are

7  official filings in the court file, and I also have some

8  victim statements that have been supplied and I've read those

9  as well.

10          Did you get copies of those statements?

11          MS. COOK:  Yes, Your Honor.

12          THE COURT:  So that Mr. Russell had an opportunity

13  to read them as well?

14          MS. COOK:  I believe he's had an opportunity.  Have

15  you read all of them?

16          THE DEFENDANT:  Yes, I believe so.

17          THE COURT:  There are five of them.

18          MS. COOK:  Yes, we just got them in the courtroom.

19          THE COURT:  Yes, I just got them myself, but you did

20  read them, and you had an opportunity to read all of them, did

21  you?

22          THE DEFENDANT:  Yes, I did.

23          THE COURT:  Now, beside what I've mentioned here,

24  the things that are in the court's file and these filings by

25  interested parties and victims of these offenses, nothing else

REDACTED TRANSCRIPT          9

1  has come to me that I've withheld from you.  So there have

2  been no other letters or no other communications, no e-mails,

3  no telephone conferences with the lawyers.  Sometimes I have

4  to do that to get a case moving procedurally, but we didn't

5  have to do that here.  So you know everything that I know of a

6  factual nature on the basis of which I'll make a sentencing

7  decision today.

8          Do you understand that?

9          THE DEFENDANT:  Yes.

10          THE COURT:  Now, there's partial exception to that.

11  It's only a partial exception.  And that is the probation

12  officer has prepared a memo to me to assist me in fashioning a

13  sentence so that the sentence covers all the appropriate

14  bases, and properly takes into account the legal

15  considerations.

16          That memo from the probation officer to me doesn't

17  have any new facts.  It relates to the facts in the report.

18  And it, as I said, is intended to be of assistance to me as

19  the sentencing judge.  And that memo's not disclosed to anyone

20  else because it's confidential between the probation officer

21  and the sentencing judge.

22          So that's the only thing I have that hasn't been

23  available to everyone else.  Do you understand that, sir?

24          THE DEFENDANT:  Yes.

25          THE COURT:  Now, you can tell from reading the

REDACTED TRANSCRIPT          10

1  report, the Presentence Investigation Report, that we go

2  through a sentencing guideline determination.  And we use that

3  determination after we're confident that it reflects a correct

4  application of the law to the facts of your case, to inform

5  the decision that the Court has to make as to a reasonable

6  sentence.

7          So the guideline computation's not binding on the

8  Court as such.  I'm not obligated to make the calculations and

9  give a sentence that is precisely called for under the

10  guidelines.  The statute does limit my discretion.  I can't go

11  outside the statutory limits.  And I'll tell you about those

12  in just a minute.

13          But with respect to the sentencing guidelines, after

14  we've made that computation, then we ask one more question.

15  We say okay, that's how the guidelines work, but is that a

16  reasonable sentence, because my obligation is to impose a

17  reasonable sentence under the law and under the facts of your

18  case.

19          So that's what we're going to be doing.  We're

20  headed for that point.  Reasonable is a concept that's defined

21  by law.  It's not just if it seems right to me.  Of course, if

22  it didn't seem right to me, I wouldn't do it, but I am bound

23  by what the statute requires, and that will be the measure of

24  a reasonable sentence.  And the criteria for a reasonable

25  sentence are set out in a statute that I assume Ms. Cook and

REDACTED TRANSCRIPT          11

1  Mr. McKinley have run by you and discussed with you that the

2  lawyers and I refer to as Section 3553(a) of Title 18, and if

3  you've read those -- have you?

4          THE DEFENDANT:  I looked over them, yes.

5          THE COURT:  Those seven factors are the factors that

6  the Court will be using as I'm listening to the evidence and

7  trying to decide what a reasonable sentence is.  And to the

8  extent that I succeed in folding those factors into the final

9  decision, it will be deemed legally reasonable.  So that's

10 what we're going to do today and that's where we're headed.

11 Do you understand that, sir?

12         THE DEFENDANT:  Yes.

13         THE COURT:  Now under the guidelines, as they've

14 been calculated in the report, you have a total offense level

15 of 49, and a criminal history category of 1.  The upshot of

16 that is under the guidelines, the guideline sentence for the

17 period of incarceration would be life imprisonment.

18         Under the probation provision of the guideline

19 sentence, you would not be eligible for that.  For supervised

20 release, which is a period of supervision following

21 incarceration, if that should be appropriate, that also is a

22 life term under the guidelines.

23         The fine range is $25,000 on the low end up to

24 $250,000 on the high end.  Restitution doesn't apply here.

25 There is a special assessment of $400, which is a fee payable

REDACTED TRANSCRIPT          12

1   to the Clerk.  And that's a mandatory fee, I can't waive that,

2   so that will be part of any sentence that's imposed.

3          Those are the guidelines as set out in the

4   presentence report.  Ms. Cook has raised various issues, and

5   we're going to resolve those, but that's our starting point

6   for the guideline determination.

7          Do you understand that, sir?

8          THE DEFENDANT:  Yes, I do, Your Honor.

9          THE COURT:  Do you understand how we got to those

10  guideline ranges?

11         THE DEFENDANT:  Yes, Your Honor.

12         THE COURT:  We go to the sentencing table.  When we

13  have the offense level and the criminal history category, we

14  go right down there and it gives us the range of sentence.

15         Is that how you understood it, sir?

16         THE DEFENDANT:  Yes.

17         THE COURT:  Now, let's take up the objections

18  because there have been a few that require the Court to rule.

19  According to the addendum, Mr. Cook, the Government has no

20  objections; is that your position?

21         MR. COOK:  That is, Your Honor.

22         THE COURT:  So let's move through the defense

23  objections.  Some of your objections have to do with your

24  disagreement with the evidence and the theories that the jury

25  resolved.  So the Court in those respects will just rely on

REDACTED TRANSCRIPT          13

1   the jury verdict, even though your position is noted of

2   record.

3          That has to do with -- that's Objection No. 1, your

4   objection to the offense conduct.  So I won't rule on that

5   further.

6          And the same with Objection 2?

7          MS. COOK:  Yes, Your Honor.

8          THE COURT:  Okay.

9          MS. COOK:  My objection was just for the purpose of

10  memorializing Mr. Russell's position where he had interposed a

11  plea of not guilty and asserted that his conduct did not

12  constitute a criminal offense.

13         THE COURT:  Okay, the Objection No. 3 has to do with

14  the acceptance of responsibility provision of the guidelines.

15  The probation officer withheld that credit or that benefit

16  because the defendant did not truthfully admit all the

17  elements of the trial -- I mean, of the charges against him

18  that went to trial.

19         He admitted part of it, that he took the

20  photographs, but he denied that he sexually exploited the

21  victims by creating child pornography, and thus he did not

22  admit the conduct comprising the offense of conviction.

23         Your view is that he relied on a legal defense

24  claiming that the photographs did not constitute pornography,

25  and that he ought to be given the acceptance of responsibility

REDACTED TRANSCRIPT          14

1  credit.  Do I have your reason properly framed there?

2          MS. COOK:  Yes, Your Honor, and I would like to

3  expound on that just briefly.

4          THE COURT:  You may.

5          MS. COOK:  As the Court knows, it has discretion in

6  the application of 3E1.1, both because of the advisory nature

7  of the guidelines generally and because this particular

8  adjustment has provisions in it that allow the Court to make a

9  determination with respect to providing acceptance of

10 responsibility points, even for defendants who opt to proceed

11 with trial.

12         While we certainly concede that the downward

13 adjustment in 3E1.1 isn't intended to apply to a defendant who

14 puts the Government to its burden of proof by denying the

15 factual elements of the guilt, of his or her guilt, the fact

16 that a defendant opts to proceed with a trial doesn't

17 automatically preclude that defendant from consideration for

18 an acceptance of responsibility reduction.

19         The guideline itself notes that there are rare

20 situations in which a defendant can demonstrate an acceptance

21 of responsibility for his criminal conduct, even though he

22 exercises the constitutional right to a trial.  The examples

23 that are given in the guidelines are where a defendant goes to

24 trial to assert and preserve issues that don't relate to

25 factual guilt; for example, raising a constitutional challenge

1  to a statute or a challenge to the applicability of a statute

2  to his conduct.  And it's the latter situation that

3  Mr. Russell finds himself in.

4         During the course of this trial and the pretrial

5  proceedings, Mr. Russell admitted the factual allegation that

6  he had created the photographs in question.  And by our

7  opening statement, the defense also acknowledged the fact that

8  those photographs had moved in interstate commerce.

9         What he denied during the trial was that the

10 photographs and the subject matter of the photographs

11 constituted pornography as defined in the statute, but our

12 position, as the Court knows, was that they did not constitute

13 a lascivious display of the genitalia of a minor child and

14 therefore did not constitute sexual conduct as defined in the

15 statute.

16        Mr. Russell's position, therefore, is analogous to

17 proceeding to trial for the sole purpose of challenging the

18 applicability of the statute to the conduct which he admitted.

19        The Government's response, which was set forth in a

20 brief that I received yesterday, indicated that their position

21 with respect to acceptance of responsibility was that

22 Mr. Russell was undeserving of that reduction because the

23 Government, in putting on its case at trial, had to call the

24 minor children as witnesses at trial to discuss the production

25 of the images, and we would strongly disagree with that.

REDACTED TRANSCRIPT          16

1          There was nothing in the minor child's testimony

2     that was necessary for the Government's burden of proof given

3     the fact that Mr. Russell never denied having created the

4     photographs.  The issue that was left for the jury was not

5     whether he produced the photographs, but the issue for the

6     jury was whether those photographs depicted sexual conduct or

7     a lascivious display as defined by the statute.

8          The minor who testified could not address that issue

9     and in fact did not address that issue.  So there was no basis

10    for the Government's position that they had to call a witness

11    on that point.  There was nothing to rebut at that point.

12         The Hendricks case, which was cited by the

13    Government in support of their position that Mr. Russell was

14    not entitled to acceptance of responsibility points, was a

15    firearms case where the defendant in that case was charged

16    with possession of a firearm.  He opted to go to trial, and

17    the defense at trial was "although I possessed the firearm, I

18    didn't knowingly do so."

19         That's a far cry from Mr. Russell's position at

20    trial where his position was "I produced the photographs, I

21    intended to produce the photographs, but they did not

22    constitute pornography as defined by the statute," which would

23    be analogous to the Hendricks defendant saying "I possessed

24    the gun, I intended to possess the gun" or "I possessed the

25    item and intended to possess it, but it wasn't in fact a

REDACTED TRANSCRIPT          17

1  firearm."

2          So I think the case that was cited is not pertinent

3  to the situation here.  We believe this is one of those

4  exceptional cases where Mr. Russell went to trial to assert

5  and to preserve an issue which was a technical, legal issue

6  unrelated to the facts and the elements of the offense.

7          We think that, based upon the fact that he admitted

8  taking the photographs and intending to take the photographs,

9  but contested only whether those photographs legally

10  constituted pornography, that he's entitled to two levels off

11  for acceptance of responsibility.

12          THE COURT:  Mr. Cook, I'll hear the Government's

13  view.

14          MR. COOK:  Thank you, Your Honor.

15          As Ms. Cook noted, we did file a response to the

16  defense's written submission.  I would point the Court to that

17  response, and add just a couple more points, that quite

18  frankly, what this comes down to is that an essential element

19  of the offense, that the defendant used or induced minors to

20  engage in sexually-explicit conduct, was put at issue in this

21  trial.

22          That's an essential element of the offense.  The

23  argument could be made that is the most important element of

24  the offense.  The testimony of the minors went directly to

25  that because they had to testify at length about the context

1   in which these photos were taken.  The context of their father

2   convincing them that they -- that nudity was part of a

3   lifestyle; the context of their father requiring them to keep

4   things secret from their mother; quite frankly, it was an

5   essential element of the offense.

6        The Government was required to call witnesses to

7   rebut that, and we did.  And the jury found him guilty of

8   those offenses in finding that he had violated an essential

9   element.

10        THE COURT:  I agree with the Government's view of

11   the defendant's entitlement to an acceptance of responsibility

12   benefit.  He accepted partial responsibility, I guess we could

13   say, but he left a major matter for the jury to resolve, and

14   it required enough evidence and enough proceedings that we had

15   to have the trial extended over some couple of days, as I

16   recall, perhaps three, although I don't have perfect recall on

17   that; but it was not a matter that was insignificant.

18        It was, in fact, at the heart of this case partly

19   because the evidence was overwhelmingly convincing as to the

20   other elements that he conceded, but as to the nature of the

21   materials, I share the Government's view that it was

22   important, in fact essential, to their ability to prove that

23   element beyond a reasonable doubt, which they had to do, to

24   call the victims to explain the circumstances surrounding the

25   creation of those photographs that were the gravamen of each

REDACTED TRANSCRIPT          19

1  of the four counts.

2          The guidelines permit a benefit to the defendant or

3  a defendant who basically demonstrates an acceptance of

4  responsibility by owning up to what happened and saving the

5  Government the cost of the further investigation and

6  preparation for trial and so forth.  None of those things

7  occurred here because we had to go to trial on that very

8  important matter that was left unadmitted to.

9          So in terms of the defendant's truthful admission of

10 the conduct comprising the offense of conviction, he went part

11 way down the road, but not all way.  And as I said, the part

12 that was left undone was a portion of the case that required

13 quite a lot of evidence and quite a lot of argument to the

14 jury to explain to them the law and to convince them of the

15 strength of the Government's case so that they could find

16 beyond a reasonable doubt that the defendant was guilty of the

17 four charges.

18         So the defendant simply is not entitled to an

19 acceptance of responsibility benefit recognizing it to be a

20 benefit, a reward or an acknowledgment of that acceptance.  It

21 just didn't happen here.  So I'll overrule that objection.

22         The next objection is interposed in the -- or is

23 referenced in the addendum as Defense Objection 4, and it has

24 to do with the issue of the Government's case with respect to

25 proving that the defendant knowingly or intentionally

REDACTED TRANSCRIPT          20

1  distributed the charged photographs.

2          The defendant conceded -- I'm paraphrasing now, this

3  is not what was in your objection, but the defendant conceded

4  that the photographs that had been placed into the computer

5  network wound up in Canada, discovered on a Canadian

6  offender's computer, but the defense view is that Mr. Russell

7  did not knowingly cause the photographs to be distributed.

8          So do you want to elaborate on that further?

9          MS. COOK:  Yes, Your Honor, if I may.  Our position

10  is that there is a complete lack of evidence that Mr. Russell

11  knowingly or intentionally distributed the photographs in

12  question.

13          It appears to be the Government's position, first,

14  that Mr. Russell may have distributed photographs constituting

15  pornography by posting them on the modeling websites about

16  which there was testimony during trial.

17          However, there were no photographs that were

18  introduced into evidence during the trial that constituted

19  pornography and came from the modeling website.

20          The initial report which was made concerning the

21  existence of the modeling websites was investigated by, I

22  believe, the Carmel Police Department, which received some

23  notification and came to the girl's school.  And at the point

24  when --

25          THE COURT:  I thought it was Greenfield.

REDACTED TRANSCRIPT          21

1        MS. COOK:  I don't remember.  It may have been

2   Greenfield.

3        But a report came to the girl's school at a time

4   prior to Mr. Russell receiving any notification that there was

5   an investigation.

6        When those modeling websites were examined, there

7   were no photographs on there that constituted pornography.

8   And we've never had any evidence that would indicate that any

9   of the images which are allegedly pornographic and which were

10  found in collections across the country about which I think

11  the Government is going to present some evidence later this

12  afternoon, we've never heard that any of those images came off

13  of the modeling websites.  I think, at most, the images that

14  came from the modeling websites were -- could be characterized

15  as erotica.

16       I do recognize that one of the minors who testified

17  during trial indicated that she believed she had seen a

18  photograph of herself unclothed on the modeling website, but I

19  would suggest to the Court that given the passage of time,

20  it's extremely unlikely that that was accurate, particularly

21  given the fact that there has not been any documentation of

22  allegedly pornographic images coming off of those websites

23  either in terms of --

24       THE COURT:  What was discovered on the Canadian

25  offender's computer?

REDACTED TRANSCRIPT          22

1          MS. COOK:  There were images that the Government

2     contends were pornographic, but they did not --

3          THE COURT:  Were they these four that were being

4     tried?

5          MS. COOK:  Yes.

6          THE COURT:  So these four that were the subject

7     matter of the charges here --

8          MS. COOK:  Yes.

9          THE COURT:  -- were found to be on a computer in

10    Canada in possession of somebody, we don't know who?

11         MS. COOK:  Yes, Your Honor.  And I'm going to get to

12    that point in just a minute.

13         My initial point was that I don't believe there's

14    been sufficient evidence or any credible evidence that would

15    indicate that there were any pornographic images on the

16    modeling websites.

17         The second issue are the images which were

18    introduced at trial --

19         THE COURT:  So just let me see if I -- I can't tell

20    in your argument if you're maintaining the defense that these

21    were not illegal photos.  I'll just say it that way instead of

22    using the words of the statute.

23         Are you simply holding to the defendant's version of

24    guilt, that is to say he's not guilty, or are you telling me

25    something else about these particular pictures?

REDACTED TRANSCRIPT          23

1          MS. COOK:  I'm saying that even with respect to the

2    Government's argument, there's been no evidence that the

3    photographs on the modeling websites were illegal photographs.

4          THE COURT:  Were these four on the modeling?

5          MS. COOK:  No, but the photographs from the modeling

6    websites are referenced both in the response to my objection.

7    And so I'm addressing that response to my objection.

8          Now I'm moving to the issue of the photographs which

9    were in evidence which formed the basis for the four counts of

10   which Mr. Russell was convicted.  With respect to those

11   photographs, we do know that they moved in interstate

12   commerce, but Mr. Russell has always denied that he

13   distributed them in any fashion or caused them to move in

14   interstate commerce or did so knowingly or intentionally.

15         It's our understanding based upon representations

16   made by the agents, and at least partially contained in one of

17   the reports that we received, that these photographs were

18   recovered from an individual by the name of Doug DuBois who

19   was an acquaintance of Mr. Russell, who said that Mr. Russell

20   had provided to him, given to him a box that had materials in

21   it; given that to him for safekeeping, not for his review, not

22   for his viewing, but for safekeeping at a time when the

23   parties were engaged in some civil litigation; that Mr. DuBois

24   then opened the box, looked at the materials in the box,

25   copied them and distributed them, and then returned the box to

REDACTED TRANSCRIPT          24

1  Mr. Russell.

2          So our position is that Mr. Russell never had the

3  intent to distribute these materials or to cause them to be

4  distributed in any fashion.  So we believe that because he

5  didn't do so, that he should not receive the two-level

6  enhancement for distribution.

7          THE COURT:  Mr. Cook?

8          MR. COOK:  Thank you, Your Honor.

9          THE COURT:  Do you wish to introduce evidence on

10 this?

11         MR. COOK:  I am prepared to present more evidence if

12 the Court's ready to hear it.  I can also argue first and then

13 present that evidence.  What's the Court's --

14         THE COURT:  Well, usually we present evidence and

15 then argue in my experience.

16         MR. COOK:  I'm sorry, there's certain responses to

17 Ms. Cook and also our evidence.  Why don't we present the

18 evidence that the Court is ready to hear?

19         THE COURT:  All right.  Are you calling a witness

20 for that?

21         MR. COOK:  Yes, the Government would call Senior

22 Special Agent Michael Johnson.

23         THE COURT:  Would you have a seat over there,

24 please, Ms. Cook and Mr. Russell.

25         Good afternoon, sir.

REDACTED TRANSCRIPT          25

1       THE WITNESS:  Good afternoon, Your Honor.

2       THE COURT:  Will you be sworn please.

3       **MICHAEL JOHNSON, PLAINTIFF'S WITNESS, SWORN**

4                 **DIRECT EXAMINATION**

5       THE COURT:  You may be seated.

6       THE WITNESS:  Thank you, Judge.

7   BY MR. COOK:

8   Q   Please state your name for the record.

9   A   Michael Johnson.

10  Q   And what do you do for a living, sir?

11  A   I'm a Special Agent with the United States Immigration and

12  Customs Enforcement.

13  Q   And what are your duties with that agency, sir?

14  A   I am assigned to investigate cyber crimes, and I am a

15  digital forensics examiner.

16  Q   And does that mean that, at times, you have investigated

17  the production of sexually-explicit images of minors?

18  A   Yes, sir, I have.

19  Q   As part of your duties with the Department of Homeland

20  Security and the Customs Division, have you had contact with

21  an organization called the National Center for Missing and

22  Exploited Children?

23  A   I have, sir.

24  Q   What is that?  What is the National Center?

25  A   With respect to these cases, the National Center for

1  Missing and Exploited Children is a clearinghouse, if you

2  will, of the child pornography images that are recovered in

3  child exploitation investigations across the country.  They

4  maintain the clearinghouse.  As we work investigations and

5  recover images, we submit those images to the National Center

6  for Missing and Exploited Children.

7          At that time, they're able to tell us if there are

8  known victims involved in the cases.  And then that assists us

9  in victim notification and things of that nature.  And then if

10 they are not known victims, then those are placed in that

11 clearinghouse, and then we begin the task of attempting to

12 locate those victims.

13 Q    Now that "clearinghouse," does the National Center I

14 suppose partition its database at all to provide law

15 enforcement opportunity to sort these things through?  In

16 other words, do they create series of child pornography images

17 to assist law enforcement?

18 A    Yes, sir, when a group of pictures are submitted and it is

19 determined that there are a series of victims, those victims

20 are then -- that series is then kept to itself under a series

21 name, and that's how they're identified from that point

22 forward.

23 Q    Special Agent Johnson, are you familiar with a series

24 maintained by the National Center for Missing and Exploited

25 Children, I refer to it as the Ballet Girl series?

1   A   Yes, sir, I am.

2   Q   What is it the Ballet Girl series?

3   A   The Ballet Girl series is a series of pictures that are

4   the pictures relative to the charges in this case.

5   Q   And you are familiar with the two named victims in this

6   case?

7   A   I am, sir.

8   Q   And that Ballet Girls series depicts them; is that

9   correct?

10  A   Yes.

11  Q   Special Agent Johnson, you're also familiar with the

12  images that were charged in the present case; is that correct?

13  A   Yes, sir.

14  Q   You examined those images for ExIf data; is that right?

15  A   That is correct.

16  Q   And those images that were charged in this case, are those

17  part of the Ballet Girl series as --

18  A   They are.

19  Q   -- identified by the National Center?

20  A   Yes.

21  Q   In preparation for the sentencing today, did you contact

22  the National Center requesting reports about the Ballet Girls

23  series?

24  A   Yes, sir, through my agency's liaison at the National

25  Center.

1  Q   And what was nature of the report that you requested?

2  A   The report told me that between May of 2006 and Friday's

3  date, the National Center for Missing and Exploited ––

4              THE COURT:  This past Friday?

5              THE WITNESS:  Yes, ma'am.

6              THE COURT:  Which would be May ––

7              THE WITNESS:  14th, Judge.

8  A   The National Center for Missing and Exploited Children had

9  received submissions of images from the ballet series 1,567

10 times from all states in the United States with the exception

11 of Wyoming, as well as submissions from the countries of

12 Canada and France.

13 Q   Your understanding is that each submission effectively, at

14 a separate time, was discovered on a separate offender's

15 computer; is that correct?

16             COURT REPORTER:  Could you repeat that slower,

17 please?

18             MR. COOK:  Sure.

19 BY MR. COOK:

20 Q   It's your understanding, Special Agent Johnson ––

21             THE COURT:  That's not any slower.

22 BY MR. COOK:

23 Q   Your understanding, Special Agent Johnson, is that each

24 submission represents a separate offender?

25 A   Each submission, I believe, sir, represents a separate

JOHNSON – DIRECT/COOK          29

1    case, yes.

2              MR. COOK:  No further questions, Your Honor.

3              THE COURT:  All right.  Cross-examine?

4                      **CROSS EXAMINATION**

5    BY MS. COOK:

6    Q   Agent Johnson, with respect to the distribution of these

7    photographs in the Ballet Girl series, you were not able to

8    determine that any of those photographs were sent from a

9    computer operated by Mr. Russell, were you?

10   A   No, ma'am.

11   Q   And with respect to the Ballet Girl series, none of those

12   photographs appear to have come from the modeling websites

13   that Mr. Russell created, did they?

14   A   I would not be able to tell, ma'am.

15   Q   Are you familiar with Mr. Douglas DuBois?

16   A   No, ma'am, I am not.

17   Q   Have you been made aware of his involvement in the

18   investigation of this case?

19   A   No, ma'am, I am not aware.

20   Q   You don't have any evidence to the effect that Mr. Russell

21   himself caused any of these photographs to be e-mailed or

22   posted on the Internet or sent to other individuals, do you?

23   A   I do not, ma'am.

24             MS. COOK:  I have no further questions.

25             THE COURT:  Redirect?

Cross-examination Ms. Cook.     30

1          MR. COOK:  Could I have a moment with co-counsel,
2  Your Honor?

3          THE COURT:  Yes.

4          MR. COOK:  Thank you.

5                 (Off-the-record discussion.)

6          MR. COOK:  Your Honor, the Government has no further
7  questions for this witness.

8          THE COURT:  All right.

9          MR. COOK:  If we may, we do have an additional
10 witness given what defense argument was, if the Court will
11 hear from him now.

12         THE COURT:  All right.  Sir, you may step down,
13 Agent Johnson.  Watch your step as you go.

14         MR. COOK:  The Government would call Detective Andy
15 Byers.

16         THE COURT:  Come to the witness stand, sir.  Good
17 afternoon.

18         THE WITNESS:  Thank you, Your Honor.

19         THE COURT:  Remain standing and be sworn by the
20 Clerk.

21        **ANDY BYERS, PLAINTIFF'S WITNESS, SWORN**

22              **<u>DIRECT EXAMINATION</u>**

23         THE COURT:  You may be seated.

24         THE WITNESS:  Thank you.

25 BY MS. HELART:

BYERS - DIRECT/HELART          31

1  Q   Good afternoon, Detective Byers.

2  A   Good afternoon.

3  Q   I see that you're dressed in a more casual way than a

4  uniform or suit.  Were you expecting to testify today?

5  A   No, I was not.

6  Q   All right.  Were you part of the investigation team and

7  are you part of the audience today in this Dale Russell

8  sentencing?

9  A   That is correct.

10 Q   And did you just hear the defense argue about Doug DuBois

11 and his part in this case?

12 A   Yes, I did.

13 Q   Have you been involved in this case since approximately

14 2004?

15 A   That is correct.

16 Q   Do you know the name Doug DuBois?

17 A   Yes, I do.

18 Q   Who is he to this investigation?

19 A   In the early stages of this investigation, I was contacted

20 by ICE agents up in Michigan, up in the Grand Rapids office,

21 and they had been investigating a subject by the name of Doug

22 DuBois, or Duboys (phonetic).

23        And during the course of their investigation, they

24 recovered a significant amount of photos from this, which was

25 later termed Ballet Girl series, including images that are

BYERS - DIRECT/HELART          32

1  charged in this investigation, in this hearing.

2          During their initial interviews with DuBois, he made

3  statements about his relationship with Dale Russell, and

4  that's how he came to be in possession of those images of the

5  girls, of the victims.

6  Q   How did Mr. DuBois that he came into possession of the

7  Jane Doe 1 and 2 victims?

8  A   During -- at a later point in time, I went up to Michigan,

9  and I sat in on a proffer and interviewed him myself in

10 person.  And during that time, he told me that he was friends

11 with Dale Russell, had traveled, gone on vacations with Dale

12 Russell, and at some point in time, Dale Russell had sent him

13 a box full of articles, including hard drives and CDs and a

14 video tape that he -- his statement was Dale told him to hang

15 onto them for safekeeping, and he would get them -- ask for

16 them back at a later date.  DuBois, during the course of the

17 time he was in possession of those, got into the box and

18 reviewed the items that were there.

19 Q   Did he readily admit that he got into the box and reviewed

20 them?

21 A   Yes, he did.

22 Q   What did he say about why he did that?

23 A   He stated it was just pure curiosity.

24 Q   Did he have a relationship with Mr. Russell based on the

25 Internet first?

1  A    Yes.

2  Q    How did that first start?

3  A    As Mr. Russell has talked about, he's had –– was running

4  teen modeling websites and preteen modeling websites.  Doug

5  DuBois was also running similar websites.  And DuBois stated

6  that he made initial contact with Dale as he did with many

7  other webmasters, if you will, who were running similar type

8  sites.

9         Part of the conversations were initiated with

10 e-mails, commenting on the content, as well as asking for

11 different recommendations on the financial aspect and kind of

12 the go-between for the pay service.

13 Q    Did he make it clear that it was difficult for people who

14 were running websites involving this kind of material to find

15 an honest service that would take their credit cards and

16 actually give them back their money?

17 A    That is correct, and that was a common problem.

18 Q    Did they often run the content of pictures by each other

19 to see what each other thought?

20 A    According to DuBois, yes, they did, that was a common

21 practice.

22 Q    Did DuBois talk about why he, DuBois, first made contact

23 with Dale Russell in terms of liking his material?

24 A    That was exactly what he said.  He liked his material and

25 was interested because at that time, he told me that

1  Mr. Russell was running more than 10 different websites, had

2  various different models and he was just inquiring about the

3  nature of the different models and who they were and how he

4  was gaining access to these different photographs.

5  Q   And when you were speaking with Mr. DuBois -- and the

6  spelling is that is D-U, capital B, -O-I-S?

7  A   That's correct.

8  Q   When you were speaking with him, what is the content that

9  you and he spoke of?  What are we talking about?

10  A   He said that most of what they were trying to do, they

11  meaning the other webmasters that he was in contact with, the

12  same as Mr. Russell, was what they called -- termed "implied

13  nudes" which is often children who are mostly female, some

14  males, but mostly female were nude, partially nude, genitalia

15  partially covered, sometimes see-through.  And part of what

16  they would do is send images that they were in question about

17  back and forth to each other to kind of check and, "Do you

18  think I can get away with this," basically; "Is this a little

19  over the line, is this going to get me in trouble?"  So they

20  were kind of self-checking to see, but in the course of that,

21  they were sending private collections as well.  This is for

22  you, this is not for post.

23  Q   Do you have a sense of the timing that if Mr. DuBois's

24  timing was accurate when Dale Russell sent him the material

25  to -- to hang onto?

BYERS - DIRECT/HELART            35

1  A   Yes, and the time frame he gave was during the civil

2  litigation, during the divorce hearings and custody issues

3  that was going on.  And that was when I was initially involved

4  in the case in the fall of, I believe it was 2004, I believe,

5  when I first became aware of the complaint from the Carmel

6  Police Department investigation.

7             THE COURT:  It was Carmel; is that right?

8             THE WITNESS:  Yes.

9  BY MS. HELART:

10  Q   We do have two police departments referred to, though.

11  Was Greenfield Police Department the police department that

12  first notified Mrs. Russell?

13  A   That is correct.

14  Q   Then how did Carmel become involved, and how did you

15  become involved with Carmel?

16  A   Carmel was involved because that was the town or the place

17  where Mr. Russell was living.  And that's where the computer

18  and all the information was residing there.  So the mother and

19  the victims were living in Greenfield.  So then, thus the two

20  different police departments were initially involved.

21             I was contacted by the FBI.  Carmel Police

22  Department called the FBI and asked for help.  They got their

23  call and asked for my assistance as well, and that's how I got

24  there.  The point they really needed help with was trying to

25  gain access to the websites to view the content of

1  Mr. Russell's websites.

2  Q    And that's the point that maybe Ms. Cook was trying to

3  make was when Carmel was looking at the websites, they

4  couldn't find anything, but at that point, the Court had

5  ordered them to take them down?

6  A    That is correct.  The Court, through the records that I

7  read and the information I had at the time, we knew that

8  possibly we were not going to find any content on there

9  because the Court had actually –– the judge in that civil case

10  had actually ordered Mr. Russell to take down any images or

11  take down the websites of the victims in this case.

12  Q    In this case, you knew about the significant date of

13  October 19, 2004?

14  A    Yes.

15  Q    And that was the date that Dawn Russell first went into

16  court on an emergency hearing because she had first discovered

17  this within a week from the Greenfield Police Department?

18  A    That is correct.

19  Q    So if it is consistent that that's about –– or after that

20  time period was about when Mr. Russell sent the material, the

21  box, to Mr. DuBois, the investigation might have been heating

22  up?

23  A    That is correct.

24  Q    And so Mr. DuBois, going back to that part of the story,

25  stated he was curious.  What else did he state, that he really

1  wanted to get in that box?

2  A    Correct, he wanted to get in there and look because he

3  knew that he had been in contact with Mr. Russell.  Also, he

4  had made mention that he had been on vacation with Mr. Russell

5  down in Florida where he had taken several –– he was a part of

6  assisting Dale Russell take nude photographs of the victims in

7  this case.  So he had an interest of were those pictures going

8  to be there that he was actually a witness to.

9  Q    So with respect to that aspect of Mr. Dubois's story, what

10  did he say, Mr. DuBois, about his part in going on vacation

11  and having seen Mr. Russell taking nude photographs of his

12  children?

13  A    He said that was –– he came down, was kind of like a

14  family friend, went on vacation with them, went to a couple

15  different beaches.  He stated at one beach in particular, it

16  wasn't a nude beach per se, but they were there early in the

17  morning, like 7:00, 7:30 something like that.  To his best

18  recollection, Mr. DuBois's, that it was really before anyone

19  else got there, and he was kind of holding a reflector and

20  things like that.  He kind of complained.  Mr. DuBois is

21  somewhat infirm and walks with a cane, so he continued to tell

22  the story of how he was complaining that he had to carry all

23  the cameras and equipment and have his cane and walk through

24  the sand.

25              So once he kind of got things set up and was there

1   for -- observed Mr. Russell take a few photographs on the

2   first camera.  And then according to Mr. DuBois, Dale Russell

3   took the camera and the girls and went down closer to the

4   water and took several more photos because Mr. DuBois wasn't

5   capable of following them that far.

6   Q   Did Mr. DuBois get a set of these nude photographs?

7   A   No, he did not.

8   Q   Did he express any emotion about that?

9   A   Yes, he was disappointed.

10   Q   Can you explain?

11   A   He was disappointed that he put forth the effort and was

12   there on the trip with them and felt that he should have got

13   his copy or at least been able to view them.

14          So when I interviewed him, that was kind of his

15   reasoning why he felt he had a right to look in the box and

16   look for the different items to see if those were there.

17   Q   Did he see anything significant in the box?

18   A   Yes, he did.

19   Q   This was the box he had received from Mr. Russell?

20   A   Correct.

21   Q   And what did he see in the box?

22   A   He said he had a video tape that had showed Mr. Russell

23   and the victims at the gym that was in Carmel.  He also -- he,

24   DuBois -- stated he was there at the gym during the first part

25   of that photo session before the victims were told to remove

BYERS - DIRECT/HELART          39

1  their clothes or instructed to remove their clothes.

2          He left the gym at that time, and all that stuff

3  happened after he was told by Mr. Russell that he was going to

4  start taking some nude photographs, and it was time for Doug

5  to leave at that time, DuBois.

6  Q   Did Mr. DuBois explain what other content of material was

7  in that box that Mr. Russell had sent to him?

8  A   Yes, he said some of the hard drives contained hundreds of

9  pictures, his words, of the victims in various states of

10 undress, fully nude, some clothed, some provocative, as well

11 as a lot of other photos that were tagged or labeled that were

12 to be posted on the websites, on Mr. Russell's websites.

13 Q   As part of this investigation, was it your experience that

14 it was evolving, that is didn't see much on the Internet and

15 as time went on started seeing more and more and more?

16 A   That is correct.

17 Q   And so did you have any pictures to show Mr. DuBois to say

18 "Did you see this from the box" or "Did you see this from the

19 box?"

20 A   At that stage of the investigation, no, I did not.

21 Q   Did Mr. DuBois get convicted himself?

22 A   Yes, he did.

23 Q   And is he serving a prison sentence for possession or

24 distribution or something?

25 A   Yes, but I'm not sure if he's still serving that or what

1  the status of that is, but he was convicted in federal court

2  and was offered a plea.

3  Q   Was that for his own material, for his own websites he was

4  running?

5  A   Yes, in conjunction included -- part of that included

6  Mr. Russell's collection as well.

7  Q   Later in June 2005, you and Agent Rothrock went to

8  Mr. Russell's house and did an interview; is that correct?

9  A   That is correct.

10  Q   Did Mr. Russell refer to this box or anything of interest

11  or significance being stolen from him?

12  A   Yes, he did.

13  Q   What did he say?

14  A   I talked to him during the course of that interview, asked

15  about a box of materials, and Doug DuBois, to see what --

16  where he would lead me with that.  And he right away claimed

17  that he did have a box, that did have hard drives, that did

18  have a lot of personal items in it.  And he claimed that Doug

19  DuBois came and stole that particular box when DuBois and at

20  least one of his sons came down to help them move from, I

21  believe it would be the Braeburn Apartments over to the house

22  in Carmel, to the Carmel address; that during the course of

23  that move, he -- his claim, Dale Russell's claim, was that

24  DuBois took those articles from him.

25            MS. HELART:  All right, thank you.  No other

1  questions.

2          THE COURT:  Did Mr. DuBois say anything about his

3  having put Mr. Russell's materials out on the Internet?

4          THE WITNESS:  Yes, he did.

5          THE COURT:  What did he say about that?

6          THE WITNESS:  He stated that –– I asked him "What

7  did you do with them when you found them and found there were

8  pictures of the girls that you knew, what did you do?"

9          He said, "Well, I copied them of course."

10          And you know, "Why would you do that?"

11          He said, "Well, it's because they're –– I was there.

12  I know them."

13          And even Mr. Russell's stepdaughter, DuBois bragged

14  about how he had helped pay medical bills and bought clothes

15  for her and things.  So for Mr. DuBois, it was kind of a sense

16  of pride and a trophy that he had copies of these pictures to

17  show his other webmaster friends that were also in some cases

18  possibly, you know, friends with Mr. Russell because they were

19  also running websites, that he shared with them as well.

20          THE COURT:  Okay.

21  BY MS. HELART:

22  Q   Did he, just as a clarification, did he say he sent them

23  to other people or he put them on his website?

24  A   He said he sent them to other people.  He did not post

25  them on his website.  His words were "That could get me in

1  trouble because they could lead that back to me."

2        But he sent them to other webmasters, kind of like

3  other people who were running these child modeling websites

4  because they had a relationship between them on various

5  levels, but they would also share their personal collections

6  as well.

7  Q   Did he ever relate what he had already seen on Dale

8  Russell's websites with what was in the box?  Did he ever make

9  a comparison?

10 A   To some extent.  He explained that a lot of the pictures

11 that he saw on the hard drives were pictures that were on the

12 websites, because part of what Mr. DuBois said was they also,

13 as webmasters share and give each other master passwords so

14 they can actually access everything for free on each other's

15 websites, again just if nothing else, bragging

16 rights according to Mr. DuBois to say "Hey, look at my

17 collection, look what I have.  Since you have several

18 websites, I'll give you a master password, you give me a

19 master password, and we'll look at each others sites for

20 free."

21       So he had access to Dale Russell's websites and made

22 comments that several of the photographs that were in the box

23 and on the hard drives were also images that were on the

24 website.  And he did not -- to clarify that, too, he did not

25 make any specific statements on the pictures that were charged

1   here, that were on there.  He didn't -- he didn't make any

2   allegations towards that.

3   Q   Is the gymnastics video that Mr. DuBois had and saw in the

4   box the same one where at least it looks like the similar

5   photo shoot from Counts 2 and 4 of the girls in the gym?

6   A   That's correct.

7          MS. HELART:  All right.  Thank you.  No other

8   questions.

9          THE COURT:  Cross?

10                    **CROSS EXAMINATION**

11  BY MS. COOK:

12  Q   Detective Byers, I just want to be clear about this.  Now,

13  your testimony is that one of the items that was in the box,

14  at least according to Mr. DuBois, was the gymnastics video --

15  A   Yes.

16  Q   -- that's been at issue in this case?

17  A   And that's the way he titled it at that time.

18  Q   Now, are you familiar with a memorandum that was authored

19  by Agents Rothrock and Rodriguez concerning their interview of

20  Doug DuBois on May 31st of 2005?

21  A   Briefly.

22  Q   Okay.  And during the course of that telephone interview,

23  Mr. DuBois was asked about how he obtained the videotape of

24  the victims doing nude gymnastics that was found in his

25  possession, right?

*BYERS - CROSS/COOK*          44

1  A   Okay.

2  Q   And he told the agents at that time he didn't know how the

3  tape got to his house?

4  A   That's possible if you're reading from that.  My interview

5  is a separate date, and it was after that date.  I was not

6  present during their -- the interview that you're speaking of

7  there in their report, I was not present.  I was not there for

8  that.

9  Q   So on one occasion, he may have said he didn't know how he

10 got it, and on another occasion he may have said that

11 Mr. Russell gave it to him?

12 A   May I clarify that with my answer?

13 Q   Yes.

14 A   On the telephone interview, he says he didn't know how to.

15 When I interviewed him in person during the course of a

16 proffer with his defense attorney present, he admitted that's

17 how he got the tapes.  That's when he made the admission, when

18 he was -- during the course of a proffer.

19 Q   He wasn't under oath either time, was he?

20 A   No, he was not.

21 Q   So you don't know which of those statements that he made

22 was truthful?

23 A   No, I do not.

24 Q   And he did tell you that it was he who copied the items

25 from the box and distributed them?

1  A    That's correct.

2  Q    Now, when you talked to him about this trip that he took

3  with Mr. Russell and his family to a beach in Florida, he

4  didn't identify that beach for you, did he?

5  A    No, he did not.

6  Q    So you weren't able to independently ascertain whether or

7  not that was a nude beach, were you?

8  A    That's correct.

9  Q    And at least with respect to the photographs that were

10 taken on that beach, he didn't get any copy of those

11 photographs from Mr. Russell?

12 A    He stated he did not, that's correct.

13 Q    And I believe you indicated that when the photographs were

14 taken in the gym at the point when the girls were not wearing

15 clothing, he was asked to leave?

16 A    That's correct.

17 Q    And he did?

18 A    According to Mr. DuBois, yes, he did.

19 Q    Now, you testified that there was a point in time when the

20 court had ordered Mr. Russell to take down the modeling

21 websites that we've been discussing?

22 A    That's correct.

23 Q    But prior to the time the court ordered those websites to

24 be taken down, those websites had been viewed by people who

25 found them to be objectionable?

1  A   I believe –– to my understanding, not by law enforcement,

2  but I think that was something from the school and how that

3  was initiated.  But not law enforcement, to my knowledge.

4  Q   Nobody from the school ever told law enforcement that they

5  saw any nude photographs on those modeling websites, did they?

6  A   No, that's correct.

7  Q   And with respect to those modeling websites, Mr. DuBois

8  said, did he not, that he had seen disks of photographs that

9  came from the modeling websites?

10 A   That's correct.

11 Q   And that there was nothing inappropriate about those

12 photographs from the modeling websites?

13 A   I don't think he made a comment to me one way or the other

14 that they were appropriate or inappropriate other than they

15 were photographs that were in various states of nudity.

16         I don't know that he made them, if that's what

17 you're asking.  To make sure I'm clear, if you're asking if he

18 made a statement and he identified them as appropriate or

19 inappropriate?  I don't remember if he did and I don't know

20 that he did.

21 Q   You've never seen any photographs from those modeling

22 websites where the girls depicted were nude, have you?

23 A   No, I have not.

24 Q   And Mr. DuBois, when he indicated that he and Mr. Russell

25 had given one another access to the websites, also said that

1   at one point Mr. Russell had given him some computer disks

2   with photographs on them?

3   A   Ask me the first part of that question again, would you

4   clarify?

5   Q   Yes.  You testified that they gave one another access to

6   the websites?

7   A   That's true.

8   Q   Mr. DuBois never produced any photographs from the

9   modeling websites for you that depicted nude girls, did he?

10  A   No, he did not.

11  Q   And he told you, or he told agents, that at one point in

12  time Mr. Russell had given him some computer disks with

13  photographs of them?

14  A   That's correct.

15  Q   And those would have been photographs of the girls in

16  question here?

17  A   That's correct.

18  Q   And he told you specifically that there were no

19  inappropriate photographs on those disks?

20  A   I don't remember if he said that or not.

21  Q   All right.

22  A   I don't remember if I --

23  Q   Have you had an opportunity to review the report of the

24  interview between Agents Rothrock and Rodriguez and

25  Mr. DuBois?

1  A    It's been a couple of years since --

2  Q    Would it refresh your memory to see a copy of that report?

3  A    That would be helpful, yes.

4          MS. COOK:  Might I approach, Your Honor?

5          THE COURT:  Yes.

6          MS. COOK:  I'm showing you what I'm representing to

7  you is a document provided to us by the Government containing

8  a summary of a May 31st, 2005 interview of Mr. DuBois, and

9  will direct your attention to the third paragraph from the

10 bottom on the second page and ask if you would review that.

11         MS. HELART:  For the record, objection just inasmuch

12 as Detective Byers wasn't even there for this interview.

13         MS. COOK:  He indicated that he had some familiarity

14 with it.

15         THE COURT:  And he said it would refresh his

16 recollection.

17         MS. HELART:  Okay, but just for the record, he still

18 wasn't present for this telephone interview.

19         THE COURT:  That's how I understand it as well.

20         THE WITNESS:  You said these last two paragraphs

21 here?

22 BY MS. COOK:

23 Q    The third from the bottom, I think.

24 A    Okay.  It states here that DuBois states according to the

25 interview they had that none of those images were

1  inappropriate.

2  Q   Okay.  Mr. DuBois has never told you that Mr. Russell gave

3  him permission to open any box containing photographs or DVDs

4  or videos, did he?

5  A   No, you're correct.

6  Q   And then if he did open a box and retrieve those

7  photographs, he did that on his own because he was curious?

8  A   That's correct.

9  Q   He did it without permission from Mr. Russell?

10  A   That's correct.

11  Q   Then he copied that material and posted it on the

12  Internet?

13  A   The first part of that is correct.  He told me that yes,

14  he had got into it and made copies.  The second part is he

15  e-mailed that to -- the copies of those to his other friends.

16  He didn't say that he actually posted it.  So it kind of gets

17  into --

18  Q   All right, I'm --

19  A   -- are you posting it or sending it to someone on the

20  Internet?  Yes, he transmitted across the Internet to other

21  people.  But I don't know that he actually posted or hosted it

22  on a site.

23  Q   Transmitted it via the Internet to other people?

24  A   That is correct.

25  Q   All right.  Thank you, sir.

1          THE COURT:  Redirect?

2                  **REDIRECT EXAMINATION**

3    BY MS. HELART:

4    Q    In response to Ms. Cook's question about did Mr. DuBois

5    ever produce nude photographs of Jane Doe 1 and Jane Doe 2,

6    you said no.  Was he ever asked to produce nude photographs of

7    Jane Doe 1 and 2?

8    A    I did not ask him that because all of his items -- he was

9    not in possession of any of his computers or computer-related

10   or digital media.  That was all in possession of Immigration

11   Customs in Grand Rapids, and their forensics people were still

12   in the process of going through the examination.  So I had no

13   cause to ask him to show me any pictures.

14   Q    In other words, your "his" in that answer was Mr. DuBois

15   was no longer in custody of his own, Mr. DuBois's computer

16   equipment?

17   A    That is correct.

18   Q    And was he in possession of Mr. Russell's computer disks

19   that he had gotten in this box?

20   A    To my knowledge, not at that time, no.

21   Q    Because?

22   A    According to the statement that Mr. DuBois made to me, he

23   had shipped that box back or given that box back to Dale

24   Russell.  Dale had requested it back, so he gave it back to

25   him.  And I'm not sure of the mode of transportation from

1   one -- from Michigan to Mr. Russell.

2   Q   Are you trusting Mr. DuBois's definition of the word

3   "inappropriate"?

4   A   No.  Personally no, and professionally no.

5   Q   And what about Mr. Russell's use of the word

6   "inappropriate" photos?  Are you trusting that definition to

7   be the same as law enforcement's or the law's definition?

8   A   No, I'm not.

9   Q   All right.  Thank you.  No other questions.

10              THE COURT:  Redirect?

11              MS. COOK:  Very briefly, Your Honor.

12                      **RECROSS-EXAMINATION**

13   BY MS. COOK:

14   Q   I assume, Agent, that if Mr. DuBois said in the course of

15   his conversation with you that photographs were inappropriate,

16   you would have inquired as to what he meant by that, wouldn't

17   you?

18   A   That's correct.

19   Q   And asked if that meant nude photographs of minors?

20   A   That's correct.

21              MS. COOK:  No further questions.

22              THE COURT:  Redirect -- Re-redirect?

23              MS. HELART:  No, Your Honor.

24              THE COURT:  You may step down.

25              THE WITNESS:  Thank you, Your Honor.

1          THE COURT:  Any further evidence?

2          MR. COOK:  No further evidence, Your Honor.

3          THE COURT:  I'll hear your argument, Mr. Cook.

4          MR. COOK:  Thank you.

5          Quite frankly, the Government completely disagrees

6  with Miss Cook's assertion that there's a complete lack of

7  evidence of Mr. Russell himself distributing many of the

8  images that he produced of his daughters.

9          He told both girls that he would.  He said, as we

10  heard in testimony from the trial from Jane Doe 1, that the

11  pictures at the gym that he took relating to Counts 2 and 4

12  were for special people who would pay more; not just himself,

13  special people who would pay more, inferring directly that

14  they would be distributed.

15          And in fact, they were found and continued to be

16  found to be out in the world.  This Court just heard testimony

17  this afternoon that it's been found in 49 states and two

18  foreign countries.

19          This Court will recall testimony from Jane Doe

20  No. 2, the defendant's daughter, Jane Doe 2.  This Court will

21  recall her recollection that she would not come off of during

22  cross-examination as she saw on her website nude photos that

23  the defendant had taken of her, that it was her understanding

24  that every photo that the defendant took of her was to go up

25  on a website.

1          Now, photos on a website can go up and down.  We

2     don't know the extent to which the school system or whomever

3     it was that first became aware of this website, the extent to

4     which they got into it, but that is Jane Doe 2's memory, and I

5     would suggest to the Court that her testimony is credible,

6     especially taken together with her sister's testimony,

7     especially when taken together with the fact that these images

8     have been seen in 49 states and two foreign nations.

9          The Court is not asked today to make a finding that

10    Mr. Russell distributed these things through his modeling

11    websites, though it's quite possible that he did.  The reason

12    that that point is brought up in the Government's response to

13    the defense objections is quite frankly that it's reasonable

14    to infer that if this defendant would post and sell images of

15    his daughters' in panties and other revealing clothes,

16    sexually-suggestive poses, it is quite reasonable to believe

17    that he, in fact, did sell images like the charged images, the

18    charges images themselves which are, in fact, again out in the

19    world.

20         It makes sense to believe that because he told them

21    that he would:  "Special people who would pay more is why

22    we're taking these pictures today, girls."

23         Whether or not Mr. DuBois also sent these images

24    out, there is evidence that this defendant, Dale Russell,

25    distributed the images.  There is evidence of that, and I

1  would suggest to the Court that in looking at the burden of

2  proof today, the preponderance of the evidence and the

3  credible evidence from this trial, and the surrounding facts

4  that have been presented today, that he should face the

5  two-point assessment on his guideline calculation.  Thank you.

6         THE COURT:  Thank you, Mr. Cook.

7         Do you want to present a rebuttal argument?

8         MS. COOK:  Thank you, Judge.

9         We don't dispute the fact that the photographs that

10  were introduced into evidence at the trial were recovered and

11  have been recovered from numerous collections across the

12  country, but it's our position that there is absolutely no

13  evidence that Mr. Russell distributed those photographs.

14         The absence of nude photographs doesn't indicate the

15  presence of nude photographs.  The Government hasn't

16  introduced one item of evidence that would indicate that

17  photographs that show up on an individual's computer were sent

18  to that computer from Mr. Russell.  There's been no evidence

19  of that.

20         And although we certainly understand that one of the

21  girls testified as to having seen what she believed to have

22  been a nude photograph and what she believed to have been her

23  website, there's been no tender of any photographs that came

24  off those websites that depicted nude minors.

25         Yes, there were photographs on the websites that

1  depicted girls wearing a variety of kinds of clothing, but

2  none which were even arguably pornographic.

3       It is true that those websites were taken down at a

4  particular point in time, but the Government hasn't provided

5  the testimony of any individual who saw those websites before

6  they were taken down who would testify that they contain nude

7  images.  And they haven't introduced any evidence that would

8  indicate that any of these thousands of people who apparently

9  have photographs in their collections have photographs of nude

10  minors that came off of those websites.  There is a complete

11  paucity of evidence on that point.

12       If these photographs moved in interstate commerce,

13  it's our contention that they moved in interstate commerce and

14  they were distributed because Mr. DuBois, without

15  Mr. Russell's consent, looked at them and took it upon himself

16  to transmit them via the Internet.  We think without any

17  credible evidence that the photographs were distributed by

18  Mr. Russell, that there is no basis for a two-level

19  enhancement for distribution.

20       THE COURT:  Let me recount what I know and believe

21  that the evidence to have been with respect to this issue

22  based on the evidence adduced here and the evidence at trial.

23       What we know is that Mr. Russell took a lot of

24  pictures.  He took a lot of pictures of Jane Doe 1 and Jane

25  Doe 2, many of which are actionable photos under the criminal

1   statutes for being sexually exploitative of a minor because
2   they were production of sexually-explicit visual or printed
3   material.

4          So there are those photos created along with the
5   others that may be less culpable, I assume they are less
6   culpable.  They aren't charged in any event.

7          So we know there were a lot of photos taken.
8   Mr. Byers apparently said that in his proffer to the
9   Government attorneys in conjunction with the prosecution
10  against him, which makes those statements more believable
11  because of the point in time at which they were made.

12         We also have Mr. Russell's statement to Jane Doe 1
13  and Jane Doe 2 that explained his reasons for taking certain
14  photos, that they would bring more money, that they would be
15  more valuable, they'd be more lucrative, which sounds like an
16  intent to distribute for economic gain clearly.

17         We know that the photos, these photos, wound up in
18  Canada, so we know they were distributed.  So the question is
19  whether Mr. Russell placed these specific photos into the
20  Internet channels so that they constituted distribution.

21         Now, the application note one definition of
22  distribution under Section 2G2.1 states as follows:
23  "Distribution means any act, any act, including possession
24  with intent to distribute production, transmission,
25  advertisement, and transportation related to the transfer of

1    material involving the sexual exploitation of a minor."

2           Because of the breadth of that definition, I believe

3    that the guideline has been complied with, that there was

4    distribution, even if you take Mr. Byers' testimony and only

5    Mr. Byers' testimony, that he received the box of materials

6    that included these photographs from Mr. Russell who

7    obviously -- at least obvious to me -- was trying to get rid

8    of them at that time when he was under the watchful eye of the

9    court and knew that the school officials had picked up on his

10   activities and his behaviors with the girls.  He was trying to

11   get rid of these materials that he knew to be inculpating.

12          So you could say even that his possession himself

13   with the intent to distribute, his production of them, his

14   transmission of them to Mr. Byers, his transportation of them

15   to Mr. Byers, he let them go out of his control.  They were

16   photographs he made, and he sent them to Mr. Byers knowing Mr.

17   Byers had an interest in this, a shared interest, and that

18   Mr. Byers was -- had been apparently with Mr. Russell and Jane

19   Doe 1 and Jane Doe 2 when other photos were made, that his own

20   interest in it and his own network of like-minded recipients

21   would be such that Mr. Russell was going to lose control of

22   these even if they were just copied and he got his originals

23   back.

24          So he gave them to an untrustworthy person in that

25   sense because he had reason to believe that Mr. Byers would

1    look at them.  And guess what, he did.  And guess what he did,

2    he made copies of them.  So it was Mr. Russell who put in

3    process that chain of events first by taking the photographs

4    and then placing them in a place -- in a circumstance where

5    they were likely to be exploited by other people who shared

6    the same interests that Mr. Russell did.

7           Now, that's the facts in the light most favorable to

8    Mr. Russell, that he didn't actually distribute it.

9           Did I get the name of the guy -- oh, DuBois.  Where

10   I said "Byers," I meant "DuBois."  I'm obviously doing oral

11   findings here.  So Mr. DuBois is the person to whom the box

12   was sent by Mr. Russell and he placed the box into

13   circumstances in which it was likely to be used, observed,

14   viewed, copied, and that's what happened.

15          When I said Mr. Byers before, obviously it was a

16   misstatement referring to Detective Andy Byers who testified.

17          So that's -- those are the facts most favorable to

18   Mr. Russell because they make the distribution one step

19   removed from him.

20          In my opinion, there's also evidence that would

21   justify a finding by the Court by a preponderance of the

22   evidence that Mr. Russell himself distributed them partly

23   because of the number of photographs, partly because of his

24   great interest in creating them and sending them out into the

25   Internet marketplace; and thirdly, because of his statement to

1   his daughters, Jane Doe 1 and Jane Doe 2, that more money

2   could be obtained by taking certain photos.

3          It could only be money from customers or people who

4   are accessing them, and that these photos were part of a much

5   larger pattern by Mr. Russell of photographing the victims in

6   various states of activity and undress.

7          So by a preponderance, I make these findings, and

8   will overrule the objection on removing the two-level

9   enhancement for -- because the offense involved distribution

10  as provided under 2G2.1B3.

11         Would you come back to the podium, please, Miss Cook

12  and Mr. Russell.

13         The next objection is No. 5, and it has to do with

14  your argument that the range of imprisonment under the

15  guidelines is not warranted by the empirical date.  I'll take

16  that into account when I'm deciding a reasonable sentence, but

17  it doesn't represent an objection to the guidelines.  So I

18  won't consider it in that context.

19         MS. COOK:  And I think that Mr. McKinley will

20  address that argument as well.

21         THE COURT:  That's fine.

22         The next objection's No. 6.  The objection goes to

23  paragraph 71 with the five-level enhancement under Section

24  4B1.5B1.  The presentence report reflects that five-level

25  enhancement because of the description of the defendant as a

1  repeat and dangerous sex offender against minors.

2         The defense objection was that it's not intended for

3  application here where the range -- it results in a range

4  which is far greater than necessary to satisfy the purposes of

5  the sentencing in this case.  So in a sense, this is the same

6  argument in a different form; is that right?

7         MS. COOK:  I think that the argument with respect to

8  the inapplicability of 4B1.5 is a little more specific than

9  the general argument about the sex offender guidelines.

10         THE COURT:  Go ahead and make that because perhaps

11  the probation officer didn't catch it exactly right.

12         MS. COOK:  It's our position that the application of

13  those guidelines to Mr. Russell's situation is unwarranted and

14  results in the imposition of a guideline range that is unduly

15  harsh and far greater than necessary to serve the purposes of

16  sentencing.

17         We would concede that the guideline is technically

18  appropriate with respect to an individual convicted of the

19  offenses for which Mr. Russell has been convicted.  And I say

20  that because any person who produces at least two separate

21  images that are deemed to be pornographic photographs of

22  minors fits within the definition set forth in 4B1.5.

23         But I think that it would be inappropriate for the

24  Court to apply that guideline to Mr. Russell.  The fact that

25  the Sentencing Commission included the section dealing with

1  repeat and dangerous sex offenders with the section that also

2  deals with career offenders and armed career offenders, it

3  gives us some idea of what they were thinking in terms of

4  creating this substantial enhancement for people who are

5  deemed to be repeat and dangerous sex offenders.

6           I mean, if we look at the analogous sections having

7  to do with career offenders, we find that the penalties are

8  substantially increased for those persons who are within their

9  categories, what we might call the worst offenders, those who

10 have multiple serious priors, armed felons, people who are not

11 amenable to treatment because they have already been in

12 institutions before as a result of prior convictions.

13          In this particular situation, this guideline is

14 applicable to people with no priors, no prior treatment, who

15 on a first offense have been convicted of simply creating two

16 separate photographs.  The -- by including persons such as

17 Mr. Russell within the ambit of that enhancement, you have a

18 situation where there is no ability to distinguish people who

19 create two photographs from those individuals who are the most

20 culpable, those individuals who have, in addition to creating

21 at least two photographs, engaged in intercourse, photographed

22 minors who are engaging in intercourse, photographed minors

23 engaged in bondage scenes or bestiality scenes, all of those

24 offenders are lumped together in this enhancement.

25          And because they are all lumped together, you get

1 the inequitable result of someone who has taken the

2 photographs such as Mr. Russell's photographs, which are, I

3 think even the Government would have to admit, a far cry from

4 what the Courts have deemed to be the worst of the worst in

5 terms of the content of the photographs.

6          So the strict application of this guideline to

7 Mr. Russell is not only unwarranted but it's unduly harsh.  It

8 results in a penalty which is unjust, and it punishes him in

9 the same way that it punishes individuals who can properly be

10 called the worst of the worst because they have had a history

11 of prior convictions for this offense, because they have

12 engaged in sexual intercourse with the victims of their

13 photography, because they have caused sex acts to be committed

14 between numerous victims of a far more tender age than the

15 girls in this case.

16          So it fails to distinguish between those type of

17 offenders who are the most culpable and people who find

18 themselves in Mr. Russell's situation.  We think that that

19 strict application works an inequitable result, and believe

20 that the Court should not impose the five-level enhancement.

21          THE COURT:  Thank you, Ms. Cook.

22          Mr. Cook?

23          MR. COOK:  Your Honor, this seems an appropriate

24 time to offer to the Court, if it's ready to hear it,

25 additional evidence from Jane Doe 1, the defendant's daughter,

1  Jane Doe 1.

2          THE COURT:  All right.  Please have a seat over

3  here.

4          Good afternoon.  Come to the witness stand.  Remain

5  standing.  Raise your right hand.  Be sworn by the Clerk.

6          **JANE DOE 1, PLAINTIFF'S WITNESS, SWORN**

7                  **<u>DIRECT EXAMINATION</u>**

8          THE COURT:  You may be seated.

9          MR. COOK:  May I proceed, Your Honor?

10          THE COURT:  Please.

11  BY MR. COOK:

12  Q   Would you please state your name for the record?

13  A   Jane Doe 1.

14  Q   And Jane Doe 1, you are the defendant, Dale Russell's,

15  daughter; is that correct?

16  A   Yes.

17  Q   Do you recall testifying during the trial in this matter

18  back in March regarding nude pictures he took of you; is that

19  correct?

20  A   Yes.

21  Q   You also testified very generally about inappropriate

22  sexual touching that your father did of you between 2001 and

23  2004; is that right?

24  A   Yes.

25  Q   I would like, if you're ready and able, to go over with

JANE DOE 1 - DIRECT/COOK          64

1  you this afternoon more about some of the details of this

2  incident.  Are you prepared to testify about that?

3  A   Yes.

4  Q   If you could, why don't you tell the Court the first time

5  that you can recall any inappropriate contact between you and

6  your father.

7  A   We lived at his friend Mary Kay's house, and we were -- he

8  had taken pictures of all three of us covered in powdered

9  sugar, and my brother and sister were in the shower and he sat

10  me on the toilet standing up and licked my genitals.

11  Q   I want to back up just a little bit.  First of all, you

12  said when he was living at Mary Kay's house.  How old were you

13  at this time, to the best of your recollection?

14  A   Around nine or ten.

15           THE COURT:  Ten did you say?

16           THE WITNESS:  Around nine or ten.

17           THE COURT:  Nine I heard?

18  BY MR. COOK:

19  Q   And when you say "the three of us," he took pictures of

20  you, who were the three people that were in the pictures?

21  A   Me and my brother and my sister.

22  Q   And what was the nature of these pictures?  Were you

23  clothed or unclothed?

24  A   Unclothed.

25  Q   Where in the house did these pictures take place?

JANE DOE 1 – DIRECT/COOK          65

1  A   In the kitchen.

2          MR. COOK:  If I might approach the witness, Your

3  Honor, with Government's A and B?

4          THE COURT:  Yes, you may.

5  BY MR. COOK:

6  Q   And if you could take a look at those for a moment.  Can

7  you tell the Court what Government Exhibit A is?

8  A   Me and my brother and my sister in powdered sugar, covered

9  in it.

10 Q   And how about Government's Exhibit B?

11 A   Me and my sister covered in powdered sugar.

12 Q   And those appear to be the images that were produced on

13 the evening that your father had inappropriate sexual contact

14 with you?

15 A   Yes.

16          MR. COOK:  Your Honor, I ask the Court to accept in

17 evidence Government's Exhibit A and B.

18          THE COURT:  Have you shown them to the defense?

19          MR. COOK:  I have.

20          THE COURT:  Okay, yes, you may.

21          Any objection?

22          MS. COOK:  No, Your Honor.

23          THE COURT:  Exhibits A and B are admitted.

24     (Government's Exhibits A–B received in evidence.)

25          MR. COOK:  May I proceed?

JANE DOE 1 – DIRECT/COOK          66

1          THE COURT:  Yes.

2    BY MR. COOK:

3    Q    Now, Jane Doe 1, you were fully nude in those photographs

4    your father took that evening?

5    A    Yes.

6    Q    Whose idea was it for you to be nude and take pictures

7    that evening?

8    A    His idea.

9    Q    Whose idea was it for you to be covered with what appears

10   to be some kind of powder?

11   A    His idea.

12   Q    What was that powder that we see in Government's Exhibits

13   A and B?

14   A    Powdered sugar.

15   Q    And who put that on your bodies?

16   A    He did.  Sometimes, like some of it, we did ourselves.

17   Q    Now, you stated that the three of you, being your sister

18   and your brother --

19          THE COURT:  I didn't understand your answer when you

20   said "Whose idea was it?"

21   A    My father's idea.

22          THE COURT:  Okay.  I hear it now.  Your father's

23   idea.  Okay, go ahead.

24   BY MR. COOK:

25   Q    Jane Doe 1, do your best to speak up if you can, although

JANE DOE 1 - DIRECT/COOK          67

1   I know it's difficult.

2          You stated that you, your brother and your sister

3   made your way to the bathroom.  Was this to shower and get

4   this powdered sugar off of you?

5   A   Yes.

6   Q   Who got into the shower first, to your recollection?

7   A   My brother and my sister.

8   Q   And was your father in the bathroom with the three of you

9   as well?

10  A   Yes.

11  Q   You stated that you ended up -- were you standing on the

12  toilet?  Did your father lift you up on the toilet?

13  A   I can't remember.  I think so.

14  Q   Your testimony was that he licked your genitals; is that

15  correct?

16  A   Yes.

17  Q   Did he say anything about that to you at that time or any

18  other time?

19  A   No.

20  Q   Was there an additional incident around that same time

21  period when you were nine or ten years old of you being in a

22  shower?

23  A   Yes.

24  Q   Can you please tell the Court about that?

25  A   He had come in the shower when I was in there and said

1   that –– he started washing me, and he said that "Wouldn't it

2   be nice to have your own personal –– your own person to wash

3   you for you?"

4   Q   When you say he started washing you, did he wash your

5   genitals as well?

6   A   Yeah, he washed my whole body.

7   Q   And at that age when –– you were nine or ten years old at

8   that time; is that correct?

9   A   Yeah.

10  Q   At that age, were you in the common practice of bathing

11  yourself?

12  A   Yeah.

13  Q   So was it abnormal for your father to be involved in any

14  part of that process?

15          MS. COOK:  I'm going to object to the leading nature

16  of the questions.  I think he's had a lot of latitude with the

17  witness at this point.

18          THE COURT:  Overruled.

19  BY MR. COOK:

20  Q   I'm going to draw your attention or ask you, was there

21  then a third incident later in time that occurred between you

22  and your father?

23  A   Yes.

24  Q   Around how old were you when this third incident occurred?

25  A   Around 10 or 11.

JANE DOE 1 – DIRECT/COOK          69

1  Q   Where were you -- where was your father living at that

2  time?

3  A   We lived at Braeburn Village Apartments.

4  Q   If you would, tell the Court about this incident.

5  A   He had used -- he had bought muscle relaxers for me, and

6  I -- and he used one on my genitals and held it on there.

7  Q   Now what you refer to as muscle relaxers, can you describe

8  what those are for the Court, please, what your father called

9  muscle relaxers?

10  A   They vibrated and they had batteries in them.

11  Q   And were you nude when he held this against your genitals?

12  A   Yes.

13  Q   For how long did he hold this apparatus against your

14  genitals?

15  A   For one or two minutes.

16  Q   Now, Jane Doe 1, you had discussed with me on previous

17  occasions, and also earlier today, what these apparatuses look

18  like.  I suppose I should ask you first, was there one "muscle

19  relaxer" or two?

20  A   There were two.

21  Q   And did both of those belong to you or --

22  A   Yeah, I had both of them, that he gave to me and I gave

23  one to my sister.

24          MR. COOK:  Your Honor, if I may approach the witness

25  with Government's Exhibit C?

JANE DOE 1 – DIRECT/COOK          70

1           THE COURT:  Yes, you may.

2           MS. COOK:  A preliminary question, Your Honor?

3           THE COURT:  You may ask.

4           MS. COOK:  Jane Doe 1, with respect to what's been

5  marked as Government's Exhibit C, is this a drawing that you

6  created today?

7           THE WITNESS:  Yes.

8           MS. COOK:  And you previously had created another

9  drawing?

10          THE WITNESS:  Yes.

11          MS. COOK:  Did the Government's attorneys ask you to

12 redraw it?

13          THE WITNESS:  Yes.

14          MS. COOK:  With more detail?

15          THE WITNESS:  Yes.

16          MS. COOK:  And did you have a discussion about the

17 detail?

18          THE WITNESS:  No, I don't know –– what do you mean?

19          MS. COOK:  What's been marked Government's Exhibit C

20 is a lot more detailed than what you drew previously.

21          THE WITNESS:  Yeah.

22          MS. COOK:  I have no objection.

23          THE COURT:  Exhibit C –– are you offering Exhibit C?

24          MR. COOK:  I suppose I should show it to the witness

25 and have her identify it first.

 1          THE COURT:  Yes, you should.

 2   BY MR. COOK:

 3   Q   Jane Doe 1, I'd like you to take a look at Government's

 4   Exhibit C, and is that a picture that you prepared today?

 5   A   Yes.

 6   Q   And you drew that yourself, correct?

 7   A   Yes.

 8   Q   Can you describe to the court what it is that you drew?

 9   A   Muscle relaxers.

10   Q   Okay.  And those accurately reflect your memory of them?

11   A   Yes.

12          MR. COOK:  Your Honor, I would ask the Court to

13   accept into evidence Government's Exhibit C.

14          THE COURT:  No objection?

15          MS. COOK:  No objection, Your Honor.

16          THE COURT:  Exhibit C is admitted.

17       (Government's Exhibit C received in evidence.)

18   BY MR. COOK:

19   Q   Jane Doe 1, at the time of these three incidents, what

20   were your feelings about them?

21   A   I just -- what did you ask?  Sorry?

22   Q   At the time of these incidents, what were your feelings

23   about them?  What was your reaction to the incidents?

24   A   I just froze up at first, and I didn't tell anyone about

25   it for a long time, and I just -- you know, I thought it was

1  wrong.

2  Q    Now, as we discussed during the course of the trial, you

3  had spoken with a number of people in law enforcement over the

4  years about whether your father had sexual contact with you,

5  correct?

6  A    Yes.

7  Q    And until February of this year, during the course of the

8  trial preparation, those prior incidences of speaking about

9  whether there had been sexual contact, you had always said

10  there had not been, correct?

11  A    Yes.

12  Q    Why did you say during those other times that he had not

13  had any sexual contact with you?

14  A    Because I was still confused.  I was still confused about

15  it, and not sure what had actually happened, and I guess I was

16  just -- at first, I was trying to protect him from getting

17  into any more trouble until I realized what he had actually

18  done.

19  Q    Jane Doe 1, are you telling the truth today with

20  everything that you've testified about?

21  A    Yes.

22          MR. COOK:  Your Honor, I have no further questions.

23          THE COURT:  Cross-examine?

24

25

**CROSS EXAMINATION**

BY MS. COOK:

1

2

3   Q   Jane Doe 1, Mr. Cook asked you about -- did I just turn

4   that off (indicating)?   I'm sorry.

5        Mr. Cook asked you about your failure to tell other

6   people with whom you had spoken about your father's

7   activities, about these allegations you testified to today?

8   A   Uh-huh, yes.

9   Q   And as I understand it, you had conversations with people

10  at your school about the modeling websites?

11  A   Yes.

12  Q   And you didn't indicate to any of those people, including

13  a school counselor, that any of these activities had taken

14  place?

15  A   No.

16  Q   And you were interviewed by local law enforcement

17  officers?

18  A   Yes.

19  Q   You didn't tell any of them?

20  A   No.

21  Q   And during those interviews, the topic was whether or not

22  your father had photographed you in inappropriate ways?

23  A   Yes.

24  Q   And those officers asked you, too, if your father had done

25  anything else that was inappropriate?

1  A    Yes.

2  Q    And you denied it?

3  A    Yes.

4  Q    When your mother took your father back to court, you had

5  an opportunity to talk to a counselor?

6  A    Yes.

7  Q    And it was a female counselor --

8  A    Yes.

9  Q    -- who was concerned about your welfare?

10 A    I guess.

11 Q    And she told you you hadn't done anything wrong, right?

12 A    Yes.

13 Q    And during the course of your meetings with her, you

14 didn't tell her that there had ever been any inappropriate

15 touchings by your father, did you?

16 A    No, we hadn't spoken very many times.

17 Q    Well, during the times that you did speak with her, she

18 was concerned about your welfare, wasn't she?

19 A    Yes.

20 Q    And she talked to you about the photographs that had been

21 taken?

22 A    No.

23 Q    She talked to you about your relationship with your

24 father?

25 A    No.

1  Q   Well, what did she talk to you about during the counseling

2  sessions?

3  A   We were just trying to get to know each other better.  We

4  didn't get into any details about anything like that.

5  Q   You had more than one session with her, didn't you?

6  A   Yes.

7  Q   In fact, you had more than two?

8  A   Around three, I think.

9  Q   Okay.  And during those three counseling sessions, you

10 never told her that there had been any inappropriate touchings

11 by your father?

12 A   No.

13 Q   When this prosecution began, you had a number of occasions

14 when you met with the Government's attorneys?

15 A   Yes.

16 Q   And you didn't tell them, up until shortly, prior to the

17 trial?

18 A   Yes.

19 Q   And, in fact, you had a meeting with Mr. McKinley before

20 the trial?

21 A   Yes.

22 Q   Where he specifically asked you whether there had been any

23 inappropriate contact with your father?

24 A   Yes.

25 Q   And you told him that there hadn't been any?

1  A   Right.

2  Q   And it was only after you had some additional –– spent

3  some additional time with the Government's attorneys in

4  preparation for the trial that for the first time you made

5  these allegations?

6  A   Yes.

7              MS. COOK:  I have no further questions.

8              THE COURT:  Redirect?

9              MR. COOK:  No further questions, Your Honor.

10             THE COURT:  Let me ask you a couple of questions if

11 I may.  Who was the first person you told about the

12 inappropriate touchings and the experiences you've testified

13 to today?  Who was the first person?

14             THE WITNESS:  I told Brant.

15             THE COURT:  You told Mr. Cook?

16             THE WITNESS:  Yes.

17             THE COURT:  And that was in the course of talking to

18 him getting ready for the trial?

19             THE WITNESS:  Yes.

20             THE COURT:  And when you told him about it the first

21 time, was this new information you brought up or did he ask

22 you?

23             THE WITNESS:  When he had seen –– when he had seen

24 the way I answered to Mr. McKinley's question, he brought it

25 back up again.

1      THE COURT:  And then you felt like you could tell

2  him the truth?

3      THE WITNESS:  Yes.

4      THE COURT:  Is what you've told us the truth?

5      THE WITNESS:  Yes.

6      THE COURT:  You know the difference between the

7  truth and a lie, don't you?

8      THE WITNESS:  Yes.

9      THE COURT:  And you know that because you told a lie

10  about this, or at least you didn't disclose it for quite a

11  while?

12      THE WITNESS:  Yes.

13      THE COURT:  And was that because it was hard to

14  tell?

15      THE WITNESS:  Yes.

16      THE COURT:  Because it made you feel bad about

17  yourself; is that right?

18      THE WITNESS:  Yes.

19      THE COURT:  Okay.  Anybody else have any questions?

20      MS. COOK:  No, Your Honor.  Thank you.

21      THE COURT:  Thank you very much.  You may step down.

22      Your next witness.

23      MR. COOK:  Your Honor, I have no further witnesses

24  on this point.  I would ask the Court to hear argument if you

25  would.

1        THE COURT:  I will.

2        MR. COOK:  The Government did file a response that

3   was written.  And I would point the Court back in that

4   direction, but I do want to make some response to some points

5   that were raised today by Ms. Cook.

6        Ms. Cook seems to suggest that the repeat and

7   dangerous sex offender portion of 4B1.5 is out of place

8   because it's in a section that is accompanied by a career

9   offender and those sorts of offenders.  But that argument,

10  Your Honor, ignores the particularly pernicious nature or the

11  particularly damaging nature of the kind of conduct that the

12  defendant took part in, and quite frankly, Congress's strong

13  response to that, and Congress's strong suggestions to the

14  Court through the Sentencing Commission on how to deal with

15  these sorts of offenses.

16        The nature of this conduct is secret.  Men like this

17  offender do their deeds behind closed doors, manipulating

18  children, in this case manipulating family members,

19  manipulating people into being quiet.

20        Often in this kind of offense, you don't catch a

21  person the first time or the second time or the third or

22  fourth or fifth time.

23        Because of that, the Sentencing Commission --

24  Congress, through the Sentencing Commission, has said that if

25  the Government can establish, as we have done here, that the

*RUSSELL – CROSS/COOK*          79

1   conduct took place on multiple occasions, that it should be

2   treated as severely as those who are career offenders and so

3   forth.

4          Secondly, I would point the Court to 18 United

5   States Code 3559(e) as just a very good simple example of how

6   serious Congress takes these offenses.  Now, it doesn't apply

7   in this case, but that subsection, Your Honor, has where a

8   person has one prior conviction for the sexual abuse of a

9   child, and then, for instance, produces child pornography and

10  is convicted of such, they get a life sentence.  It's not

11  three strikes and you're out in this kind of conduct.  It's

12  two strikes.

13         The five-point enhancement for the kind of conduct

14  here, the manipulation of his daughters, two of his daughters,

15  of his ex-wife, the unrepentant manner in which this defendant

16  approaches the Court shows quite clearly that he is, in fact,

17  a repeat and dangerous sex offender, and that five-point

18  enhancement is entirely appropriate.  Thank you.

19         THE COURT:  Ms. Cook?

20         MS. COOK:  Well, as Mr. Cook said, the two strikes

21  provision of 1859 doesn't apply here, and one might surmise

22  that that provision is in there to more harshly punish an

23  individual who has already been convicted of an offense and

24  had an opportunity to be rehabilitated and then reoffends.

25         Also, in the case of the guideline that we're

1   looking at, the enhancement is not for manipulation of other

2   people, much less manipulation of the mother.  The enhancement

3   is simply based on two separate incidents of production.

4          So we think that that guideline throws an

5   extraordinarily broad net across offenders and captures

6   individuals such as Mr. Russell who cannot fairly be

7   characterized as being the worst of the worst of the sex

8   offenders who are prosecuted for like offenses.

9          We think that the Court should decline to apply it

10  in this case as the Court has the discretion to do given the

11  advisory nature of the guidelines.

12         THE COURT:  The Court's judgment is as follows,

13  although this is a close call I have to say.  And one of the

14  reasons it's a close call is because of the abhorrent nature,

15  as in abhor and nature, of the conduct that's been testified

16  to.

17         There's no getting past the fact that the behaviors

18  by Mr. Russell towards his children in the ways in which they

19  were testified to, not only here but at the trial, reflect

20  exceedingly grave exploitative behavior.

21         The defense virtually concedes that the behaviors

22  that have been testified to could fit within this provision,

23  but implores the Court not to expand on or exaggerate the

24  behaviors, bad as they are, by using the highly-punitive

25  five-level increase under the guidelines for repeat and

*RUSSELL – CROSS/COOK*          81

1  dangerous sex offenders against minors.

2          It does occur to me that that provision contemplates

3  something other than what we have here.  As horrific as the

4  behaviors were, they don't reflect the repeat and dangerous

5  patterns of activity against minors that seem to be

6  contemplated under the guidelines.

7          So I will sustain the objection with respect to the

8  five-level increase but I will, at the same time, indicate to

9  the parties that I will fold this factor into the sentencing

10  decisions under the offense characteristics and behaviors

11  under the 3553(a) factors.

12          But in terms of the guidelines, we'll start the

13  guideline computation without regard to the five-level

14  enhancement as is set out in paragraph 71 I think it is.  Let

15  me make sure.  Yes, the Chapter 4 enhancements.

16          So I will disallow that five-level increase and

17  sustain the defense objection for the reasons that I've

18  stated.  It does seem to me that this provision is intended to

19  address proven, extended patterns of activity that are

20  repeated in that sense and dangerous as to minors.  And so for

21  the reasons stated, I'll disallow this enhancement.

22          Now, let's address the remaining objections in the

23  addendum.  That is Objection No. 6, I think, that's

24  incorporated in that ruling.  Objection 7 entitled Release

25  Status, the defendant has been detained, he says, since

1   August 21, 2009.  There's no response necessary to that

2   according to the probation officer.

3            Do you agree with that, Miss Cook?

4            MS. COOK:  I think that the objection simply went to

5   the credit time that should be awarded to Mr. Russell.

6            THE COURT:  Right, we let the Bureau of Prisons

7   decide.

8            MS. COOK:  That's fine.

9            THE COURT:  So I won't make a ruling on that.

10                     (Brief interruption)

11           I don't know what's making that noise.  The arrests,

12   both of those offenses you want to highlight were dismissed,

13   so no response is necessary to that.

14           Do you agree?

15           MS. COOK:  Yes, Judge.  The remaining points that I

16   made were primarily points of clarification of facts that were

17   set forth in the Presentence as opposed to objections calling

18   for a ruling.

19           THE COURT:  Okay, good.  Then I won't go through

20   each one because that's my analysis as well.  I've noted them,

21   I'll have them in mind when I make the remaining rulings.

22           Now, noting your objections no doubt to the issues

23   where I did not sustain your objections, and preserving those

24   positions, do you nonetheless accept the presentence report as

25   it's been tendered and reviewed here in all other respects in

 1  other words?

 2          MS. COOK:  Yes, with the clarifications that we've

 3  pointed out in our list of objections.

 4          THE COURT:  Yes, okay.  So the presentence report --

 5                  (Brief interruption)

 6          If someone has a cell phone on, that's likely

 7  creating the feedback, so please turn off -- all the way off,

 8  not just to silence, any cell phones.

 9          I adopt as my own the Presentence Investigation

10  Report as it's been formulated here with the exceptions as

11  I've ruled upon them today, the most notable being paragraph

12  71 where I've disallowed the five-level enhancement.

13          The result of that is a total offense level of 44.

14  Is that how you do it, Mr. Schoettmer?

15          PROBATION OFFICER:  Correct, Your Honor.

16          THE COURT:  And a criminal history category of one,

17  and that results in the following guideline ranges:  For the

18  period of incarceration, it's 2- -- let's see, 44, sorry.

19  It's life.  It's still life.

20          PROBATION OFFICER:  The guideline provisions doesn't

21  change.

22          THE COURT:  Yes, that's what my quick review

23  demonstrates as well.  So the period under the guidelines, the

24  period of incarceration is life.  The defendant's not eligible

25  for probation.  The period of supervised release is life.  The

*RUSSELL – CROSS/COOK*          84

1  fine range is $25,000 on the low end up to $250,000 on the

2  high end.  Restitution doesn't apply.  The special assessment

3  of $400 is mandatory and so that will be a part of the

4  judgment.

5          So with the exceptions noted previously, do you

6  agree with that extrapolation, Ms. Cook?

7          MS. COOK:  We agree that that's the guideline, the

8  advisory guideline computation.

9          THE COURT:  Right.  Is that consistent with your

10  judgment as well, Mr. Cook?

11          MR. COOK:  With the exception of the 4B1.5, yes, it

12  is, Your Honor.

13          THE COURT:  So that's the beginning point for the

14  Court's decision making.  I think it's appropriate if we take

15  a little break and we'll come back and hear from Mr. Russell

16  and his counsel, and then from Government counsel and impose

17  the sentence.  So let's just take about a 10-minute recess.

18              (Recess taken from 4:11 p.m. to 4:31 p.m.)

19                      (Open court.)

20          THE COURT:  You may be seated.

21          The Court has been alerted, of course, to the fact

22  that there are victim impact implications here, and therefore,

23  victims who may want to address the Court.  So do you wish to

24  present that information before I call on Mr. Russell and his

25  counsel or after?

1          MS. HELART:  We would prefer to do it after

2    Mr. Russell's presentation and before the Government's

3    presentation.

4          THE COURT:  All right.

5          Miss Cook, would you escort Mr. Russell to the

6    podium again, and Mr. McKinley as well.

7          Mr. Russell, as I indicated at the beginning of our

8    hearing, the Court's obligation is to impose a reasonable

9    sentence.  We've gone through the guideline calculation so far

10   in our hearing in order to get that nailed down.  And as I

11   said at the outset, having determined as best I can and as

12   accurately as I can a correct guideline application, then I

13   must decide one further thing, and that is, are the guidelines

14   reasonable here in your case.

15         The Court has to keep in mind the statutory

16   boundaries.  The statute here says 15 years minimum up to 30

17   years maximum per count.  And there are four counts.  So I

18   must comply with that statutory range or those boundaries set

19   out in the statute.

20         But the Court has discretion with respect to issues

21   of supervised release and the fine amount, if any, and so

22   forth.  So it's appropriate for you to speak and to tell me

23   whatever it is you want me to know and think about and take

24   into account.

25         I encourage you to use this opportunity because

1  we're not likely to have another chance when you can influence

2  the Court's judgment on the important matters here.  After I

3  hear from you, sir, then I'll hear from, I guess is it

4  Mr. McKinley?

5              MS. COOK:  Yes, Your Honor.

6              THE COURT:  Who will speak on your behalf.  So you

7  may lead off, Mr. Russell.

8              THE DEFENDANT:  Thank you, Your Honor.  The picture

9  of the monster that the prosecution has painted is not me.  I

10  am a good and loving father and have always tried to teach my

11  children right from wrong, good values, honesty and the

12  importance of education.  Even though my beliefs and methods

13  may be unorthodox, there's a good heart behind them.

14              But like any parent, I've made mistakes, and it

15  breaks my heart to know my mistakes have caused such distress,

16  problems and embarrassment for my kids and my family.  And I

17  am so sorry about that.

18              I alone am responsible for these mistakes, and I

19  would like to apologize to my family for any pain I've caused.

20  I wish I could turn back time and change what has happened,

21  but I can't.  None of us can.

22              All I can do is ask God, my family, for forgiveness

23  and understanding.  I had no intentions of ever creating

24  anything that could be misconstrued as pornographic nor for it

25  to leave the confines of our family, but it has happened, and

1   I regret it every day.

2            So to my family and kids, I love you and I never

3   meant to hurt you.

4                    (Pause.)

5            I'm truly sorry for what has happened.  Please find

6   it in your heart and forgive me, and to you, Your Honor, in

7   your wisdom, please have mercy in your sentencing.

8            THE COURT:  I know how difficult that was for you to

9   say those things, Mr. Russell, because the underlying fact is

10  that the ripples that go out from this case go way beyond

11  anything we can perceive or imagine.  And nobody knows that

12  more or better than you do, because as a result of this

13  prosecution and the punishment that's going to ensue, it's

14  life changing for everyone.

15           Sometimes it's within the Court's power to say well,

16  you committed the crime, now you have to be punished and we'll

17  look forward to another day when you've paid your debt to

18  society and so forth.  But the nature of these offenses is

19  such that the debt can't ever be discharged in that way, that

20  the punishment goes on, and the supervised release term goes

21  on, and the pain that you've caused your children, especially

22  your wife, your former wife, and the grandparents as they have

23  written about it, it's hard to imagine how it can end.

24           Maybe some things can happen that can ameliorate it.

25  Maybe there can be some psychological help, some good

*RUSSELL – CROSS/COOK*          88

1  counseling and psychiatric advice, but what we know is that

2  especially when the violations that occurred here, not just of

3  law, but the violations of the children's own sense of

4  personhood and integrity and so forth, when those violations

5  occur, the Court does not have enough power or wisdom to fix

6  all those problems.

7          The most that can happen here today, by virtue of a

8  sentence, is for the societal balance to be righted.  We have

9  to put things back in as much balance as we can in terms of

10 society's interest.  But as I said, the other interests can't

11 be fixed quite so easily, if ever, or if at all.

12         Because I presided over the trial and heard all the

13 testimony back and forth and had to make the judgments that

14 were entrusted to me on the law and what the statutes mean,

15 and how we had to position the case so the jury could decide

16 it and so forth, and now having heard the evidence today and

17 the arguments and so forth, if anything, having all that

18 information has just made my job harder because I see how many

19 interests there are to balance.

20         I think that what you've alluded to here, that

21 there's a certain disconnect between the facts that have been

22 portrayed, not just by the Government, but by the witnesses

23 that were called by the Government, there's a disconnect

24 between what you perceived to be your true self and your true

25 intentions, and that picture or that description.

1      I can see how you can say that because I think there

2  are some elements in your background and in your outlook that

3  are worthy goals, but somehow it all got ugly and it got

4  distorted and it got pushed beyond the pail, and that's when

5  it became illegal.

6      And now, the underlying fact is that these pictures

7  that you took, for whatever purpose you say you took them, are

8  out there for all the world to see.  So that's the harm.

9  That's what Congress says when it enacts these statutes and

10  imposes severe penalties.  And that's why we're here, because

11  of that.

12      Mr. McKinley, what would you say on Mr. Russell's

13  behalf?

14      MR. McKINLEY:  Your Honor, this Court obviously has

15  an unenviable task today in trying to determine what is enough

16  time, what is sufficient but not greater than necessary to

17  comply with the purposes of sentencing in light of the nature

18  and circumstances of the offense and the history and

19  characteristics of Dale Russell.

20      With regard to the offense conduct, I'm not going to

21  stand here and try to soft pedal it.  I can't begin to imagine

22  what the victims have endured in this case.  I recognize that

23  this is –– this case presents difficult issues from a variety

24  of perspectives.

25      The fact that the conduct here isn't as egregious as

1  it is in many pornography cases that we see in federal

2  district court, the fact that there were no physical injuries

3  to the victims do little to ameliorate the real impact of the

4  offenses that Mr. Russell's been convicted of here.  And I'm

5  not -- like I say, I'm not going to try to stand here and soft

6  pedal what happened.

7          The only dispute as to what transpired here involves

8  allegations by the victims of improper sexual touching, which

9  Dale Russell has adamantly denied that there was any -- there

10 was ever any inappropriate touching.  But be that as it may,

11 the fact that these images have been disseminated around the

12 world, we're certainly sensitive to the impact it's going to

13 have on him.

14         I mean, I read the impact statements.  We've all

15 read the impact statements.  And quite frankly, they just tear

16 your heart out.  I know that.  But one of the things that

17 you're required to consider also is Dale Russell's personal

18 history and characteristics.  And he is certainly not a man

19 without unredeeming qualities.

20         I don't know if I said that right -- he is a man

21 with many redeeming qualities.  He's got no criminal history

22 to speak of, and I won't go through all of this because I

23 think it's -- there's a very fair snapshot of his personal

24 profile and personal background contained in the presentence

25 report.

1        But when we think about what is sufficient and what

2   is sufficient to promote respect for the law, to provide for

3   adequate deterrence, to provide for just punishment, we have

4   to keep this case and this conduct in perspective.

5        The Government has suggested that in light of the

6   statutory maximum here, which if you stack sentences, the

7   maximum sentence, really we're looking at a range of 15 years

8   on the bottom end to 120 years.

9        The Government's not asking for 120 years.  The

10  Government's asking for 80 years.  And in support of that,

11  they have cited other cases which they say maybe give this

12  Court some guidance as to what an appropriate sentence would

13  be in light of how other people, similarly-situated defendants

14  have been sentenced.  But the Government's examples are way,

15  way wide of the mark.

16       They reference the case of United States versus

17  McGrath.  Mr. McGrath was sentenced, I think, about two weeks

18  ago.  He received a sentence of 370 years.  They reference

19  United States versus Dick Noel.  Dick Noel received an 80-year

20  sentence after proceeding to trial.

21       They reference United States versus Mark Armstrong,

22  a New Albany case that I believe was Judge Hamilton, where

23  Mr. Armstrong received a 75-year sentence.

24       The facts of those cases -- and I don't claim to

25  have any intimate familiarity with those, my familiarity of

1  those is largely from the public record; but I know that all

2  of those cases involved images that portrayed not just

3  sexually-explicit conduct, but actual sexual acts,

4  intercourse, oral and anal penetration, most portraying the

5  defendant himself engaged in such conduct with not just

6  minors, but infants, ranging anywhere from two to 12 years

7  old.

8          Even if the Court credits the testimony of Jane Doe

9  1 concerning the allegations of improper touching, we're not

10 anywhere near comparable to the cases of Dick Noel,

11 Mr. Armstrong or Mr. McGrath.

12         The Government suggests in its sentencing memorandum

13 that they –– that these ought to serve as some kind of sign

14 post, or some type of indicators of, or a touch stone for how

15 a sentence ought to be fashioned here.  Every one of those

16 defendants received a life sentence.  80 years is a life

17 sentence.  75 years for a person who's in their 50s is a life

18 sentence.

19         An 80-year sentence, which is what the Government's

20 requesting here, after good-time credit, would require Dale

21 Russell to serve a minimum of 69 years, eight months and eight

22 days.  His projected release date would be February of 2079.

23 He will be 117 years old.  A 60-year sentence is a death

24 sentence for Dale Russell.

25         Life sentences are for a Bernie Madoff.  They are

*RUSSELL – CROSS/COOK*          93

1   for Desmond Turner.  Life sentences are for Richard Reid, the

2   shoe bomber.  Life sentences are for people like Dick Noel,

3   people like Mark Armstrong and people like McGrath.  This is

4   not a case that calls for a sentence of life in prison.  And

5   that's what the Government is asking for here.

6        A sentence anywhere in the range of what the

7   Government is suggested here, it's like a live burial.  I

8   mean, it's going to extinguish any hope that Dale Russell

9   would have for the rest of his life for ever getting out of

10  prison.  That type of sentence, I submit, has to be reserved

11  specifically for the worst of the worst.  And notwithstanding

12  all of the allegations and all of the evidence that's been

13  introduced in this case, Dale Russell is a far cry from being

14  the worst of the worst.

15       I submit that the sentence here has to be tempered

16  with the realization that this man deserves an opportunity to

17  demonstrate that this is never going to happen again.  A

18  lifetime of supervision, which I know is going to follow any

19  term of imprisonment that's imposed here, guarantees that he's

20  going to conform his conduct to the prescriptions of law

21  because one slip up, one failure to report, can trigger what,

22  a life sentence.  Again, this man is not the worst of the

23  worst.

24       Deterrence?  The Government suggests we need to have

25  that, we need to have an 80-year sentence to send that message

1  out to the larger population.  The only message a life

2  sentence like that sends is that the sentence is based on

3  vindictiveness and retribution, because it's life.  He is not

4  the worst of the worst.

5          Deterrence?  Yes, a substantial sentence is required

6  in this case, but 15 years, 16, 17, 18 years is a very

7  substantial sentence.  It's a sentence that if that is not

8  going to deter someone when that sentence is followed by a

9  lifetime of supervised release, I venture to say little ––

10  there's nothing that's going to deter someone from engaging in

11  this conduct who's determined to do so.

12          The need to avoid unwarranted disparity now;

13  tempering the sentence with an understanding and appreciation

14  that this is not the worst of the worst is not going to

15  generate any type of disparity.  That would be completely ––

16  what would create a disparity is to sentence him to

17  effectively a life term.

18          Prior to the hearing today, we looked at some 7th

19  Circuit cases because I recall that there had been some

20  language, particularly from Judge Posner in a concurring

21  opinion back in the '80s.  And we found this language.  And he

22  noted, "There's a worthy tradition that death in prison is not

23  to be ordered lightly, and the probability that a convict will

24  not live out his sentence should certainly give pause to a

25  sentencing court."

1          A sentence that forces or results automatically in a

2    person going to prison knowing they are going to die in

3    prison, that's where they are going to spend their entire

4    life, inflicts considerable more punishment than other types

5    of sentences.  To extinguish all hope is not something that's

6    warranted here.  It's not something that's justified here.

7          I am not going to make a specific sentence

8    recommendation for this Court other than I'd ask this Court to

9    be mindful that we're dealing with a 48-year-old man here who

10   is facing a mandatory minimum that is going to render him --

11   he's going to be in his middle 60s even with a minimal

12   sentence here.

13         What is sufficient, but not greater than necessary,

14   I think that's sufficient.  The Government's recommended

15   sentence here is significantly more than what is necessary to

16   accomplish all of those appropriate goals that are set out in

17   3553(a).

18         I'd ask this Court to take those things into

19   consideration and give Mr. Russell some hope that he will be

20   able to breathe the fresh air of a free man at some point down

21   the road.

22         It's an appropriate sentence in this case, and I

23   think that it would reflect that he is a far cry from being

24   the worst of the worst.

25         THE COURT:  Thank you, Mr. McKinley.

1          Ms. Cook, do you wish to defer to Mr. McKinley's
2    argument?

3          MS. COOK:  Yes, Your Honor, thank you.

4          THE COURT:  Would you move over, the three of you, a
5    little bit, and give Mr. Cook some podium space.

6          Or is it you, Ms. Helart, which one?

7          MS. HELART:  I will be taking care of the victim
8    impact statements, and Mr. Cook will be making the argument.

9          THE COURT:  You might as well be seated because it
10   will take a little longer.

11         MS. HELART:  If the Court has Mr. and Mrs. Mills'
12   victim impact statements --

13         THE COURT:  I've reviewed all the statements that
14   have been submitted.

15         MS. HELART:  The victim impact statements that would
16   like to be read are Mrs. Russell and Jane Doe 1 and Jane Doe
17   2's victim statements.

18         THE COURT:  It was Jane Doe 1 who testified, right?

19         MS. HELART:  Yes.

20         THE COURT:  Is she 1 or 2?

21         MS. HELART:  She's 1.

22         This is from Mrs. Dawn Russell:

23         "I would like to make known the degree of
24   destruction Dale Russell has caused in my life.  The crimes he
25   committed against my children, his own daughters, are the most

1  heinous offenses an adult can commit against a child, and this

2  is a father to his own children.

3          "I found out about the websites from the Greenfield

4  Police Department, and was told there would be further

5  investigating, which was reassuring, but the impact of the

6  trauma was profound.  I felt an overwhelming need to protect

7  my kids and found it difficult to do anything else.  I felt

8  like I couldn't move, and as a result, lost my job.

9          "With no income to pay rent, nor child support, we

10  were evicted.  A friend graciously allowed us to live in one

11  of his rental properties rent-free.  I planned to stay only a

12  month or two, but it ended up being seven.  Still traumatized

13  and with no income, nor child support, my teenage kids and I

14  moved into the Hancock County Homeless Shelter where we all

15  slept in an 8-by-10 room.  After staying there a month, we

16  moved into the shelter's transitional housing, but after ten

17  months there, we and every tenant in the apartment building

18  was evicted to do repairs and given one month to move out.

19          "It wasn't much time, but I found an apartment in

20  the same middle school district so Jane Doe 2 didn't have to

21  change schools again.  I had found a job but wasn't able to

22  keep it and rent was still due.  We would have been homeless

23  again if my parents would not have helped out.

24          "It was 18 months before I started feeling stronger

25  and not paralyzed, but I will always be scarred by Dale's

*RUSSELL - CROSS/COOK*          98

1   actions.  My daughters are beautiful, and when we are out, it

2   concerns me when a man looks at them longer than a glance

3   fearing that he recognizes them from the exploited photos Dale

4   took and distributed.

5          "I'm concerned for their physical safety if they are

6   recognized.  I am concerned about the repercussions these

7   crimes could have on my kids as they go through life stages,

8   and I'm concerned for the level of self-respect each one

9   carries, and that it may not be high enough, thus causing them

10  to make poor choices as they go through their lives.

11         "Now, when I meet a man I might consider dating, I

12  wonder if he could have inappropriate attraction to my

13  daughters.  I don't date much.  Dale is an expert liar, thief,

14  computer hacker and pedophile.  And I ask for the longest

15  sentence allowed for his crimes and that he never have access

16  to a computer while he serves it.

17         "Signed, Dawn Russell, 5-17-2010."

18         This is from Jane Doe 2:

19         "The terrible things my father did has greatly

20  affected the lives of my family, and little" --

21         Excuse me.

22                          (Pause.)

23         I think part of this is a copy issue.

24         -- "the lives of my family, and he made me and my

25  sister believe that everything he did was --

*RUSSELL - CROSS/COOK*          99

1        THE COURT:  She says "It affected the lives of my

2  family and I.  He made me and my sister" as I read it.

3        MS. HELART:  Yes.  I'll start over.

4        "The terrible things my father did has greatly

5  affected the lives of my family and I.  He made me and my

6  sister believe that everything he did was normal.  He made us

7  lie to my mom countless times and had no remorse.

8        "He left my mom with three kids and no support.  He

9  made her have to go through things that no mother should have

10  to.  He made my childhood a horrible secret that no one could

11  know.  He exposed us for his own sick pleasure.

12        "How could a father do these things to his own

13  innocent daughters and then plead not guilty?  Why would he

14  even want to?  He is a horrible person for doing what he did,

15  and he does not deserve to be any part of my life or memories.

16        "I will never forgive him.  I hope he spends the

17  rest of his life in prison.

18        "Signed, Jane Doe 2."

19        The third statement is from Jane Doe 1:

20        "I wish I could close my eyes and it would all go

21  away, but all I see are flashbacks.  I used to think I had a

22  good, normal dad who took his kids places, loved them and

23  taught them things, but mine was living two different lives.

24        "I've had to live with the question my whole life of

25  which side is really him, but the hardest question to answer

1    is why?  He got us to trust him with only a trust that

2    children have with their fathers, then manipulated us into

3    believing his lies, and then twisting my view of right into

4    something I thought was strange and wasn't allowed to tell

5    anyone about.

6         "Then there was a lot of confusion.  My dad had me

7    eating out of the palm of his hand to the point where I was on

8    his side, and I was drifting away from my mom because I didn't

9    understand what was going on.

10         "Even after it all came out about the pictures and

11   the websites, I was so brain-washed that I didn't talk to my

12   mom about it at all, and I kept things from her and the

13   lawyers just to make sure that he didn't get in trouble.

14         "There was so much anger, confusion and sadness

15   built up in me, and still is.  After being depressed, I

16   started to realize the raw truth in this situation, that I

17   couldn't hide from it, and it wasn't going to disappear.  I've

18   had to live my life pretending to be happy, like nothing is

19   wrong.  I had it all inside.

20         "My privacy and myself has been violated and my

21   pictures are on the Internet all over the world.  It's an

22   undescribable, horrible feeling.  I don't understand why

23   people ruin lives like this just for their own personal

24   pleasure.

25         "The pictures they see of the children are actually

1   real people.  They grow up to live their lives just like

2   everyone else.  I am one of them.  And I didn't ask for this.

3            My dad will never know what it feels like.  How is

4   that fair?  This has impacted my future because I try not to

5   live in the past.  All I can do now is look forward.  I can't

6   let it consume my life, and I try not to let it hold me back.

7   My boyfriend taught me that.

8            "It's not easy to explain to my boyfriend and

9   friends the things that have happened, and I know it has

10  affected their lives, too.  I sometimes get so mad about the

11  smallest things because I have anger bottled up inside of me,

12  and I let a lot of it out on my boyfriend, which doesn't help

13  our relationship either.

14           "My mom was left with no support trying to raise

15  three kids on her own.  Our relationship isn't the same, and I

16  hate seeing her so upset about this.  She was just trying to

17  protect us and she couldn't even do that.

18           "I've missed school for days when I feel like

19  staying under the covers and not talking to anyone.  It's not

20  easy having to go downtown all the time in the past six years

21  to answer questions about things that I really don't want to

22  talk about, and going through another court.

23           "Because of someone else's decisions and actions, I

24  had to suffer, my sister had to suffer, and my family had to

25  suffer, all because of one person.

1          "People say one person can change your life, usually

2    for the better, and that's true.  But why should one person

3    have that kind of power, to change someone's whole life, not

4    for the better but for the worst.

5          "Even though I've tried so hard to forget, there's

6    not a day that goes by that it doesn't affect me.  If it's

7    that I break down into tears all of a sudden, I don't talk for

8    a day, I get random flashbacks, I have horrible nightmares, or

9    I have to tell someone that my dad isn't around, but I do try

10   to forget.

11         "He's out of my life and that's his decision.  I

12   don't want to see him again.  I hope he stays in prison

13   forever.  Even if he does, that's not going to take back

14   anything that happened.

15         "Signed, Jane Doe 1."

16         THE COURT:  Mr. Cook?

17         MR. COOK:  Thank you, your Honor.  If I can have

18   just a moment.

19                        (Pause.)

20         May it please the Court, counsel:  The Court has

21   been presented with a large amount of information about this

22   exceptionally serious case already.  The Court's seen a

23   two-and-a-half-day trial.  You've read through a long

24   presentence report, heard aspects of this hearing today.

25         The Court read and now has heard read through its

1  victim impact statements from the victims of these offenses.

2  The Court has seen sentencing memoranda from both sides.

3          In one sense, there's not much left to say, but yet

4  there are certain points that need, in my opinion, Your Honor,

5  to be highlighted for the Court, and in the context of what

6  the sentence must ultimately be, and that the sentencing

7  factors that 18 U.S.C. 3553 are appropriately considered; and

8  that is, the Government would suggest a sentence of not less

9  than 80 years.

10          Now, I want to address this looking at two general

11  points:  Number one, why the sentence of this defendant must

12  be so lengthy as to ensure that he never gains his freedom

13  again; secondly, why a sentence that is in excess of his life

14  span, not less than 80 years, is not just appropriate but is

15  demanded by the nature and circumstances of these vile

16  offenses by an appropriate consideration of the guidelines and

17  the sentencing factors of 3553(a).

18          Looking first to why a sentence that ensures

19  Mr. Russell never gets out, Your Honor, I would argue it's not

20  a close point that he must never regain his freedom.  In

21  looking simply at just a few of the sentencing factors at

22  3553(a), protection of the public from further crimes of this

23  defendant and his history and characteristics demonstrates

24  this quite well.

25          Quite simply, Dale Russell is a remarkably dangerous

*RUSSELL − CROSS/COOK*          104

1  individual.  He is a talented exploiter of children.  To look

2  at him sitting here today or meeting him on the street, this

3  is a hard point to grasp, but that's exactly the point.

4        This offender was able to hide in plain sight over

5  the course of the year that the offenses that are before this

6  Court took place, over the course of the years that he

7  manipulated his daughters and to allow him to take naked photo

8  photographs of them, the years that he psychologically and

9  emotionally manipulated them into fueling his and others to

10 whom he distributed these pictures sexual desires.

11       He manipulated his girls when they were 10 and 12

12 years old, and even younger, to pose in sexually−suggestive

13 outfits, bathing suits, underwear, and finally fully nude.

14 And had so twisted their trust and love of him to his own

15 purposes that they actually enjoyed doing these photo shoots

16 and agreed to hide from their mother that there were websites

17 of them with these sexually−suggestive pictures being sent God

18 knows where; that pictures of them taken in the nude at

19 Spectrum Gym were being given to special people who would pay

20 more.

21       To victimize one's own children to this degree takes

22 a special and horrific talent that this defendant demonstrates

23 quite well.

24       The defendant similarly demonstrated his great

25 talent as a sexual exploiter of children, and has managed to

1  keep the children quiet over this long period of time.  They

2  wanted to please their father and he used that love to his

3  advantage to repeatedly sexually exploit them for his

4  enjoyment.

5          This is not an easy task to pull off, yet this

6  defendant was successful in so doing for years.  This

7  defendant's history and characteristics also demonstrate that

8  he cannot be expected to comply with conditions of supervised

9  release if he's ever allowed to rejoin society.

10         First, he's completely unrepentant.  To this day, he

11 maintains that his despicable pattern of exploitation was in

12 fact some form of art.

13         This defendant, in almost a cliche form, tried to

14 escape prosecution by fleeing to Mexico after the United

15 States Attorney's Office made clear it was moving forward

16 against him.  He did not return to the States till he was

17 forcibly expelled from that country and escorted out and met

18 here.

19         This defendant is also $37,000 in child support

20 arrearage to these very children whom he claims to love so

21 much.  He refused to support them, refused to abide by a court

22 order.

23         In short, this defendant's history and

24 characteristics show a long pattern of him trying to dodge

25 legal liability and court orders over and over again.

*RUSSELL - CROSS/COOK*          106

1          In conclusion on this point, Your Honor, this

2    offender is remarkably dangerous.  The United States Congress,

3    through the Sentencing Commission, recognizes it, which is why

4    it's a guideline life sentence.  3553(a) recognizes it when it

5    directs the Court to look at adequately deterring him and his

6    history and his characteristics.

7          This is not a close question.  He must be in prison

8    till the day he dies.

9          The question before the Court then also, and the

10   Government's asking for a term of 80 years, that is well in

11   excess of this man's remaining life span, is how does that fit

12   into the 3553(a) factors?  How is that a just sentence?

13         Well, first, I want to look at the guidelines just

14   quickly.  They calculate a total offense level of now 44, with

15   the 4B1.5, five points not being given.

16         Even at that very high offense level, the

17   defendant's conduct is actually underrepresented.  It doesn't

18   take into account necessarily what he did to his daughter,

19   Jane Doe 1, on at least three occasions where he had sexual

20   contact with her, where he licked her genitals.

21         It underrepresents what he did because only two

22   points are added to the offense level for distribution of

23   images.

24         Now, we had a long argument today in front of the

25   Court about whether those two points would even be assessed.

1  I would suggest to the Court that clearly they ought to have

2  been, and the Court made the right decision, but that two

3  points doesn't capture that added -- that added harm that is

4  done with that distribution.

5          You heard in some of the victim impact statements

6  about how each of the defendant's daughters have been

7  victimized.  You heard how they're struggling to learn to deal

8  with that.  You heard how these images have been found in 49

9  states and two other countries.

10          A two-level enhancement on the guidelines does not

11  begin to capture -- does not represent the totality of just

12  the evil of that distribution out into the world.

13          In any event, even where the offense level is, the

14  guideline sentence is maximum consecutive sentences on each

15  count of conviction.  As noted in the sentencing memorandum,

16  the 7th Circuit has repeatedly upheld sentences well in excess

17  of the remainder of the defendant's life.

18          And in cases similar to the defendant's, I would

19  cite the Court to United States versus Dick Noel as we did in

20  our sentencing memorandum.  I'll talk about that case in

21  response to the defendant's argument here in a moment, but the

22  defendant's guideline sentence is 120 years, and that just is

23  what it is, but it is equally clear that the defendant must

24  get a sentence well in excess of his natural remaining life.

25          In looking --

1          COURT REPORTER:  Would you please slow down?

2          MR. COOK:  Yes.

3          It is equally clear that the defendant should get a

4    sentence in excess of his remaining life.

5          Looking simply at 3553(a):  The nature and

6    circumstances of these offenses are just terrible and

7    demonstrate exactly why Congress and the courts take these

8    cases so seriously.

9          Now, I know that the Court is well aware of what

10   this defendant has done at this point, but I raise the

11   following points that cannot be overlooked as you pass

12   sentence today, as this Court struggles to sort out what is a

13   just sentence in this case.

14         These were the defendant's daughters when they were

15   10 and 12 years of age, as they're starting to come into their

16   own, starting to form their own individuality; at an age, at

17   least at 12, where perhaps a girl is just starting to get some

18   awareness of her sexuality; and the defendant, at that point

19   in their lives, his own daughters inserts his twisted view of

20   what sexuality is, his twisted view of when it's appropriate

21   to take your clothes off, what kind of poses to take.

22         These girls, now 15 and 17, now have to learn to

23   live with not just that they were sexually objectified by

24   their own father, but that nude images of them are all over

25   the country and world.

1          This is exactly why the base offense level is so

2     high on the guidelines, and the mandatory minimum and

3     statutory maximums are so high on this case.

4          Congress sees the need to stop these sorts of

5     offenses, both to stop the hands-on exploitation that this

6     defendant did do on at least three occasions with his

7     daughter, Jane Doe 1; but also to stop the horrific,

8     never-ending exploitation of images being passed around the

9     world that was made possible by this defendant, this man,

10    creating digital images that can be distributed with a touch

11    of a button.

12         The Court's also directed in 3553(a) to consider how

13    to craft a sentence that provides a just punishment.  The

14    Government suggests to the Court that a single life sentence

15    is simply not adequate.  It is not just for what this man did,

16    to run any count concurrent to another is to ignore his

17    heartless, cruel manipulation of children.  It is not just to

18    let him get away with even one of these travesties, even one

19    of these four counts of convictions that is before the Court.

20         The Court is also directed in 3553(a) to craft a

21    sentence that affords adequate deterrence to criminal conduct

22    or simply general deterrence.  Your Honor, simply put, those

23    people who are like this defendant, who would contemplate, or

24    who are currently doing something like what he is doing, we

25    heard about these other individuals with whom he would

*RUSSELL – CROSS/COOK*          110

1  correspond, the Doug DuBoises of the world, and the other

2  individuals who are trying to do these modeling websites and

3  so forth.  They can only be shaken from that sick obsession

4  when they see a court that is willing to issue a sentence that

5  will address the full monstrosity of their crimes if they step

6  over the line, as this defendant did on multiple occasions.

7          Defenders like this defendant will not stop if they

8  do not live in fear of being subjected to the full power of

9  the law.

10          I might point out as well that, where as here the

11  images that this defender created are now so widespread, are

12  the subject of prosecutions around the country, that it's

13  important that there be an appropriate sentence that labels

14  the depravity, the seriousness of the criminal conduct that

15  this defendant engaged in.  There needs to be that.  There's

16  the general deterrent effect that this sentence can be larger

17  because of the extent of his distribution.

18          In a sick sense, this offender, by being the

19  producer of these images that are so widespread, is famous,

20  and we need a sentence that speaks to other offenders like him

21  and to those who would traffic in and possess the images of

22  his daughters.

23          Finally, Your Honor, the sentence comprised of

24  consecutive sentences on each count of conviction is in line

25  with where similar offenders in this district have been

*RUSSELL – CROSS/COOK*          111

1  appropriately sentenced.

2        Now, the Government recognizes that it's always

3  dangerous to compare cases.  I get that.  The cases cited to

4  this Court in our sentencing memorandum are cited for the

5  principle that consecutive sentences with guideline life, even

6  where you're criminal history one, are appropriate in these

7  sorts of circumstances.

8        I would like to also note that, again being careful

9  not to argue about different facts and different cases, but

10 looking at United States of America versus Noel, that was

11 appealed and affirmed in the 7th Circuit, the images in that

12 case that involved a single victim, were images of lascivious

13 exhibition of his genitals or pubic area with the exception of

14 one image of the genitals of the offender in close proximity

15 to the child depicted, while the child was asleep with no

16 evidence that –– that that conduct took the next step to

17 actual contact.

18        So it's entirely appropriate to look at the United

19 States versus, to look at these other cases such as United

20 States of America versus Mark Armstrong, United States of

21 America versus Andrew McGrath, and say what did courts do

22 there?  What do they do there?  Well, the general principle is

23 that consecutive sentences were appropriate.

24        Here's what the Government's asking for, Your Honor.

25 The Government is seeking not less than 20 years on each count

*RUSSELL – CROSS/COOK*          112

1   of conviction running consecutive to one another.  That is

2   based on the principle that I mentioned a couple times during

3   my presentation, that this defendant should not get a free go

4   for the exploitation and manipulation of his daughters.

5          Now, two of those –– two of the counts happened on

6   the same evening in the Spectrum Gym, but they were one each

7   to each of his daughters.  He shouldn't get a free go at

8   another one of his daughters.

9          The 20 years takes into account the fact that these

10  images were "only lascivious exhibition" but they should still

11  be run consecutive to allow for his manipulation for the

12  separate times that they occurred.

13         I do ask the Court to issue lifetime-supervised

14  release irregardless of whether this defendant receives a

15  sentence that will be in excess of his life.  I do ask for

16  that lifetime supervised release with conditions that are

17  appropriate to this case.

18         And, finally, the Government does ask this Court to

19  show this man, show this defendant, show the community what

20  he's done; to give his daughters, his victims, justice; and to

21  protect the public.  And I ask you to sentence him to not less

22  than 80 years.

23         THE COURT:  Thank you, Mr. Cook.

24         Mr. McKinley and Mr. Russell and Ms. Cook, would you

25  come back to the podium, please.

*RUSSELL – CROSS/COOK*          113

1    MR. McKINLEY:  Your Honor, the defense requests an

2 opportunity to respond briefly to a couple of points that --

3    COURT REPORTER:  I can't hear you, sir.  Is your mic

4 on?

5    THE COURT:  Put your mic on.

6    One minute.

7    MR. McKINLEY:  Your Honor, the Government suggests

8 that the guidelines here reflect what Congress and the

9 Sentencing Commission, how seriously they take this offense.

10 Your Honor's familiar with my position on these guidelines.

11 This guideline here is almost --

12    THE COURT:  I know that.  That position's been

13 developed in your submissions.

14    MR. McKINLEY:  All right.  With respect to the

15 conduct in the other cases cited by the Government, Noel being

16 one of them, the Court of Appeals' opinion is not clear as to

17 exactly what happened in that case.  They talk about the

18 molestation of an infant from the age of two to the point

19 where the child was 12 years old.

20    They spare the despicable details of that in fact

21 because those specific facts didn't factor into the issue of

22 appeal.  They note that they are going to spare the reader the

23 stomach-churning details of that offense.  Those offenders and

24 those cases are a far cry from what we have in this particular

25 instance.

1          Finally, with respect to the need to stack these

2   sentences consecutive to avoid giving him some kind of a pass,

3   we're not asking for a pass.  They're asking for a sentence

4   that's a life sentence.

5          There is a specific statute that addresses this

6   issue of repeat offenders, and they referenced it earlier.

7   It's a two-strike statute.  That's where life sentences are

8   required to be imposed and are most appropriately imposed, but

9   again, this is not the case.  This is not the situation where

10  we've got conduct that's anywhere comparable to those cases

11  that they have cited in their memorandum.

12          THE COURT:  It should be obvious to all, as it is

13  obvious to me, that the interests here before the Court in

14  fashioning a reasonable sentence and a just sentence and just

15  punishment have tugs and pulls in every direction, and not

16  just two directions may I say, but the lawyers have done their

17  usual eloquent job in framing those tensions and those

18  conflicts about as well as they can be positioned for the

19  Court.

20          These are issues that the Court has already

21  struggled with.  I'm helped by your arguments, of course, and

22  by the articulate, really eloquent way in which you advance

23  your respective views.

24          So mindful of my obligations under 3553(a) to impose

25  a reasonable sentence, I want to speak to a couple of issues

1    and tell you how I have taken your respective adversarial

2    positions and distilled it into my own sense of what a just

3    and reasonable sentence is.

4          I want to underscore primarily for people who are

5    not used to making these judgments every day, those people in

6    the gallery, that this is the way in which the Court's

7    empowered and expected and entrusted with the obligation to

8    essentially sort it all out.

9          So to the extent that I pull back from either

10   position, and I will, in fashioning a sentence, it's not

11   because I didn't believe you or I didn't go with you or I

12   rejected your side and credited the other side.  The Court's

13   decision making is an effort to meld all of these factors, and

14   they play off against each other.

15         There are some factors about this case that redound

16   to Mr. Russell's benefit.  There are some obviously that put

17   him in great jeopardy before the Court.  And in that sense, I

18   guess you could say they redound to the benefit of the

19   Government's position.

20         The Government argues its position.  It doesn't have

21   any other interest beyond justice.

22         So the first thing is that these photographs, the

23   four photographs, horrific as they are and offensive as they

24   are, and violative of the rights of the two victims of them,

25   were not, to use the expression that's been used otherwise in

1   this hearing today, the worst of the worst.

2          And I suppose it says something about the nature of

3   the work that the courts perform that I can say to you that

4   I've seen much worse.  Juries have seen much worse.  You

5   lawyers have seen much worse.

6          So they're not -- they're not in any way acceptable

7   photographs, but they're not the worst of the worst.  The fact

8   that your children, Mr. Russell, were the victims, has its own

9   great egregiousness and sadness, special to that fact,

10  attributable to that fact.  But you can also make a case, and

11  it's been made before in this Court by other lawyers in other

12  cases, that it is at least equally bad, and perhaps worse in

13  some ways, that people unknown to the defendant were

14  victimized.  They were just random victims.

15         And there was in your activity, Mr. Russell, if you

16  hadn't stepped over the line in such a horrific way, there is,

17  in your photography, beauty, and that was the point you were

18  trying to make to me and to the jury.

19         It doesn't apply to these photographs because these

20  were beyond the pail.  But I think that you actually were

21  drawn to the art of photography in very nice ways, lovely

22  ways, but not with these pictures.

23         And it occurred to me when I was thinking about you

24  and this case and what happened, that in a lot of ways, I

25  think, I think, I'm just over here trying to understand, but I

1  think that your life was a little fringy in some ways, and you

2  could have lived with that and society would have accepted

3  that -- I know it's not unlawful for you to participate in

4  nudest activities.  It's a little fringy.  It's not what most

5  people do.  You would have to admit that.  You say it about

6  yourself, it's not something you put on your resume.  You wait

7  to see.  And it's behavior that's not nice.  It's not

8  generally-accepted behavior.  But nobody's punishing you for

9  that.

10         But this tendency to live on the edge in your art

11  and in your personal behaviors and your recreational stuff,

12  had you walking on the edge.  And when you overstepped, and

13  you went too far, and your interest in your daughters went too

14  far, it was no longer just a father's interests, and a

15  father's love and a father's support.  You were over the line.

16         And that's what Congress does in writing the laws.

17  It says "Here's the line."  And everything on this side you're

18  a free man.  You can do it.  People may arch an eyebrow and

19  turn up a nose and say "It's not for me," but it's lawful.

20         It's when you get over the line in that direction

21  that it's unlawful.  And in this instance, it's so egregious

22  that the stiffest, toughest, most severe punishments are

23  imposed because the harm is so great.

24         It must have been -- if you have any normal feelings

25  left in you, and I think you do, I have to assume you do, it

1  had to be crushing to hear your daughter testify today and

2  during the trial, and to hear both of your daughters and to

3  hear the letters read, just crushing; if you have anything

4  normal left in you, and I think you do, as I said.

5          So it's because you moved them into that ugliness

6  that the penalties are so stiff.  But is it just to assume

7  that this is the worst of the worst cases?  No.  It's bad

8  enough without being the worst of worst.

9          So taking into account the fact that up until these

10  events transpired, everything would have been okay in your

11  life, and then what you did not only victimized these children

12  once, it victimizes them now as you know over and over and

13  over and over and over again.

14          And it appeals to the prurient interests of other

15  sick people.  And you can't change that.  You can't pull that

16  back.  You can't put that genie back in the bottle.  That's

17  harm done that gets multiplied over and over again.

18          So we can't -- we have to deter you.  We have to

19  deter others.  We can't run the risk that you'll ever do this

20  again, but I don't think that I need to deter you as much as I

21  need to deter others.  You need to be punished, and so there

22  will be punishment in this sentence.  It can't be otherwise.

23          So here's how it seems to me.  The statute says 15

24  to 30 years.  With respect to Jane Doe 1, who's Jane Doe 1,

25  and was named in Counts 1 and 2, because of the other

1  inappropriate touching, the other aggravating circumstances

2  with respect to her, and the testimony that she provided, the

3  sentence on Counts 1 and 2 will be 20 years to run

4  concurrently.  So that's 240 months.

5          With respect to -- I want to get her name right,

6  Alecia?

7          MS. COOK:  Jane Doe 2.

8          THE COURT:  Jane Doe 2, yes, I'm sorry.  I lost my

9  piece of paper.

10          The sentence can be somewhat less, but not the

11  minimum because she was your daughter.  And that was violative

12  of a very special relationship, a relationship in which both

13  girls were entitled to trust you completely, and you violated

14  the trust completely.

15          So as to her two counts, 218 months, which is 18

16  years, and on her two counts, 3 and 4, those will run

17  concurrently, but the two girls' sentences will run

18  consecutively.  And if I've done my math right, that's 38

19  years, and it's a total of 458 months.

20          That's my best effort to differentiate based on the

21  evidence, to fold into the decisions the harsh, ugly facts,

22  and take into account all the 3553(a) factors.

23          For you, sir, that's maybe a life sentence.  Only

24  God knows that.  I don't know that.  It is a long time.

25          The Court will impose a life term of supervised

1  release so that if you get out of prison at some point, you'll

2  have to march to that drum beat.  You'll have to do the things

3  that are required of you by the Court in terms of supervised

4  release and will be enforced by the probation department.

5          During the period of supervised release, these will

6  be the terms and conditions:  You must not commit any other

7  federal, state or local crime.  You must not possess a

8  firearm, ammunition, destructive device or other dangerous

9  weapon.  You must cooperate with the collection of a DNA

10  sample, and refrain from all unlawful uses of controlled

11  substances.

12          You will be suspended from drug testing mandated by

13  the Crime Control Act of 1994 because you pose a low risk of

14  future substance abuse.  You must provide the probation

15  officer access to any requested financial information.  You

16  may not open any new credit charges or open additional lines

17  of credit without the prior approval of the probation officer.

18  We don't want you running into financial problems that drive

19  you into criminal activity.

20          You'll be subjected to searches, and you must submit

21  to them with the assistance of other law enforcement as

22  necessary.  The Government, the probation office, can execute

23  such searches of your person, vehicle, office, business,

24  residence, and property, including computer systems and

25  peripheral devices.

1          You must submit to the seizure of any contraband,

2   which means any illegal computer programs, pornography, stolen

3   property, drugs, et cetera, guns.

4          You must not possess or use a computer unless you

5   agree to comply with the computer restriction and monitoring

6   program at the direction of the probation officer.  Monitoring

7   will occur on a random or regular basis.

8          You must advise the probation office of all

9   computers available to you for use.  Any computer or

10  Internet−enabled device that you are found to have used and

11  not disclosed will be considered contraband and may be

12  confiscated by the probation officer.  You must warn the

13  other −− or you should warn the other occupants of wherever

14  you are living or working that you are subject to such

15  monitoring software being placed on your computer because it

16  can implicate their rights as well.

17         You must not possess any pornography, erotica or

18  nude images.  Any such material found in your possession will

19  be considered contraband and may be confiscated by the

20  probation officer.

21         You must participate in a program of treatment for

22  sexual disorders, including periodic polygraph examinations as

23  directed by the probation officer.  The Court authorizes the

24  release of the presentence report and available psychological

25  evaluations to mental health providers approved by the

1  probation officer.

2          It is also a condition of supervised release,

3  Mr. Russell, that you not have any unsupervised contact with

4  any minor child unless that contact has been disclosed to and

5  approved by the probation officer.  In determining whether to

6  approve such contacts involving members of your family, the

7  probation officer shall determine if you have notified the

8  persons having custody of such minors about this conviction,

9  and the fact that you're under supervision.

10          If this notification has been made, and if the

11 person having custody consents to the contact, then this

12 condition is not intended to prevent approval of the contact,

13 but it has to be made known in advance, disclosed to the

14 persons having custody and so forth.  So all facts are known.

15 All cards are on the table.

16          You must register as a sex offender with the

17 appropriate authorities of any state in which you reside, are

18 employed or attend school.  And you must not have any contact

19 with the victims, Jane Doe 1 and 2, unless they initiate the

20 contact or a qualified treatment provider deems it necessary

21 for their benefit.

22          I'm going to impose a $5,000 fine and make the

23 payment of that fine an additional condition of supervised

24 release.  That amount that remains unpaid at the commencement

25 of the term of supervised release is a condition of supervised

1  release as well.

2          The special assessment of $400 is mandatory.  Can

3  that be paid today?

4          MS. COOK:  No, Your Honor.  Mr. Russell is indigent.

5          THE COURT:  We'll make arrangements for that to be

6  paid through the Inmate Financial Responsibility Program

7  administered by the Bureau of Prisons because I can't waive

8  that, that particular fee.

9          Do you have a recommendation as to a place of

10 incarceration?

11         MS. COOK:  Yes, we would ask that the Court make a

12 recommendation that Mr. Russell be incarcerated at the

13 institution in Butner, North Carolina, which I believe has a

14 specialized sex offender treatment unit.

15         THE COURT:  I'll make that recommendation and

16 embellish it a little to say that if there's not space

17 available there, that he be permitted and enlisted, or

18 enrolled, I should say, into some other similar program at

19 another institution.

20         MS. COOK:  Thank you, Judge.

21         THE COURT:  That's the sentence that I intend to

22 impose.  Keeping in mind the objections that you've

23 interposed, but apart from those, do you have any legal

24 objection to the way in which it's been fashioned, or do you

25 request any further elaboration of my reasons?

1          MS. COOK:  We have no questions about the reasons

2     that the Court has enunciated, and no objections other than

3     those which have already been made of record.

4          THE COURT:  All right.

5          How about you, Mr. Cook?

6          MR. COOK:  No objections from the Government, Your

7     Honor.

8          THE COURT:  All right.  The sentence then that I've

9     outlined as my intended sentence, Mr. Russell, is now the

10    judgment of the Court, and a Judgment and Commitment Order

11    will be drawn up to reflect these elements as I've laid them

12    out here today, and they'll bind you in these ways until the

13    judgment's fully satisfied.

14         There was a forfeiture provision in the indictment,

15    and so the Court orders the forfeiture as well of the matters

16    referenced as being subject to the forfeiture.  Let me find

17    those.

18         You must forfeit any and all visual depictions and

19    any property, real or personal, used or intended to be used in

20    relation to Counts 1 and 4.  In addition, any other images

21    depicting minors in sexually–explicit situations must be

22    forfeited as well.

23         You have a right to appeal the jury's verdict and

24    you have a right to appeal the sentence that I've imposed

25    today.  That right of appeal, I assume that you'll exercise.

*RUSSELL − CROSS/COOK*          125

1  I encourage you to do that.  The situation that you confront
2  here with this long sentence warrants another court's review.
3  And so your lawyers can give you advice on that.  I wonder if
4  you would like me to file that Notice of Appeal through the
5  Clerk?

6          MS. COOK:  Yes, Your Honor.

7          THE COURT:  Would you take care of that, please
8  (indicating).

9          MS. COOK:  Thank you.  We had previously discussed
10 it with Mr. Russell.

11         THE COURT:  All right.  Otherwise, you would have
12 ten days within which to file the Notice of Appeal, but we'll
13 get it done promptly on the Court's docket so that that right
14 that you have is preserved.

15         THE DEFENDANT:  Thank you, Your Honor.

16         THE COURT:  That concludes the matter.  I'll remand
17 you to the custody of the marshal to continue serving your
18 sentence.  The time you've served to date will be credited
19 against the sentence that I've imposed.  The Bureau of Prisons
20 will make that calculation, though, and tell you specifically
21 where you stand.

22         Miss Cook and Mr. McKinley, thank you very much.
23 Mr. Cook and Ms. Helart, thank you very much.

24         That concludes the matter.  Good luck, Mr. Russell.

25         THE DEFENDANT:  Thank you.

1          (Court adjourned at 5:40 p.m.)

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CERTIFICATE OF COURT REPORTER


        I, Laura Howie-Walters, hereby certify that the
foregoing is a true and correct transcript from reported
proceedings in the above-entitled matter.



/S/LAURA HOWIE-WALTERS   September 9th, 2010

LAURA HOWIE-WALTERS, RPR/CSR
Official Court Reporter
Southern District of Indiana
Indianapolis Division